FILED

2023 APR 21  AM 9:40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

1   Demetrius Charles Howard
2   # C-92812
3   San Quentin State Prison
    San Quentin, CA 94974

4

5

6

7              **UNITED STATES DISTRICT COURT**

8        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

10

11  DEMETRIUS CHARLES                 Case No. EDCV23- 705 - JLS
    HOWARD,
12                Petitioner,
                                      **PETITION FOR WRIT OF**
13       v.                           **HABEAS CORPUS BY A**
                                      **PRISONER IN STATE CUSTODY**
14

15                                    (28 U.S.C. § 2254)
    OAK SMITH, Acting Warden of
16  California State Prison at San
    Quentin,
17                Respondent.

18

19

20

21

22

23

24

25

26

27

28

Petition for Writ of Habeas Corpus

# TABLE OF CONTENTS

Table of Authorities .......................................................................................... iii

I.     Introduction ............................................................................................ 1

II.    Jurisdiction ............................................................................................. 1

III.   Procedural History and Background ..................................................... 2

       A.  Conviction Upon Which the Judgment is Based ........................... 2

       B.  Pretrial and Trial Proceedings ...................................................... 2

       C.  Automatic Appeal (California Supreme Court Case No.
           S050583) ........................................................................................ 6

       D.  State Habeas Corpus Proceedings (California Supreme Court
           Case No. S142694) ........................................................................ 7

       E.  Exhaustion ..................................................................................... 10

       F.  Other Petitions ............................................................................. 10

IV.    AEDPA ................................................................................................. 10

V.     Incorporation of Exhibits and Request for Judicial Notice ............... 12

VI.    Allegations Applicable to Each and Every Claim ............................... 12

VII.   Claims for Relief ................................................................................. 15

       A.  Claim One: The Trial Court Improperly Forced Mr. Howard to
           Wear a Stun Belt During Trial, Violating His Constitutional
           Rights and Denying Him a Fair Trial .......................................... 15

       B.  Claim Two: Mr. Howard Received Ineffective Assistance of
           Counsel at the Guilt Phase of His Trial. ..................................... 32

       C.  Claim Three: The Prosecution Violated Mr. Howard's Rights
           by Failing to Disclose Brady Material; Introducing Coerced,
           Unreliable, and False Testimony; and Using Unduly
           Suggestive Identification Procedures ........................................ 129

       D.  Claim Four: Mr. Howard's Is Innocent of Murder. ................. 147

i

E.  Claim Five: Mr. Howard Was Incompetent to Stand Trial ..................... 152

F.  Claim Six: The Trial Court's Denial of the New Trial Motion Supported by Newly Discovered Evidence Corroborating Mr. Howard's Innocence Was Prejudicial Error. ........................................... 168

G.  Claim Seven: The Trial Court Erroneously and Prejudicially Admitted Inflammatory Evidence ............................................. 175

H.  Claim Eight: The Trial Court Lacked Jurisdictional to Try Mr. Howard for First Degree Felony Murder and Erred In So Instructing the Jury. ................................................................. 186

I.  Claim Nine: The Trial Court's Instructional Errors Prejudiced Mr. Howard. ...................................................................... 189

J.  Claim Ten: Death Qualifying Jurors is Unconstitutional. ........................ 196

K.  Claim Eleven: State Impediments Prevented a Full and Reliable Presentation and Litigation of All Potentially Meritorious Guilt Phase Claims for Relief. ............................................. 209

L.  Claim Twelve: Mr. Howard's Conviction Is Unconstitutional Because Prejudicial Juror Misconduct Occurred During His Trial. ................................................................................. 225

M.  Claim Thirteen: The Superior Court's Failure to Create, Preserve, and Settle a Complete, Accurate, and Reliable Record of the Proceedings Deprived Mr. Howard of His Constitutional Rights. ............................................................ 227

N.  Claim Fourteen: The Cumulative Nature of the Errors Requires Habeas Corpus Relief. ............................................... 232

VIII. Prayer for Relief

IX.  Verification

Petition for Writ of Habeas Corpus

1

## <u>TABLE OF AUTHORITIES</u>

2

3 **Cases**

4 *Ainsworth v. Woodford,*
5  268 F.3d 868 (9th Cir. 2001)................................................................ 39, 117

6 *Alcala v. Woodford,*
7  334 F.3d 862 (9th Cir. 2003)........................................ 70, 71, 179, 236

8 *Alcorta v. Texas,*
9  355 U.S. 28 (1957) .............................................................................. 174

10 *Angel v. Bullington,*
  330 U.S. 183 (1947) ............................................................................ 215

11 *Apprendi v. New Jersey,*
12  530 U.S. 466 (2000) ............................................................................ 188

13 *Arizona v. Fulminante,*
14  499 U.S. 279 (1991).......................................... 15, 23, 25, 130

15 *Ballew v. Georgia,*
16  435 U.S. 223 (1978)............................................................................ 208

17 *Baluyut v. Super. Ct.,*
  12 Cal. 4th 826 (1996)........................................................................... 52

18 *Barnett v. Super. Ct.,*
19  50 Cal. 4th 890 (2010)......................................................................... 217

20 *Batson v. Kentucky,*
21  476 U.S. 79 (1986) ............................................................................... 64

22 *Baze v. Rees,*
23  553 U.S. 35 (2008) ........................................................................ 62, 201

24 *Beagles v. Florida,*
25  273 So. 2d 796 (Fla. 1973).................................................................. 182

26 *Beck v. Alabama,*
27  447 U.S. 625 (1980) ...................................................... 168, 181, 188

28

Petition for Writ of Habeas Corpus

*Beck v. Ohio,*
   379 U.S. 89 (1964) ........................................................................ 44, 45

*Bennett v. Mueller,*
   322 F.3d 573 (9th Cir. 2003) ................................................................ 14

*Berghuis v. Smith,*
   559 U.S. 314 (2010) ............................................................ 60, 61, 62

*Bigelow v. Williams,*
   367 F.3d 562 (6th Cir. 2004) ................................................................ 70

*Blazak v. Ricketts,*
   1 F.3d 891 (9th Cir. 1993) ........................................................ 153, 164

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ............................................................ 220, 221

*In re Bower,*
   38 Cal. 3d 865 (1985) .................................................................... 212

*Bracy v. Gramley,*
   520 U.S. 899 (1997) ............................................................ 216, 218

*Brady v. Maryland,*
   373 U.S. 83 (1963) ............................................................ 133, 134

*Brecht v. Abrahamson,*
   507 U.S. 619 (1993) ............................................................ 14, 236

*Briggs v. Brown,*
   3 Cal. 5th 808 (2017) .................................................................... 225

*Brumfield v. Cain,*
   576 U.S. 305 (2015) ...................................................................... 11

*Bruton v. United States,*
   391 U.S. 123 (1968) ...................................................................... 180

*Cacoperdo v. Demonsthenes,*
   37 F.3d 504 (9th Cir. 1994) ............................................................ 161

*Cargle v. Mullin,*
   317 F.3d 1196 (10th Cir. 2003) ................................................ 93, 124

iv

*Carriger v. Stewart,*
   132 F.3d 463 (9th Cir. 1997)..................................................................... 148

*Carter v. Texas,*
   177 U.S. 442 (1900) ................................................................................. 215

*Catlin v. Super. Ct.,*
   51 Cal. 4th 300 (2011).............................................................................. 218

*Chambers v. Mississippi,*
   410 U.S. 284 (1973) ......................................................................... 14, 236

*Chandler v. Jones,*
   813 F.2d 773 (6th Cir. 1987)..................................................................... 121

*Chapman v. California,*
   386 U.S. 18 (1967) ..........................................................................*passim*

*Chavez v. United States,*
   656 F.2d 512 (9th Cir. 1981)..................................................................... 164

*Chessman v. Teets,*
   354 U.S. 156 (1957) ....................................................................... 228, 232

*Clanton v. Cooper,*
   129 F.3d 1147 (10th Cir. 1997).................................................................. 130

*Cochrane v. Scutt,*
   No. 09-11963, 2013 WL 655140 (E.D. Mich. 2013).............................. 216, 219

*Coleman v. Alabama,*
   377 U.S. 129 (1964) ....................................................................... 215, 216

*Coleman v. Thompson,*
   501 U.S. 722 (1991) ................................................................................. 14

*Commonwealth v. Krick,*
   67 A.2d 746 (Pa. 1949) ................................................................... 171, 172

*Cooper v. Oklahoma,*
   517 U.S. 348 (1996) ....................................................................... 160, 161

*Crane v. Kentucky,*
   476 U.S. 683 (1986) ................................................................................. 169

Petition for Writ of Habeas Corpus

*Credell v. Bodison,*
  818 F. Supp. 2d 928 (D.S.C. 2011) ................................................................ 121

*Cullen v. Pinholster,*
  563 U.S. 170 (2011) ..................................................................................... 220

*Daniels v. Roe,*
  No. 02-55328, WL 31863697 (9th Cir. 2002) (unpublished) ..................... 58, 59

*Davis v. Ayala,*
  576 U.S. 257 (2015) ....................................................................................... 14

*Davis v. Wechsler,*
  263 U.S. 22 (1923) ....................................................................................... 215

*In re Davis,*
  8 Cal. 3d 798 (1973) .................................................................................... 166

*Deck v. Missouri,*
  544 U.S. 622 (2005) .............................................................................*passim*

*Deere v. Woodford,*
  339 F.3d 1084 (9th Cir. 2003) ..................................................................... 162

*DeJonge v. Oregon,*
  299 U.S. 353 (1937) ..................................................................................... 188

*Devenpeck v. Alford,*
  543 U.S. 146 (2004) ....................................................................................... 45

*Donnelly v. DeChristoforo,*
  416 U.S. 637 (1974) ..................................................................................... 124

*Douglas v. People of State of Cal.,*
  372 U.S. 353 (1963) ..................................................................................... 212

*Douglas v. Woodford,*
  316 F.3d 1079 (9th Cir. 2003) ..................................................................... 215

*Draughon v. Dretke,*
  427 F.3d 286 (5th Cir. 2005) .......................................................................... 80

*Driscoll v. Delo,*
  71 F.3d 701 (8th Cir. 1995) ........................................................................... 80

Petition for Writ of Habeas Corpus

*Drope v. Missouri,*
   420 U.S. 162 (1975) ................................................................ *passim*

*Dudley v. Duckworth,*
   854 F.2d 967 (7th Cir. 1988) ................................................... 113

*Duncan v. Henry,*
   513 U.S. 364 (1995) ................................................................ 112

*Duncan v. Ornoski,*
   528 F.3d 1222 (9th Cir. 2008) ................................................... 80

*Durdines v. Super. Ct.,*
   76 Cal. App. 4th 247 (1999) ............................................. 217, 220

*Duren v. Missouri,*
   439 U.S. 357 (1979) ........................................................... 60, 62

*Dusky v. United States,*
   362 U.S. 402 (1960) ............................................................... 160

*Earp v. Ornoski,*
   431 F.3d 1158 (9th Cir. 2005) .................................................. 11

*In re Edward S.,*
   173 Cal. App. 4th 387 (2009) ................................................... 39

*Enmund v. Florida,*
   458 U.S. 782 (1982) ............................................................... 140

*Ervin v. Cullen,*
   No. C 00-01228 CW, 2011 WL 4005389 (N.D. Cal. 2011) ............ 218

*Estelle v. McGuire,*
   502 U.S. 62 (1991) ................................................................ 112

*Estelle v. Williams,*
   425 U.S. 501 (1976) ............................................................... 168

*Evitts v. Lucey,*
   469 U.S. 387 (1985) ................................................................ 15

*Fernandez v. Roe,*
   286 F.3d 1073 (9th Cir. 2002) ............................................ 64, 65

Petition for Writ of Habeas Corpus

*Ferrell v. Hall*,
  640 F.3d 1199 (11th Cir. 2011)..................................................... 127

*Ferrier v. Duckworth*,
  902 F.2d 545 (7th Cir. 1990)........................................................ 183

*Florida v. Bostick*,
  501 U.S. 429 (1991) .................................................................... 45

*Florida v. J.L.*,
  529 U.S. 266 (2000) .................................................................... 45

*Foster v. California*,
  394 U.S. 440 (1969) .................................................................. 144

*Gardner v. Florida*,
  430 U.S. 349 (1977) ................................................. 139, 183, 228

*Gideon v. Wainwright*,
  372 U.S. 335 (1963) .................................................................... 24

*Giglio v. United States*,
  405 U.S. 150 (1972) .................................................................. 133

*Glossip v. Gross*,
  135 S. Ct. 2726 (2015) .............................................................. 201

*Godfrey v. Georgia*,
  446 U.S. 420 (1980) ........................................................... 213, 216

*Gonzalez v. Pliler*,
  341 F.3d 897 (9th Cir. 2003)............................................... *passim*

*Gravley v. Mills*,
  87 F.3d 779 (6th Cir. 1996).................................................. 124, 127

*Gray v. Mississippi*,
  481 U.S. 648 (1987) ........................................................... 206, 208

*Green v. Bock Laundry Machine Co.*,
  490 U.S. 504 (1989) .................................................................. 191

*U.S. ex rel. Green v. Washington*,
  917 F. Supp. 1238 (N.D. Ill. 1996) ............................................. 39

Petition for Writ of Habeas Corpus

*Griffin v. Illinois,*
  351 U.S. 12 (1956) ............................................................... 212

*Hall v. Director of Corrections,*
  343 F.3d 976 (9th Cir. 2003) .............................................. 138

*Hamling v. United States,*
  418 U.S. 87 (1974) .............................................................. 188

*Harrington v. Richter,*
  562 U.S. 86 (2011) ................................................................ 11

*Harris By & Through Ramseyer v. Wood,*
  64 F.3d 1432 (9th Cir. 1995) ........................................ 66, 120

*Hart v. Gomez,*
  174 F.3d 1067 (9th Cir.1999) ............................................... 69

*Hayes v. Brown,*
  399 F.3d 972 (9th Cir. 2005) ...................................... 137, 138

*Herrera v. Collins,*
  506 U.S. 390 (1993) ........................................................... 148

*Hicks v. Oklahoma,*
  447 U.S. 343 (1980) .................................................... 174, 181

*Hodge v. Hurley,*
  426 F.3d 368 (6th Cir. 2005) .............................................. 124

*Holbrook v. Flynn,*
  475 U.S. 560 (1986) ...................................................... 23, 168

*Honore v. Wash. State Bd. of Prison Terms & Paroles,*
  466 P.2d 485 (Wash. 1970) ................................................ 212

*House v. Bell,*
  547 U.S. 518 (2006) ...................................................... 14, 148

*Howard v. California,*
  565 U.S. 866 (2011) ................................................................ 7

*Illinois v. Allen,*
  397 U.S. 337 (1969) .............................................. 22, 25, 27

ix

*Irvin v. Dowd,*
  366 U.S. 717 (1961) ................................................................. 226, 227

*Israel v. Odom,*
  521 F.2d 1370 (7th Cir. 1975) .................................................. 144, 146

*Jammal v. Van de Kamp,*
  926 F.2d 918 (9th Cir. 1991) ............................................. 112, 179, 183

*Jennings v. Woodford,*
  290 F.3d 1006 (9th Cir. 2002) ......................................................... 48

*In re Jimenez,*
  50 Cal. 4th 951 (2010) .................................................................. 211

*Johnson v. Mississippi,*
  486 U.S. 578 (1988) ...................................................................... 139

*Kaupp v. Texas,*
  538 U.S. 626 (2003) .......................................................... 41, 44, 45

*Keenan v. Super. Ct.,*
  31 Cal. 3d 424 (1982) ............................................................... 35, 39

*Kennedy v. Cardwell,*
  487 F.2d 101 (6th Cir. 1973) ..................................................... 28, 30

*Killian v. Poole,*
  282 F.3d 1204 (9th Cir. 2002) ..................................... 138, 171, 236

*Kraus v. Cnty. of Pierce,*
  793 F.2d 1105 (9th Cir.1986) ........................................................ 46

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ....................................................... 134, 181, 235

*Lindh v. Murphy,*
  521 U.S. 320 (1997) ....................................................................... 10

*Lindsay v. Normet,*
  405 U.S. 56 (1972) ........................................................................ 191

*Lockett v. Ohio,*
  438 U.S. 586 (1978) ...................................................................... 184

x

*Lockhart v. McCree,*
   476 U.S. 162 (1986) ................................................................ 196, 197, 204, 205

*Lord v. Wood,*
   184 F.3d 1083 (9th Cir. 1999) ................................................................ 70

*Loux v. United States,*
   389 F.2d 911 (9th Cir. 1968) ................................................................ 18

*In re Lucas,*
   33 Cal. 4th 682 (2004) ................................................................ 210

*Mak v. Blodgett,*
   970 F.2d 614 (9th Cir. 1992) ................................................................ 236

*Manson v. Brathwaite,*
   432 U.S. 98 (1977) ................................................................ 146

*Martin v. Parker,*
   11 F.3d 613 (6th Cir. 1994) ................................................................ 113

*Martinez v. Ryan,*
   566 U.S. 1 (2012) ................................................................ 15, 212

*Matheney v. Anderson,*
   253 F.3d 1025 (7th Cir. 2001) ................................................................ 166

*Matthews v. Abramajtys,*
   319 F.3d 780 (6th Cir. 2003) ................................................................ 93

*McKaskle v. Wiggins,*
   465 U.S. 168 (1994) ................................................................ 24

*McKinney v. Rees,*
   993 F.2d 1378 (9th Cir. 1995) ................................................................ 113, 168

*Medina v. California,*
   505 U.S. 437 (1992) ................................................................ 161

*Miller v. Marr,*
   141 F.3d 976 (10th Cir. 1998) ................................................................ 220

*Miller v. Pate,*
   386 U.S. 1 (1967) ................................................................ 169, 174

xi

*Miller-El v. Dretke,*
545 U.S. 231 (2005) ................................................................. 65

*Mitcham v. Davis,*
103 F. Supp. 3d 1091 (9th Cir. 2015) ..................................... 65

*Moore v. United States,*
464 F.2d 663 (9th Cir. 1976) ............................................ 163, 165

*Moran v. Godinez,*
57 F.3d 690 (9th Cir. 1995) ................................................. 164

*In re Morgan,*
50 Cal. 4th 932 (2010) ..................................................... 211, 214

*In re Morris,*
363 F.3d 891 (2004) ............................................................. 53

*Murgia v. Mun. Ct.,*
15 Cal. 3d 286 (1975) .......................................................... 52

*Napue v. Illinois,*
360 U.S. 264 (1959) ............................................ 138, 169, 174

*Neil v. Biggers,*
409 U.S. 188 (1972) ............................................................ 144

*Odle v. Woodford,*
238 F.3d 1084 (9th Cir. 2001) ....................................... 161, 162

*Orin v. Barclay,*
272 F.3d 1207 (9th Cir. 2001) .............................................. 45

*Oyler v. Boles,*
368 U.S. 448 (1962) ............................................................. 51

*Panetti v. Quarterman,*
551 U.S. 930 (2007) ............................................................. 11

*Parker v. Gladden,*
385 U.S. 363 (1966) ....................................................... 226, 227

*Parle v. Runnels,*
505 F.3d 922 (9th Cir. 2007) ............................................... 14

xii

*Pate v. Robinson,*
   383 U.S. 375 (1966) .......................................................................................*passim*

*People v. Andrade,*
   79 Cal. App. 4th 651 (Cal. Ct. App. 2000) ........................................... 93

*People v. Badgett,*
   10 Cal. 4th 330 (1995)........................................................................... 131

*People v. Banks,*
   61 Cal. 4th 788 (2015)........................................................................... 140

*People v. Betts,*
   34 Cal. 4th 1039 (2005)........................................................................... 52

*People v. Boyer,*
   38 Cal. 4th 412 (2006)........................................................................... 130

*People v. Burgener,*
   29 Cal. 4th 833 (2003)............................................................................. 60

*People v. Cardenas,*
   31 Cal. 3d 897 (1982)............................................................................ 128

*People v. Castaneda,*
   2005 WL 2995165 (Cal. App. 4 Dist.) (unpublished) ......................... 50

*People v. Castro,*
   38 Cal. 3d 301 (1985)............................................................................ 192

*People v. Cavanaugh,*
   44 Cal. 2d 252 (1955)............................................................................ 182

*People v. Chavez,*
   50 Cal. 2d 778 (1958)............................................................................ 182

*People v. Clark,*
   63 Cal. 4th 522 (2016)........................................................................... 140

*People v. Cox,*
   53 Cal. 3d 618 (1991)............................................................................ 223

*People v. Danielson,*
   3 Cal. 4th 691 (1992)............................................................................. 164

xiii

*People v. Duran*,
  16 Cal. 3d 282 (1976)...................................................................... 18

*People v. Duvall*,
  9 Cal. 4th 464 (1995)...................................................................... 220

*People v. Dyer*,
  45 Cal. 3d 26 (1988)....................................................................... 171

*People v. Earp*,
  20 Cal. 4th 826 (1999).................................................................... 134

*People v. Falsetta*,
  21 Cal. 4th 903 (1999).................................................................... 183

*People v. Fitch*,
  55 Cal. App. 4th 172 (1997)............................................................ 183

*People v. Fosselman*,
  33 Cal. 3d 572 (1983)..................................................................... 170

*People v. Frye*,
  18 Cal. 4th 894 (1998).................................................................... 195

*People v. Gonzalez*,
  51 Cal. 3d 1179 (1990).................................................................... 216

*People v. Green*,
  27 Cal. 3d 1 (1980)......................................................................... 180

*People v. Gutierrez*,
  28 Cal. 4th 1083 (2002)..................................................................... 58

*People v. Guzman*,
  45 Cal. 3d 915 (1988)............................................................... 164, 166

*People v. Hairgrove*,
  18 Cal. App. 3d 606 (1971)............................................................. 173

*People v. Hale*,
  44 Cal. 3d 531 (1988)..................................................................... 164

*People v. Hansen*,
  9 Cal. 4th 300 (1994)...................................................................... 187

Petition for Writ of Habeas Corpus

*People v. Harrington*,
42 Cal. 165 (1871).................................................................... 28

*People v. Hawthorne*,
4 Cal. 4th 43 (1992).................................................................. 229

*People v. Holt*,
37 Cal. 3d 436 (1984).............................................................. 128

*People v. Howard*,
51 Cal. 4th 15 (2010)................................................................... 7

*People v. Jackson*,
10 Cal. App. 4th 13 (1992)......................................................... 58

*People v. Jackson*,
14 Cal. App. 4th 1818 (1993)............................................... 17, 22

*People v. Jennings*,
81 Cal. App. 4th 1301 (2000).......................................... 180, 183

*People v. Jones*,
186 Cal. App. 4th 216 (2010)..................................................... 39

*People v. Jones*
53 Cal. 3d 1115 (1991)............................................................ 166

*People v. Kelly*,
162 Cal. App. 4th 797 (2008)..................................................... 58

*People v. Mar*,
28 Cal. 4th 1201 (2002).................................................... *passim*

*People v. Marks*,
45 Cal. 3d 1335 (1988)............................................................ 166

*People v. Marsh*,
175 Cal. App. 3d 987 (1985).................................................... 182

*People v. Marshall*,
13 Cal. 4th 799 (1996)............................................................ 172

*People v. Martinez*,
808 N.E.2d 1089 (2004)............................................................ 32

Petition for Writ of Habeas Corpus

*People v. Mayfield,*
  14 Cal. 4th 668 (1997)..............................................................................58

*People v. Mincey,*
  2 Cal. 4th 408 (1992)..............................................................................191

*People v. Minnick,*
  214 Cal. App. 3d 1478 (1989)...............................................................172

*People v. Montiel,*
  39 Cal. 3d 910 (1985).............................................................................180

*People v. O'Dell,*
  126 Cal. App. 4th 562 (2005).................................................................165

*People v. Pennington*
  66 Cal. 2d 508 (1967)......................................................................163, 165

*People v. Ramos,*
  15 Cal. 4th 1133 (1997)...........................................................................60

*People v. Rogers,*
  39 Cal. 4th 826 (2006)...........................................................................160

*People v. Ruthford,*
  14 Cal. 3d 399 (1975).............................................................................134

*People v. Seaton,*
  26 Cal. 4th 598 (2001).............................................................................18

*People v. Superior Court (Marks),*
  1 Cal. 4th 56 (1991).............................................................................166

*People v. Taylor,*
  47 Cal. 4th 850 (2009).............................................................................58

*People v. Watson,*
  30 Cal. 3d 290 (1981).............................................................................187

*People v. Weaver,*
  26 Cal. 4th 876 (2001)...........................................................................164

*Perez v. Rosario,*
  294 F. Supp. 2d 1125 (N.D. Cal. 2003) ...............................................120

Petition for Writ of Habeas Corpus

*Porter v. McCollum,*
    558 U.S. 30 (2009) ............................................................ 11

*Pyle v. Kansas,*
    317 U.S. 213 (1942) .......................................................... 130

*Raheem v. Kelly,*
    257 F.3d 122 (2d Cir. 2001) .................................... 143, 146

*Ramseur v. Beyer,*
    983 F.2d 1215 (3rd Cir. 1992) ........................................ 60

*Randolph v. California,*
    380 F.3d 1133 (9th Cir. 2004)........................................ 62

*Reid v. Georgia,*
    448 U.S. 438 (1980) .......................................................... 45

*Rhoden v. Rowland,*
    172 F.3d 633 (9th Cir. 1999)........................................ 22

*Richey v. Bradshaw,*
    498 F.3d 344 (6th Cir. 2007) .................................. 81, 82

*Riggins v. Nevada,*
    504 U.S. 127 (1992) ................................................*passim*

*Rock v. Arkansas,*
    483 U.S. 44 (1987) ............................................................ 30

*Rodriguez v. Marshall,*
    125 F.3d 739 (9th Cir. 1997)...................................... 226

*Romano v. Oklahoma,*
    512 U.S. 1 (1994) ............................................................ 112

*Rompilla v. Beard,*
    545 U.S. 374 (2005) .......................................... 11, 34, 39

*Sanders v. Ratelle,*
    21 F.3d 1446 (9th Cir. 1994)...................................... 214

*Sanders v. Sullivan,*
    900 F.2d 601 (2d Cir. 1990) ...................................... 138

Petition for Writ of Habeas Corpus

*In re Sassonian,*
  9 Cal. 4th 535 (1995) ............................................................... 138, 139

*Sawyer v. Whitley,*
  505 U.S. 333 (1992) ...................................................................... 148

*Schlup v. Delo,*
  513 U.S. 298 (1995) ...................................................................... 148

*Schneckloth v. Bustamonte,*
  412 U.S. 218 (1973) ...................................................................... 130

*Schwendeman v. Wallenstein,*
  971 F.2d 313 (9th Cir. 1992) .................................................. 193, 196

*Seidel v. Merkle,*
  146 F.3d 750 (9th Cir. 1998) ........................................................ 215

*Simmons v. South Carolina,*
  512 U.S. 154 (1994) ...................................................................... 139

*Simmons v. U.S,*
  390 U.S. 377 (1968) .............................................................. 143, 146

*Smith v. Berghuis,*
  543 F.3d 326 (6th Cir. 2008) .......................................................... 61

*Smith v. Wainwright,*
  777 F.2d 609 (11th Cir. 1985) ........................................................ 47

*Solomon v. Smith,*
  645 F.2d 1179 (2d Cir. 1981) .................................................. 144, 146

*Spain v. Rushen,*
  883 F.2d 712 (9th Cir. 1989) ............................................ 18, 22, 27

*Stanley v. Martel,*
  No. C-07-4727 EMC, 2011 WL 5085060 (N.D. Cal. 2011) ............ 218

*State v. Calderon,*
  13 P.3d 871 (Kan. 2000) ................................................................. 32

*State v. Damon,*
  669 A.2d 860 (N.J. Super. A.D. 1996) ........................................... 25

Petition for Writ of Habeas Corpus

*State v. Fortin*,
843 A.2d 974 (N.J. 2004)................................................................. 188, 189

*State v. Nelson*,
48 P.3d 739 (Mont. 2002) ......................................................................... 190

*In re Steele*,
32 Cal. 4th 682 (2004)....................................................................... 216, 217

*Stewart v. Corbin*,
850 F.2d 492 (9th Cir. 1988) ..................................................................... 18

*Strickland v. Washington*,
466 U.S. 668 (1984) ....................................................................... *passim*

*Strickler v. Greene*,
527 U.S. 263 (1999) ................................................................................. 134

*Sullivan v. Louisiana*,
508 U.S. 275 (1993) ................................................................................... 24

*Taylor v. Louisiana*,
419 U.S. 522 (1975) ......................................................................... 204, 205

*Teague v. Lane*,
489 U.S. 288 (1989) ................................................................................... 13

*Terry v. Ohio*,
392 U.S. 1 (1968) ................................................................... 41, 44, 143

*Thomas v. Borg*,
159 F.3d 1147 (9th Cir. 1998)................................................................... 60

*Thompson v. Calderon*,
120 F.3d 1045 (9th Cir. 1997)........................................................... 93, 215

*Tison v. Arizona*,
481 U.S. 137 (1987) ................................................................................. 140

*In re Tony C.*,
21 Cal. 3d 888 (1978).......................................................................... 41, 44

*Trevino v. Thaler*,
569 U.S. 413 (2013) ................................................................................... 15

Petition for Writ of Habeas Corpus

*Tumey v. Ohio,*
   273 U.S. 510 (1927) ........................................................................ 24

*Turner v. Duncan,*
   158 F.3d 449 (9th Cir. 1998) ......................................................... 215

*Ulster Cnty. Court v. Allen,*
   442 U.S. 140 (1979) ............................................................. 192, 193

*United Stated v. Agurs,*
   427 U.S. 97 (1976) ...................................................................... 139

*United States v. Armstrong,*
   517 U.S. 456 (1996) ...................................................................... 53

*United States v. Badalamente,*
   507 F.2d 12 (2d Cir. 1974) ........................................................... 134

*United States v. Bagley,*
   473 U.S. 667 (1985) ............................................................. 134, 139

*United States v. Carolene Products,*
   304 U.S. 144 (1938) .................................................................... 200

*United States v. Collins,*
   109 F.3d 1413 (9th Cir. 1997) ......................................................... 18

*United States v. Cooper,*
   173 F.3d 1192 (9th Cir. 1999) ....................................................... 138

*United States v. Cotton,*
   535 U.S. 625 (2002) .................................................................... 186

*United States v. Cronic,*
   466 U.S. 648 (1984) ...................................................................... 80

*United States v. Del Vizo,*
   918 F.2d 821 (1990) ............................................................... 45, 46

*United States v. Delgadillo-Velasquez,*
   856 F.2d 1292 (9th Cir. 1988) ......................................................... 45

*United States v. Domina,*
   784 F.2d 1361 (9th Cir. 1986) ....................................................... 144

Petition for Writ of Habeas Corpus

*United States v. Durham,*
  287 F.3d 1297 (11th Cir. 2002)...................................................................*passim*

*United States v. Frederick,*
  78 F.3d 1370 (9th Cir. 1996).................................................................128, 236

*United States v. Gainey,*
  380 U.S. 63 (1965) ...............................................................................192

*United States v. Harbin,*
  250 F.3d 532 (7th Cir. 2001)..................................................................195

*United States v. Hernandez-Estrada,*
  749 F.3d 1154 (9th Cir. 2014)..............................................................61, 63

*United States v. Hughes,*
  864 F.2d 78 (8th Cir. 1988)...................................................................64

*United States v. Hung Thien Ly,*
  646 F.3d 1307 (11th Cir. 2011).............................................................121

*United States v. Jackman,*
  46 F.3d 1240 (2nd Cir. 1995)................................................................63

*United States v. Johnson,*
  873 F.2d 1137 (8th Cir. 1989)...............................................................64

*United States v. Kojayan,*
  8 F.3d 1315 (9th Cir. 1993)..................................................................124

*United States v. Peter,*
  310 F.3d 709 (11th Cir. 2002)...............................................................186

*United States v. Petty,*
  982 F.2d 1365 (9th Cir. 1993)...............................................................139

*United States v. Ramos-Zaragosa,*
  516 F.2d 141 (9th Cir. 1975).................................................................46

*United States v. Recio,*
  258 F.3d 1069 (9th Cir. 2000)...............................................................127

*United States v. Ricardo D.,*
  912 F.2d 337 (9th Cir. 1990).................................................................46

Petition for Writ of Habeas Corpus

*United States v. Rogers,*
   73 F.3d 774 (8th Cir. 1996)..................................................................... 60, 63

*United States v. Rubio-Villareal,*
   967 F.2d 294 (9th Cir. 1992)....................................................................... 192

*United States v. Samuel,*
   431 F.2d 610 (4th Cir. 1970)..................................................................... 18, 21

*United States v. Sharpe,*
   470 U.S. 675 (1985) ...................................................................................... 46

*United States v. Sutton,*
   455 F.2d 974 (9th Cir. 1972)....................................................................... 171

*United States v. Teague,*
   953 F.2d 1525 (11th Cir. 1992)................................................................... 120

*United States v. Theriault,*
   531 F.2d 281 (5th Cir. 1976)..................................................................... 21, 22

*United States v. Thomas,*
   211 F.3d 1186 (9th Cir. 2000)................................................................... 44, 45

*United States v. Vasquez,*
   597 F.2d 192 (9th Cir. 1979)................................................................. 226, 227

*United States v. Wade,*
   388 U.S. 218 (1967) .................................................................................... 143

*United States v. Warren,*
   25 F.3d 890 (9th Cir. 1994)........................................................................ 192

*United States v. Williams,*
   469 F.2d 540 (D.C. Cir. 1972) ............................................................. 144, 146

*United States v. Young,*
   17 F.3d 1201 (9th Cir. 1994)........................................................ 138, 169, 174

*United States v. Zygadlo,*
   720 F.2d 1221 (11th Cir. 1983)..................................................................... 28

*Utah v. Cloud,*
   722 P.2d 750 (Utah 1986) ........................................................................... 182

Petition for Writ of Habeas Corpus

*Uttecht v. Brown,*
   551 U.S. 1 (2007) ........................................................................ 62

*Van Tran v. Lindsey,*
   212 F.3d 1143 (9th Cir. 2000).................................................... 47

*Vasquez v. Hiller,*
   474 U.S. 254 (1994) .................................................................. 24

*Viereck v. United States,*
   318 U.S. 236 (1943) ................................................................ 124

*Wade v. Calderon,*
   29 F.3d 1312 (9th Cir. 1993).................................................... 128

*Wainwright v. Witt,*
   496 U.S. 412 (1985) ................................................................ 197

*Wardius v. Oregon,*
   412 U.S. 470 (1973) ......................................................... 191, 195

*Washington v. Hofbauer,*
   228 F.3d 689 (6th Cir. 2000).................................................... 124

*Washington v. Lambert,*
   98 F.3d 1181 (1996) ............................................................ 45, 46

*Wayte v. United States,*
   470 U.S. 598 (1985) .................................................................. 52

*Wiggins v. Smith,*
   539 U.S. 510 (2003) .................................................................. 34

*Williams v. Taylor,*
   529 U.S. 362 (2000) ........................................................... 11, 34

*Williams v. Woodford,*
   384 F.3d 567 (9th Cir. 2002).................................................... 162

*In re Winship,*
   397 U.S. 358 (1970) ................................................................ 191

*Witherspoon v. Illinois,*
   391 U.S. 510 (1968) ................................................. 197, 198, 208

Petition for Writ of Habeas Corpus

*Woodson v. North Carolina,*
   428 U.S. 280 (1976) ................................................................. 204

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886) .................................................................. 51

**Constitutional Provisions**

U.S. Const. amend. V ...................................................... 17, 189

U.S. Const. amend. VI ............................................................ *passim*

U.S. Const. amend. VIII .......................................................... *passim*

U.S. Const. amend. XIV ........................................... 41, 168, 188, 193

**Statutes**

28 U.S.C. § 2241 ........................................................................ 1

28 U.S.C. § 2251 ........................................................................ 1

28 U.S.C. § 2254 .............................................................. *passim*

Cal. Civ. Proc. Code § 231 ................................................... 56

Cal. Evid. Code § 210 ........................................................ 184

Cal. Evid. Code § 352 ...................................................... *passim*

Cal. Evid. Code § 352 ........................................................ 176

Cal. Evid. Code § 402 ................................... 44, 85, 176, 179

Cal. Evid. Code § 402 ........................................................ 179

Cal. Gov. Code § 68662 .................................................... 225

Cal. Penal Code § 21 .......................................................... 99

Cal. Penal Code § 148.9 ...................................................... 42

Cal. Penal Code § 187 ........................................... 4, 186, 187

Cal. Penal Code § 188 ........................................................ 10

Petition for Writ of Habeas Corpus

Cal. Penal Code § 189 ............................................................ 10, 99, 186

Cal. Penal Code § 190.2 ................................................................. 3, 4

Cal. Penal Code § 190.9 ................................................................. 229

Cal. Penal Code § 417 ..................................................................... 89

Cal. Penal Code § 422 ..................................................................... 89

Cal. Penal Code § 745 ..................................................................... 49

Cal. Penal Code § 987.9 ........................................................... 39, 118

Cal. Penal Code § 1054.9 ............................................ 217, 218, 219

Cal. Penal Code § 1172.6 ............................................................... 10

Cal. Penal Code § 1181 ................................................................. 170

Cal. Penal Code § 1237 ................................................................. 169

Cal. Penal Code § 1335 ................................................................. 218

Cal. Penal Code § 1368 .......................................... 163, 164, 166

Cal. Penal Code § 1466 ................................................................. 169

Cal. Penal Code § 1484 ................................................................. 217

Cal. Penal Code § 1509.1 ............................................................. 225

Cal. Penal Code § 12025 ................................................................. 89

**Rules of Court**

32 C.F.R. § 776.43 ......................................................................... 124

C.D. Local Rule 83-17.7(c) ............................................................ 10

Cal. Rule Ct. 4.551 ........................................................................ 220

Cal. Rule Ct. 8.385 ........................................................................... 8

Cal. Rule Ct. 8.610 ........................................................................ 229

Cal. Rules Ct. 8.391 ...................................................................... 225

Petition for Writ of Habeas Corpus

**Other Authorities**

Adam Liptak, *Facing a Jury of (Some of) One's Peers*, N.Y. Times, July 20, 2003, sec. 4 ............................................................... 203

Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislature's Multi-Billion-Dollar Debacle*, 44 Loy. L.A. L. Rev. S41, S55 n.26 (2011) ............................................................................... 224

Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislatures Multi-Billion-Dollar Debacle*, 44 Loy. L.A. L. Rev. S41, S55 n.26 (2011) ............................................................................... 222

Arthur L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. 697 (2007) .................................... 210, 211, 212, 222

California Commission on the Fair Administration of Justice, *Report and Recommendation on the Administration of the Death Penalty in California* 115 (Gerald Uelmen ed., 2008) .......................... 222, 224

Cassia Sphon, John Gruhl & Susan Welch, *The Impact of the Ethnicity and Gender of Defendants on the Decision to Reject or Dismiss Felony Charges*, 25 Criminology 175 (1987) ...................... 51

Claudia L. Cowan, William C. Thompson & Phoebe C. Ellsworth, *The Effects of Death Qualification of Jurors; Predisposition to Convict and the Quality of Deliberation*, 8 Law & Hum. Behav. 53 (1984) ............................................................................... 197

Craig Haney, *Death by Design: Capital Punishment as a Social Psychological System* (Oxford Univ. Press 2005) ........................... 202

David Kairys, Joseph Kadane & John Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists*, 65 Cal. L. Rev. 776 (1977) ............................................................... 63

Donald N. Bersoff & David J. Glass, *The Not-So Weisman: The Supreme Court's Continuing Misuse of Social Science Research*, 2 U. Chi. L. Sch. Roundtable 279 (1995); ........................................ 198

Glenn L. Pierce & Michael L. Radelet, *The Impact of Legally Inappropriate Factors on Death Sentencing for California Homicides, 1990-99*, 46 Santa Clara L. Rev. 1 (2005) .......................................... 50

Ian T. Moar, *Death-Qualified Juries in Capital Cases: The Supreme Court's Decision in Lockhart v. McCree*, 19 Colum. Hum. Rts. L. Rev. 369 (1988).................................................................. 198, 199, 200, 201

J. Alexander Tanford, *The Limits of a Scientific Jurisprudence: The Supreme Court and Psychology*, 66 Ind. L.J. 137 (1990)................................ 198

James Kelley, *Addressing Juror Stress: A Trial Judge's Perspective*, 43 Drake L. Rev. 97 (1994)........................................................................ 185

James Luginbuhl & Kathi Middendorf, *Death Penalty Beliefs and Jurors' Response to Aggravating and Mitigating Circumstances in Capital Trials*, 12 Law & Hum. Behav. 263 (1988)........................................ 201

James S. Liebman, *The Overproduction of Death*, 100 Colum. L. Rev. 2030 (2000) ................................................................................. 200, 203, 205

Jane Byrne, *Lockhart v. McCree: Conviction-Proneness and the Constitutionality of Death-Qualified Juries*, 36 Cath. U. L. Rev. 287 (1986) ............................................................................. 198, 199, 200

John W. Poulos, *Capital Punishment, The Legal Process, and the Emergence of the Lucas Court in California*, 23 U.C. Davis L. Rev. 157 (1990)..................................................................................... 223

Joseph R. Grodin, *Developing a Consensus of Constraint: A Judge's Perspective on Judicial Retention Elections*, 61 S. Cal. L. Rev. 1969 (1988) ...................................................................................... 223

Julie Rubenstein, *A Picture Is Worth a Thousand Words – The Use of Graphic Photographs as Evidence in Massachusetts Murder Trials*, 6 Suffolk J. Trial & App. Advoc. 197 (2001) ........................................ 184

K.S. Douglas et al., *The Impact of Graphic Photographic Evidence on Mock Jurors' Decisions in a Murder Trial: Probative or Prejudicial?*, 21 Law & Hum. Behav. 485 (1997)................................... 184, 185

L. Marshall Smith, *Due Process Education for the Jury: Overcoming the Bias of Death Qualified Juries*, 18 Sw. U. L. Rev. 493 (1989) . 198, 199, 205

Petition for Writ of Habeas Corpus

M.O. Miller & Thomas Mauet, *The Psychology of Jury Persuasion*,
22 Am. J. Trial Advoc. 549 (1999) .................................................................. 185

Mona Lynch & Craig Haney, *Capital Jury Deliberation: Effects on
Death Sentencing, Comprehension, and Discrimination*, 33 Law &
Hum. Behav. 481 (2009) ........................................................................ 62, 201

Plamen I. Russev, *Restraining U.S. Violations of International Law:
An Attempt to Curtail Stun Belt Use and Manufacture in the United
States Under the United Nations Convention Against Torture*, 19
Ga. St. U.L. Rev. 603 (2002) .............................................................................. 26

Rick Seltzer, *The Effect of Death Qualification on the Propensity of
Jurors to Convict: The Maryland Example,* 29 How. L.J.
571(1986) ................................................................................... 200, 202, 203

Shelley A. Nieto Dahlberg, *"The React Security Belt: Stunning
Prisoners and Human Rights Groups into Questioning Whether Its
Use is Permissible Under the United States and Texas
Constitutions"* 30 St. Mary's L.J. 239 (1988).................................................. 28, 29

Susan Rozelle, *The Principled Executioner: Capital Juries' Bias and
the Benefits of True Bificurcation*, 38 Ariz. St. L.J. 769 (Fall 2006)....... 202, 203

W.C. Thompson, *Death Qualification After Wainwright v. Witt and
Lockhart v. McCree*, 13 Law & Hum. Behav. 185 (1989) .............. 198, 199, 203

William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing:
The Law's Failure to Purge Arbitrariness from Capital
Sentencing*, 39 Crim. L. Bull. 51 (2003)................................................... 200, 202

Williams J. Bowers, *The Capital Jury Project: Rationale, Design, and
Preview of Early Findings*, 70 Ind. L.J. 1043 (1995) ......................................... 202

Petitioner Demetrius Charles Howard respectfully petitions this Court for a writ of habeas corpus pursuant to Title 28 of the United State Code, sections 2241 and 2254 et seq., and by this verified petition alleges the following facts and causes for issuance of the writ:

## I.  INTRODUCTION

In 1995, following a trial marred by multiple constitutional defects, petitioner Demetrius Charles Howard was convicted of first-degree felony-murder with special circumstances and sentenced to death.  Mr. Howard was not the actual killer.  That man, Mitchell Funches, got a sentence of life without the possibility of parole.

Recognizing the deficient and prejudicial performance of counsel at the penalty phase of Mr. Howard's capital trial, the California Supreme Court issued an order to show cause on a claim to that effect.  Following a hearing which took place in March 2022, Mr. Howard was granted relief from his death sentence after twenty-six years on death row (Attachment 1), and on May 12, 2022, he was resentenced to life without the possibility of parole.

Mr. Howard has always maintained his innocence.  If not for the constitutional defects that infected every stage of this case, from arrest through sentencing, including but in no way limited to state misconduct, ineffective assistance of counsel and racism, the outcome would have been very different for Mr. Howard.  Mr. Howard accordingly and respectfully petitions this Court for a writ of habeas corpus pursuant to Title 28 of the United State Code, sections 2241 and 2254 et seq., and by this verified petition alleges the facts and causes herein for issuance of the writ.

## II.  JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 United States Code sections 2241 and 2254.  Venue in this Court is proper because it is the court for the district containing the state court of conviction (Superior Court of San Bernardino County, California).  28 U.S.C. § 2251(d).

## III.  PROCEDURAL HISTORY AND BACKGROUND

### A.  Conviction Upon Which the Judgment is Based

*Nature of Offenses:*     Penal Code Sections 187(a), 190.2(a)(17), 664/211

*Case Number:*     San Bernardino County Superior Court Case No. CHCJS1900008

*Date of Conviction:*     May 10, 1995 (guilt); 1 CT 285-87

*Date of Sentence:*     May 31, 1995 (death); 2 CT 347

*Date of Judgment:*     December 7, 1995 (death penalty); 2 CT 456-64

*Date of Resentence:*     May 12, 2022 (life without parole)

### B.  Pretrial and Trial Proceedings

*Arrest.* Mr. Howard was arrested on December 6, 1992, the same day the victim, Sherry Collins, was found dead in San Bernardino, California. 7 RT 1776-79.[1] Two suspects were seen running from the scene of the crime towards an apartment complex approximately a mile away. 8 RT 1912.  While Officer Edward

---

[1]     Throughout this petition, the designation "RT" refers to the Reporter's Transcript and "CT" refers to the Clerk's Transcript.  There are five augmented/supplemental CT volumes, lettered A through E.  These are referred to with the designation ASupp. CT – ESupp. CT.  The juror questionnaires are contained in 19 supplemental CT volumes.  These volumes are referred to as "JQCT." "ART" refers to the Augmented Reporter's Transcript.

    The record also contains two sets of pre-trial proceedings that span across multiple days but do not have volume numbers.  These pages will be referred to as "Pretrial RT," followed by the date of the proceeding and the page(s) referenced (for example, Pretrial RT, 1/1/1994, 4). For the citations noted above, the volume, if applicable, precedes the CT or RT designation and the page number follows (for example: 10 RT 2657, 1 ACT 50, 2 ESupp. CT 35, 5 JQCT 38).

    With respect to exhibits used and/or introduced into evidence at trial, exhibits from Mr. Howard's trial are cited as "People's Ex. No." and "Defense Ex. No.," followed by the number of the exhibit that is referenced.  Exhibits referenced from former co-defendant Mitchell Funches's trial are cited as "Funches People's Ex. No." and "Funches Defense Ex. No."

Brock was attempting to apprehend one of these suspects, Funches (8 RT 1916), Funches shot him. Funches was immediately arrested and charged with the murder of Sherry Collins and with the attempted murder of Ofc. Brock. ASupp. 1 CT 10.

Several hours later, Mr. Howard was arrested while making a phone call from a telephone phone booth near the apartment complex where Ofc. Brock had been shot. 8 RT 2025, 2031. The arresting officers searched him for weapons but found none. 8 RT 2027-28. Mr. Howard was booked into San Bernardino County jail on a bench warrant. SHP Ex. 1 at 307. He was subsequently remanded to the California Department of Corrections on December 8, 1992.

***Complaint.*** On March 9, 1993, over four months after Mr. Howard was arrested, a Felony Complaint was filed in the Superior Court of San Bernardino County, charging Mr. Howard with the first-degree murder of Sherry Collins. ASupp. CT 31. The Complaint alleged that Ms. Collins' murder took place during the course of a robbery within the meaning of California Penal Code section 190.2(a)(17). ASupp. CT 31. Mr. Howard was not implicated in the shooting of Ofc. Brock. ASupp. CT 31.

On April 7, 1993, Mr. Howard was arraigned and entered a plea of not guilty to all charges. An attorney from the conflict panel accepted appointment. Pretrial RT, 4/7/1993, 9. A preliminary hearing was scheduled for April 15, 1993. Pretrial RT, 4/7/1993, 9. On April 15, 1993, a colleague of the attorney who had accepted appointment at arraignment appeared and informed the court that their office could not take the case. Pretrial RT, 4/15/1993, 11. Private attorney Chuck Nacsin, who was present in the court, volunteered to represent Mr. Howard and the Court subsequently appointed him. Pretrial RT, 4/15/1993 12. The Court did not appoint, nor did Nacsin request, *Keenan* counsel. Pretrial RT, 4/15/1993, 12.

***Grand Jury Indictment.*** Nacsin asked the court to continue Mr. Howard's preliminary hearing eight times from the date of appointment until the District Attorney referred his case to a grand jury. Pretrial RT, 3/8/94, 1; *see also* ART (grand

1   jury proceedings).  As a result, Mr. Howard did not have a preliminary hearing or

2   cross-examine probable cause witnesses.  1 RT 28.

3        The prosecution presented evidence to the grand jury from March 1 to March

4   3, 1994 (ART 1), resulting in indictments of both Mr. Howard and Funches for first-

5   degree murder (Penal Code § 187) and special circumstances that the murder

6   occurred during the commission of a robbery (Penal Code § 190.2(a)(17)) and with

7   attempted second-degree robbery (1 CT 2).  1 CT 1-5.  The grand jury further

8   indicted Funches with attempted first-degree murder of Officer Edward Brock

9   (Penal Code §§ 664/187), and having exhibited a firearm in order to avoid arrest.  1

10  CT 3.

11       *Trial*.  Mr. Howard's case was assigned to Judge Stanley Hodge, in

12  Victorville, for trial and pre-trial motions.  Proceedings began on August 12, 1994.

13  1 RT 72.  On April 3, 1995, the court granted Mr. Howard's motion to sever his trial

14  from Funches' based on antagonistic defenses.  ESupp. 2 CT 935; 2 RT 478.

15       On April 4, 1995, the court determined that while in court, Mr. Howard was

16  to be restrained by a stun belt.  1 CT 123; 2 RT 505.  Trial counsel objected to this,

17  but the court denied trial counsel's motion to have the restraints removed.  1 CT 123;

18  2 RT 504-05.

19       Jury selection in Mr. Howard's case began on April 4, 1995 (2 RT 504), and

20  concluded on April 20, 1995.  6 RT 1529, 1568.

21       *Guilt Phase.*  The guilt phase of Mr. Howard's trial began April 25, 1995.  7

22  RT 1601.  There was no dispute that Funches shot Sherry Collins.  10 RT 2609.

23  Evidence of Mr. Howard's alleged involvement in the crimes came from two

24  principal sources: Cedric Torrence, who testified that he had heard Mr. Howard and

25  Funches talk about doing a robbery, or a "jacking," (7 RT 1662); and testimony from

26  a criminalist that some cotton and polyester fibers found on the bottom of Ms.

27  Collins' shoes were consistent with fibers contained in Mr. Howard's clothing.  8 RT

28  2163-64.  The guilt phase ended on May 8, 1995, and jury deliberations began the

4

1    same day.  9 RT 2395.  On May 10, 1995, the jury found Mr. Howard guilty on all

2    charges.  1 CT 285-87.

3         ***Penalty Phase.***  The penalty phase began on May 22, 1995.  10 RT 2529.  The

4    prosecutor read the stipulated testimony of Randi Collins, the daughter of the victim,

5    into the record.  10 RT 2550-51.  The prosecutor also presented Mr. Howard's

6    certified felony convictions for assaults against two witnesses who also testified.  10

7    RT 2536-50.  Trial counsel presented no mitigation witnesses.  The penalty phase

8    ended on May 23, 1995.  10 RT 2581, 2593.  The jury began deliberations on the

9    same day.  10 RT 2617.  On May 31, 1995, after five days of deliberation, the jury

10   rendered a death verdict.  10 RT 2746.  During deliberations, the jury asked for read-

11   back of the testimony of, inter alia, Cedric Torrence and Dale Blackwell (cross-

12   examination).  10 RT 2626-28, 2692, 2712-13, 2732-33; 2 CT 305, 311.

13        ***Motion for New Trial.***  On September 29, 1995, trial counsel moved for time

14   to prepare a motion for a new trial based on exculpatory evidence discovered post-

15   trial.  2 CT 357.  On November 15, 1995, Mr. Howard filed a motion for a new trial.

16   2 CT 361.  On December 7, 1995, the court denied the motion for a new trial.  11 RT

17   2767.

18        Prior to the court's pronouncement of its judgment of death, Mr. Howard

19   addressed the court directly on a motion the court treated as an additional motion for

20   a new trial.  2 CT 456; 11 RT 2767-72.  Mr. Howard informed the court that he had

21   been taking anti-psychotic medication during the trial prescribed by jail medical

22   staff, and that the medication had adversely affected his demeanor, appearance, and

23   functioning during trial and his own testimony.  11 RT 2767-69.  Trial counsel

24   declined to add any additional arguments or statements.  11 RT 2769.  The court

25   denied Mr. Howard's motion and did not declare a doubt or suspend proceedings.

26   11 RT 2770-72.

27        Mr. Howard's conviction and judgment of life without the possibility of parole

28   are final because his state court and habeas corpus proceedings are concluded.

Petition for Writ of Habeas Corpus

**C.    Automatic Appeal (California Supreme Court Case No. S050583)**

*Appointment of Appellate Counsel.* On December 27, 1999, this Court appointed the Office of the State Public Defender to represent Mr. Howard in his direct appeal proceedings.

*Appellate Briefing.* On July 15, 2005, appellate counsel filed Mr. Howard's Opening Brief in the California Supreme Court.  Appellate counsel raised the following issues related to Mr. Howard's guilt phase:

1.    The trial court deprived Mr. Howard of his federal constitutional rights by forcing him to wear a stun belt throughout trial without a finding of compelling circumstances or consideration of less restrictive means;

2.    The trial court abused its discretion and prejudicially violated Mr. Howard's due process rights when it denied his new trial motion, which presented newly discovered evidence of Mr. Howard's innocence and demonstrated that a principal state witness, Cedric Torrence, had given false evidence.

3.    The trial court violated Mr. Howard's constitutional rights when it failed to hold competency hearings after Mr. Howard declared a doubt as to his own competency due to the medication prescribed by a jail doctor.

4.    The trial court prejudicially violated Mr. Howard's constitutional rights by admitting into evidence a gun that was undisputedly not the murder weapon, based on weak and unreliable evidence linking it to Mr. Howard.

5.    The trial court prejudicially violated Mr. Howard's constitutional rights by instructing the jury on the uncharged crime of first-degree malice murder.

6.    The trial court prejudicially violated Mr. Howard's constitutional rights by instructing the jury on consciousness of guilt, which duplicated the circumstantial evidence instruction, and for instructing on admission of guilt and corpus delicti.

7.    The trial court prejudicially violated Mr. Howard's constitutional rights by admitting irrelevant and inflammatory photographs of the victim's body.

8.    Cumulative error.

The State filed its Respondent's Brief on February 8, 2006. On December 22, 2006, appellate counsel filed Mr. Howard's Reply Brief. On February 22, 2008, appellate counsel filed Appellant's Supplemental Opening Brief, raising an additional claim that:

9.    The process of death qualifying jurors violated Mr. Howard's constitutional rights and skewed the jury to being more conviction prone.

On April 28, 2008, the State filed Respondent's Supplemental Brief. Appellate counsel filed Appellant's Second Supplemental Opening Brief on November 24, 2008, raising the additional claim that:

10.   Mr. Howard's conviction was based on insufficient and inconsistent evidence in violation of his constitutional rights.

On February 23, 2009, the State filed Respondent's Second Supplemental Brief. On April 22, 2009, appellate counsel filed Appellant's Second Supplemental Reply Brief. The direct appeal was argued and submitted on October 6, 2010.

*Appellate Decision.*   On December 16, 2010, The California Supreme Court issued its opinion affirming the judgment in full. *People v. Howard*, 51 Cal. 4th 15 (2010), *reh'g denied and modified* February 16, 2011. Appellate counsel filed a Petition for Writ of Certiorari in the United States Supreme Court on June 8, 2011. The Petition was docketed on the same date. On July 11, 2011, the Attorney General filed its brief in opposition to certiorari. On October 3, 2011, the Petition for Writ of Certiorari was denied. *Howard v. California*, 565 U.S. 866 (2011).

**D.    State Habeas Corpus Proceedings (California Supreme Court Case No. S142694)**

*Appointment of Habeas Corpus Counsel.*   On September 7, 2001, the California Supreme Court appointed Robert C. Chandler as habeas corpus/executive clemency counsel. On July 18, 2006, Mr. Chandler moved to withdraw as counsel. On August 16, 2006, the state high court granted his motion and vacated the appointment and simultaneously appointed Michael Millman of the Capital

Appellate Project as interim habeas/executive clemency counsel. On October 11, 2006, Judd C. Iverson replaced Michael Millman as habeas corpus counsel. Attorney Iverson subsequently moved to withdraw, and on May 12, 2008, the state high court again appointed Michael Millman as interim counsel. On April 29, 2009, this Court appointed the Habeas Corpus Resource Center (HCRC) to represent Mr. Howard.

**Habeas Petition.** In order to preserve Mr. Howard's right to file a petition pursuant to 28 U.S.C. section 2254 after exhausting his claims in the state courts, the HCRC filed a Petition for Writ of Habeas Corpus in the California Supreme Court on Mr. Howard's behalf on October 4, 2011, that challenged Mr. Howard's confinement, sentence, and convictions. He requested that the petition be deemed properly and timely filed, and that he be permitted to file an amended petition within the period of time set forth by the order appointing HCRC as counsel.

On April 30, 2012, Mr. Howard timely filed an Amended Petition in the California Supreme Court. On May 1, 2012, pursuant to rule 8.385(b) of the California Rules of Court, the California Supreme Court requested an informal response from respondent and a reply to the informal response from petitioner. On January 29, 2013, respondent filed an informal response. On March 17, 2014, Mr. Howard filed a reply to the informal response.

**State Habeas Briefing.** The claims raised in Mr. Howard's amended petition relating to the guilt phase of Mr. Howard's capital trial are:

1.    The prosecution violated Mr. Howard's constitutional rights by failing to disclose *Brady* material; introducing coerced, unreliable and false testimony; and by using unduly suggestive identification procedures.

2.    Mr. Howard received prejudicially ineffective assistance of counsel in the guilt phase of trial, including inter alia, conflicts of interest, and deficient investigation of the guilt defense, state witnesses, and Mr. Howard's brain damage;

3.    State impediments prevented a full and reliable presentation and

litigation of all potentially meritorious claims for relief, including delays in the appointment of appellate and habeas counsel, inadequate fact development mechanisms, and arbitrary adjudication of direct appeal and habeas claims;

    4.    Prejudicial juror misconduct;

    5.    Mr. Howard's conviction violated international laws and treaties;

    6.    Mr. Howard was tried and convicted while incompetent;

    7.    Mr. Howard was deprived of his right to the effective assistance of counsel and to a fair and reliable determination of guilt and the special circumstance findings by trial counsel's prejudicially deficient performance;

    8.    Mr. Howard was innocent of murder;

    9.    The superior court's failure to create, preserve, and settle a complete, accurate, and reliable record of the proceedings deprived Mr. Howard of his constitutional rights; and

    10.    The cumulative nature of the errors requires relief.

***State Habeas Decision.*** On September 18, 2019, the California Supreme Court issued an order to show cause as to why Mr. Howard should not be granted relief on grounds that trial counsel provided ineffective assistance during the penalty phase. The court simultaneously denied all other claims raised in Mr. Howard's Amended petition for Writ of Habeas Corpus. Demetrius Howard on Habeas Corpus, Cal. Supreme Court docket (Case No. S196958) at https://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=19 93423&doc_no=S196958&request_token=NiIwLSEmLkw7WzBVSCNNSE9IMF A0UDxfKiM%2BIz9RMCAgCg%3D%3D.

On February 28, 2022, a hearing was held in San Bernardino Superior Court. On March 2, 2022, oral arguments were made by the parties. On March 4, 2022, the superior court issued an order granting relief and vacating Mr. Howard's death sentence. Attachment 1. On May 12, 2022, Mr. Howard was resentenced to life in prison without the possibility of parole.

**E.    Exhaustion**

Mr. Howard believes that all the claims contained in this Petition have been fairly presented to the California Supreme Court. Because Mr. Howard was under a sentence of death until his state habeas proceedings concluded, and because he is currently without counsel, he respectfully requests that the Court employ the procedures set forth in Local Rule 83-17.7(c) and order a conference of counsel, once counsel is appointed,[2] regarding exhaustion if respondent declines to waive exhaustion and order the parties to meet and confer regarding exhaustion and file a separate joint statement regarding exhaustion should such a joint statement be necessary.

**F.    Other Petitions**

Mr. Howard has a statutory resentencing petition pending in the Superior Court of California, County of San Bernardino, pursuant to California Penal Code Section 1172.6, which provides in pertinent part that a person convicted of felony murder may petition to be resentenced on any remaining counts when the petitioner could not now be convicted of murder because of changes to California Penal Code Sections 188 and 189, defining the elements of murder. This pending petition is not considered a habeas petition under state law.

## IV.  AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Petition. *Lindh v. Murphy*, 521 U.S. 320 (1997). AEDPA, however,

---

[2]    This Petition is a protective petition being filed on behalf of Mr. Howard to ensure it is timely filed. The request includes a Declaration of Susan Garvey that explains why filing a protective petition is necessary. Attachment 2. Concurrently with this Petition, Mr. Howard files a request for appointment of counsel and includes a Declaration by Elizabeth Dahlstrom, Chief Attorney of the Capital Habeas Unit for the Federal Defender, Central District, asserting that her office is prepared to represent Mr. Howard in federal habeas corpus proceedings. Attachment 3.

Petition for Writ of Habeas Corpus

1    does not foreclose relief for the violation of Mr. Howard's constitutional rights.

2    Under AEDPA, this Court may grant habeas relief if it determines that Mr. Howard

3    suffered a violation of his federal constitutional rights and that Mr. Howard has

4    satisfied 28 U.S.C. section 2254(d). *See* 28 U.S.C. § 2254(a), (d).

5         Section 2254(d) is satisfied if the Court finds that the state court's adjudication

6    of Mr. Howard's claims was either (1) contrary to or an unreasonable application of

7    clearly established federal law as determined by the United States Supreme Court,

8    or (2) based on an unreasonable determination of the facts in light of the record that

9    was before the state court. 28 U.S.C. § 2254(d).  Mr. Howard is not required to satisfy

10   both sections 2254(d)(1) and 2254(d)(2). *Harrington v. Richter*, 562 U.S. 86 (2011).

11   When a federal court concludes that the state court decision is contrary to *or* an

12   unreasonable application of federal law, § 2254(d)(1), *or* is based on an unreasonable

13   determination of the facts, § 2254(d)(2), it reviews the claim de novo in assessing

14   whether the petitioner's constitutional rights were violated. *Panetti v. Quarterman*,

15   551 U.S. 930, 953 (2007).  Under such circumstances, the federal court can also

16   consider evidence not presented in state court and grant discovery and an evidentiary

17   hearing;[3] it may also grant relief.[4]

18        In this Petition, Mr. Howard alleges that he is entitled to relief under § 2254(a)

19   and that § 2254(d) does not bar relief.  Mr. Howard has not briefed whether § 2254(d)

20   applies or has been satisfied on particular claims.   He respectfully requests the

21   opportunity to brief the merits of his claims, and whether § 2254(d) bars relief on

22   them, after Respondent files its Answer.  Nonetheless, Mr. Howard alleges that, as

23   to each claim previously raised, the state court's rejection of it was an unreasonable

24   application of law and/or facts under § 2254(d) and/or was the result of a deficient

25

26   [3]   *See, e.g., Brumfield v. Cain*, 576 U.S. 305, 311-12 (2015); *Earp v. Ornoski*,
     431 F.3d 1158, 1166-72 (9th Cir. 2005).

27
28   [4]   *See, e.g., Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Rompilla v.
     Beard*, 545 U.S. 374 (2005); *(Terry) Williams v. Taylor*, 529 U.S. 362 (2000).

state postconviction process.

## V.  INCORPORATION OF EXHIBITS AND REQUEST FOR JUDICIAL NOTICE

While Mr. Howard has made every effort to specifically state all facts and law supporting each claim in this Petition, additional supporting facts and law may have been stated in separate claims.  For this reason, Mr. Howard incorporates by reference each and every paragraph of this Petition into each and every claim presented, as if fully set forth therein. Mr. Howard also incorporates into each claim all exhibits filed concurrently with this Petition and the state habeas petition and all exhibits which may be subsequently filed in this action.

Mr. Howard requests that this Court take judicial notice of the certified record on appeal and all pleadings, briefs, orders, and exhibits filed in state court in connection with both his direct appeal (*People v. Howard*, California Supreme Court Case No. S050583) and his Amended State Petition for Writ of Habeas Corpus (*In re Demetrius Charles Howard*, California Supreme Court Case No. S196958 & San Bernardino County Superior Court Case No. CHCJS1900008).

## VI.  ALLEGATIONS APPLICABLE TO EACH AND EVERY CLAIM

In the interest of brevity and to avoid repetition, Mr. Howard makes the following allegations for each enumerated claim below and incorporates these allegations into each claim:

The facts in support of each claim are based on the allegations in this Petition; the declarations and other documents contained in the exhibits to the Petition; the entire record of all the proceedings involving Mr. Howard in the California state courts, including the documents, exhibits, and pleadings in: (1) *People v. Howard*, San Bernardino County Superior Court Case No. FSB03736 (trial); (2) *People v.*

*Howard*, California Supreme Court Case No. S050583 (direct appeal); (3) *In re Demetrius Charles Howard*, California Supreme Court Case No. S196958 & San Bernardino County Superior Court Case No. CHCJS1900008 (state habeas proceedings); judicially noticed facts; and all other documents and facts that Mr. Howard may develop and present. The allegations set forth in this Petition generally are incorporated by this reference into each claim below as though set forth in full.

Legal authorities in support of each claim are briefly identified within that claim. Each claim is based on at least one "violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). 28 U.S.C. § 2254(d) does not bar relief on any of Mr. Howard's claims; nor does the rule of *Teague v. Lane*, 489 U.S. 288 (1989), or any other procedural rule, including state procedural bars. The Court cannot properly deny Mr. Howard relief without first affording him an opportunity for discovery and an evidentiary hearing to further show his entitlement to relief. Despite his requests and his diligence, Mr. Howard was denied meaningful discovery and an evidentiary hearing in state habeas on all claims other than Claim Nine of his state habeas petition. Mr. Howard requests the opportunity to brief his entitlement to court-sponsored fact development and relief.

Mr. Howard does not waive any applicable rights or privileges by filing this Petition and the supporting exhibits and, in particular, he does not waive the attorney-client or work-product privileges. Mr. Howard requests that any waiver of a privilege occur only after a hearing with sufficient notice and the right to be heard on whether a waiver has occurred and the scope of any such waiver. Mr. Howard also requests "use immunity" for each and every disclosure he has made and may make in support of this Petition.

The violation of Mr. Howard's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the error was harmless. Even assuming that the harmless error doctrine applies, however, relief is nevertheless required because every constitutional error alleged,

individually and cumulatively, "had substantial and injurious effect or influence" in determining Mr. Howard's convictions and sentences. *Brecht v. Abrahamson*, 507 U.S. 619, 627, 631, 638 (1993); *Davis v. Ayala*, 576 U.S. 257, 268 (2015). Relief is also required because each error so infected the integrity of the proceeding as to warrant habeas relief, even if it did not substantially influence the jury's verdict. *Brecht*, 507 U.S. at 638 n.9.

The constitutional violations set forth in each individual claim alone mandate relief from the convictions and sentences. However, even if these violations do not mandate relief standing on their own, relief is required when each claim is considered together with the additional errors alleged in the other claims in the Petition. Cumulatively, these errors mandate relief from Mr. Howard's convictions and sentences. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Parle v. Runnels*, 505 F.3d 922, 927 & nn.5, 6 (9th Cir. 2007). If Respondent contends that any claim should not be considered on the merits because the final state court decision found the claim to be procedurally barred under state law, Mr. Howard contends that the bar does not preclude federal merits review because it is not an adequate and independent state ground. *Bennett v. Mueller*, 322 F.3d 573, 580 (9th Cir. 2003). If this Court finds any claim to be procedurally defaulted, federal review of the merits of the claim is nevertheless required because Mr. Howard can establish cause and prejudice for the default and that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *House v. Bell*, 547 U.S. 518, 522 (2006). Mr. Howard requests notice and an opportunity to be heard on these issues.

To the extent that any claim, or part thereof, is deemed to be unexhausted, untimely, or procedurally or otherwise barred, it is a result of the ineffective assistance of prior counsel (state trial, appellate, and/or habeas counsel) and/or inadequate state court funding for post-conviction proceedings, and accordingly this Court should adjudicate the claim on the merits. Prior counsel (state trial, appellate

1   and/or habeas counsel) were ineffective in not raising the claim earlier. *Trevino v.*
2   *Thaler*, 569 U.S. 413, 417, 429 (2013); *Martinez v. Ryan*, 566 U.S. 1, 17 (2012);
3   *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). Mr. Howard requests notice and an
4   opportunity to be heard on these issues before this Court makes any ruling on
5   procedural default.

6

7                    **VII.  CLAIMS FOR RELIEF**

8

9   **A.     Claim One: The Trial Court Improperly Forced Mr. Howard to Wear a**
10          **Stun Belt During Trial, Violating His Constitutional Rights and Denying**
11          **Him a Fair Trial.**

12          **1.  Introduction**

13          The trial court's order to restrain Mr. Howard with a stun belt for the duration
14  of trial without the presence of compelling circumstances or consideration of less
15  restrictive alternatives was structural error and violated his rights to: due process,
16  equal protection, a fair and impartial trial, testify in his own defense, counsel, and
17  freedom from cruel and unusual punishment under the Fifth, Sixth, Eighth, and
18  Fourteenth Amendments.   Due Process requires that restraints be specifically
19  justified by circumstances of the case. *Deck v. Missouri*, 544 U.S. 622 (2005);
20  *Arizona v. Fulminante*, 499 U.S. 279, 307-09 (1991); *Riggins v. Nevada*, 504 U.S.
21  127, 129 (1992).   Restraints are only justified where there are "compelling
22  circumstances," an adequate record, and consideration of less restrictive alternatives.
23  *Gonzalez v. Pliler*, 341 F.3d 897, 901-02 (9th Cir. 2003); *see also People v. Mar*, 28
24  Cal. 4th 1201, 1216 (2002), (affirming the state high court's prior decisions in
25  *People v. Duran*, 16 Cal. 3d 282 (1976) and *People v. Harrington*, 42 Cal. 165
26  (1871), that court action which imposes "physical burdens, pains and restraints upon
27  a prisoner during . . . his trial, prejudicially affect his constitutional right of defense,"
28  when imposed "without evident necessity"). None of that occurred here.

The fear and anxiety caused by the imposition of the stun belt,[5] which discharged 50,000 volts of electricity – enough to inflict severe pain, incapacitation for up to 40 minutes, and cause Mr. Howard to urinate and defecate on himself, among other outcomes – was cruel and unusual and violated Mr. Howard's Eighth Amendment rights.[6]

During pre-trial proceedings, on April 4, 1995,[7] defense counsel raised a continuing objection to both the use of shackles and the use of a stun belt on Mr. Howard during trial. 1 CT 123; 2 RT 504-05. Defense counsel argued such restraints were unwarranted given that Mr. Howard had behaved properly during trial, never made any outbursts and "never acted out in any manner whatsoever" at any of his court appearances. 2 RT 505. Counsel also objected to the extreme shock the stun belt would administer. 2 RT 505.[8]

---

[5] Mr. Howard also alleges that the imposition of the stun belt contributed to his incompetence at trial, in combinations with other circumstances which caused psychological impairment preventing him from meaningfully participating in his own defense. They include the use of medication, lifelong neuropsychological impairments and neurobiological anxiety, and stressful and violent conditions at the jail throughout proceedings. *See* Claim Five: Competency.

[6] Other, non-structural errors flow from unjustified use of restraints such as the unconstitutional interference with Mr. Howard's ability to communicate with counsel, to testify and to fully participate in his own defense, in violation of his Sixth Amendment rights. Even if this Court deems the error not to be structural, the trial court's prejudicial errors warrants reversal under *Chapman v. California*, 386 U.S. 18, 24 (1967) as discussed below.

[7] The day before, the Court granted the motion to sever Mr. Howard's trial from Mr. Funches'. 2 RT 478. The court's decision to restrain Mr. Howard was made just before jury selection began.

[8] Other than the 50,000-volt shock, the physical attributes of the stun belt are not described on the record. However, as described in *People v. Mar*, 28 Cal. 4th at 1214-15, "'[t]he type of stun belt which is used while a prisoner is in the courtroom consists of a four-inch-wide elastic band, which is worn underneath the prisoner's clothing. This band wraps around the prisoner's waist and is secured by a Velcro

Petition for Writ of Habeas Corpus

1    Notwithstanding the lack of any courtroom problems with Mr. Howard's

2    conduct, the trial court denied the motion to have the devices removed, stating it was

3    a "prophylactic measure," in light of the "nature of defendant's past." 2 RT 505.

4    The trial court determined there was no harm in applying the restraints based on his

5    observation that the stun belt could not be seen by the jurors. 2 RT 505.

6    The court's brief discussion does not comport with the requirement that a

7    court must "make a full factual record of the type of restraints used, whether they

8    were visible to the jury, and the number of armed officers in the courtroom." *People*

9    *v. Jackson*, 14 Cal. App. 4th 1818, 1826 (1993); *see also Deck v. Missouri*, 544 U.S.

10   622 (finding, inter alia, that the defendant's constitutional rights under the Fifth and

11   Fourteenth Amendments were violated by the trial court's use of visible shackles

12   without any showing of specific need). And "'[t]he showing of nonconforming

13   behavior in support of the court's determination to impose physical restraints must

14   appear as a matter of record . . . [citation omitted]'" *People v. Mar*, 28 Cal. 4th at

15   1217.

16   Federal law requires compelling circumstances, an adequate record, and

17   consideration of less restrictive alternatives, in order to justify the use of restraints.

18   *Gonzalez v. Pliler*, 341 F.3d at 901-02. Even when the record in an individual case

19   establishes that it is appropriate to impose some restraint upon the defendant as a

20

21   fastener. The belt is powered by two 9- volt batteries connected to prongs which

22   are attached to the wearer over the left kidney region. [citations omitted] [¶] The

     stun belt will deliver an eight-second, 50,000-volt electric shock if activated by a

23   remote transmitter which is controlled by an attending officer. The shock contains

24   enough amperage to immobilize a person temporarily and cause muscular

     weakness for approximately 30 to 45 minutes. The wearer is generally knocked to

25   the ground by the shock and shakes uncontrollably. Activation may also cause

26   immediate and uncontrolled defecation and urination, and the belt's metal prongs

     may leave welts on the wearer's skin requiring as long as six months to heal. An

27   electrical jolt of this magnitude causes temporary debilitating pain and may cause

28   some wearers to suffer heartbeat irregularities or seizures. [citations omitted].'"

Petition for Writ of Habeas Corpus

1  security measure – which it did not in Mr. Howard's case – a trial court properly

2  must authorize the least obtrusive or restrictive restraint that effectively will serve

3  the specified security purposes.  *People v. Duran*, 16 Cal. 3d 282, 291 (1976);

4  accord, *Spain v. Rushen*, 883 F.2d 712 (9th Cir. 1989).

5      "Compelling circumstances" that physical restraints are necessary may exist

6  when there is unruly or aggressive behavior (*Stewart v. Corbin*, 850 F.2d 492, 497

7  (9th Cir. 1988) (defendant physically assaulted officers in the courtroom, threatened

8  a judge and an attorney, tore off and took part of an exhibit, disobeyed the orders of

9  several judges, and officers testified that he could not be controlled by a leg brace

10  alone)), or a serious threat of escape. *United States v. Collins*, 109 F.3d 1413, 1418

11  (9th Cir. 1997) (defendant, inter alia, discussed faking medical emergencies and

12  escape plans with other inmates, spoke with inmates who had handcuff keys, planned

13  to kill a custodial officer, and had scraped caulking from his window); *Loux v. United*

14  *States*, 389 F.2d 911, 919 (9th Cir. 1968) (defendants had history of escape attempts

15  and had begun preparations for another escape); *United States v. Samuel*, 431 F.2d

16  610, 614-15 (4th Cir. 1970) (status as a convicted felon, standing alone, insufficient

17  to warrant shackling).[9]

18      **2.  Circumstances Did Not Exist That Compelled Imposition of a Stun**

19          **Belt and the Court Failed to Consider Less Restrictive Alternatives.**

20      A defendant should attend his trial free of restraints except where the court

21  _____

22      [9]   California state law is analogous the Ninth Circuit's restraints doctrine,
requiring a finding of "manifest need," along with an adequate record, and

23  consideration of less restrictive alternatives, to compel a defendant to wear a stun

24  belt. *People v. Mar*, 28 Cal. 4th at 1218 (reversing murder conviction where court
compelled defendant to wear a stun belt where there was no indication that his

25  conduct posed threat of violence in courtroom); relying on *People v. Duran*, 16 Cal.

26  3d at 293; *see also People v. Seaton*, 26 Cal. 4th 598, 651 (2001) ("[t]he
circumstance that defendant was charged with a violent crime . . . does not establish

27  a sufficient threat of violence or disruption to justify physical restraints during

28  trial").

makes a finding of "compelling circumstances," based upon acts such as threats of escape or disruption of court proceedings and consideration of less restrictive alternatives. The court must make a sufficient record to support these findings. *Gonzalez v. Pliler*, 341 F.3d 897.

   **a. No compelling circumstances justified the use of the stun belt.**

  Mr. Howard's behavior prior to and during trial was above reproach. 2 RT 504-05.  There was no record of circumstances which justified the use of the stun belt, such as aggression or escape attempts.  Mr. Howard was small of stature and had appeared in court unrestrained at pre-trial hearings hearing without incident.  1 RT 6.  The record is devoid of any indication that any need, compelling or otherwise, existed to justify the trial court's imposition of a stun belt restraint:

   MR. NASCIN: I would object to that [stun belt] for the same reason.  He's never – in all of his court appearances through San Bernardino to here, he's never acted out in any manner whatsoever.  He's never been disrespectful to the court or anybody else.  I would object on those grounds.

   THE COURT: Well, it's a prophylactic measure, and given the nature of the case, I believe it would – and given the nature of Mr. Howard's past – and it is – it can't be seen which is a nice thing about it – it insures everyone that nothing unfortunate is going to happen. And it can't be seen by jurors.  So it doesn't reflect poorly upon Mr. Howard in their eyes.   But your objections are noted.

2 RT 505.

  Yet, since early in proceedings, the trial court had allowed Mr. Howard to appear in court without shackles.  The following colloquy occurred at a pre-trial hearing on April 22, 1994:

   MR. NACSIN: Excuse me, your Honor, before we go any further, I would request that my client, Mr. Howard be uncuffed.

1    THE COURT: Okay, any objection?

2    MR. NACSIN: There's never been any disturbance by Mr.

3  Howard whatsoever in any court proceeding and we've been to court

4  many times.

5    THE COURT: Any objection?

6    MR. HESS: No objection.

7    THE COURT: Mr. Howard may be uncuffed.

8 1 RT 6.

9    Nothing occurred between the April 22, 1994 hearing and the April 4, 1995

10 hearing to warrant the imposition of the stun belt.  Mr. Howard's courtroom

11 behavior had been impeccable.  2 RT 505.  Deputy District Attorney Hess agreed

12 that Mr. Howard's handcuffs should be removed at the April 22, 1994, hearing and

13 remained conspicuously silent at the April 5, 1995, hearing on whether Mr.

14 Howard should wear a stun belt.  2 RT 504-05.  In contrast, District Attorney

15 Hess vigorously supported the use of shackles – not a stun belt – for Mr. Howard's

16 co-defendant, Mr. Funches, citing to incidents that had occurred both in and out of

17 the courtroom.  1 RT 7-9.

18    The trial judge's sole justification for forcibly restraining Mr. Howard with

19 the stun belt was that it was a "prophylactic measure given the nature of the case . . .

20 the nature of Mr. Howard's past . . . . "  2 RT 505.  The fact that Mr. Howard had

21 been previously convicted of and was currently charged with a violent crime does

22 not, without more, justify the use of restraints.  *Deck v. Missouri*, 544 U.S. 622

23 (reversal where the trial court imposed shackles on defendant during his penalty re-

24 trial, failing to justify it by "a risk of escape . . . or a threat to courtroom security"

25 and instead erroneously relied upon the sole fact that the defendant "'has been

26 convicted'").

27    Here, as in *Gonzalez v. Pliler*, "[t]he record is completely devoid of any action

28 taken by the defendant in the courtroom that could be construed as a security

1   problem" and the trial court abused its discretion in forcing Mr. Howard to wear the

2   restraint.    *Gonzalez*, 341 F.3d at 902 (reversal where defendant was improperly

3   restrained with stun belt for showing a "little attitude").   Given that there were no

4   circumstances that justified restraining Mr. Howard by a stun belt, it is no surprise

5   that the court failed to make a record about any misconduct by Mr. Howard which

6   would warrant use of such an extreme measure. *United States v. Durham*, 287 F.3d

7   1297, 1305-06 (11th Cir. 2002) (judgment vacated, inter alia, because court abused

8   its discretion by failing to make findings sufficient to justify the use of the stun belt);

9   *United States v. Theriault*, 531 F.2d 281, 285 (5th Cir. 1976) (court required to put

10   reasons for it decision to use shackles on the record); *Deck v. Missouri*, 544 U.S.

11   622.

**b.  The court made no record to support a finding of compelling
circumstances.**

14   In *U.S. v. Durham*, the appellate court found that given the novel technology

15   involved with a stun belt, the trial court "need[ed] to make factual findings about the

16   operation of the stun belt, addressing issues such as the criteria for triggering the belt

17   and the possibility for accidental discharge" and that "the court's rationale must be

18   placed on the record." *Durham*, 287 F.3d at 1306-07.  A trial court's discretion is

19   not "absolute" and its reasons for imposition of such an extraordinary security

20   measure must "be disclosed in order that a reviewing court may determine if there

21   was an abuse of discretion." *United States v. Samuel*, 431 F.2d at 615.

22   In *Riggins v. Nevada*, 504 U.S. at 129, the defendant was, as here, charged

23   with robbery and murder.   In that case, the trial court unconstitutionally forced

24   Mellaril, an antipsychotic drug, upon the defendant during trial.  *Id.*  In analogizing

25   the forced wearing of a stun belt to the forced administration of antipsychotic drugs,

26   the California Supreme Court in *Mar* cited to *Riggins* where, "due process principles

27   required reversal . . . because the trial court had 'failed to make findings adequate to

28   support forced administration of the drug. [Citation omitted.]'" *People v. Mar*, 28

21

1    Cal. 4th at 1228.  The violation here was even greater in that Mr. Howard was subject

2    to forced medication and a stun belt.

3         As in *Riggins*, the trial court here failed to make adequate findings for

4    imposing this extreme method of restraint.  The record amply shows that the trial

5    court here "made no supportable findings on even the most basic of the factual issues

6    related to this restraint."  *Durham*, 287 F.3d at 1308; *see also Theriault*, 531 F.2d at

7    285 (court required to put the reasons for its decision to use shackles on the record);

8    *Deck*, 544 U.S. at 634 (the state's argument – "that the trial court acted within its

9    discretion – founders on the record, which does not clearly indicate that the judge

10   weighted the particular circumstances of the case").

11        **c.  The Court committed error by failing to consider less restrictive**

12             **alternatives to stun belt.**

13        Due process requires "that restraints be imposed only 'as a last resort.'"

14   *Illinois v. Allen*, 397 U.S. 337, 344 (1969); *Spain v. Rushen*, 883 F.2d at 721.   The

15   "judge must consider the benefits and burdens associated with imposing physical

16   restraints in the particular case" and "[i]f the alternatives are less onerous yet no

17   less beneficial, due process demands that the trial judge opt for one of the

18   alternatives."  *Id.* at 728; *see also Gonzalez v. Pliler*, 341 F.3d at 900, citing

19   *Duckett v. Godinez*, 67 F.3d 734, 748 (9th Cir. 1995) (before a court orders the use

20   of physical restraints on a defendant at trial, it "'must be persuaded by compelling

21   circumstances . . . [and] . . . must pursue less restrictive alternatives . . . '");

22   *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) ("due process requires the

23   trial court to engage in an analysis of the security risks posed by the defendant and

24   to consider less restrictive alternatives before permitting a defendant to be

25   restrained").

26        Here, there was no evidence that the trial court considered the stun belt to be

27   a last resort.  *Illinois v. Allen*, 397 U.S. at 344; *Spain v. Rushen*, 883 F.2d at 721;

28   *People v. Jackson*, 14 Cal. App. 4th at 1826.  The court gave no "weight to the

22

defendant's perspective" or the psychological consequences of the restraint on a testifying defendant and never considered the numerous less draconian alternatives to the stun belt. *People v. Mar*, 28 Cal. 4th at 1228. If any disruptive behavior had occurred in the courtroom, the trial court had the option of admonishing Mr. Howard and threatening him with additional restraint, or using additional shackles, or bringing in additional security personnel. *See, e.g.*, *Holbrook v. Flynn*, 475 U.S. 560, 565-66 (1986) (presence of armed guards in courtroom not "inherently prejudicial"). The court considered none of these or any other options, nor the specific impact of the stun belt on Mr. Howard.

The trial court lacked any need, compelling or otherwise, for forcing Mr. Howard to wear a stun belt. The court failed to state any factual basis for authorizing the stun belt, failed to consider less restrictive alternative restraints, and failed to assess the risks and the potential for harm in using the stun belt on Mr. Howard as a particular defendant. Any one of these failures standing alone was a denial of Mr. Howard's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments; all of them combined lead to an inescapable conclusion of a rights violation.

### 3. The Trial Court Committed Structural Error by Imposing a Stun Belt without a Record of Compelling Circumstances and Consideration of Less Restrictive Alternatives.

#### a. Structural Error

The error here was structural, not trial, error. The United States Supreme Court has developed distinct methodologies to determine whether an error of federal constitutional magnitude is subject to or defies harmless error analysis. In *Arizona v. Fulminante*, 499 U.S. 279, 307-09 (1991), the Court differentiated "structural error," which defies harmless error analysis, from "trial error," which is subject to

1    such analysis.  Structural errors require automatic reversal.[10]

2     The error in this case is similar in kind to the error the United States Supreme

3    Court has found cannot be subject to harmless error analysis.  In *Riggins v. Nevada*,

4    504 U.S. 127, where the court failed to make sufficient findings to support forcing

5    the defendant to take an antipsychotic drug during trial, the United States Supreme

6    Court reversed without requiring a prejudice showing from *Riggins*.  *Id*. at 129.  In

7    other words, he was not required to show how the trial would have proceeded

8    differently if he had not been forced to take the antipsychotic medication. *Id*. at 137.

9    The Court observed:

10     Efforts to prove or disprove actual prejudice from the record before us

11     would be futile, and guesses whether the outcome of the trial might

12     have been different if Riggins' motion had been granted would be

13     purely speculative . . . .   Like the consequences of compelling a

14     defendant to wear prison clothing," (*Estelle v. Williams* (1976) 425

15     U.S. 501, 504-05) "or of binding and gagging an accused during trial,"

16     (*Illinois v. Allen* (1969) 397 U.S. 337, 344), the precise consequences

17     of forcing antipsychotic medication upon Riggins cannot be shown

18     from a trial transcript.

19   *Id*.

20    What the United States Supreme Court would "not ignore, is a strong

21   possibility that Riggins' defense was impaired due to the administration of Mellaril."

22   *Id*.  The *Riggins* opinion held that, even if the Nevada Supreme Court was correct in

23

24    [10]   Errors the high court has found to be structural include: racial discrimination

25   in the grand jury selection (*Vasquez v. Hiller*, 474 U.S. 254 (1994)); denial of self-
     representation at trial (*McKaskle v. Wiggins*, 465 U.S. 168, 177-78, n.8 (1994));

26   complete denial of counsel (*Gideon v. Wainwright*, 372 U.S. 335 (1963)); biased

27   adjudicator (*Tumey v. Ohio*, 273 U.S. 510 (1927)); defective reasonable-doubt
     instruction (*Sullivan v. Louisiana*, 508 U.S. 275 (1993)).

28

1  holding that expert testimony allowed jurors to assess Riggins' demeanor fairly, "an

2  unacceptable risk of prejudice remained." *Id.* at 138 (reversing the Nevada Supreme

3  Court's judgment). *Id.*[11]

4      *Riggins* governs this case and requires, without an actual prejudice

5  assessment, reversal of Mr. Howard's convictions and death judgment. The precise

6  consequences of forcing the stun belt restraint upon Mr. Howard cannot be shown

7  from a trial transcript. There is a strong possibility Mr. Howard's defense was

8  impaired due to the involuntary stun belt restraint. An unacceptable risk of prejudice

9  remains that, because of the stun belt restraint, jurors were not allowed to assess Mr.

10  Howard's demeanor fairly during his testimony in his own defense. *Riggins v.*

11  *Nevada, supra,* 504 U.S. at 129, 137-38; *Illinois v. Allen, supra,* 397 U.S. 337;

12  *Arizona v. Fulminante, supra,* 499 U.S. 279; *see also State v. Damon,* 669 A.2d 860,

13  863-64 (N.J. Super. A.D. 1996) (rejecting restraint harmless error doctrine). Mr.

14  Howard's convictions accordingly must be reversed.

15          **b.  Prejudice**

16              **1)  The psychological impact of wearing the stun belt prejudiced**

17                  **Mr. Howard.**

18      Even if this Court does not apply the *Riggins* rule to this case, Mr. Howard

19  was clearly prejudiced by the harmful psychological impact from wearing a stun

20  belt, which is well documented and acknowledged by many jurisdictions, including

21  in California:

22          After all, if you were wearing a contraption around your waist that by

23          the mere push of a button in someone else's hand could make you

24  ─────────────────

25      [11]  In *People v. Mar,* 28 Cal. 4th 1201, 1227-28, the California Supreme Court
     recognized that the concerns raised in Riggins by the involuntary administration of
26  antipsychotic medication, are the same as those raised by the compelled use of a
     stun belt insofar as both involve the circumstance that the State's intervention may
27  result in the impairment, mental or psychological, of a criminal defendant's ability
     to participate in his defense at trial.
28

─────────────────

25

defecate or urinate yourself, what would that do to you from the psychological standpoint?

*People v. Mar*, 28 Cal. 4th at 1227, n.8 (citation omitted). Amnesty International explains that:

> To be effective, [the stun belt] relies on the wearer's fear of the severe pain and humiliation that could follow activation. Such fear is a leading component of the mental suffering of a victim of torture or cruel, inhuman or degrading treatment which is banned under international law.[12]

*U.S.A.: The Stun Belt – Cranking Up the Cruelty*, (1999) Amnesty International website, [www.amnestyusa.org].)

This same "mental suffering," the constant fear of a severe shock being administered at any time, is banned by the prohibition against cruel and unusual punishment under the Eighth Amendment. The stun belt has an undisputed harmful psychological impact on the wearer, notwithstanding its lack of visibility to jurors.[13]

---

[12] The international law includes, inter alia, the United Nations Minimum Rules for the Treatment of Prisoners and the International Covenant on Civil and Political Rights to which this country is a party. *See* Amnesty International, *U.S.A.: Use of Electro-Shock Stun Belts*, June 12, 1996, and *U.S.A.: Cruelty in Control? The Stun Belt and Other Electro-Shock Equipment in Law Enforcement*, Nov. 9, 2004, at www.amnestyusa.org; *see also* Plamen I. Russev, *Restraining U.S. Violations of International Law: An Attempt to Curtail Stun Belt Use and Manufacture in the United States Under the United Nations Convention Against Torture*, 19 Ga. St. U.L. Rev. 603 (2002).

[13] The trial court found the belt was not visible to jurors while Mr. Howard was seated at counsel table (2 RT 505), but the record is silent as to whether it was visible when Mr. Howard took the stand to testify on his own behalf. Mr. Howard had to walk in front of the jury to the witness stand and "if the stun belt protrude[d] from the defendant's back to a noticeable degree, it is at least possible that it may be viewed by a jury. If seen the belt 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant'[citation omitted]." *United States v. Durham*, 287 F.3d at 1305.

1   Federal courts have found that "[w]earing a stun belt is a considerable impediment to a
2   defendant's ability to follow the proceedings and take an active interest in the
3   presentation of his case." *United States v. Durham*, 287 F.3d at 1306; *see also Illinois v.*
4   *Allen*, 397 U.S. at 344 (restraints may impede a defendant's ability to communicate with
5   his counsel and participate in his defense). In accord with federal law, the California
6   Supreme Court has itself recognized that stun belts "may impair the defendant's ability
7   to think clearly, concentrate on the testimony, communicate with counsel at trial, and
8   maintain a positive demeanor before the jury," noting that the Supreme Court of Indiana
9   has banned the use of stun belts in courtrooms altogether because other forms of restraint
10  "can do the job without inflicting the mental anguish." *People v. Mar*, 28 Cal. 4th at
11  1226-27.

12      A defendant's ability to follow the events at trial is seriously compromised by
13  the imposition of a stun belt because he would be "occupied by anxiety over the
14  possible triggering of the belt" and "likely to concentrate on doing everything he can
15  to prevent the belt from being activated, and is thus less likely to participate fully in
16  his defense at trial." *United States v. Durham*, 287 F.3d at 1306. The restraint also
17  creates "a far more substantial risk of interfering with a defendant's Sixth
18  Amendment right to confer with counsel than do leg shackles." *Gonzalez v. Pliler*,
19  341 F.3d at 900. A primary advantage to a defendant's presence at trial is his ability
20  to communicate with his counsel and "[s]tun belts may directly derogate this
21  'primary advantage.'" *Gonzalez v. Pliler*, 341 F.3d at 900 (relying upon *Spain v.*
22  *Rushen*, 883 F.2d at 720).

23          The fear of receiving a painful and humiliating shock for any gesture
24          that could be perceived as threatening likely "hinders a defendant's
25          participation in defense of the case," chill[ing] [the] defendant's
26          inclination to make any movements during trial – including those
27          movements necessary for effective communication with counsel.

28  *Gonzalez v. Pliler*, 341 F.3d at 900 (internal citation omitted).

---

27

Petition for Writ of Habeas Corpus

1    A defendant knowing that at any moment he could be subject to an electric
2    shock powerful enough to cause, incapacitation, urination or defecation, confusion,
3    the cessation of breathing, severe burning, paralysis, or heart irregularities, is
4    tantamount to psychological torture.  *See* Shelley A. Nieto Dahlberg, *"The React*
5    *Security Belt: Stunning Prisoners and Human Rights Groups into Questioning*
6    *Whether Its Use is Permissible Under the United States and Texas Constitutions"* 30
7    St. Mary's L.J. 239, 249-52 (1988).

8    The trial court's determination that the device was harmless because it could
9    not be seen by jurors is wrong and unfounded.  2 RT 505; *Gonzalez v. Pliler*, 341
10   F.3d at 900-01 (reversal where state court improperly forced defendant to wear stun
11   belt after observing that "the belt is not visible to anyone"); *United States v. Zygadlo*,
12   720 F.2d 1221, 1223 (11th Cir. 1983) (even leg shackles which are not visible to jury
13   "may confuse the defendant, impair his ability to confer with counsel, and
14   significantly affect the trial strategy he chooses to follow").

15           **2)  Mr. Howard was the most important witness to his defense and**
16               **imposition of the stun belt prejudicially affected his testimony.**

17   Because the restraint unquestionably affected Mr. Howard psychologically, it
18   is highly likely it impacted his testimony and demeanor, as well as the jury's
19   perception of him while testifying and throughout the duration of trial.

20   While it is "not unusual for a defendant, or any witness, to be nervous while
21   testifying," given "the nature of a stun belt and the debilitating and humiliating
22   consequences that such a belt can inflict . . . it is reasonable to believe that many if
23   not most persons would experience an increase in anxiety if compelled to wear such
24   a belt while testifying at trial." *People v. Mar*, 28 Cal. 4th at 1224; *see also People*
25   *v. Harrington*, 42 Cal. 165, 168 (1871) (a restraint upon a prisoner during trial
26   "inevitably tends to confuse and embarrass his mental faculties," particularly where
27   the defendant is testifying on his own behalf); *accord, Kennedy v. Cardwell*, 487
28

Petition for Writ of Habeas Corpus

1    F.2d 101, 106 (6th Cir. 1973).[14]

2        The increased anxiety from wearing the belt impacts a defendant's demeanor
3    on the stand and "this demeanor, in turn, impacts a jury's perception of the
4    defendant, thus risking material impairment of and prejudicial affect on the
5    defendant's 'privilege of becoming a competent witness and testifying in his own
6    behalf.'" *Gonzales v. Pliler*, 341 F.3d at 900-02 (citations omitted).

7        Mr. Howard testified on his own behalf.  His defense rested "completely on
8    the jury's evaluation of [his] credibility" and that evaluation "depended in large part
9    upon [his] demeanor . . . . " *People v. Mar*, 28 Cal. 4th at 1224.  Mr. Howard's had
10   to testify while worrying about an intentional or accidental discharge of a 50,000-
11   volt shock secured to his vulnerable midsection.

12       At all stages of the proceedings, the defendant's behavior, manner,
13       facial expressions, and emotional responses, or their absence, combine
14       to make an overall expression on the trier of fact, an expression that
15       can have a powerful influence on the outcome of the trial."

16   *Riggins v. Nevada,* 504 U.S. at 142; *see also Dahlberg*, 30 St. Mary's L.R. at 289-
17   90 (an accused's fear of the stun belt's painful physical consequences would affect
18   his outward physical demeanor).  "Alternatively, a juror may simply notice that the
19   defendant is watching whomever is holding the monitor," or "form the belief that
20   the defendant's nervous guise is a result of guilt, therefore destroying the
21   impartiality of the jury." *Id*. at 290.

22       The right to testify on one's own behalf at a criminal trial has sources
23       in several provisions of the Constitution.  It is one of the rights that
24       'are [sic] essential to due process of law in a fair adversary process.'

25

26   [14]   Amnesty International states that the proponents of the stun belt
27   "euphemistically refer to 'anxiety'" in place of "fear." *U.S.A.: Cruelty in Control?
     The Stun Belt and Other Electro-Shock Equipment in Law Enforcement*, at
28   www.amnestyusa.org.

Petition for Writ of Habeas Corpus

1    [Citation omitted.]  The necessary ingredients of the Fourteenth

2    Amendment's guarantee that no one shall be deprived of liberty

3    without due process of law include a right to be heard and to offer

4    testimony . . .  The right to testify is also found in the Compulsory

5    Process Clause of the Sixth Amendment, which grants a defendant the

6    right to call 'witnesses in his favor,' a right that is guaranteed in the

7    criminal courts of the States by the Fourteenth Amendment.  [Citation

8    omitted.]  Logically included in the accused's right to call witnesses

9    whose testimony is 'material and favorable to his defense,' [citation

10   omitted], is a right to testify himself, should he decide it is in his favor

11   to do so.  In fact, the most important witness for the defense in many

12   criminal cases is the defendant himself.

13  *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987).

14       Mr. Howard had a fundamental right to testify on his own behalf and the forced

15  wearing of a stun belt seriously compromised that right.  *Gonzales v. Pliler*, 341 F.3d

16  at 900-02; *Kennedy v. Cardwell*, 487 F.2d 101, 106 (6th Cir. 1973).  Mr. Howard's

17  defense was one of mistaken identity and that he was in the wrong place at the wrong

18  time.  Because there was no reliable physical evidence tying Mr. Howard to the

19  scene and because he presented an alibi defense, the entire case hinged on the jury's

20  evaluation of witnesses' credibility, including and especially Mr. Howard's.[15]

21  _____

22      [15]   The only forensic evidence linking Mr. Howard to the crime was some cotton
     and polyester fibers from Mr. Howard's clothing which were "consistent" with
23   fibers found on the victim's shoes.  8 RT 2124.  However, as pointed out by the
     defense on cross-examination of the prosecution fiber expert, Dr. Ogino, cotton and
24   polyester are very common, and unlike fingerprints, cannot be positively proved as
     belonging to Mr. Howard.  8 RT 2155-57.  Additionally, there were no fingerprints
25   linking Mr. Howard to either the murder weapon or the victim's car, as it had linked
26   co-defendant Funches.  7 RT 1810-12, 8 RT 2064-67, 2084-85, 2091-95.  Mr.
     Howard's own testimony was corroborated by other witness testimony regarding
27   the reason for being in the vicinity of the offense – that he was on his way to his
28

Petition for Writ of Habeas Corpus

In *Mar*, as here, it was "not explicitly apparent from the transcript of the proceedings what effect the stun belt had on the content of defendant's testimony or on his demeanor while testifying," observing that Mr. Mar was nervous while testifying when his counsel tried to keep the defendant from speaking too rapidly:

> [Counsel]: Stop just a minute. You get a little excited; don't you, Mr. Mar? [Defendant]: Yeah, I do.
>
> [Counsel]: Have you ever testified before? [Defendant]: No.
>
> [Counsel]: Are you a little nervous? [Defendant]: Very.

*People v. Mar*, 28 Cal. 4th at 1213, quotation marks omitted.

A similar exchange occurred in the present case, showing that Mr. Howard was nervous from the moment he took the stand to testify on his own behalf:

> Q. Good morning.
>
> A. Good Morning.
>
> Q. Little nervous today?
>
> A. Yes.
>
> Q. In fact, you've been feeling ill over the last weekend, haven't you?
>
> A. Yes.
>
> Q. Have you ever testified before?
>
> A. No.

8 RT 2185.

Mr. Howard was so nervous it may have made him sick and he also had trouble following questions, frequently asking what counsel meant and asking counsel to repeat questions. 9 RT 2228, 2231, 2239, 2242. As in *Mar*, the prejudice to his case was not diminished because Mr. Howard "was able to testify at length to his version

---

aunt's house on Kendall Drive, when he was arrested on Kendall Drive. 9 RT 2206. His former girlfriend was taking him there when they fought and she dropped him off on Kendall Drive before arriving at his aunt's house. 9 RT 2201-02, 2204-05.

Petition for Writ of Habeas Corpus

1    of events" or because "the stun belt was not activated" at any time during trial.

2    *People v. Mar*, 28 Cal. 4th at 1213; 9 RT 2185-255.

3         The wearing of the stun belt thus created "the possibility that the substance

4    of [Mr. Howard's] own testimony, his interaction with counsel, or his

5    comprehension at trial were compromised . . . ." *Riggins v. Nevada*, 504 U.S. at

6    135. Mr. Howard's "behavior, manner, facial expressions, and emotional

7    responses, or their absence combine[d] to make an overall impression on the trier

8    of fact, an impression that can have a powerful influence on the outcome of the

9    trial" and indeed could have signaled deceit and guilt to the jury. *State v.

10   Calderon*, 13 P.3d 871, 879 (Kan. 2000).   A conscientious reviewing court cannot

11   therefore determine beyond a reasonable doubt that the stun belt had no effect on

12   the jury's impression of his guilt and reversal is required.   *Chapman v. California*,

13   386 U.S. 18, 24 (1967); *United States v. Durham*, 287 F.3d at 1297 (finding the

14   error of federal constitutional dimension); *Gonzalez v. Pliler*, 341 F.3d at 902;

15   *People v. Martinez*, 808 N.E.2d 1089, 1091-92 (2004).

16

17   **B.    Claim Two: Mr. Howard Received Ineffective Assistance of Counsel at**

18   **the Guilt Phase of His Trial.**

19        **1. Introduction**

20        Mr. Howard's trial counsel rendered constitutionally deficient representation

21   in failing adequately to investigate, prepare, or present meritorious guilt and special

22   circumstance defenses, prejudicing Mr. Howard at all critical stages of the criminal

23   proceedings. Mr. Howard's convictions, sentence, and confinement were unlawfully

24   and unconstitutionally imposed in violation of his privilege against self-

25   incrimination and rights to a trial by a fair and impartial jury; a reliable, fair, non-

26   arbitrary, and non-capricious determination of guilt and penalty; the effective

27   assistance of counsel; present a defense; confrontation and compulsory process; a

28   trial free of materially false and misleading evidence; an impartial and disinterested

tribunal; equal protection; due process of law; and a fair and objective judicial determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, customary international law, international human rights law and under the doctrine of jus cogens, and state law.

Trial counsel unreasonably and prejudicially failed to conduct a timely or adequate investigation of the potential guilt issues, did not adequately challenge the prosecution's evidence with the extensive materials at his disposal, did not make informed and reasonable decisions regarding potentially meritorious defenses and tactics, and did not develop or present an adequate and coherent trial defense. A reasonably competent attorney acting as a diligent and conscientious advocate would not have performed in the manner that Mr. Howard's trial counsel did.

Competent counsel handling a capital case at the time of Mr. Howard's trial knew that a thorough investigation of the prosecution's theory of guilt, independent analysis of the evidence supporting that theory, a review and examination of law enforcement's investigation, research and examination of testifying witnesses, and consultation with appropriate experts were necessary to the development and presentation of a defense at trial. Competent counsel also would have recognized that a thorough investigation of Mr. Howard's background and family history was essential to adequately prepare a coherent, consistent guilt phase presentation.

But for counsel's unprofessional errors, the result of the proceedings would have been different.

Facts and allegations set forth in Claims Three, Four, Five, Twelve, Thirteen, Fourteen, and the accompanying exhibits, are incorporated by reference as if fully set forth herein.

### 2. Clearly Established Federal Law

The federal standard governing the adjudication of ineffective assistance of counsel claims is well established and set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* involves a two-part inquiry into whether (1) counsel's

Petition for Writ of Habeas Corpus

1    performance was deficient, and (2) the deficient performance prejudiced the defense.

2    *Id*. at 687. Deficient performance is representation that falls "below an objective

3    standard of reasonableness," where "reasonableness" is determined by "prevailing

4    professional norms" that are "reflected in American Bar Association standards and

5    the like." *Id*. at 688-89; *see also, e.g., Wiggins v. Smith*, 539 U.S. 510, 524 (2003)

6    (ruling that ABA guidelines are "well-defined norms" to which the Court has long

7    referred to as guides for determining reasonableness). Counsel's "strategic choices

8    made after less than complete investigation" are reasonable only to the extent that

9    limitations on investigation are reasonable. *Strickland*, 466 U.S. at 688, 690-91

10   (ruling that "the performance inquiry must be whether counsel's assistance was

11   reasonable considering all the circumstances"). At a minimum, trial counsel must

12   thoroughly investigate the circumstances of the case and the defendant's

13   background. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Williams v.*

14   *Taylor*, 529 U.S. 362, 396 (2000). Claims of "strategic decision-making" by trial

15   counsel or the courts must be rejected where they "resemble[] more a post-hoc

16   rationalization of counsel's conduct than an accurate description of their

17   deliberations prior to sentencing." *Wiggins*, 539 U.S. at 526-27; *see also id*. at 527-

18   28 (where counsel "chose to abandon their investigation at an unreasonable

19   juncture," a "fully informed decision with respect to sentencing strategy [was]

20   impossible").

21        In determining whether a defendant has been prejudiced, "the question is

22   whether there is a reasonable probability that, absent the errors, the factfinder would

23   have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. "A

24   reasonable probability is a probability sufficient to undermine confidence in the

25   outcome." *Id*. at 694. The Court in *Strickland* recognized that "a defendant need

26   not show that counsel's deficient conduct more likely than not altered the outcome

27   in the case," and thus rejected a "preponderance of the evidence" standard for

28   establishing prejudice. *Id*. at 693-94. In making the prejudice determination, the

1    court must consider the "totality" of the evidence before the judge and jury.  *Id.* at

2    695-96.  "[A] verdict or conclusion only weakly supported by the record is more

3    likely to have been affected by errors than one with overwhelming record support."

4    *Id.*

5        Significantly, clearly established law does not require Mr. Howard to prove

6    the absence of a justification for trial counsel's conduct.  *Strickland*, 466 U.S. at 690

7    ("A convicted defendant making a claim of ineffective assistance must identify the

8    *acts or omissions of counsel* that are alleged not to have been the result of reasonable

9    professional judgment.  The court must then determine whether, in light of all the

10    circumstances, the identified acts or omissions were outside the wide range of

11    professionally competent assistance.") (emphasis added).

12        **3.  Trial Counsel Was Burdened by Multiple Conflicts of Interest and**

13        **Failed   to   Request   *Keenan*   Counsel,   Resulting   in   Deficient**

14        **Representation that Prejudiced Mr. Howard.**

15        Trial counsel performed deficiently because of his tremendous case load and

16    consequent inability to perform the tasks necessary to effectively represent Mr.

17    Howard.  His inability to perform these essential tasks was compounded by his

18    unreasonable failure to request second counsel under *Keenan v. Super. Ct.*, 31 Cal.

19    3d 424 (1982); *see also* 1989 ABA Guideline 2.

20        Trial counsel maintained a staggering case load that necessarily interfered

21    with his representation of Mr. Howard.  *See, e.g.*, ABA Guideline 6.1.  Indeed,

22    counsel's representation in all respects failed to comport with the ABA Guidelines.[16]

23    As described in detail throughout this claim, he failed to procure all discovery

24    concerning the events giving rise to the charges, and all corresponding information

25

26    [16]   Trial counsel replicated the omissions and commissions he committed in

27    investigating and developing evidence of the penalty phase – errors the superior
     court determined warranted relief – in his woefully inadequate preparation for the

28    guilt phase.  *See* Section III(D) of this petition.

Petition for Writ of Habeas Corpus

1   about any material and improper law enforcement practices or prosecutorial conduct.

2   1989 ABA Guideline 11.4.1.  He failed to conduct a thorough investigation to obtain

3   information relevant to the guilt phase of trial, as defined by California statutory and

4   decisional law.   1989 ABA Guideline 11.4.1.  He failed to interview all available

5   witnesses who had or potentially had knowledge about the charged offense and the

6   circumstances surrounding it.  1989 ABA Guideline 11.4.1.  And he failed to consult

7   with appropriate experts to adequately understand the prosecution's case in order to

8   rebut any portion of the prosecution's case at the guilt/innocence phase of the trial.

9   1989 ABA Guideline 11.4.1.

10      Trial counsel abdicated his responsibility to effectively guide the

11  investigation.  He did not formulate an investigation plan, identify potential guilt

12  themes, or supervise his investigator in order to facilitate an efficient and thorough

13  investigation of guilt phase issues.

14          **a.  Facts and Allegations**

15      Trial counsel accepted appointment to Mr. Howard's case on April 15, 1993.

16  Pretrial RT, 4/15/93, 10.  Trial counsel moved to continue Mr. Howard's preliminary

17  hearing on eight occasions so that he could attend to his other case commitments,

18  including murder cases.  Pretrial RT, 9/21/1993-3/3/1994, 32, 36, 45, 61, 65, 68, 70,

19  77-78.   After Mr. Howard was indicted, trial counsel made several additional

20  requests to continue matters related to Mr. Howard's case because his other client

21  obligations impeded his ability to attend to it.  1 RT 33, 39, 94.  The restricted time

22  trial counsel had to prepare for Mr. Howard's trial, precluded him from performing

23  the tasks necessary to effectively represent a client charged with capital murder.

24      More specifically, trial counsel repeatedly acknowledged that he was

25  burdened by an incredible workload in the time leading up to Mr. Howard's trial.

26  On June 21, 1993, the pre-preliminary hearing was moved because trial counsel was

27  "unavailable."  ASupp. 1 CT 61.  On September 21, 1993, trial counsel requested

28  that the pre-preliminary hearing date be reset for October 15, 1993, because he had

Petition for Writ of Habeas Corpus

1   been "assigned out to trial in Judge Isaef's court," which he anticipated would go

2   through "November sometime." Pretrial RT, 9/21/1993, 32. On October 15, 1993,

3   trial counsel requested to continue the pre-preliminary hearing to December 10,

4   1993, because he was "engaged in trial," and that trial was expected to go through

5   mid-December. Pretrial RT, 10/15/1993, 36, 45.

6       On December 10, 1993, trial counsel was unable to appear in court, and asked

7   co-defendant's counsel to appear on his behalf and inform the court that he was

8   "sitting protem in a Juvenile Court Hearing," and to request that "Mr. Howard's

9   matter be [moved] to next Friday for disposition resetting." Pretrial RT, 12/10/1993,

10  49. On December 17, 1993, trial counsel requested a preliminary hearing date of

11  February 24, 1994, because he had a "murder trial he [was] about to start that would

12  conflict, make him unavailable." Pretrial RT, 12/17/1993, 52.

13      On February 23, 1994, the preliminary hearing date was again pushed back to

14  March 7, 1994, because both co-defendant's counsel and trial counsel had case

15  conflicts. Pretrial RT, 2/23/1994, 65-70. At this time trial counsel additionally

16  expressed reservation about a date of March 7 because he was "on assignment

17  calendar for a murder on March the 4th." Pretrial RT, 2/23/1994, 70. On March 3,

18  1994, trial counsel again asked the court to continue the preliminary hearing because

19  he was "in trial . . . and [had] a murder assignment calendar tomorrow . . . ." Pretrial

20  RT, 3/3/1994, 79. Trial counsel's overwhelmingly burdened schedule was noted on

21  the record by co-defendant's initial counsel, David Negus, who confirmed that trial

22  counsel was largely responsible for delaying the preliminary hearing:

23          The public defender has basically been ready since May of 1993. The

24          requests [for continuances], all of the requests from May 15th [1993]

25          to the present [February 23, 1994], with the exception of one request

26          on September 7th, which was continued over to September 21st, have

27          been at the request of [trial counsel] Mr. Nacsin. [The prosecutor] Mr.

28

Petition for Writ of Habeas Corpus

1        Hess has refused to sever the cases and we have been involuntarily

2        dragged along.

3  Pretrial RT, 2/23/1994, 65; *see also*, Pretrial RT, 3/8/1994, 2-4 (further references

4  by co-defendant's counsel as to trial counsel's overcommitments).

5        Trial counsel's failure to properly attend to Mr. Howard's case was further

6  underscored for the court on April 22, 1994, when discussing a trial date in the winter

7  of 1994, trial counsel stated: "My position is the same. I never treated it, necessarily,

8  as a death penalty . . . . It's going to take a lot. I will do whatever possible to get

9  ready when the court says, but I'm not saying I will be ready . . . . " 1 RT 33.

10  Even after trial counsel became aware that a trial date was impending, he did not

11  lighten his schedule to focus on Mr. Howard's capital case. When the court

12  attempted to set a May 6, 1994 date for review of the discovery, trial counsel asked

13  for a date of May 20 because he had "four cases downtown." 1 RT 39. When

14  discussing timing for the co-defendant's competency hearing, trial counsel informed

15  the court that he was not going to be able to attend because he had to "be in San

16  Bernardino on another murder case and then Fontana at 1:30 on another one." 1 RT

17  94. Trial counsel's case load coupled with his assertion that he did not have the time

18  to adequately prepare for Mr. Howard's case unequivocally establishes that he was

19  unable to perform tasks necessary to represent a capitally charged client. This failing

20  was exacerbated by trial counsel's failure to request *Keenan* counsel.

21        The paucity of affirmative evidence trial counsel put forth in the guilt phase

22  of the trial coupled with his acknowledgment that had he possessed the information

23  contained in the declaration of Lawrence Wayne he would have used it at Mr.

24  Howard's trial, demonstrate the degree to which trial counsel's schedule

25  compromised his ability to do the necessary investigation and presentation. SHP Ex

26  90 at ¶¶ 6, 16.

27        **b. Legal Framework.**

28        The Sixth Amendment guarantees a capitally charged defendant the right to

Petition for Writ of Habeas Corpus

have his attorney secure the benefit of services that are reasonably available under California law and necessary to prepare his case. *See Ainsworth v. Woodford*, 268 F.3d 868, 876-77 (9th Cir. 2001) (finding counsel deficient, in part, for failing to seek the services of additional defense trial team members pursuant to Penal Code section 987.9). Constitutionally effective representation includes conducting a thorough guilt phase investigation in advance of trial. *Rompilla*, 545 U.S. at 380-81 ("it is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case"). Where counsel is unable to meet this standard because he is burdened with an overwhelming caseload his performance is deficient. *People v. Jones*, 186 Cal. App. 4th 216, 242 (2010) (finding trial counsel's performance ineffective within the meaning of *Strickland* because an excessive caseload and inadequate resources to conduct an adequate investigation created conflicted representation); *see, e.g., U.S. ex rel. Green v. Washington*, 917 F. Supp. 1238, 1275 (N.D. Ill. 1996) ("When excessive caseload forces the public defender to choose between the rights of the various indigent criminal defendants he represents, a conflict of interest is inevitably created."); *see also In re Edward S.*, 173 Cal. App. 4th 387 (2009) (same).

Trial counsel is also ineffective for failing to request resources necessary to effectively represent his client, including second counsel. By 1982, it was well-settled that second counsel could lend "important assistance" to the legally and factually complex task of representing a capital defendant at trial. *Keenan v. Super. Ct.*, 31 Cal. 3d at 434. At the time of Mr. Howard's trial, it was the prevailing standard of care in San Bernardino County and elsewhere in California for capital defendants to be represented by two qualified attorneys. SHP Ex. 45 at ¶ 3; American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (hereafter "ABA"), Guideline 2.1 (1989 ed.) (stating that "two qualified attorneys should be assigned to represent the defendant" in a capital trial). While neither second counsel nor other necessary services are

1  guaranteed, trial counsel is ineffective where he unreasonably fails to request them,

2  thus depriving the court of the opportunity to exercise its discretion in the

3  defendant's favor.

4      **c.  Trial Counsel's Overburdened Schedule Prejudiced Mr. Howard**

5      As discussed above, in large part because of trial counsel's staggering number

6  of additional cases, trial counsel was unable to represent Mr. Howard in his

7  preliminary hearing for nearly a year after his initial appointment to Mr. Howard's

8  case (Pretrial RT 4/15/1993-3/7/1994, 11-91) and expressed concern to the court

9  about his ability to be ready for trial in part because he had not taken the steps

10  necessary to prepare a capital case. 1 RT 31-33.

11      As trial counsel's declaration makes clear, he was further unable to devote the

12  time necessary to prepare a guilt defense on behalf of Mr. Howard as a result of the

13  trial judge's insistence on moving the case along at a pace that was not compatible

14  with "investigating and representing a capitally-charged individual." SHP Ex. 90 at

15  ¶ 3.  Reasonable counsel would and should have taken action to ensure he could

16  devote the time necessary to represent Mr. Howard, including eliminating competing

17  workload and seeking *Keenan* counsel.  Trial counsel's failure to do so prejudiced

18  Mr. Howard.

19      **4.  Trial Counsel was Ineffective for Failing to Challenge Mr. Howard's**

20          **Unconstitutional Arrest and the Unconstitutionally Obtained**

21          **Evidence Flowing from It.**

22      Mr. Howard, while attempting to call his sister to arrange a ride home from a

23  phone booth on the evening of Ms. Collins' death, was approached by police officers

24  with their weapons drawn, forced to his knees, searched, handcuffed and put in the

25  back seat of a police car.  SHP Ex. 1 at 402-03.  At that time the only suspect

26  descriptions available to the police indicated that the suspect was a Black male

27  wearing a white t-shirt, or white shirt.  Mr. Howard was wearing a gray hooded

28  sweater.  *Id.* at 402.  Because of this unconstitutional arrest, the police gathered

clothing and witness information that they transformed into evidence, albeit flimsy and unreliable, incriminating Mr. Howard.

The Fourth Amendment protects individuals from unreasonable searches and seizures because every individual is "entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio*, 392 U.S. 1, 9 (1968). This includes the right to be free from unconstitutional detentions and arrests. *See Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (detentions); *In re Tony C.*, 21 Cal. 3d 888, 895 (1978) (arrests).

Trial counsel prejudicially, and without any strategic reason, failed to challenge Mr. Howard's unconstitutional arrest or any of the unconstitutionally obtained evidence flowing from it. Had trial counsel moved to suppress the evidence obtained as a result of Mr. Howard's unconstitutional arrest, numerous pieces of incriminating evidence would have been excluded at trial, including the fiber evidence, the .357 revolver, and multiple incriminating statements Torrence provided to the police.

### a. Facts and Allegations

Trial counsel knew or should have known that Mr. Howard was unconstitutionally arrested and that evidence law enforcement obtained and subsequently introduced at Mr. Howard's trial was the direct fruit of this unlawful arrest. Trial counsel also knew or should have known that the prosecution detained Mr. Howard for four months on pre-textual grounds before filing capital charges. The facts demonstrating this, all of which come from police reports trial counsel possessed, follow.

Around 10:00 p.m. on December 6, 1992, Mr. Howard used the pay phone at a 7-Eleven to call his sister for a ride home. SHP Ex. 1 at 402. While on the phone, Officers Keller and Castro approached Mr. Howard with their weapons drawn. *Id.* at 403. They told him to slowly turn around, to remove his hands from his pocket, to place them on the top of his head, and proceeded to conduct a kneeling search for weapons. *Id.* at 403. They found no weapons, yet handcuffed Mr. Howard to

1    "prevent him from escaping," and placed him in the back of the police car. *Id.* Mr.

2    Howard remained cooperative throughout the process. *Id.*

3        At this time, they informed him that he matched the description of a suspect

4    for whom they had been looking, and told him that he was going to be "detained,"

5    until they completed their investigation. *Id.* During the course of their search, Ofc.

6    Castro asked Mr. Howard for his name. Mr. Howard, who was at the time in

7    violation of his parole, gave the officers the name of his cousin instead of his own.

8    *Id.* After Mr. Howard was placed in the police car with handcuffs, the officers

9    determined that Mr. Howard had provided a false name, "formed the opinion" that

10   Mr. Howard was in violation of California Penal Code section 148.9 for providing

11   false information to a peace officer, and arranged to have him taken to the police

12   station on the basis of this violation. *Id.*

13       The police filed an arrest/booking application for Mr. Howard on the basis of

14   his outstanding parole violation at 10:30 p.m. on December 6, 1992. *Id.* at 307. Mr.

15   Howard was officially taken into custody on these grounds until a warrant was issued

16   over three months later, on March 9, 1993, for his alleged involvement in Sherry

17   Collins' death. 1 CT 488.

18       Neither Mr. Howard's appearance nor his demeanor gave the arresting Police

19   Officers Castro and Keller sufficient probable cause to arrest, or even a reasonable

20   suspicion to detain, him. *See* Claim Three. Immediate reports from witnesses

21   described an individual vastly different in appearance than Mr. Howard.

22       The police officer's post-hoc justifications similarly fail to establish sufficient

23   probable cause for Mr. Howard's arrest or even reasonable suspicion to have

24   detained him. Ofc. Castro claimed that Mr. Howard's failure to make eye contact

25   with the officers as he talked on a public phone and the tapping of his foot suggested

26   that he appeared nervous and that he might run. SHP Ex. 1 at 402.

27       Neither looking around in a suspicious manner, nor being in a suspicious

28   location is sufficient to support probable cause to arrest a suspect. A suspect's

Petition for Writ of Habeas Corpus

nervous appearance likewise cannot provide the police with sufficient reasonable suspicion to detain him, let alone arrest him. The police's initial and unconstitutional arrest of Mr. Howard for the homicide was pre-textual and cannot be remedied by Mr. Howard's outstanding parole violation warrant.

As a result of the unconstitutional arrest, the police obtained key prosecution evidence: Mr. Howard's clothing and the fiber evidence derived from it. Eleven days after arresting Mr. Howard, law enforcement delivered his clothing to the Sheriff's Central Property. *Id.* at 339. This clothing was subsequently sent to the Sheriff's Department Forensic Science Laboratory, where technicians were tasked with comparing the fibers contained in the clothing to those present on the soles of Ms. Collins' shoes. *Id.* at 349, 359. The police sent this request as the highest level of priority. *Id.*

The prosecution used these fibers to argue that Mr. Howard was the second perpetrator in the homicide. 9 RT 2406-07. This unreliable evidence was the only physical evidence allegedly linking Mr. Howard to the crime. Had Mr. Howard not been arrested without cause and held because of this unconstitutional arrest, his clothing would not have been available to police.

Cedric Torrence, a key prosecution witness, was contacted and enlisted as a result of Mr. Howard's unconstitutional arrest. The night of his arrest, while in custody, Mr. Howard told Det. Blackwell that he had spent part of the day with a man named Cedric who had given him a ride. He told Det. Blackwell where Torrence lived and described his car and physical appearance. The only other information the police received about Torrence came from Funches. Funches, however, said little about Torrence that would have piqued law enforcement's interest. SHP Ex. 3 at 1912-13.

It is highly unlikely that Det. Blackwell would have found Torrence or enlisted him to testify against Mr. Howard if not for Mr. Howard's unconstitutional arrest and interrogation. Torrence, in turn, linked Mr. Howard to the possession of a .357

revolver law enforcement recovered six days after the killing and one mile away from the garage where the victim was shot. 6 RT 1580-81; 7 RT 1601-13. Without Torrence's testimony at the Evidence Code 402[17] hearing, or at trial, this gun would not have been admitted into evidence. *See* 7 RT 1601-13; 7 RT 1675-76.

Trial counsel possessed all the records demonstrating the unconstitutionality of Mr. Howard's arrest but failed to challenge the lawfulness of the arrest or move to suppress the evidence seized as a result of it. Reasonable counsel, knowing all this, would have challenged the arrest and the admission of the evidence derived from it. SHP Ex. 45 at ¶ 16. Trial counsel had no strategic reason not to do so as there was absolutely no downside to filing appropriate motions.

### b. Legal Framework

#### 1) Legal Framework Defining Unconstitutional Arrests and Detentions

A detention occurs when a police officer temporarily stops an individual against his or her will to ask pertinent questions, although that individual is not obliged to answer and can terminate the stop after brief questioning. *Terry*, 392 U.S. at 34; *Kaupp*, 538 U.S. at 630 (detentions); *In re Tony C.*, 21 Cal. 3d at 895 (arrests).

A police officer must have reasonable suspicion to conduct such a detention and in order to establish reasonable suspicion the officer must "point to specific, articulable facts" that are "reasonably consistent with criminal activity." *In re Tony C.*, 21 Cal. 3d at 894; *Beck v. Ohio*, 379 U.S. 89, 95 (1964); *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000). In contrast, it is not sufficient for an officer to rely on an "inchoate and unparticularized suspicion, or hunch." *Thomas*, 211 F.3d at 1192. Vague physical descriptions purportedly linking a suspect to the crime – like a person's race and a general description of his or her shirt – are insufficient to

---

[17]    All references are to the California Evidence Code unless otherwise noted. Section 402 provides the procedure for determining foundational and other preliminary facts.

1    establish reasonable suspicion. *Florida v. J.L.*, 529 U.S. 266, 271-72 (2000). In

2    addition, while conduct that is "not obviously criminal" could warrant reasonable

3    suspicion under the totality of the circumstances, nervous behavior, including

4    nervously making or avoiding eye contact, is insufficient to support reasonable

5    suspicion because such behavior could pertain to a large category of innocent people.

6    *Reid v. Georgia*, 448 U.S. 438, 441 (1980); *United States v. Del Vizo*, 918 F.2d 821,

7    824 (1990); *Washington v. Lambert*, 98 F.3d 1181, 1192 (1996). Accurate

8    descriptions of a suspect are not adequate to support reasonable suspicion if they do

9    not reveal "knowledge of concealed criminal activity." *See Florida v. J.L.*, 529 U.S.

10   at 272 (stating that descriptions lacking the link to "criminal activity" will do nothing

11   more than "help the police correctly identify the person whom the tipster means to

12   accuse"); *Thomas*, 211 F.3d at 1190.

13        An arrest occurs when "taking into account all of the circumstances

14   surrounding the encounter, the police conduct would 'have communicated to a

15   reasonable person that he was not at liberty to ignore the police presence and go

16   about his business,'" and the police must have probable cause to justify an intrusion

17   of this magnitude. *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan*

18   *v. Chesternut*, 486 U.S. 567, 567-68 (1988)). To establish probable cause, an officer

19   must be able to rely on facts that are sufficiently trustworthy for a reasonable person

20   to believe the arrested individual has violated a criminal law. *Beck v. Ohio*, 379 U.S.

21   at 91; *Orin v. Barclay*, 272 F.3d 1207 (9th Cir. 2001). The officer's state of mind is

22   irrelevant when determining whether probable cause exists. *Devenpeck v. Alford*,

23   543 U.S. 146, 153 (2004).

24        A detention may become an arrest when a reasonable person, under the totality

25   of the circumstances, feels unable to leave after brief questioning, and courts "review

26   the situation from the perspective of the person seized." *United States v. Delgadillo-*

27   *Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988); *see also Del Vizo*, 918 F.2d at 824;

28   *Kaupp*, 538 U.S. at 629. Circumstances where a detention becomes an arrest include

45

"the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Del Vizo*, 918 F.2d at 824 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

### 2)  Legal Framework Defining Whether An Arrest Has Occurred

Coercive police conduct is the "critical factor in determining [whether] an arrest [has] occurred." *United States v. Ricardo D.*, 912 F.2d 337, 340 (9th Cir. 1990); *United States v. Sharpe*, 470 U.S. 675, 682-83 (1985). Although police officers may use "reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed," they may not use detention techniques "indistinguishable from police conduct in an arrest." *Del Vizo*, 918 F.2d at 824-25 (citing *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990)).

An arrest occurs when police officers draw their weapons and order the suspect to stop moving and put their hands up. *Kraus v. Cnty. of Pierce*, 793 F.2d 1105, 1109 (9th Cir.1986) (finding an arrest where the police commanded the suspects to drop to their knees and raise their arms); *United States v. Ramos-Zaragosa*, 516 F.2d 141 (9th Cir. 1975) (holding that an arrest occurred when the officers, at gun point, instructed the suspects to stop and put their hands up); *Del Vizo*, 918 F.2d at 824 (affirming that the officers conducted an arrest when they brandished weapons, ordered the suspect to lie down on the street and subsequently handcuffed him). An arrest also occurs where the police use unnecessarily intrusive measures, such as handcuffs, to detain a cooperative individual. *Lambert*, 98 F.3d at 1187; *Del Vizo*, 918 F.2d at 824. Finally, an officer's conduct can constitute an arrest even if he or she states it is merely a "detention." *Del Vizo*, 918 F.2d at 823.

### c.  Trial Counsel's Failure to Challenge His Unconstitutional Arrest Prejudiced Mr. Howard.

As the police had neither reasonable suspicion to detain nor probable cause to

1   arrest Mr. Howard, his arrest was unconstitutional.  Like the officers in *Kraus*,

2   *Ramos-Zaragosa*, and *Del Vizo*, Officers Castro and Keller approached Mr. Howard

3   with their guns raised and commanded him to drop to his knees with his arms in the

4   air.  SHP Ex. 1 at 403.  The officers' handcuffing of Mr. Howard and placing him in

5   the back seat of the patrol car, despite being free of weapons and cooperating, further

6   supports the conclusion that the officers' actions constituted an arrest.  *Id.*  Ofc.

7   Castro's report indicates that the police officers told Mr. Howard they were

8   "detaining" him to prevent him from fleeing.  *Id.*  However, as *Del Vizo* holds, this

9   has no bearing on whether an arrest in fact occurred, and a reasonable person in Mr.

10  Howard's position would not have felt free to leave at the time he was approached

11  with weapons, forced to kneel, searched, handcuffed, and placed in a police car,

12  rendering Ofc. Castro's conduct an arrest despite his transparent statements

13  attempting to make it otherwise.

14      There is a reasonable likelihood that had counsel moved to suppress the

15  evidence seized as a result of the unlawful arrest, he would have succeeded.  "The

16  Supreme Court has held that counsel's failure to file a motion to suppress evidence

17  can provide the basis for a claim of ineffectiveness . . . .  [I]n order to show prejudice

18  when a suppression issue provides the basis for an ineffectiveness claim, the

19  petitioner must show that he would have prevailed on the suppression motion, and

20  that there is a reasonable probability that the successful motion would have affected

21  the outcome."  *Van Tran v. Lindsey*, 212 F.3d 1143, 1156 (9th Cir. 2000) (citing

22  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)) (citation omitted), *overruled on*

23  *other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003); *see also Smith v.*

24  *Wainwright*, 777 F.2d 609, 617 (11th Cir. 1985) (holding that trial counsel's failure

25  to move to suppress the defendant's statements resulted in the state's case not being

26  "subjected to the meaningful adversarial testing which is required under our system

27  of justice," and finding that the defendant was prejudiced by this unreasonable

28  failure).  Given the overwhelming lack of probable cause to detain Mr. Howard, had

Petition for Writ of Habeas Corpus

trial counsel sought suppression, he would have succeeded.

Mr. Howard was prejudiced as a result of counsel's inaction. The jury found Mr. Howard guilty of murder based almost entirely on evidence unconstitutionally obtained from an illegal arrest. First, the fiber from Mr. Howard's clothing constituted the only physical evidence allegedly placing him at the scene of the crime. 9 RT 2406-07. Had the police not arrested Mr. Howard without cause, his clothing would not have been available to the police. Second, Mr. Howard stated he had been with Cedric Torrence earlier that day, that Torrence had given him a ride, and he provided the police with a physical description of Torrence and a description of his car. But for this information, the police would not have contacted Torrence, the prosecution's key witness who linked Mr. Howard to the possession of a .357 revolver found by police six days after the crime and a mile away from where the crime occurred. Without Torrence's testimony at the Evidence Code section 402 hearing, this gun would not have been admitted into evidence.

Notwithstanding this evidence, the jury still took two full days to render a guilty verdict. If the prosecution had not procured the fiber evidence or testimony of Torrence linking Mr. Howard to the possession of a gun, there is a reasonable probability the jury would not have convicted Mr. Howard. *See Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002) (finding it reasonably probable that a jury deliberating "as long as it did"– for two full days – would have found a reasonable doubt that the defendant committed the murder).

### 5. Trial Counsel was Ineffective for Failing to Challenge the Prosecution's Charging Decision.

The San Bernardino County District Attorney's Office ("District Attorney") decided to charge Mr. Howard capitally and pursue the death penalty as a result of invidious discrimination based on his and the victim's respective races and genders.

#### a. Facts and Allegations

Mr. Howard has so far been precluded from discovering, compiling, and

48

presenting all available evidence demonstrating the intentional, racially discriminatory charging decision against him, including but not limited to all available evidence regarding the District Attorney's Office's racially biased, non-random capital charging patterns because San Bernardino law enforcement agents, including the District Attorney's Office, have refused to provide comprehensive, reliable data to which Mr. Howard is entitled. The evidence currently available, nevertheless, constitutes strong circumstantial evidence that racially discriminatory considerations substantially influenced the decision to seek the death penalty.[18]

Mr. Howard is a Black male; the victim is a White female. In seeking the death penalty, prosecutorial agencies and officers invidiously discriminated against Mr. Howard based on the race of the victim and Mr. Howard's race and gender.

Law enforcement agencies, including but not limited to the San Bernardino County Sheriff's Department and District Attorney's Office, conducted a racially biased and targeted investigation upon which the District Attorney relied in deciding to charge, pursue, and obtain a death sentence against Mr. Howard.

By law, Dennis L. Stout, the District Attorney at the time the capital charges were filed and prosecuted against Mr. Howard, was responsible for identifying murder cases in San Bernardino County for which the state should seek death.

Available data shows that in 1988, of the 112 adults charged with committing homicide, 100 of them were males and only 12 were females. SHP Ex. 77 at 5147. The racial breakdown of the 100 individuals is as follows: 56 were White, 33 were Hispanic, and 19 were Black. *Id*. at 5147. These numbers also represent the demographic percentages. When compared to rough 1990 census figures, the racial disparities are apparent. In 1990, the San Bernardino adult population was comprised of 71.8% White people, 17.2% Hispanic people, and 7.8% Black people.

---

[18] Mr. Howard is entitled to bring a new petition raising any and all applicable claims under Penal Code section 745. This data is germane to such claims but does not encompass all that can and will be developed in support of a petition.

SHP Ex. 19 at 3861.  Significantly more Black people were charged with homicide as compared to their demographic representation.

Available information regarding the racial composition of individuals sentenced to death from San Bernardino also suggests that Black people are disproportionately sentenced to death.  Of the 66 individuals sentenced to death from San Bernardino, there are 17 known Black individuals.  Framed in percentages, 26% of the San Bernardino death-sentenced population is Black.  This is well above the percentage of Black adults who reside in San Bernardino even assuming the percentage has grown from the 2000 census (9.1% of Black adults).  SHP Ex. 19 at 3860.

The San Bernardino District Attorney's Office sought the death penalty in this case for a homicide, which was committed against a White victim, while not seeking the death penalty in cases with similar or more egregious facts in which the victim was of Black, Latino, or other non-White heritage.  *See* Glenn L. Pierce & Michael L. Radelet, *The Impact of Legally Inappropriate Factors on Death Sentencing for California Homicides, 1990-99*, 46 Santa Clara L. Rev. 1, 19-25, 24 (2005).  Examples of such cases follow.

In 2000, the San Bernardino District Attorney declined to charge special circumstances against Elias Castaneda and Alejandro Perez for the double homicide of two Hispanic rival gang members.  *People v. Castaneda*, 2005 WL 2995165 (Cal. App. 4 Dist.) (unpublished decision).

In 1994, the San Bernardino District Attorney declined to charge special circumstances against Jean Neuer, a White man, for kidnapping, beating, and stabbing Jody Robinson, a Black man.  SHP Ex. 77 at 5149.

In 1987, Harry Clark, a White man, was permitted to plead guilty to voluntary manslaughter for the murder of Guillermo Martinez, who was of Hispanic descent.  SHP Ex. 77 at 5152-54.

Mr. Howard's race was a factor impermissibly considered in determining

whether to allege special circumstances and seek the death penalty. The San Bernardino District Attorney's Office has not charged special circumstance liability against White defendants who have committed much more egregious crimes. For example, no special circumstances were alleged against Robert Clifton Marler, a White man, for the triple homicide he committed. SHP Ex. 77 at 5155.

The San Bernardino County District Attorney and his agents also used gender as a criterion in their charging decision regarding the identification of cases in which to seek the penalty of death, including the decision to charge Mr. Howard. The gender discrimination in Mr. Howard's case was part of a pattern and practice of gender discrimination in the charging decisions made by members of the San Bernardino County District Attorney's Office. The pattern and practice of gender discrimination in the charging decisions of the San Bernardino County District Attorney's Office is consistent with empirical studies indicating the widespread presence of constitutionally impermissible gender bias in charging decisions generally. *See* Cassia Sphon, John Gruhl & Susan Welch, *The Impact of the Ethnicity and Gender of Defendants on the Decision to Reject or Dismiss Felony Charges*, 25 Criminology 175, 183-87 (1987) (data reveal a pattern of discrimination in favor of female defendants).

### b. Legal Framework

A defendant establishes a denial of equal protection if he or she demonstrates that the state is selectively prosecuting people based on an unjustifiable standard or arbitrary classification such as race. *Oyler v. Boles*, 368 U.S. 448, 456 (1962); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). When a defendant is prosecuted as a result of discrimination on the basis of race, ethnicity, national origin, or gender, the defendant is entitled to dismissal of charges or reversal of a conviction regardless of the defendant's culpability:

Because the particular defendant, unlike similarly situated individuals,

suffers prosecution simply as the subject of invidious

Petition for Writ of Habeas Corpus

discrimination . . . discriminatory prosecution becomes a compelling

ground for dismissal of the criminal charge, since the prosecution

would not have been pursued except for the discriminatory design of

the prosecuting authorities.

*Murgia v. Mun. Ct.*, 15 Cal. 3d 286, 298 (1975), *superseded in part on other grounds*; *People v. Betts*, 34 Cal. 4th 1039, 1050 (2005) (citing *Murgia*, 15 Cal. 3d at 293 n.4) ("We specifically have held that the issue whether a defendant would not have been prosecuted for the charged offense except for invidious discrimination . . . if established, prevents prosecution for that offense."); *see also Wayte v. United States*, 470 U.S. 598, 608 (1985) (the decision to prosecute may not be based on an unjustifiable standard such as race); *Baluyut v. Super. Ct.*, 12 Cal. 4th 826, 833 (1996) ("Invidious" discrimination is "intentional and unjustified . . . because it is unrelated to legitimate law enforcement objectives, but the intent need not be to 'punish' the defendant for membership in a protected class.").

### c. Trial Counsel's Failure to Challenge the Discriminatory Charging Prejudiced Mr. Howard.

Each instance of invidious discrimination identified above, alone and cumulatively with the others, violated Mr. Howard's guaranteed constitutional rights and is prejudicial per se. The animus based on race, gender, and social status so infected the integrity of the proceedings against Mr. Howard that he would not have been charged with first-degree murder with special circumstances, convicted of those crimes, or sentenced to death were he not a Black male and were his victim not a White woman. The District Attorney impermissibly and intentionally singled Mr. Howard out for prosecution on the basis of the invidious criteria of race and gender; and would not have prosecuted him *capitally* were it not for this discriminatory purpose. *Baluyut*, 12 Cal. 4th at 832.

While prosecutors have broad latitude in making charging determinations, this

1  power is not without limitations: "Although the discretion afforded prosecutors in

2  selecting who to prosecute and what charges to bring is extremely broad," discretion

3  is "subject to constitutional constraints." *In re Morris*, 363 F.3d 891, 895 (2004);

4  *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *United States v.*

5  *Batchelder*, 442 U.S. 114, 125 (1979)). In this case, it was stipulated that Mr.

6  Howard was not the shooter and there was no physical evidence that the victim had

7  been killed as part of a failed robbery. *See* Claim Four. The facts and strength of

8  the case, as it related to Mr. Howard, would not have militated towards capital

9  charges. The District Attorney's charging decision was motivated by improper

10 considerations of race and gender, entitling Mr. Howard to relief. *See Armstrong*,

11 517 U.S. at 464-66. Had trial counsel acted in accord with professional norms and

12 challenged the discriminatory charging, Mr. Howard would not have been charged

13 with capital murder.

14      Independent of the ineffective assistance of counsel claim, Mr. Howard is

15 entitled to relief because the discriminatory charging violated his constitutional

16 rights.

17  **6. Trial Counsel Unreasonably and Prejudicially Failed to Challenge the**

18      **Jury Selection Procedures in Mr. Howard's Case, Violating Mr.**

19      **Howard's Constitutional Rights to Due Process, Equal Protection,**

20      **and an Impartial Jury.**

21      Trial counsel unreasonably and prejudicially failed to effectively challenge

22 the jury selection procedures employed in Mr. Howard's case as being

23 constitutionally inconsistent with the requirement that the jury hearing the charges

24 against Mr. Howard be composed of a fair cross-section of the community, and

25 further failed to object to the prosecutor's unconstitutional use of peremptory

26 challenges. Counsel's errors violated Mr. Howard's state and federal constitutional

27 rights to due process, equal protection, and an impartial jury. Trial counsel's

28 deficient and prejudicial performance included his failure to: (1) adequately

Petition for Writ of Habeas Corpus

challenge the composition of the jury; (2) challenge the prosecutor's use of peremptory challenges to strike jurors from the panel based on their gender; and (3) exercise a peremptory strike against a juror he initially sought to excuse for cause.

### a. Facts and Allegations

#### 1) Trial counsel failed to adequately support his objection to the methods by which the jury was composed.

The record demonstrates that counsel knew that both the transfer of Mr. Howard's case to Victorville and the court's determination that the jury would be selected from individuals residing in Victorville, a vicinage, raised constitutional issues regarding jury composition. On April 3, 1995, after learning that the court intended to compile a panel of potential jurors just from Victorville and not on a county-wide basis, counsel moved for a county-wide panel. 2 RT 488.

The Court denied trial counsel's motion (2 RT 493), but throughout jury selection proceedings, counsel routinely noted the underrepresentation of African Americans after hardships had been granted. *See, e.g.*, 2 RT 568 ("[i]n my viewing the panel, there were only two Black people; one lady left already"); 3 RT 615 ("as to the panel [] I saw two Black men, one Black female. Two were excused for hardships, and I believe there's one left"); 3 RT 654 ("as to the jury panel E, my count is that there were four Black people in the jury panel; one of them were excused for hardship and there are two left"); 4 RT 927 ("[a]s to supplemental panel H, I believe there were five Black people in the panel and all were excused for hardship"); 5 RT 1128 ("[o]n the supplemental panel, I counted four Black persons on the jury panel, three were excused for hardship"); 5 RT 1253 ("[o]n supplemental panel K, I count two Black jurors in the panel, and one was excused"); and 6 RT 1439 ("[a]s to supplemental panel L, which is a supplemental to the general panel of prospective jurors who were here. There were 3 Black jurors 2 were excused for hardship").

On April 19, 1995, having made a record that the jury panels seemed to

include fewer Black people than would be constitutionally mandated, trial counsel moved to quash the jury panel "based upon the exclusion or African Americans, Black people, from the panel or the proportion from the panel." 6 RT 1522. The court denied trial counsel's fair cross-section challenge. 6 RT 1524-25. Trial counsel filed no papers in support of this motion nor did counsel present the court with demographic, census material regarding the population percentages.

The 1990 census indicates that, demographically, the jury-eligible population in San Bernardino was as follows: 71.8% White; 17.2% Hispanic; and 7.8% Black. SHP Ex. 19 at 3862. In 2000, the percentiles were: 58% White; 25.6% Hispanic; and 9.2% Black. *Id.* at 3862. As no current data is available regarding the population distribution in 1995, assuming a steady rise in population over the ten years yields the following numbers: 64.9% White; 21.4% Hispanic; and 8.5% Black. *Id.* at 3863. Both Hispanic and Black people are distinctive groups, exclusion of whom is constitutionally prohibited.

Of the 291 jury questionnaires currently part of the record on appeal – from both Mr. Howard's and Funches' trials – there were approximately 25 self-identified Hispanic people and 20 self-identified Black people who completed questionnaires. *See* 1-19 JQ CT. When compared to the group as a whole, Hispanic people comprise approximately 8.6% of the jury panel, and Black people, approximately 7%.

Absolute disparity is determined by subtracting the percentage of a certain, protected group from the percentage of that group in the jury-eligible population. Measured by this standard, Hispanic people were underrepresented by 12.8% (21.4%-8.6%). Black people were underrepresented by 1.5%. (8.5%-7%).

When measured by comparative disparity, which is determined by dividing the absolute disparity by the group's representation in the jury-eligible population, the underrepresentation is as follows: 60% Hispanic (12.8% divided by 21.45) and 12% Black (1.5% divided by 8.5%).

As set forth in Claim Thirteen, and incorporated herein, there are

Petition for Writ of Habeas Corpus

approximately twenty-one jury questionnaires that were not made part of the record, hampering an ability to determine the definitive demographic break-down.  As set forth in Claim Eleven, and incorporated herein, attempts to procure more comprehensive data regarding the procedures, practices, and demographic data from the jury's commissioner's office have been fruitless.

The underrepresentation of Hispanic people is due to their systematic exclusion from the jury selection process.  The mechanisms affecting the creation of this disparity include, but are not limited to, the knowing and intentional failure to:

Use random selection procedures throughout the jury selection process.

Use more than the list of registered voters and the Department of Motor Vehicles list as the source lists for the selection of jurors.

Properly merge and purge the source lists of duplicate names before creating the master list of prospective jurors.

Update the source lists and the master jury list.

Follow up on prospective jurors who do not complete and return juror questionnaires or who fail to appear when summoned for jury service.

Properly apply juror qualification and exemption criteria.

Properly review and excuse prospective jurors for undue hardship.

Comply with the statutory mandates for the selection of jurors set forth in the Penal Code and the Code of Civil Procedure.

**2) Trial counsel unreasonably and prejudicially failed to challenge the prosecutor's unconstitutional practice of peremptorily challenging jurors on the basis of gender.**

Trial counsel knew or should have known that impermissible factors might infect the jury composition, as demonstrated above.  The prosecutor used eight of his allotted twenty peremptory strikes.  Cal. Civ. Proc. Code § 231(a) (2012).  He utilized six, approximately 75% of his challenges, to remove women from Mr. Howard's jury.

Petition for Writ of Habeas Corpus

Trial counsel nevertheless failed to challenge the prosecutor's impermissible use of peremptory challenges. Reasonably competent counsel operating in line with the prevailing professional norms would have done so. SHP Ex. 45 at ¶¶ 13, 16. Had trial counsel done so he would have been able to prevail on a *Batson/Wheeler* motion because the prosecutor could not have established that his use of peremptory challenges was not based on gender. A comparative analysis of the prosecutor's failure to exercise peremptory challenges for men with similar voir dire answers demonstrates as much, including but not limited to the following:

The jury questionnaire asked two questions, numbers thirty and thirty-one, ostensibly designed to ferret out individuals who might be ineligible to serve based on an inability to impose the death penalty as required by *Witherspoon/Witt*. Jurors were asked to identify, on a scale of whether they strongly agreed to whether they strongly disagreed with statements that "[a]nyone who kills another person in the course of an attempted robbery should ALWAYS get the death penalty" (ALWAYS), or they should "NEVER get the death penalty" (NEVER). 1 CT 146.

Amy Harrison, against whom the prosecution exercised a peremptory challenge, answered that she disagreed somewhat with both statements. 5 JQ CT 1480; 6 RT 1545. Joseph Sherman, who served as a juror, responded similarly, after, however, initially indicating that he strongly disagreed with the ALWAYS statement. 1 JQ CT 178. Gary Woline similarly noted that he strongly disagreed with the ALWAYS statement (1 JQ CT 13), as did Robert Knight. 1 JQ CT 133.

Gary Woline indicated he needed "absolute proof" that the special circumstance exists. 5 RT 1322. Ruth Anderson indicated that she "[b]elieved in the death penalty but [would] not vote to impose it in every case." 14 JQ CT 3909. Amy Harrison shared this view. 5 JQ CT 1476. Every male but one who was picked for the jury "[n]either favor[ed] or oppose[d] the death penalty; it would depend on the facts." 1 JQ CT 144 (Billy Pope); 1 JQ CT 234 (Jesse Perez); 1 JQ CT 129 (Robert Knight); 1 JQ CT 204 (Steve Hayward); 1 JQ CT 9 (Gary Woline); 1 JQ CT

174 (Joseph Sherman); 1 JQ CT 189 (Bruce Lane).

Bruce Lane expressed that he would personally be reluctant to vote for a death sentence. 1 JQ CT 191. He was not excused, but Ruth Anderson, who shared a similar reluctance, was excused by the prosecutor's exercise of a peremptory challenge. 14 JQ CT 3911; 6 RT 1548.

The prosecutor in Mr. Howard's case and other prosecutors in the San Bernardino County District Attorney's Office engaged in a systemic pattern and practice of peremptorily challenging jurors on the basis of race, gender, and other impermissible criteria. These prosecutors were alleged to have struck prospective jurors on the basis of race and/or gender in numerous cases before and after Mr. Howard's trial. *See, e.g., People v. Taylor*, 47 Cal. 4th 850 (2009); *People v. Gutierrez*, 28 Cal. 4th 1083 (2002); *People v. Mayfield*, 14 Cal. 4th 668 (1997) (defense moves for mistrial on grounds prosecution "systematically excluding all black jurors on the panel"), *abrogated by People v. Scott*, 61 Cal. 4th 363 (2015) (abrogating on grounds that a court may not rely on a prosecutor's statement to find that defendant failed to make prima facie case of discrimination in peremptory strikes); *People v. Kelly*, 162 Cal. App. 4th 797 (2008); *People v. Jackson*, 10 Cal. App. 4th 13 (1992); *Daniels v. Roe*, No. 02-55328, WL 31863697 (9th Cir. 2002) (unpublished).

> **3) Trial counsel unreasonably and prejudicially failed to exercise a peremptory strike against a juror whom he initially sought to excuse for cause.**

Trial counsel knew or should have known that Juror Carmen Maddox would not consider Mr. Howard's life history during the penalty phase of trial when determining whether to impose a death sentence. During trial counsel's voir dire, Ms. Maddox informed trial counsel that she would not determine penalty based on the "person's life before [the crime]," but rather would only base it on the crime. 4 RT 945-46. On the basis of this answer, trial counsel moved to excuse Ms. Maddox

1    for cause.  4 RT 946.

2         During the prosecution's voir dire, the prosecution informed Ms. Maddox that

3    she would hear the history of Mr. Howard, both the good and the bad.  4 RT 950.

4    Ms. Maddox's response was: "what is the point of that?"  *Id.*

5         The prosecution explained that this information was necessary to inform Ms.

6    Maddox's decision as to which penalty was appropriate.  4 RT 950.  Ms. Maddox's

7    response indicated that she would only use Mr. Howard's past history to evaluate

8    whether Mr. Howard was guilty: "it would weigh on me as to what exactly happened,

9    of course during the committing of this crime . . . the word premeditated.  That kind

10   of thing of the circumstances involved also would make you know a difference, too.

11   You know, it's not an intentional type of thing."  4 RT 950.  The court disallowed

12   trial counsel's challenge for cause.  4 RT 951.

13        Trial counsel further questioned Ms. Maddox during which Ms. Maddox told

14   trial counsel that she understood that learning about Mr. Howard's past would

15   "widen [her] knowledge of the entire situation."  4 RT 952.  From this response, it is

16   not clear as to whether Ms. Maddox meant the "situation" with respect to the crime

17   itself, or with respect to Mr. Howard's life.  *Id.*  Trial counsel did not renew his

18   challenge for cause, nor did he exercise a peremptory strike to remove Ms. Maddox.

19   *Id.*  Trial counsel only exercised six of his twenty allotted peremptory strikes.

20        Reasonable counsel, knowing that Ms. Maddox indicated that she likely

21   would not consider Mr. Howard's life history in assessing which penalty was

22   appropriate, should have exercised a peremptory strike in order to eliminate her from

23   the jury were he unsuccessful in attempting to strike such a juror for cause.  *See* SHP

24   Ex. 45 at ¶ 13.  Had counsel renewed his cause challenge or exercised a peremptory

25   challenge to strike Ms. Maddox from the jury, Ms. Maddox would not have sat in

26   judgment of Mr. Howard.

27

28

### b. Legal Framework Establishing the Right to a Jury Drawn from a Representative Cross-Section of the Community

The Sixth Amendment of the Federal Constitution guarantees the right to trial by a jury drawn from a representative cross-section of the community. *Duren v. Missouri*, 439 U.S. 357 (1979); *People v. Ramos*, 15 Cal. 4th 1133 (1997). In order to establish a fair cross-section claim, a petitioner must demonstrate that: (1) the excluded group is "distinctive"; (2) the representation of this group in the venire is not "fair and reasonable in relation to the number of such persons in the community"; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. at 364; *People v. Burgener*, 29 Cal. 4th 833, 856 (2003). Petitioners must offer the court proof of the second prong, typically in the form of statistical data demonstrating "that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." *Thomas v. Borg*, 159 F.3d 1147, 1150 (9th Cir. 1998) (quoting *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996)).

In gathering these statistics, a petitioner may provide the court with measures in terms of an absolute or comparative disparity. *Berghuis v. Smith*, 559 U.S. 314, 329 (2010). An absolute disparity is calculated by taking the difference between the percentage of the jurors belonging to the distinct group and the percentage of jurors in the population as a whole, and measuring the raw difference between the percentage of the distinct group in the jury venire versus the general population. *Id.* A comparative disparity is calculated by dividing the absolute disparity by the percentage of the distinct group in the general population. *Berghuis*, 559 U.S. at 329. This figure "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer*, 983 F.2d 1215, 1231-32 (3rd Cir. 1992). The comparative disparity has been held to be more appropriately used when the percentage of the distinct group in the general population is small. *United States v.*

*Rogers*, 73 F.3d 774, 776-77 (8th Cir. 1996) ("Although utilizing the absolute disparity calculation may seem intuitive, its result understates the systematic representative deficiencies; the percentage disparity can never exceed the percentage of African Americans in the community."); *Smith v. Berghuis*, 543 F.3d 326, 338 (6th Cir. 2008), *rev'd on other grounds*, *Berghuis v. Smith*, 559 U.S. 314 (2010) ("Where the distinctive group alleged to have been underrepresented is small, as is the case here, the comparative disparity test is the more appropriate measure of underrepresentation.").

To satisfy the second prong, a petitioner need only demonstrate a disparity between the jury venire and the general population; he need not calculate the absolute disparity by relying on the number of individuals eligible for jury service. The Supreme Court has declined to require either an absolute or comparative disparity of a certain magnitude to satisfy the second *Duren* prong. *Berghuis*, 559 U.S. at 329 n.4; *see also United States v. Hernandez-Estrada*, 749 F.3d 1154, 1164-65 (9th Cir. 2014) (concluding it is appropriate to abandon the absolute disparity approach and declining to prescribe an alternate exclusive analysis to be applied in every case).

To establish the third *Duren* prong, a petitioner may demonstrate the systematic exclusion of the distinct group through any number of ways.

> The appropriate test or tests to employ will largely depend on the particular circumstances of each case. Instead, . . . courts may use one or more of a variety of statistical methods to respond to the evidence presented. Allowing courts and defendants to use a more robust set of analytical tools will ensure more accurate, and narrowly tailored, responses to individual *Duren* challenges, which can then assess on a fully developed record specific to the circumstances presented.

United States v. Hernandez-Estrada, 749 F.3d 1154, 1164-65.

Importantly, and contrary to California Supreme Court jurisprudence, a

1   petitioner need not demonstrate that the exclusion be intentional. *See Duren*, 439

2   U.S. at 368 n.26 ("systematic disproportion itself demonstrates an infringement of

3   the defendant's interest in a jury chosen from a fair community cross section");

4   *Randolph v. California*, 380 F.3d 1133, 1141 (9th Cir. 2004) ("disproportionate

5   exclusion of a distinctive group from the venire need not be intentional to be

6   constitutional, but it must be systematic").[19]

7         **c.  Trial Counsel's Failure to Properly Support His Objection to the**

8         **Composition of the Jury Prejudiced Mr. Howard.**

9         Mr. Howard has satisfied the first prong of the *Duren* test because Black and

10  Hispanic people constitute distinctive groups. Mr. Howard has additionally satisfied

11  the second *Duren* prong because when measured as an absolute disparity, Hispanic

12  people were underrepresented in Mr. Howard's jury by 12.8% and Black people

13  were underrepresented by 1.5%. Am. Pet. at 50-51. When measured as a

14  comparative disparity Hispanic people were underrepresented by 60% and African

15  Americans were underrepresented by 12%. Am. Pet. at 50-51. Mr. Howard has

16  satisfied the third *Duren* prong by listing several systematic factors that resulted in

17  the exclusion of distinctive groups from the venire. The United States Supreme

18  Court has declined to require a minimum percentage in order to establish a disparity.

19

20      [19]   Death qualification is among the procedures that deprive a defendant of his

21  right to have a jury selected from a fair cross section of the community. This is

22  because death qualification is "a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction." *Baze v. Rees*, 553 U.S. 35,

23  84 (2008) (Stevens, J., dissenting); *cf. Uttecht v. Brown*, 551 U.S. 1, 9 (2007)

24  (holding that "a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective

25  prosecutorial challenges for cause"). Death qualification also has a discriminatory

26  effect because more Black citizens than White citizens are opposed to the death penalty. *See, e.g.*, Mona Lynch & Craig Haney, *Capital Jury Deliberation: Effects*

27  *on Death Sentencing, Comprehension, and Discrimination*, 33 Law & Hum. Behav.

28  481, 485 (2009) (evidence shows that the process of death qualification "disproportionately eliminate[s] racial minorities").

1   *Berghuis*, 559 U.S. at 330 n.4; *see also United States v. Hernandez-Estrada*, 749

2   F.3d 1154 (2014) (holding absolute disparity test is not exclusive analytical measure

3   to be employed in fair cross-section challenges). Moreover, relying on an absolute

4   disparity figure where the population of the distinct group is less than ten percent of

5   the general population, as is the case with the Black population in San Bernardino,

6   has been recognized as an inappropriate measure because a small group by definition

7   can never have a large absolute disparity. *See* David Kairys, Joseph Kadane & John

8   Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists*, 65 Cal. L.

9   Rev. 776, 790 (1977); *Rogers*, 73 F.3d at 776-77; *United States v. Jackman*, 46 F.3d

10  1240, 1247 (2nd Cir. 1995).

11      Reasonably competent counsel would have consulted with appropriate experts

12  and collected available data establishing racial population demographics. SHP Ex.

13  45 at ¶ 13. Counsel did not do so, however, and so prejudicially based his oral

14  motion only on observations made.

15      Had trial counsel conducted the necessary investigation, consulted with

16  appropriate experts, and collected available data, counsel could have presented

17  reliable, admissible, and compelling evidence that demonstrated the degree to which

18  the jury selection procedures failed to comport with the Sixth Amendment right to a

19  jury composed of a fair cross-section of the community. Had counsel performed

20  according to the prevailing standard of care, counsel could have established that

21  Hispanic people were constitutionally underrepresented.

22      Independent of the ineffective assistance of counsel claim, petitioner is

23  entitled to relief because the jury composition violated Mr. Howard's constitutional

24  right to a jury drawn from a fair cross section of the community and equal protection.

25      **d.  Legal Framework Establishing the Unconstitutional Practice of**

26          **Peremptorily Challenging Jurors on the Basis of Gender.**

27      In order to successfully demonstrate a *Batson* violation, a defendant must raise

28  an inference of purposeful discrimination in the selection of the petit jury. In

63

Petition for Writ of Habeas Corpus

considering whether the defendant has made the requisite showing, "the trial court should consider all relevant circumstances.  For example,

> [A] 'pattern' of strikes against [the cognizable group] included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose."

*Batson v. Kentucky*, 476 U.S. 79, 97 (1986).

Statistics demonstrating that the prosecutor exercised a high percentage of his peremptory strikes to eliminate members of a cognizable group from the petit jury, "standing alone," may be sufficient to establish an inference that the prosecution's peremptory challenges were motivated by race. *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (finding a *Batson* violation where the prosecutor struck four out of seven (57%) Hispanic venire members, while Hispanic people constituted only 12% of the venire, and 21% (four out of nineteen) of the prospective juror challenges were made against Hispanics venire members).

Petitioners may also establish a prima facie case of a *Batson* violation by demonstrating that the prosecutor struck a disproportionate percentage of members of a cognizable group, and that based on the record, there was insufficient justification for this disparity. *United States v. Johnson*, 873 F.2d 1137, 1140 (8th Cir. 1989) (holding that in a case where the prosecutor exercised 2 of 6 peremptory challenges to strike prospective Black jurors the "record does raise the inference of discrimination as the Government struck black veniremen at a disproportionate rate and struck blacks who did not respond during voir dire but did not strike whites who similarly did not respond."); *United States v. Hughes*, 864 F.2d 78, 80 (8th Cir. 1988) (holding that where the prosecutor exercised 3 of 5 peremptory strikes against prospective Black jurors, where there was no apparent rational justifying the strikes from the record, and where the relevant geographical district had a "history of

Petition for Writ of Habeas Corpus

1  exclusion of blacks," defendant had made a prima facie case).

2       Other relevant circumstances considered by the courts in determining whether

3  a prima facie case of discrimination has been made include evidence that a

4  prosecutor or his office maintains a pattern and practice of discrimination. *Miller-*

5  *El v. Dretke*, 545 U.S. 231, 253 (2005) ("the appearance of discrimination is

6  confirmed by widely known evidence of the general policy of the Dallas County

7  District Attorney's Office to exclude black venire members from juries at the time

8  Miller-El's jury was selected"). Finally, in making a prima facie showing of a *Batson*

9  violation, a petitioner need not prove that the prosecution had no race-neutral reasons

10 for striking the members of the cognizable group. *Fernandez*, 286 F.3d at 1079

11 (citing *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) ("[T]he initial

12 question is whether appellants presented a prima facie case sufficient to require

13 explanations; that determination must be made *before* the explanations are

14 considered.").

15       **e.  Trial   Counsel's   Failure   to   Challenge   the   Prosecutor's**

16       **Unconstitutional Practice of Peremptorily Challenging Jurors on**

17       **the Basis of Gender Prejudiced Mr. Howard.**

18       In Mr. Howard's case, the prosecution exercised six out of his eight

19 peremptory strikes, or 75% of his strikes, to exclude women from the jury. In

20 addition, the circumstances surrounding the prosecutor's exercise of these strikes

21 support a prima face showing of a *Batson* violation. Specifically, there is nothing in

22 the record demonstrating that the struck women were less likely to impose the death

23 penalty than their male counterparts who served on the jury. Moreover, the San

24 Bernardino County District Attorney's Office has a history of exclusion of

25 prospective jurors based on race, gender, and other impermissible criteria. Had trial

26 counsel objected to the prosecutor's discriminatory use of peremptory challenges,

27 the trial court would have engaged in the *Batson* inquiry and found a *Batson*

28 violation. *Mitcham v. Davis*, 103 F. Supp. 3d 1091 (9th Cir. 2015) (holding counsel's

conduct in failing to object to prosecutor's exercise of peremptory challenges was deficient performance.)

Separate and independent of this ineffective assistance of counsel claim, Mr. Howard is entitled to relief because the prosecutor unconstitutionally exercised peremptory challenges.

### f. Trial Counsel's Failure to Exercise a Peremptory Strike Against a Juror Whom He Initially Sought to Excuse for Cause Prejudiced Mr. Howard.

Trial counsel's failure to exercise a peremptory strike to eliminate Carmon Maddox was prejudicial. *See Harris By & Through Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (finding, inter alia, that counsel's failure to conduct proper voir dire contributing to prejudice resulting from deficient performance). The failure to exercise a peremptory challenge to eliminate a juror who counsel sought to strike for cause because of her stated inability to consider any evidence of Mr. Howard's life history was deficient performance, especially given that trial counsel only utilized six of his twenty peremptory challenges.

### 7. Trial Counsel Unreasonably and Prejudicially Failed to Adequately Investigate, Develop, and Present Evidence of Mr. Howard's Alibi.

Trial counsel was ineffective for failing to adequately investigate, develop, and present evidence of Mr. Howard's alibi. Trial counsel was aware that Mr. Howard had a viable alibi defense, and presented affirmative evidence that Mr. Howard was somewhere else when the crime occurred. Trial counsel, nevertheless, failed to adequately develop the evidence he knew about, and further failed to investigate, develop and present evidence about which he should have known. Counsel's prejudicial failure to solidify the alibi evidence he presented fell below "an objective standard of reasonableness" and created "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

### a. Facts and Allegations

#### 1) Trial counsel knew and presented alibi evidence.

Trial counsel argued in opening statements that on December 6, 1992, Roxanne Winn, Mr. Howard's girlfriend at the time, drove from Compton, where she was living, to San Bernardino to pick up Mr. Howard. 7 RT 1651, 1653. Trial counsel further argued that Winn eventually picked Mr. Howard up at some time after 5:00 p.m., and that she kicked him out of her car around the same time that there were helicopters and police circling the area where co-defendant Funches was arrested. *See* 7 RT 1652-53.

Mr. Howard, on the day he was arrested, December 6, 1992, was likely in the company of Winn, from the late afternoon to the evening. *See* 9 RT 2261-64. Winn testified that she picked up Mr. Howard on a Sunday in December in the late afternoon. 9 RT 2261. She further testified that she planned to take him back to Compton with her, but they got into a fight en route. 9 RT 2261-62. During this fight they drove around for approximately thirty minutes. 9 RT 2262. She eventually told him to get of her car and left him by a 7-Eleven around the time that it was getting dark. When she drove away it was raining. 9 RT 2263-64.

Patricia Washington, Mr. Howard's aunt, with whom he was living at the time, testified that she remembered Winn coming to pick Mr. Howard up on a Sunday afternoon in December. 9 RT 2297-98. Segonia Washington, Mr. Howard's cousin and Patricia's daughter, similarly testified that she remembered that Winn came to pick Mr. Howard up on a Sunday afternoon in December. 9 RT 2303, 2307-08.

Mr. Howard testified that he had planned on getting some money from his Uncle Willie Kelly who lived with his sister and Mr. Howard's aunt, Sandra Willcot, in an apartment on Kendall Drive. 9 RT 2202, 2237. On the evening of December 6, 1992, after Roxanne Winn left him at the 7-Eleven, he walked over to the 1660 Kendall apartment complex looking for apartments in the one-hundred range because he knew that his aunt lived in an apartment complex on Kendall Drive, and

1    that her apartment was in that range, but he had never been to it before.  9 RT 2202-

2    06.

3        In closing arguments, trial counsel argued that Mr. Howard was with Winn

4    when the crime occurred; that the sequence of events precluded Mr. Howard's

5    involvement.  9 RT 2423-24.  Trial counsel, however, unreasonably failed to solidify

6    this affirmative evidence.

7        **2)  Trial counsel knew or should have known about additional**

8            **evidence and argument to effectively support the alibi defense.**

9        At the time in question Sandra Willcot lived at 2490 Kendall Drive, apartment

10   103B.  SHP Ex. 72 at ¶ 20.  Counsel was aware that Willie Kelly lived with his sister

11   on Kendall Drive.  9 RT 2295.  Despite possessing this information, trial counsel

12   failed to interview her and to present her testimony.  SHP Ex. 72 at ¶ 23.

13       As noted, trial counsel knew that Winn remembered picking up Mr. Howard

14   on Sunday in December.  9 RT 2261.  Trial counsel knew or should have known that

15   Sunday, December 6th was the first Sunday in December of 1992.  Trial counsel

16   likewise knew or should have known that Mr. Howard was arrested on Sunday,

17   December 6th, that he was not released from jail or prison at any time after this date,

18   and that weather reports confirmed it was raining that day.  (Ex. 1 at 307.)

19       Reasonably competent counsel, operating under the prevailing norms, would

20   have conducted the necessary investigation, developed the facts, and presented

21   evidence to corroborate and ground the testimony counsel did present.  SHP Ex. 45

22   at ¶¶ 10, 11, 22.  Trial counsel had no strategic reason for having failed in this regard

23   as this investigation dovetailed with trial counsel's guilt phase strategy.

24       **3)  Had counsel acted in accordance with prevailing norms, he**

25           **could have presented reliable, credible, and admissible**

26           **evidence establishing an alibi defense.**

27       The non-exclusive evidence counsel could have presented but did not,

28   follows.  Sandra Willcot was expecting Mr. Howard to come by and pick money up

on December 6, 1992, and remembers that it was this date because it was the same day as a benefit at her husband Robert Willcot's grandmother's church. SHP Ex. 72 at ¶ 20.

Willie Kelly was expecting Mr. Howard to come by and pick money up on the first Sunday in December – December 6, 1992 – and also remembers that it was this date because it was the same day as Robert Willcot's grandmother's church benefit. SHP Ex. 62 at ¶ 23. Willie Kelly was willing to give Mr. Howard money at that time because he knew how difficult it was to find financial support after being released from prison, and at the time, he had a regular job and was "making good money." SHP Ex. 62 at ¶ 23.

Roxanne Winn remembered picking Mr. Howard up on a Sunday in December (9 RT 2261), and as December 6 was the first Sunday that month, the only date she could have picked him would have been December 6, 1992, as he was incarcerated every other Sunday in December after that.

Counsel's failures affected the jury. Counsel was chiefly concerned that Mr. Howard's alibi witnesses were not sufficiently certain about on which Sunday Ms. Winn came and got him. SHP Ex. 74 at ¶ 3. There is a reasonable probability that but for trial counsel's failure to have presented evidence establishing the date and confirming that Mr. Howard planned to pick money up from his aunt and uncle's apartment, located on Kendall Drive, in apartment 103B, the results of the proceedings would have been different.

### b.  Legal Framework

"A lawyer who fails adequately to investigate, and to introduce into evidence, [information] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir.1999). This includes a failure to adequately interview and present the testimony of potential alibi witnesses, even if testimony of these witnesses may be only to bolster the testimony

Petition for Writ of Habeas Corpus

of another alibi witness. *Lord v. Wood*, 184 F.3d 1083, 1093 (9th Cir. 1999) ("[C]ounsels' cursory investigation of the three possible alibi witnesses, and their subsequent failure to put them on the stand, constitutes deficient performance that was prejudicial to [petitioner's] defense."); *Alcala v. Woodford*, 334 F.3d 862, 870 (9th Cir. 2003) (finding counsel's failure to call additional witnesses with helpful alibi testimony deficient); *Bigelow v. Williams*, 367 F.3d 562 (6th Cir. 2004) (holding that testimony of additional alibi witnesses to bolster testimony of one that was called was not cumulative and that failure to call said witnesses constituted ineffective assistance of counsel). This also includes a failure to present helpful evidence regarding the time and date of the alibi: "When defense counsel undertakes to establish an alibi but does not present available evidence of the time or even the date of the alibi, or offer a strategic reason for failing to do so, his actions are unreasonable." *Alcala,* 334 F.3d at 871-72.

### c. Trial Counsel's Commissions in Developing, Investigating and Presenting an Alibi Defense Prejudiced Mr. Howard.

Trial counsel failed to solidify the date of Mr. Howard's alibi – a critical fact that the jurors claimed was an issue for them in determining the verdict of guilt – by presenting additional information from the witnesses who *did* testify on Mr. Howard's behalf. SHP Ex. 74 at ¶ 3. Willy Kelly could have testified that he was expecting Mr. Howard to come by and pick money up on the first Sunday in December – December 6, 1992 – and that he remembered the date because it was the same day as Robert Willcot's grandmother's church benefit. SHP Ex. 62 at ¶ 23. Roxanne Winn could also have corroborated the December 6 date, since it was the first Sunday in the month and Mr. Howard was incarcerated thereafter. 9 RT 2261. Additionally, testimony from Sandra Willcot would have undermined the prosecution's argument that the alibi defense was concocted as would have additional testimony from Kelly. SHP Ex. 62 at ¶ 23. The prejudice that resulted from counsel's failure to present evidence linking the alibi witnesses to the date of

December 6, 1992, is underscored by juror declarations describing their uncertainty as to the applicable date relevant to the alibi defense. SHP Ex. 74 at ¶ 3.

The prosecution exploited counsel's failure to shore up the alibi defense. The prosecution established on cross-examination that Winn did not know when she picked Mr. Howard up in relation to when he was arrested or the exact date the Sunday events in December took place. 9 RT 2264-65. Likewise, on cross-examination the prosecution emphasized that neither Segonia Washington nor Patricia Washington were able to name the exact date on which Winn arrived to pick up Mr. Howard. 9 RT 2298, 2307-08. In closing arguments, the prosecutor re-affirmed these key points. 9 RT 2433-34. The prosecutor also argued that Mr. Howard's testimony that he was going to get money from his aunt and uncle on Kendall Drive was a "story designed to put in this complex down here at just the right time." 9 RT 2435.

Had trial counsel conducted the necessary investigation and put forth evidence solidifying the date at issue, the prosecutor would not have been able to make this argument. The prejudice resulting from trial counsel's failure to solidify Mr. Howard's alibi with this additional evidence is manifest throughout the record. *Alcala*, 334 F.3d at 870 (holding that although trial counsel presented some evidence supporting the alibi defense, he "failed in his duty to present that defense reasonably and competently").

### 8. Trial Counsel Unreasonably and Prejudicially Failed to Investigate, Develop, or Present Reliable, Credible, and Admissible Evidence Challenging the Prosecution's Forensic Evidence, Cedric Torrence's Testimony, and Eyewitness Testimony.

Trial counsel failed to adequately challenge integral aspects of the prosecution's case against Mr. Howard. This includes failing to present evidence demonstrating that (1) the prosecution's fiber evidence was fabricated and misleading; (2) Cedric Torrence changed his story in key respects, threatened to

Petition for Writ of Habeas Corpus

falsely implicate Mr. Howard, and testified after being threatened with incarceration and unemployment; (3) there was no plan to rob Ms. Collins; (4) Mr. Howard did not know the alleged co-defendant Mitchell Funches; (5) the eye-witness identification evidence against Mr. Howard was not credible; and (6) the police's investigation was not reliable for a variety of reasons.

### a. Trial Counsel Unreasonably and Prejudicially Failed to Investigate, Develop, and Present Evidence Impeaching the Prosecution's Forensic Evidence.

#### 1) Facts and Allegations

**Fiber Evidence**

The prosecution case relied heavily on fiber evidence that trial counsel failed to investigate, develop, and present evidence to challenge. Trial counsel knew or should have known that the prosecution intended to, and did in fact, present forensic evidence that allegedly established that Mr. Howard was present when the victim was killed. The prosecution argued that Ms. Collins was kicking at Mr. Howard and that fibers from his clothing transferred to the bottom of her shoe. The evidence known to counsel follows.

On December 17, 1992, Det. Blackwell requested that the San Bernardino County Sheriff's Scientific Investigations Unit compare the fibers contained in Mr. Howard's clothing to any fibers present on the bottom of the victim's shoes. SHP Ex. 1 at 349. The request stated that the victim "kick[ed]" the suspects. *Id.* at 349.

On this same date, the San Bernardino Police Department delivered the clothing Mr. Howard had been wearing when arrested to Sheriff's central property. *Id.* at 339. Craig Ogino, a criminalist who worked in the San Bernardino Sheriff's Crime Laboratory at this time, tested fibers present on the bottom of the victim's shoes to determine whether they were consistent with fibers contained in the clothing Mr. Howard had been wearing on December 6, 1992. *Id.* at 339-40.

On January 7, 1993, Criminalist Ogino wrote a one-page report stating in total:

Petition for Writ of Habeas Corpus

1    "Demetrius Howard's clothing (Item R) is made up of 100% cotton except his jacket
2    (Item R-5) which is made up of three types of polyesters and two types of acrylic.
3    Cotton and polyester fibers which are consistent with Demetrius Howard's clothing,
4    were found on the soles of Sherry Collins' shoes (Item K-1)." *Id.* at 340.   In
5    discovery, the prosecution provided just four pages of raw notes said to document
6    Ogino's testing.  *Id.* at 380-81.

7        Trial counsel knew that the prosecution's fiber evidence was central to their
8    case, stating: "The only physical evidence that puts Mr. Howard at the crime scene
9    is that fiber evidence.  That's the only physical evidence." 7 RT 1614. Accordingly,
10   trial counsel retained an expert to evaluate the evidence, but apparently did not
11   follow through on having the prosecution's conclusions evaluated.

12       Ogino testified at the guilt phase that he found eight fibers present on the soles
13   of Ms. Collins' shoes – five on the right shoe and three on the left shoe.  *See* 8 RT
14   2120-23, 2154, 2158-59.  On the right shoe, Ogino determined that there was a nylon
15   trilobal fiber, most likely from a carpet (8 RT 2120); a round, partially oval polyester
16   with a diameter of 20 microns, slightly delustered (8 RT 2121); a white cotton fiber
17   (8 RT 2120); a round polyester fiber between 17 and 20 microns in diameter and
18   delustered (8 RT 2122); and, a round polyester fiber 17 microns in diameter and
19   slightly delustered.  8 RT 2158-59.  From the left shoe, Ogino concluded that there
20   were two white and dark-colored cotton fibers and a white cotton fiber. (8 RT 2120.)

21       Orgino further determined that the black Levi jeans Mr. Howard wore the
22   night of his arrest were composed of one-hundred percent white and dark-colored
23   cotton. 8 RT 2123. Ogino concluded that Mr. Howard's gray sweater was composed
24   of three different types of polyester and two types of acrylic.  8 RT 2123.  Of the
25   representative fibers he tested in Mr. Howard's sweater, Ogino found one trilobal
26   polyester fiber with a diameter of twenty-five microns and delustered (8 RT 2153-
27   54); one bilobal fiber with a diameter of thirty-five microns and delustered (8 RT
28   2154); and one round polyester fiber with a diameter of seventeen microns slightly

1    delustered (8 RT 2154.)  He also found an acrylic fiber with a diameter of twenty-

2    two microns, and an acrylic fiber with a diameter of twenty microns.  8 RT 2154.

3        Based on this testing, Ogino determined that there was nothing "inconsistent"

4    between the tuft of white and dark-colored cotton fibers present on the victim's left

5    shoe and the cotton fibers from Mr. Howard's black Levi jeans.  8 RT 2141.  He also

6    determined that the polyester fibers present on the bottom of the victim's right shoe

7    were consistent with the polyester fibers contained in Mr. Howard's sweater.  8 RT

8    2142.

9        More specifically, Ogino testified that the polyester fibers present in Mr.

10   Howard's sweater came from the same manufacturer, as did the fibers present on the

11   bottom of the victim's shoes.  8 RT 2141.  He further testified that there were one

12   hundred different types of polyester and that he found only a very few were present

13   in Mr. Howard's sweater.  8 RT 2140.  Ogino stated that "of those types found in the

14   sweater he found at least one of those types on at least three places on the right shoe.

15   8 RT 2140.

16       Ogino also testified that he did not find any larger diameter polyester fibers of

17   the type present in Mr. Howard's sweater on the bottom of the victim's shoes.  He

18   asserted this oddity could be explained because smaller diameter fibers break free

19   first.  8 RT 2125.  He testified it was not "very probable" that the black and white

20   fibers present on the bottom of the victim's shoes came from the victim's shirt

21   because they were sticking out from her shoe which requires force.  8 RT 2171-72.

22       Trial counsel attempted to undermine the testimony on cross-examination by

23   establishing that the white cotton and white polyester were very common; and that

24   "lots" of tons of white cotton and "lots" of tons of white polyester were

25   manufactured between 1990 and 1992 (8 RT 2143-44); that Ms. Collins was wearing

26   clothing made out of cotton, Orlon, and kodel polyester; that she was also wearing

27   black Levi Jeans and two pairs of socks, including a black pair (8 RT 2146-47); that

28   cotton was manufactured in many places in the world, including America, India,

---

74

Egypt, and Asia (8 RT 2147); that there were many black Levi jeans produced in
1992 (8 RT 2148.); that Ogino did not know who manufactured each of the fibers he
tested (8 RT 2154-55); and that fiber evidence was not "quite as accurate," as
fingerprint evidence (8 RT 2155), or as accurate as DNA evidence in terms of the
quantity required to identify the source.  8 RT 2156.

Counsel presented no affirmative evidence challenging Ogino's testing or
conclusions.  Reasonable counsel, operating in accordance with prevailing
professional norms, knowing that the prosecution planned to and did present the
above evidence, would have retained, consulted with, and presented expert
testimony undermining Ogino's conclusions.  SHP Ex. 45 at ¶ 13.

If trial counsel had consulted with and presented the testimony of a qualified
expert as required by the standard of care, trial counsel could have introduced
reliable, credible, admissible evidence that demonstrated that the testing Ogino
performed was inadequate to permit the conclusions he drew, and the conclusions
were likewise false.  Such non-exclusive evidence follows.

Ogino performed several basic tests insufficient to support the conclusions
that he reached.  First, he examined the fibers present on the bottom of the victim's
shoes with a naked eye in order to determine whether they were synthetic, vegetable,
or animal fibers.  Next, he mounted the fibers individually and looked at them under
a low-powered microscope to determine their shape.  Then, Ogino examined the
fibers under a high-powered microscope using polarized light.  During this
examination he conducted a Becke line test and made other determinations about the
fibers' properties including their diameters, color, as well as presence and amount of
any delustrant.  SHP 70 at ¶¶ 7, 12.

A Becke line test is one method used to obtain a measurement called a relative
refractive index, which allows a microscopist to determine the material composition
of a fiber.  Microscopists use the relative refractive index in order to classify a fiber;
for example, whether a fiber is composed of nylon, polyester, acrylic, acetate and so

Petition for Writ of Habeas Corpus

1  forth.    A relative refractive indices measurement, however, is inadequate for
2  determining whether a fiber of one class is the same as another fiber of the same
3  class.    Thus, a relative refractive indices measurement, contrary to Ogino's
4  testimony, is too imprecise to differentiate two polyester fibers. *Id*. at ¶ 13, 14.

5      Qualified microscopists seeking to differentiate fibers of the same class, for
6  example two polyester fibers, employ a refractive index measurement. This value is
7  different from *relative* refractive indices because it is a numerical measurement
8  rather than a relative measurement and thus allows microscopists to differentiate
9  fibers made of the same material.    For example, the refractive indices of one
10  polyester may be very different from the refractive indices of another polyester
11  whereas the relative refractive indices would be the same for both.  Microscopists
12  obtain a numerical value for the refractive index that at its most elementary can be
13  measured with the accuracy of plus or minus 0.001.  *Id*. at ¶ 10.

14      Based on the testing Ogino did perform, he could conclude that the fibers
15  contained on the bottom of the victim's shoes were cotton and polyester, and could
16  conclude that the fibers he tested in Mr. Howard's sweater were similarly polyester,
17  and that the fibers contained in Mr. Howard's pants were similarly cotton.  However,
18  he could not make any conclusions beyond this. *Id*. at ¶ 10, 15.

19      Ogino made several additional misrepresentations to the court and to the jury
20  that counsel could have refuted had trial counsel retained and presented the
21  testimony of a qualified expert.  For example, Ogino testified that the fibers present
22  on the bottom of the shoes of the victim and the fibers contained in Mr. Howard's
23  clothing came from the same manufacturing plant, 8 RT 2141, but based on the
24  testing Ogino performed he would not have been able to determine whether the
25  polyesters were even of the same type, let alone from the same manufacturing plant.
26  SHP Ex. 70 at ¶¶ 19, 20.

27      Based on the testing Ogino performed he was not able to conclude, as he
28  testified, that that "of those types [of polyester] found in the sweater he found at least

Petition for Writ of Habeas Corpus

1    one of those types on at least three places on the right shoe." (8 RT 2140). SHP Ex.

2    70 at ¶ 20.

3        Ogino stated that he did not find any larger diameter polyester fibers of the

4    type present in Mr. Howard's sweater on the bottom of the victim's shoes, attributing

5    this to his assertion that smaller diameter fibers break free first. 8 RT 2125. This is

6    not the case. The size of the diameter of a polyester fiber is not related to how easily

7    it breaks from its source. SHP Ex. 70 at ¶ 21.

8        Ogino testified that it is not "very probable" that the black and white fibers

9    present on the bottom of the victim's shoes came from the victim's shirt or pants

10   because they were sticking out from her shoe which requires force. 8 RT 2125-26.

11   This is not accurate. It is possible that fibers fell from the victim's shirt, landed on

12   the floor, and that she stepped on them. Also possible, is that that she rubbed one of

13   her shoes against her own pants which could easily explain the presence of black

14   and white cotton fibers on the bottom of her shoe. SHP Ex. 70 at ¶ 22.

15       The prejudice flowing from counsel's failures is underscored by the weight

16   the jurors accorded the fiber evidence and the emphasis placed on it by the

17   prosecution. For several jurors, the fiber evidence convinced them that Mr. Howard

18   was culpable (SHP Ex. 59 at ¶ 5; SHP Ex. 74 at ¶ 4), while the prosecutor argued the

19   fiber evidence at length in closing argument. *See, e.g.*, 7 RT 1649-50, 9 RT 2407-

20   24.

21       **Fingerprint Evidence**

22       Trial Counsel also unreasonably and prejudicially failed to investigate,

23   develop, and present evidence demonstrating that the prosecution's theories about

24   fingerprint evidence (or lack thereof) were inaccurate. The prosecution presented

25   testimony that the absence of fingerprint evidence linking Mr. Howard to the crime

26   scene as well as to the gun the prosecutor alleged Mr. Howard possessed, could be

27   attributed to natural forces and common deterioration. 8 RT 2006-07, 2011, 2018.

28       Trial counsel knew or should have known that the prosecutor intended to call

1    Richard Houle and Randall Beasley, to testify about collecting and examining the

2    fingerprints obtained through law enforcement investigation. Both were named on

3    the prosecutor's list of witnesses. More specifically, counsel knew what follows.

4        On December 12, 1992, the prosecution retrieved a .357 revolver from the

5    1660 Kendall apartment complex, located in bushes near apartment number 3. SHP

6    Ex. 1 at 301. On this same date, San Bernardino Sheriff's Department Identification

7    Technician Goss processed the gun for fingerprints with negative results. *Id.* 1 at

8    303.

9        At trial, counsel stipulated to the fact that Goss processed the .357 revolver

10    and found no prints. 9 RT 2183-84. Prosecution expert forensic specialist Randall

11    Beasley testified that it was difficult to obtain prints from a weapon that had been

12    exposed to the elements and to rain for five or six days because fingerprints were

13    composed of ninety-nine percent water and therefore could easily be washed off by

14    water. 8 RT 2006-07; 2011.

15        On December 9, 1992, Beasley processed the victim's vehicle for fingerprints.

16    SHP Ex. 1 at 316. Beasley lifted a total of four prints from the car. 8 RT 2007.

17    Beasley provided a summary of his work in a report consisting of a few sentences

18    stating that he submitted these prints to "Cal-*ID*." SHP Ex. 1 at 316. He did not

19    provide any notes detailing what tests or methods he used to identify or collect these

20    prints. Beasley testified that he processed the car after it had rained which made it

21    unlikely to find prints because "water can obviously wash off fingerprints because

22    fingerprints are about 99% water." 8 RT 2006-07. Beasley also testified that the

23    reason none of Mr. Howard's prints were found on the .357 revolver or on the

24    victim's car is because fingerprints evaporate. 8 RT 2018.

25        The prosecution's fingerprint examiner, Richard Houle testified that he

26    examined and compared the prints obtained by Beasley from the victim's car. 8 RT

27    2018. He further testified that one of those prints was not suitable for comparison,

28    (8 RT 2069), and that the three other prints that were suitable for comparison did not

match the prints of Mr. Howard, the tow-truck driver who transported the car after the crime, or Funches.  8 RT 2069.  His testimony is based on a very brief, typed summary.  SHP Ex. 1 at 308-09.  He did not provide notes detailing how he made these comparisons, or detailing the extent to which he tested these prints to develop potential information about any other suspects.  SHP Ex. 1 at 308-09.

Counsel prejudicially and unreasonably failed to retain appropriate experts to assess the prosecution's fingerprint evidence.  Instead, trial counsel inadequately attempted to undermine the prosecution's fingerprint evidence by establishing that, according to Beasley, there was a likelihood of obtaining prints from an object a person touched multiple times, though not necessarily a greater likelihood.  8 RT 2014.  And that of the prints Houle tested from the driver's side of the victim's car, there were two partial palm prints and one partial fingerprint, none of which matched those of Mr. Howard.  8 RT 2070.

The prevailing professional norms at the time required counsel to retain, consult and present evidence undercutting the prosecution's fingerprint evidence. Such an expert could have (1) reviewed the prosecution's fingerprint testing and collection methods, (2) assessed the validity of the prosecution's assertion that rain washed away Mr. Howard's prints which otherwise would have been found on the gun or the victim's car; and, (3) determined whether the prosecution adequately tested the three comparable prints that did not match those of Mr. Howard's or co-defendant Funches, to develop evidence of a third party guilt suspect.  SHP Ex. 45 at ¶ 13.

Trial counsel had no strategic reason not to have acted in accordance with prevailing professional norms.  Had counsel performed competently, counsel would have retained such an expert who in turn would have discovered and could have presented reliable, credible, admissible evidence debunking the prosecution's theory including, but not limited to the following:

Fingerprints, contrary to the testimony of the prosecution's forensic specialist

1    Beasley, are not washed away by the rain. While fingerprints are predominantly

2    composed of water, they are also composed of oils, proteins, amino acids, and salts.

3    Prints thus can remain even after being exposed to rain and the elements. SHP Ex.

4    75 at ¶ 11.

5        Neither Beasley nor Houle adequately documented the methods they

6    employed to test or collect the fingerprints, as is customary. As such, there was

7    reason to question whether they adequately tested the comparable prints obtained

8    from the victim's car to determine whether they could identify a third-party suspect.

9    SHP Ex. 75 at ¶¶ 8, 10.

10        **2) Legal Framework Establishing That Trial Counsel Was**

11           **Ineffective for Failing to Adequately Challenge the**

12           **Prosecution's Forensic Evidence.**

13        It is well established that trial counsel in a criminal case is required to "subject

14    the prosecution's case to meaningful adversarial testing;" the failure to do so violates

15    the defendant's Sixth Amendment right to counsel. *United States v. Cronic*, 466 U.S.

16    648, 659 (1984). Trial counsel may render unconstitutionally ineffective assistance

17    when he fails to challenge the prosecution's forensic evidence through the use of

18    expert testimony. *Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008) (finding

19    trial counsel ineffective for failing to consult with and present the testimony of an

20    expert to challenge the prosecution's forensic evidence); *Draughon v. Dretke*, 427

21    F.3d 286, 296-97 (5th Cir. 2005) (granting a claim of ineffective assistance of

22    counsel at the guilt phase based on trial counsel's failure to obtain an expert

23    examination of key forensic evidence and to present this evidence); *see also Driscoll*

24    *v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (granting a claim of ineffective assistance

25    of counsel at the guilt phase based on trial counsel's failure to adequately prepare to

26    challenge the prosecution's forensic evidence and to "prevent the jury from retiring

27    with an inaccurate impression," regarding this evidence). Trial counsel is also

28    ineffective under circumstances where he has hired an expert but has failed to

adequately consult with that expert. *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("[T]he mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable.").

### 3) Trial Counsel's Failure to Meaningfully Challenge the Prosecution's Forensic Evidence Prejudiced Mr. Howard.

Trial counsel was ineffective for failing to investigate, develop, and present evidence impeaching the prosecution's forensic evidence. As trial counsel acknowledges, he retained a forensic expert to review the prosecution's fiber evidence because he understood this evidence to be pivotal to the prosecution's case. SHP Ex. 90 at ¶ 5. Trial counsel nevertheless did not call this expert or proffer any affirmative evidence undermining the prosecution expert's, Ogino's, conclusions, despite the numerous mistakes and misrepresentations Ogino made detailed above.

Moreover, affirmative evidence establishing the ubiquitous nature of cotton and polyester fibers and the absolute inability, given the tests Ogino conducted, of concluding that the fibers were manufactured at the same plant, would have significantly discredited the prosecution's case. SHP Ex. 70 ¶¶ 18-21 (explaining how Ogino's conclusions were not supported by the testing conducted). Cross-examining Ogino was insufficient to elicit this crucial evidence. The fiber evidence convinced several jurors that Mr. Howard was culpable for the capital crime. SHP Ex. 59 at ¶ 5; SHP Ex. 74 at ¶ 4. The prejudice is similarly evidenced by the significant weight the prosecution accorded Mr. Ogino's fiber testimony. It was the final piece of evidence the prosecution previewed for the jury in opening statements. 7 RT 1649-50. During closing argument, the prosecutor hammered on the fiber evidence as not only establishing Mr. Howard's presence but also as corroborating Randi Collins's description of events and Torrence's testimony. 9 RT 2406-12. The fiber evidence was a cornerstone of the prosecution's forensic case. Trial counsel understood this as this was the last factual argument counsel made before discussing

81

1  the law. 9 RT 2416-28.

2        Trial counsel was also ineffective for failing to investigate, develop, and

3  present evidence demonstrating that the prosecution's theories concerning the

4  absence of Mr. Howard's fingerprints at the crime scene and on the gun the

5  prosecution claimed Mr. Howard carried on the day of the crime, were invalid.  At

6  the very least, had the jury learned that fingerprints were not wiped away by the rain,

7  this would have given them yet further evidence that Mr. Howard was not at the

8  scene of Ms. Collins' shooting.

9        Evidence demonstrating that law enforcement relied on faulty forensic science

10  would have underscored the absence of Mr. Howard's fingerprints on the gun he

11  purportedly carried on the day of the crime, and as well as on the victim's car.  The

12  dearth of physical evidence would have convinced at least one juror not to convict

13  Mr. Howard of first-degree murder.  *Richey v. Bradshaw*, 498 F.3d 344 (finding

14  ineffective assistance of counsel where, inter alia, trial counsel failed to present

15  competing scientific evidence against state's forensic experts).

16        **b.  Trial Counsel Unreasonably and Prejudicially Failed to Test the**

17        **Testimony of Key Prosecution Witness Cedric Torrence.**

18        Counsel possessed or knew about evidence that could have undermined

19  Torrence's testimony in general as well as specific recollections.  Yet, trial counsel

20  failed to effectively cross examine Torrence about his motivations for implicating

21  Mr. Howard. Counsel knew that Det. Blackwell's interviews with Torrence provided

22  incentive for Torrence to implicate Mr. Howard.

23        **1)  Facts and Allegations**

24        **Police Coercion of Torrence**

25        As set forth in Claim Three subsection A(2), and incorporated by reference

26  herein, Det. Blackwell intimidated and coerced Torrence by threatening his job and

27  by implying that Mr. Howard had implicated him. On April 25, 1995, when cross-

28  examining Torrence, trial counsel twice asked if he remembered Det. Blackwell

Petition for Writ of Habeas Corpus

implying that Torrence's job was in jeopardy if he did not cooperate, and further, that unless he did, he might also be facing criminal trouble. Specifically, counsel asked if he, Torrence, remembered Det. Blackwell telling him that "being involved in this kind of case could mess you up at your work," but that Det. Blackwell would not do that "depending on what Torrence told him." 7 RT 1698. Torrence responded that he did not. Trial counsel dropped this line of questioning and made no attempt to refresh Torrence's recollection. 7 RT 1698-99.

Reasonable counsel, knowing that Det. Blackwell threatened Torrence's job and further threatened him with incarceration if he did not provide him with the information the detective sought, would have utilized the transcript of the February 10, 1993 and January 5, 1995 interviews to highlight the pressure Det. Blackwell placed on Torrence and the bias generated as a result. SHP Ex. 45 at ¶¶ 16, 18, 19. Trial counsel had no reason not to use the information trial counsel possessed.

Had trial counsel performed within prevailing norms, he could have impeached Torrence and established his bias. Torrence was the *only* witness to testify that Mr. Howard and Funches planned to commit a robbery and that they knew each other prior to the date of the incident. 7 RT 1662-63. Any evidence that undermined his credibility or demonstrated a motivation to implicate Mr. Howard would have undercut the prosecution's case. This was aptly demonstrated by the fact that Torrence did not testify against Funches, whose jury hung on the robbery charge.

**Torrence's Conflicting Statements about the Gun**

Trial counsel failed to adequately impeach Torrence with his conflicting statements as to whether and under what circumstances he saw Mr. Howard with a gun on December 6, 1992. Counsel knew or should have known that law enforcement and defense investigators interviewed Torrence multiple times about whether Mr. Howard carried a gun on the day of the crime. Counsel was also familiar with Torrence's testimony at the Grand Jury proceedings. Torrence gave

Petition for Writ of Habeas Corpus

1    inconsistent statements across these interviews and testimony regarding whether and

2    when he allegedly saw Mr. Howard with a gun on December 6, 1992.

3    During Det. Blackwell's initial February 10, 1993 interview with Torrence,

4    Torrence stated that he did not see Mr. Howard with a gun on December 6, 1992.

5    SHP Ex. 9 at 2503; Ex. 3 at 1988-89.

6    When Det. Blackwell interviewed Torrence five days later, on February 15,

7    1993, however, Torrence contradicted himself and stated that he had seen Funches

8    and Mr. Howard with guns in the garage on December 6, 1992.  SHP Ex. 3 at 2037-

9    78, 2047-48.  Det. Blackwell questioned Torrence at length about Funches' gun and

10    whether Torrence had seen Funches with the gun on previous occasions, whether

11    Funches knew how to use the gun, whether Funches had shot the gun before, and

12    what length of time Funches had had the gun.  *Id.* at 2046-47.  Torrence made no

13    mention of having seen Mr. Howard with a gun prior to being in the garage on

14    December 6, 1992. *Id.* at 2037-78.

15    On September 20, 1993, Funches' investigator, Tom Dawson, interviewed

16    Torrence about whether he saw Funches or Mr. Howard with a gun in the garage on

17    December 6, 1992.  Torrence responded: "I had seen 'em before."  SHP Ex. 9 at

18    2428.  When asked a second time about whether he saw the guns in the garage, he

19    stated "yeah, I seen 'em." *Id.* at 2428.  He did not state that he had seen Mr. Howard

20    with a gun earlier that day or on any other day. *Id.* at 2428-30.

21    Approximately six months later, Torrence testified before the grand jury on

22    March 1, 1994.  He stated that he had seen Mr. Howard with a .357 revolver in the

23    garage on the day of the crime but did not say that he had seen Mr. Howard with a

24    gun at any earlier point that day.  ART 10-20.

25    On January 5, 1995, Funches' investigator, Tom Dawson, and Mr. Howard's

26    investigator, Gerald Williamson, interviewed Torrence in the presence of San

27    Bernardino Police Officer Hans Vander Veen.  Torrence initially stated that he had

28    not seen Mr. Howard with a gun on December 6, 1992:

Petition for Writ of Habeas Corpus

1    Mr. Williamson: "You saw some guns, that night?"

2    Torrence: "I seen some guns. I didn't say I seen them that night. I said I'd

3    seen them before."

4    Mr. Williamson: "Okay. Did you see any guns that night?"

5    Torrence: "I'd seen some before."

6    Williamson: "Okay but not that night, in the garage. Okay, how about that

7    afternoon?"

8    Torrence: "Well, I knew they keep 'em. On 'em." SHP Ex. 9 at 2448.

9    Later in this same interview Torrence stated that he had seen "the gun strapped

10    on [Demetrius] earlier in the day [of December 6, 1992]," though he did not say

11    when or where. *Id.* at 2486. Torrence made no mention of having seen Mr. Howard

12    with a gun on multiple occasions during the day on December 6, 1992, as he later

13    testified at trial.

14    On April 25, 1995, during an Evidence Code section 402 hearing regarding

15    the admissibility of the .357 revolver that the prosecution alleged Mr. Howard

16    carried on the day of the crime, Torrence stated for the first time, that he had seen

17    Mr. Howard with the .357 revolver on multiple occasions on December 6, 1992.

18    Specifically, he testified to what follows.

19    Torrence claimed that he initially saw Mr. Howard with the .357 revolver

20    when he picked Mr. Howard up on the morning of December 6, 1992. 7 RT 1607.

21    He next claimed that he saw Mr. Howard with the .357 revolver when they arrived

22    at his house prior to playing football. According to Torrence, Mr. Howard "put the

23    gun up," under Torrence's bed. 7 RT 1608. Then, he saw Mr. Howard with the gun

24    after they got back from playing football and prior to going over to the garage. 7 RT

25    1609. According to Torrence, Mr. Howard retrieved the gun from Torrence's room.

26    7 RT 1609. Torrence said that he saw the gun a fourth time on the day of the incident:

27    he saw it between his house and the garage, when Demetrius "put [the gun] up" in

28    the street on the way to the garage. 7 RT 1609. Finally, Torrence testified that he

Petition for Writ of Habeas Corpus

1    saw the gun one last time once they arrived in the garage.  7 RT 1610.

2    Later that same day, in the prosecution's case-in-chief, Torrence testified that

3    he picked Mr. Howard up from his aunt's house in the late morning of December 6,

4    1992, at which time he saw that Mr. Howard was carrying a gun in his back belt.  7

5    RT 1656- 1657, 1693.  He testified that they then went to Torrence's house where

6    they "put the gun up," under Torrence's mattress (7 RT 1693), and then went to play

7    football.  7 RT 1657.  Torrence testified that after they played football, they went

8    back to his house, Demetrius got the gun from under the mattress, put it in his belt

9    buckle (7 RT 1695), and they then walked over to the garage.  7 RT 1658.  Torrence

10   stated that he again saw the gun when they went into the garage, because Mr. Howard

11   "pulled it out" and "put it back up."  7 RT 1696.  At no point during Torrence's

12   testimony in the case-in-chief did he state that he had seen Mr. Howard with a gun

13   in the street on the way to the garage.  7 RT 1655-718.

14   Reasonable counsel, knowing that Torrence was asked repeatedly and under

15   oath about seeing Mr. Howard with a gun on December 6, 1992, and knowing that

16   he gave several prior inconsistent statements and testimony, would have impeached

17   him with those statements.  SHP Ex. 45 at ¶¶ 16, 18, 19.  There is no strategic reason

18   why trial counsel failed to do so.  Had trial counsel acted in accordance with

19   prevailing norms and impeached Torrence with his conflicting statements about

20   whether and if he saw Mr. Howard with a gun on December 6, 1992, he would have

21   established what follows.

22   Despite being asked in multiple interviews and under oath during grand jury

23   proceedings, about whether and when he saw Mr. Howard with a gun, Torrence never

24   mentioned having seen Mr. Howard with a gun when he picked him up in the

25   morning, prior to the football game at his house, after the football game at his house,

26   or en route to the garage, until the day of his testimony.  7 RT 1608-12, 1693-96.

27   On January 5, 1995, Torrence initially emphatically stated that he had not seen

28   Mr. Howard with a gun on December 6, 1992.  SHP Ex. 9 at 2448.  Only when asked

Petition for Writ of Habeas Corpus

again did he state that he had seen Mr. Howard with a gun, though he did not give details as to when or where. *Id.* at 2486. On September 20, 1993, Torrence initially stated he did not see Mr. Howard with a gun, and only when asked a second time did he vaguely state that "yeah," he'd "seen 'em." *Id.* at 2428. Given that Torrence was the only witness to tie Mr. Howard to the purported plan to commit a robbery and to the gun, impeaching his credibility was critical. Counsel's failure to do so when he possessed all of the material to impeach him fell below the standard of care. SHP Ex. 45 at ¶¶ 16, 18, 19.

Trial counsel also unreasonably and prejudicially failed to impeach Torrence with his inconsistent statements as to whether Mr. Howard stated he needed a ride because he had a gun, or a strap, with him. Trial counsel knew or should have known that Torrence had made inconsistent statements regarding his conversation with Mr. Howard about a ride on the evening of December 6, 1992.

All parties agreed that on the evening of December 6, 1992, Mr. Howard called Torrence and asked him for a ride home. 9 RT 2207. On February 10, 1993, when Det. Blackwell initially asked Torrence about what Mr. Howard had told him over the phone, Torrence stated that Mr. Howard told him he was stranded and needed a ride. SHP Ex. 3 at 2001. In response, Det. Blackwell told Torrence "not to play [a] hiding game," and "to stop holding out on [him]." *Id.* at 2001-02. Torrence then offered that Mr. Howard told him he needed a ride because he had his strap on him. *Id.* at 2002.

On February 15, 1993, in Torrence's second interview with Det. Blackwell, Det. Blackwell asked Torrence if Mr. Howard told him over the phone that he had a gun with him. *Id.* at 2061. Torrence told him that he "[he] thought he did, but I'm not for certain." *Id.* at 2061. He further stated that he could not be sure because he had been drinking and he "couldn't remember the conversation." *Id.* at 2062-63. On January 5, 1995, just a few months prior to Mr. Howard's trial, defense investigators, Dawson and Williamson, asked Torrence what Mr. Howard said when

Petition for Writ of Habeas Corpus

he called him the night of December 6, 1992.  SHP Ex. 9 at 2486.  Torrence responded that Mr. Howard "[said] that he needed a ride home." *Id.* at 2486.  In response to a specific question about whether Mr. Howard referenced a gun or strap while on the phone, Torrence responded that he had "seen [the gun] strapped on [Mr. Howard] earlier that day," but made no mention of Mr. Howard having said that he had a strap on him during their phone conversation that evening. *Id.* at 2486.  During his testimony for the prosecution, however, Torrence testified that Mr. Howard called him for a ride on the evening of December 6, 1992, and stated that he "had his strap on." 7 RT 1668.

Trial counsel failed to effectively or adequately confront Torrence with his prior inconsistent statement or utilize his interactions with Det. Blackwell to establish bias.  Reasonably competent counsel, knowing that Torrence made inconsistent statements about whether Mr. Howard told him that he had a gun on him on the phone, and knowing that Torrence provided the prosecution's only evidence linking Mr. Howard to a gun, would have impeached Torrence with each of his conflicting statements.  SHP Ex. 45 at ¶¶ 16, 18, 19.

**Torrence's Threats against Mr. Howard's Sister**

Trial counsel also unreasonably and prejudicially failed to impeach Torrence with his prior criminal record and with statements indicating that he would testify falsely against Mr. Howard to protect his own interests as set forth in Claim Three, subsection 2, and incorporated by reference herein,

Trial counsel knew or should have known that Torrence had a prior criminal record related to threats made against Mr. Howard's sister, Delena Gandy, and that these threats included testifying in Mr. Howard's case if Gandy did not accede to his demands.  Law enforcement provided in discovery the information that follows.

Gandy, Mr. Howard's half-sister, had a baby with Torrence. SHP Ex. 1 at 420-21.  On December 26, 1993, when Gandy and Torrence were no longer in a relationship, Torrence went to Gandy's house armed with a .22 semi-automatic

88

Petition for Writ of Habeas Corpus

handgun, brandished it at Gandy and her mother, Milford Dodson, and threatened them over child visitation issues. *Id.* at 419-20.

Torrence told Gandy that "he should have killed her when he had the chance so he could have their son." *Id.* at 420. Torrence further threatened Gandy's mother, by telling her that "he had been up nights thinking about ways to kill Gandy, so he could have the child." *Id.* at 420.

Law enforcement officers caught Torrence as he was leaving their house, searched him for weapons, and found the .22 semi-automatic handgun concealed his front right pocket. *Id.* at 420. Torrence was subsequently charged with having violated Penal Code section 422 (making terrorist threats that could result in death and great bodily injury), Penal Code section 417 (brandishing a firearm), and Penal Code section 12025 (carrying a concealed weapon). *Id.* at 416. Just a few months prior to this incident, in September 1993, Torrence told Gandy that he would get Mr. Howard "off the hook" provided Gandy was reasonable regarding the support and custody of their son. SHP Ex. 26 at 4109, 4111.

Trial counsel inadequately and ineffectively attempted to elicit testimony from Torrence regarding the confrontation, his threats, and his explicit statements that he would testify in Mr. Howard's favor in exchange for child custody rights. 7 RT 1706. Torrence denied having engaged in any of this behavior, and trial counsel failed to use police reports and a temporary restraining order in his possession to impeach Torrence's false statements. Trial counsel's failures permitted the prosecutor, on re-direct, to ask Torrence to confirm that he never made comments to Mr. Howard's sister about his being able "to help or hurt" Mr. Howard, and Torrence confirmed that he had not. 7 RT 1706.

Reasonable counsel, knowing all this would have used those documents to attack his veracity and establish his bias. SHP Ex. 45 at ¶¶ 19, 20. Had counsel acted in accordance with prevailing norms, counsel could have elicited or introduced reliable, admissible, and compelling evidence to paint Torrence as untrustworthy

because he had a vendetta against Mr. Howard's sister regarding the custody and support of their son and made clear that he would implicate Mr. Howard in the instant crime were she not to cooperate with his demands.  SHP Ex. 3 at 4109, 4111.

**False Statements about Mr. Howard Knowing Mitchell Funches**

Trial counsel unreasonably and prejudicially failed to investigate, develop, and present reliable and admissible evidence to impeach Torrence's assertion that Mr. Howard had a previously existing relationship with Mitchell Funches. Specifically, trial counsel failed to use information in his possession, and to uncover additional, readily available evidence.  Counsel knew or should have known that Torrence maintained that Mr. Howard and co-defendant Funches had a previously existing relationship, that such an assertion was damaging to Mr. Howard's case, and that there was substantial evidence indicating the contrary.

Det. Blackwell interviewed Funches right after Mr. Howard's arrest at 12:53 a.m., December 7, 1992.  SHP Ex. 3 at 1902.  Throughout the interview, despite promptings from Det. Blackwell – including telling Funches that "Demetrius want[ed] to talk about [him]" – Funches steadfastly maintained that he did not know who Mr. Howard was or what he had been doing on the day of the crime.  *Id.* at 1932-34.  In addition, George Rivera, in a taped-recorded interview with Det. Blackwell on April 27, 1993, stated that he did not know whether Funches and Mr. Howard knew one another.  SHP Ex. 4 at 2264.[20]  Nevertheless, during his first interview with Det. Blackwell on February 10, 1993, Torrence told Det. Blackwell that Mr. Howard and Funches knew each other.  *Id.* at 1978, 1981.  Torrence then falsely testified that Mr. Howard and Funches knew each other prior to December 6, 1992.  7 RT 1662.  Trial counsel failed to impeach Torrence with information in his

---

[20]  Trial counsel, however, failed to present evidence indicating that Det. Blackwell made material omissions in his interview with George Rivera, including omitting information tending to suggest that Mr. Howard and Funches did not know one another prior to being charged for the instant crime.

1    possession to the contrary.

2       Reasonable counsel, knowing that Funches told Det. Blackwell multiple times

3    that he did not know Mr. Howard would have also located, interviewed, and

4    presented readily available witnesses who could have verified that Funches and

5    Howard did not know each other. The standard of care obligated counsel to locate

6    witnesses or documentary evidence to substantiate Funches' adamant statements and

7    to undermine Torrence's testimony. SHP Ex. 45 at ¶¶ 8, 16, 18, 19.

8       Trial counsel failed to do so even though there were several available

9    witnesses, about whom counsel knew or should have known, who could have

10   provided information to this effect. Had trial counsel acted in accord with the

11   standard of care trial counsel could have located reliable, credible witnesses who

12   could have provided admissible, trustworthy testimony establishing that Funches did

13   not know Mr. Howard. These witnesses include, but are not limited to Danny Rivera,

14   Michael Funches, and Deborah Funches. They would have provided trial counsel

15   with information that follows.

16      According to Danny Rivera, George's brother, a prosecution witness, and a

17   friend to both Funches and Torrence, Funches and Torrence were part of the same

18   group of friends, and Mr. Howard was not part of that group. SHP Ex. 68 at ¶¶ 1, 2.

19   According to Michael Funches, Funches' brother, Mitchell Funches and Cedric

20   Torrence were part of the same friend group, as were Danny and George Rivera.

21   SHP Ex. 51 at ¶¶ 1, 3. Mr. Howard was not part of this group. SHP Ex. 51 at ¶ 2.

22   Michael Funches had never heard about Mr. Howard from his brother and did not

23   recognize him when shown his photograph. SHP Ex. 51 at ¶ 2. According to

24   Deborah Funches, Funches' sister-in-law, she was familiar with Funches' friends and

25   never heard of or met anyone by the name of Demetrius Howard. SHP Ex. 50 at

26   ¶¶ 3-4.

27      Had the jury heard evidence from multiple sources, including Funches,

28   against his penal interest, that Funches and Mr. Howard were not to their knowledge

Petition for Writ of Habeas Corpus

1  friends or part of the same friend group, the jury could have accorded credence to

2  Mr. Howard's statements.  Without such corroboration, the jury had little reason to

3  doubt Torrence.

4  **Funches' Statements That He Was Alone During the Offense**

5  Trial counsel unreasonably and prejudicially failed to introduce Funches'

6  multiple statements against interest that he was alone when he shot the victim.  These

7  statements were critical because they would have exculpated Mr. Howard and

8  impeached Torrence's testimony.

9  At the outset of Det. Blackwell's first interview with Funches, Funches told

10  Det. Blackwell, upon being asked about who was with him when the victim was

11  shot, that "nobody was with [him]."  SHP Ex. 3 at 1904.  During this same interview,

12  Det. Blackwell again asked Funches about the person who was with him and

13  Funches again stated "wasn't anybody with me."  *Id.* at 1905.

14  Det. Blackwell continued to question Funches about who he had been with on

15  that day and evening.  Funches told him that he had been with Cedric that day and

16  that they had been drinking together.  *Id.* at 1912.  Funches also told him that he had

17  been at his friend Greg, or Baby G's house, earlier that day.  *Id.* at 1908-11.  Funches

18  also told Detective Blackwell that he did not know anyone by the name of Demetrius

19  Howard.  *Id.* at 1932, 34.

20  Reasonably competent counsel, knowing that the prosecution's case against

21  Mr. Howard turned on his purported participation in both the planning and attempted

22  effectuation of a carjacking with Funches, and knowing that the only evidence

23  supporting the prosecution's case was the testimony of Torrence, would have

24  presented Funches' statements admitting, against his penal interest, that he was alone

25  when he carried out the crime.  SHP Ex. 45 at ¶ 16.  The standard of care mandated

26  trial counsel present this evidence and trial counsel had no strategic reason not to do

27  so.  Had trial counsel utilized Funches' statements, he could have presented the jury

28  with evidence that the co-defendant repeatedly claimed that he did not know Mr.

Howard and that Mr. Howard was not with him during the commission of the crime. SHP Ex. 3 1904-05, 1932, 1934.

### 2) Legal Framework Establishing That Trial Counsel Was Ineffective for Failing to Interview, Adequately Cross-Examine, or Impeach Key State Witnesses About Inconsistencies in Their Testimony.

Trial counsel is ineffective when he fails to interview, adequately cross-examine, or impeach key state witnesses about inconsistencies in their testimony. *Thompson v. Calderon*, 120 F.3d 1045, 1054-55 (9th Cir. 1997) (en banc), *reversed on other grounds*, 523 U.S. 538 (1998) (granting guilt phase relief in part based on the fact that counsel could have "discovered and presented substantially more impeaching evidence" against an informant); *Cargle v. Mullin*, 317 F.3d 1196, 1213-14 (10th Cir. 2003) (finding ineffective assistance of counsel where counsel failed to impeach prosecution witnesses); *Matthews v. Abramajtys*, 319 F.3d 780, 789-90 (6th Cir. 2003) (finding ineffective assistance of counsel where counsel failed to challenge key discrepancies in state's case); *see also People v. Andrade*, 79 Cal. App. 4th 651, 657 (Cal. Ct. App. 2000) (trial counsel provides unconstitutional representation when his failure to impeach a key prosecution witness is due to unfamiliarity with that witness's prior statements).

### 3) Trial Counsel's Failure to Test the Testimony of Key Prosecution Witness Cedric Torrence Prejudiced Mr. Howard.

Trial counsel provided ineffective assistance of counsel by failing to adequately test the testimony of key prosecution witness Torrence. As set forth above, trial counsel failed to impeach Torrence on a variety of consequential matters, including: (1) Torrence's interest in self-protection as a motivation to implicate Mr. Howard; (2) whether and under what circumstances Torrence saw Mr. Howard with a gun on the day of the crime; (3) whether Mr. Howard asked Torrence for a ride because he had a strap, or gun, on him; (4) Torrence's prior criminal history of

Petition for Writ of Habeas Corpus

threatening the mother of his child, Delena Gandy, who is also Mr. Howard's sister, with implicating Mr. Howard in Ms. Collins' death in order to obtain custody over their child; and (5) Torrence's assertion that co-defendant Funches and Mr. Howard had a pre-existing relationship.

Trial counsel understood that "it was important to impeach Mr. Torrence's credibility" through cross-examination.   SHP Ex. 90 at ¶ 7.   He focused on Torrence's credibility in his closing arguments.  9 RT 2415 ("I told you [Torrence's] credibility was going to be an issue and it is.").   Yet, he failed to cross-examine Torrence on the wealth of impeachment evidence he possessed, or should have obtained through a competent investigation.  Evidence indicating that Torrence was dishonest would have undermined the value of his testimony and changed the outcome of Mr. Howard's case.  Because Torrence was the only prosecution witness linking Mr. Howard to the crime scene and to any purported car-jacking, impeaching him was crux of the defense's case.   But counsel's attempted impeachment of Torrence – regarding his drug and alcohol consumption, the size of the gun he purportedly saw Mr. Howard carry, and Torrence's statement, made for the first time during trial, that he and Mr. Howard were alone in the garage prior to the crime – was ineffectual and ineffective in its own right.

The prosecutor capitalized on counsel's failures, arguing, for example, in closing that Mr. Howard was being dishonest when he claimed not to have known Funches prior to being arrested for this offense.  9 RT 2432.  These failures individually and cumulatively left the jury with the misimpression that Torrence had no pressures or motivation to implicate Mr. Howard.  Had trial counsel utilized the wealth of material readily available to him, the jury would not have convicted Mr. Howard of first-degree murder or found the special circumstance to be true.

Petition for Writ of Habeas Corpus

**c. Trial Counsel Unreasonably and Prejudicially Failed to Investigate, Develop, and Present Evidence Challenging the Attempted Robbery Charges against Mr. Howard.**

**1) Facts and Allegations**

Counsel knew that the sole assumed criminal conduct that made Mr. Howard culpable for first degree murder and subjected him to special circumstance liability was the supposed plan he and Funches concocted to commit a robbery. Because it was undisputed that Funches was the actual shooter, the only way Mr. Howard could be liable was as an aider and abettor of first-degree murder and special circumstance liability. Counsel knew, therefore, that if the prosecution could not prove beyond a reasonable doubt that there had been an attempted robbery, the jury could not convict Mr. Howard.

Counsel consequently knew or should have known that a plethora of evidence indicated that the homicide was not committed in furtherance of a robbery, including: (1) physical evidence and (2) inaction on the part of the perpetrators. The non-exclusive physical evidence militating against an attempted robbery includes what follows.

Funches had twenty-six dollars and thirty-eight cents. Funches' Defense Ex. No. 78. Funches was also wearing a 10-karat gold ring and 14-karat gold hoop earrings at the time of his arrest. Funches' Defense Ex. No. 87.

Sherry Collins had thirty-four dollars and eighty cents in her pocket that was left undisturbed at the time of her death. SHP Ex. 1 at 121. She was wearing four silver necklaces, a silver wristwatch, and a gold bracelet, all of which were left undisturbed at the time of her death. *Id.* And she had keys in her front jacket pocket that were left undisturbed at the time of her death. *Id.*

Inaction on the part of the perpetrator or perpetrators militating against the conclusion that a robbery was attempted follows.

According to Randi Collins, the perpetrator or perpetrators did not attempt to

1    take Sherry Collins' purse.  SHP Ex. 2 at 1840.  The perpetrators did not attempt to

2    take Sherry Collins' keys.  *Id.*  The perpetrators did not attempt to take anything from

3    inside Ms. Collins' car.  *Id.*

4        Trial counsel asked no questions and elicited no independent evidence

5    establishing that Funches was arrested with money and valuable jewelry, but that no

6    property, money or other items were taken from Ms. Collins.  7 RT 1751-67, 8 RT

7    2101-08.[21]

8        Counsel was or should have been aware that law enforcement agents advanced

9    a felony-murder theory from the beginning and manipulated evidence to support it,

10    including cajoling Randi Collins, the victim's five-year-old daughter, into ratifying

11    their theory, despite that she had made no comments indicating that there had been

12    a robbery or attempted robbery prior to Det. Blackwell's involvement, or that the

13    purported second assailant held a gun.

14        Det. Blackwell pre-determined that Funches' motive for killing Ms. Collins

15    was a robbery.  During his interview of Funches, a few hours after Funches was

16    arrested on December 6, 1992, Det. Blackwell accused Funches of shooting Ms.

17    Collins in order to take her car and to rob her.  SHP Ex. 2 at 1923.  Funches denied

18    this as being the motive and told Det. Blackwell that in fact, he had "some money in

19    his pocket."  SHP Ex. 1 at 1922.  Funches further told Det. Blackwell that he killed

20    Ms. Collins because she "almost hit [him] with [her] car."  SHP Ex. 3 at 1922.

21        Yet, in Det. Blackwell's interview with Randi Collins, despite having no

22    evidence that Funches intended to rob the victim or take her car, Det. Blackwell

23

24    [21]  Relatedly, trial counsel unreasonably and prejudicially did not ask the
25    prosecution to provide him with a property report listing the items law enforcement
      took from Mr. Howard upon his arrest.  The San Bernardino Police Department
26    requires the making of such a report (SHP Ex. 76) and, it is possible that Mr.
      Howard, like Funches, similarly had money or property on him on the day of the
27    crime.  Trial counsel could have presented such information to further challenge
28    the prosecution's robbery theory.

Petition for Writ of Habeas Corpus

extensively questioned Miss Collins about whether the men were trying to take her mother's car or property. SHP Ex. 2 at 1841-4242; 1848-50. Trial counsel departed from the standard of care and did not ask Det. Blackwell any questions to establish that Det. Blackwell determined that robbery was the motive prior to speaking with any witnesses who allegedly offered support for this theory. 7 RT 1751-67; 8 RT 2101-08.

Trial counsel also failed to present evidence of Miss Collins' three conversations with adults, including two law enforcement officers, in the immediate aftermath of the crime in which she said nothing to indicate that a robbery was attempted when her mother was shot. In accordance with the prevailing standard of care, trial counsel should have established salient material facts blunting the prosecution's theory, which include facts that follow.

Shortly after the shooting of Ms. Collins, Det. Lotspeich conducted a neighborhood canvass of the area where Ms. Collins' was shot. SHP Ex. 1 at 8-9. During the course of this canvass, Det. Lotspeich spoke with Garduno, a neighbor of Ms. Collins, and the woman to whose apartment Randi Collins went immediately after the shooting of Ms. Collins. *Id.* at 9. Garduno told him that Miss Collins knocked on her door in the aftermath of her mother's shooting, told her that her mother had been shot, and that the perpetrators were two Black guys, one of whom was carrying a bat. *Id.* Garduno reported all that Miss Collins told her and there was no mention of a robbery or an attempted robbery. *Id.* Det. Lotspeich also spoke with Miss Collins close in time to her mother's death. SHP Ex. 1 at 5. Miss Collins did not indicate that there had been a robbery or an attempted robbery. *Id.*

On December 6, 1992, Police Officer Christine Hall spoke with Randi Collins about what had occurred. SHP Ex. 1 at 14. Miss Collins made no statements indicating that there had been a robbery or an attempted robbery. *Id.*

Trial counsel possessed evidence of alternative motives for the shooting of Ms. Collins that he should and could have elicited to further subvert the

Petition for Writ of Habeas Corpus

prosecution's robbery theory. For example, witness Mark Huse was interviewed by Detective Potts at 10:20 p.m. on December 6, 1992. On December 6, 1992, at around 10:00 p.m., Mark Huse was walking in the 5280 North Little Mountain Drive apartment complex, where the homicide occurred, when he heard a "boyfriend/girlfriend type fight," coming from a garage south of where he was walking. SHP Ex. 1 at 58. Shortly thereafter, Huse heard gunshots, a female scream, and then saw two men, one wearing all dark clothing and one wearing a "bright white tee-shirt" exit from the same area. SHP Ex. 1 at 58. Huse subsequently told another person he saw passing by about what had happened, and together they found the body of the victim in the garage. *Id*. at 59. The interview took place a few hours after Huse heard the shots. *Id*. at 58. Trial counsel neither subpoenaed Huse nor did he seek to have Det. Potts testify about Huse's statement.

Finally, trial counsel should have established through readily available evidence that had Funches been motivated to commit a robbery, his friends would have known about it and discussed it after Funches was arrested. Evidence reasonably competent counsel could have elicited to demonstrate this includes, but is not limited to what follows.

According to Danny Rivera, who was in the garage area on December 6, 1992, with Funches, Mr. Howard, Torrence, and George Rivera, there was no discussion of a robbery or jacking that day. 8 RT 2080. Also, according to Rivera, it is likely that if Funches or Mr. Howard had a discussion about committing a jacking or a robbery, people would have discussed it after they had been charged with Ms. Collins' murder. SHP Ex. 68 at ¶ 4.

Reasonable counsel knowing that the prosecution's case and special circumstance allegations turned on Mr. Howard having committed an attempted robbery (8 RT 2381), would have presented the above described evidence. SHP Ex. 45 at ¶¶ 8, 10, 16. There was no strategic reason not to conduct the necessary investigation or utilize information contained in police reports to challenge the

government's robbery theory. Funches' counsel zealously did so with constitutionally significant success: his jury hung on the attempted robbery.

### 2) Legal Framework Establishing That Trial Counsel Was Ineffective for Failing to Adequately Challenge the Attempted Robbery Charges against Mr. Howard.

Under California Penal Code Section 189, in order to establish first-degree murder through the theory of an attempted robbery felony-murder, it must be established that: (1) that there was an unlawful killing of a human being; (2) the killing occurred as a result of the attempted commission of a robbery; (3) the defendant had the specific intent to commit the robbery; and (4) the attempted commission of the robbery is proven beyond a reasonable doubt. To establish an intent to commit a robbery it must be shown that the defendant (1) had the specific intent to commit robbery; and (2) that "a direct but ineffectual act was done toward [the commission of the robbery]." Cal. Penal Code § 21(a) (2013).

### 3) Trial Counsel's Failure to Investigate, Develop, and Present Evidence Challenging the Attempted Robbery Charges Prejudiced Mr. Howard.

Trial counsel had no strategic reason not to present the aforementioned evidence establishing that absence of a robbery. Indeed, counsel explicitly asked for jury instructions on lesser included offenses which the judge gave. 9 RT 2341-43, 2358. Although Mr. Howard's chief defense was the alibi defense, counsel understood that he could argue any theory that might lessen Mr. Howard's culpability and, significantly, defend against the special circumstance allegations.

None of the determinative evidence militating against an intended robbery was presented to the jury during Mr. Howard's trial. Had it been, the jury would have likely not found Mr. Howard guilty of the robbery charges against him, which would have also eliminated the prosecution's first-degree felony murder charges levied against Mr. Howard.

Petition for Writ of Habeas Corpus

    **d. Trial counsel unreasonably and prejudicially failed to investigate, develop, and present evidence challenging the prosecution's inconsistent and unreliable eyewitness evidence.**

Trial counsel understood that the eyewitness identification was important to the prosecution's case. Trial counsel conceded that "it was important to undermine the veracity and credibility of [the witness's identification]." SHP Ex. 90 at ¶ 10. Contrary to the prevailing norms for the performance of capital counsel, trial counsel failed to utilize material in his possession or that which he could easily have procured had he conducted the necessary investigation. Yet, as set forth below time and time again, trial counsel failed to investigate, develop and present evidence undermining unreliable testimony and worse, failed to utilized documents provided to him by law enforcement to this end.

    **1) Facts and Allegations**

**Steven Larsen's Inconsistent Descriptions**

Trial counsel failed to investigate, develop, and present evidence challenging the testimony of eyewitness Steven Larsen, a prosecution witness who saw two suspects running behind his house located near to the 1660 Kendall Drive apartment complex (7 RT 1840) shortly after Ms. Collins was shot. SHP Ex. 3 at 1853. Trial counsel knew or should have known that Mr. Larsen's initial and repeated descriptions of the perpetrators' clothing– in both his phone call to 911 and in his interview on the day of the crime– were inconsistent with the clothing Mr. Howard was wearing on December 6, 1992. Indeed, it was not until Mr. Larsen testified at trial that he changed his description after being presented with a booking photograph of Mr. Howard. 7 RT 1842. Counsel should have been aware that this testimony was inconsistent with his prior descriptions. SHP Ex. 35 at 2275.

At 7:08 p.m. on December 6, 1992, Steven Larsen's wife called 911 to report that he heard on their police scanner that there was a "DOA" at the Acacia apartment complex. SHP Ex. 3 at 1853. Larsen took the phone and stated that there were two

Black males running up the back of the wash, behind his house, which was in close proximity to the apartment complex. *Id.* He added that one was wearing a "dark, or black jacket" and that the other, the second suspect, was wearing a "white tee-shirt." *Id.* at 1854.

Later that evening, at 10:50 p.m., Larsen gave a taped interview to Det. Michael Potts wherein he stated that he saw two individuals, one in a white t-shirt, and the other in a dark jacket. SHP Ex. 5 at 2277. Larsen used the term "t-shirt" multiple times to describe what the second suspect was wearing. *Id.* 2277, 2279-80, 2285. During opening statements, the district attorney announced that Larsen would testify that he saw two suspects, one wearing all dark clothing, and one wearing a "long white shirt coat." 7 RT 1646.

At trial, on April 26, 1995, Larsen initially testified that he could not remember whether the second suspect was wearing a long-sleeved shirt or a short-sleeved shirt. 7 RT 1841. The District Attorney subsequently showed Mr. Larsen a booking photograph of Mr. Howard from behind wearing the gray, pull-over, sweater he had been wearing at the time of his arrest. Funches' Prosecution's Ex. No. 67. As set forth in Claim Three, subsection 4, it is apparent that Mr. Howard is wearing handcuffs. People's Ex. No. 67. Larsen testified that the shirt in the photograph was "definitely" what he had seen on December 6, 1992, and that he was certain because he remembered the sleeves of the shirt being "bunched up" as they were in the photograph. 7 RT 1842.

Aware of Larsen's prior inconsistent statements, trial counsel nevertheless failed to cross-examine him on them although the prevailing professional norms mandated that counsel use all impeachment evidence at his disposal. SHP Ex. 45 at ¶¶ 16, 19. There was no strategic reason that could have justified trial counsel's prejudicial failure. Had trial counsel exploited documents in his possession, he could have established that Larsen's trial testimony regarding what he saw was not credible, as established above.

Petition for Writ of Habeas Corpus

**Michael Manzella's Unreliable Statement**

Trial counsel failed to present readily available impeachment evidence of prosecution eyewitness Michael Manzella, who lived in the 1660 Kendall Drive apartment complex in a critically important location. *See* Claim Three, subsections 3-4.

Michael Manzella lived with his wife Laurie Manzella, in apartment 2 at the 1660 Kendall Drive apartment complex on December 6, 1992. SHP Ex. 1 at 265.

On February 3, 1993, Detectives Dillon and Izumi interviewed Manzella about a suspect he saw on the evening of December 6, 1992. *Id.* Det. Izumi wrote the report of this interview. *Id.*

According to Det. Izumi's report, Manzella told the Officers that he and his spouse, Laurie Manzella, heard a knock at their door and that when they opened the door they saw a "Black guy" already talking to the person in the apartment directly across, apartment 3. *Id.* Manzella described the person he observed as wearing a "white pullover shirt/jacket with a hood and pockets in the front." *Id.* Manzella subsequently testified that the suspect he saw was wearing a "white top shirt like a pull over or something like that," (7 RT 1850), but acknowledged that he was only able to get a "quick glance" of the suspect from the back. 7 RT 1851.

Capital defense counsel, operating in accordance with professional norms, would have read Manzella's interview and would have learned that Manzella provided law enforcement with information indicating that he was only able to see the suspect from the back. SHP Ex. 1 at 265. Based on this information, reasonable counsel would have challenged Manzella's eyewitness account as implausible. Trial counsel adhering to the bare minimum of standards of effective representation, either during the defense case-in-chief or on cross-examination, would have presented testimony consistent with the above in order to undercut the reliability of Manzella's recollections. SHP Ex. 45 at ¶¶ 16, 19. Trial counsel took none of these actions and had no strategic reason to justify this failure.

Petition for Writ of Habeas Corpus

The evidence trial counsel could have produced had he acted in accordance with professional norms includes but is not limited to what follows.   Michael Manzella could not have seen a pocket on the front of the suspect's shirt, as is stated in Det. Izumi's report (SHP Ex. 1 at 265), if he only saw the suspect from behind.  7 RT 1851.

Michael Manzella's ability to accurately observe the suspect, including his clothing, was hampered by the conditions, including the poor lighting, the short duration of his exposure to the suspect, and his limited vantage point enabling him only to see the suspect's back.  SHP Ex. 67 at ¶¶ 13-18.  The delay of time between Manzella's observations and the description he provided to law enforcement further decreases the probability that he accurately described the suspect's clothing and, in fact, increases the chances that he provided them with an inaccurate description. SHP Ex. 67 at ¶¶ 21, 23.  The effects of this time delay on the accuracy of Manzella's memory are compounded by the unreliable conditions under which he made his initial observations.  SHP Ex. 67 at ¶ 22.

**Laurie Manzella's Unreliable Identification**

Trial counsel failed to investigate, develop, or present critical impeachment evidence of prosecution eyewitnesses Laurie Manzella, who lived in the 1660 Kendall Drive apartment complex with her husband, Michael Manzella.

Counsel knew or should have a known that a suspect knocked on Laurie and Michael Manzella's door on December 6, 1992, that Laurie Manzella made a tentative identification of Mr. Howard when she was interviewed by Police Detectives Dillon and Izumi (SHP Ex. 1 at 265), and that given this identification, it was likely that she would be called by the prosecution to testify.  *See* Claim Three, subsections 3-4.  Trial counsel also knew or should have known that Laurie Manzella made a firm identification of Mr. Howard during her trial testimony (7 RT 1856-57) and denied having initially made an initial uncertain identification.  7 RT 1860.

Reasonable counsel knowing that Laurie Manzella initially made a tentative

1  identification of Mr. Howard during an interview with police and a firm
2  identification during her testimony, would have impeached her with the report of her
3  interview.  SHP Ex. 45 at ¶¶ 16, 19; *see* Claim Three, subsections 3-4.  Reasonable
4  trial counsel would have also retained an eyewitness identification expert to
5  comment on the reliability of Laurie Manzella's identification in light of the several
6  factors calling into question her ability to have made an accurate identification,
7  including her quick glimpse of the suspect, the poor lighting conditions, her ability
8  to see the suspect only from his side and back profile, and the delay between when
9  she saw the suspect and when she made her identification.  SHP Ex. 45 at ¶ 17; *see*
10 *also* Claim Three, subsections 4-5.

11      Nevertheless, trial counsel, without any valid reason, prejudicially failed to
12 impeach Laurie Manzella with her prior inconsistent statement or to present the
13 testimony of an eyewitness expert. Had trial counsel impeached Laurie Manzella
14 with her prior inconsistent statement regarding her uncertain identification, he could
15 have presented information to the jury that would have cast doubt on the validity and
16 reliability of Laurie Manzella's identification of Mr. Howard's photograph in court,
17 and on her credibility.  Furthermore, had trial counsel retained an eyewitness expert,
18 he would have learned, and could have presented, information that would have cast
19 doubt on both Laurie Manzella's initial and subsequent in-court identification of Mr.
20 Howard's photograph in the line-up.  *See* Claim Three, subsection 4.

21      **Theresa Brown's Inconsistent Statements and Unreliable Identification**

22      Trial counsel failed to present critical impeachment evidence of prosecution
23 eyewitness Theresa Brown, an eyewitness who also lived in the 1660 Kendall Drive
24 apartment complex in close proximity to where police recovered the .357 revolver
25 they claimed Mr. Howard carried on the day of the crime (7 RT 1649, 1675-76; 8 RT
26 1972-73) and in close proximity to where co-defendant Funches was arrested.  8 RT
27 1946-50; Funches' People's Ex. No. 1.

28      Trial counsel knew or should have known that Theresa Brown lived in

Petition for Writ of Habeas Corpus

apartment 8 of the 1660 Kendall Drive apartment complex (SHP Ex.1 at 199), that she saw two suspects on the evening of December 6, 1992, and that her initial description of one of these suspects differed in critical respects from subsequent descriptions made in a police report and in her testimony at trial. Apartment 8 was located near apartment 3 (SHP Ex. 41), the apartment near where the .357 revolver was found (SHP Ex. 1 at 238), and by the location at which Funches was arrested. 8 RT 1946-50; People's Ex. No. 1. On the evening of December 6, 1992, Brown saw two suspects outside of her window around 7:00 p.m. and called 911. SHP Ex. 1 at 189. She described one of the suspects as wearing all dark clothing, specifically, dark bell bottom cords and a dark windbreaker (SHP Ex. 3 at 1855), and the other as wearing a white shirt and a backwards baseball cap. *Id.* at 1857. On December 10, 1992, San Bernardino Detectives Dillon and Izumi interviewed Ms. Brown about what she witnessed on the evening of December 6, 1992. According to Det. Izumi's report, she observed one man wearing all dark colored clothing, and another man wearing a "white woven material pullover type jacket." SHP Ex 1 at 189.

On April 26, 1995, Ms. Brown testified that one of the suspects she saw was wearing all dark clothing, and that the other was wearing "a white pullover with a hood." 7 RT 1832. During her testimony, the prosecution showed Ms. Brown an unduly suggestive booking photo of Mr. Howard (*see* Claim Three, subsection 4,), and Brown testified that the person in the photograph "could be the man I saw. I mean, definitely, the hooded jacket is mostly what I remember and the fact that the head was really close." 7 RT 1832.

Reasonable counsel, knowing that Theresa Brown's initial and contemporaneous description of the suspect's clothing included nothing about a "pull-over," a "jacket," or "white woven material," would have questioned Brown and presented these incongruities to the jury. SHP Ex. 45 at ¶¶ 16, 18-19. Trial counsel prejudicially and without an informed or strategic reason failed to do so.

**Latasha Jinnies Brown: Counsel's Failures and Police Misconduct**

1    Trial counsel failed to investigate, develop, or present evidence of

2    eyewitnesses statements indicating that it was Funches, not Mr. Howard, who was

3    in the vicinity of the .357 revolver and the area where Funches was ultimately

4    arrested on December 6, 1992. In addition, trial counsel failed to investigate,

5    develop, or present evidence indicating that at least one of these reports contained

6    falsified information.

7    Specifically, trial counsel knew or should have known that on December 6,

8    1992 Latasha Jinnies Brown was living in apartment 72 at the 1660 Kendall Drive

9    apartment complex, like the Manzellas and Theresa Brown, in close proximity to the

10    location at which the police recovered the .357 revolver, (SHP Ex. 1 at 175, 239) and

11    near to the location at which Funches was arrested (*see* 8 RT 1946-50; People's Ex.

12    No. 1), and should have known that she gave two statements to the police describing

13    a suspect she saw on the evening of December 6, 1992, only the second of which

14    arguably implicated Mr. Howard. SHP Ex. 1 at 175.

15    Trial counsel also should have known that she was a neighbor of the Manzellas

16    and Theresa Brown (*Id.* at 175; SHP Ex. 41;), and that her initial statement

17    contradicted each of their eyewitness accounts, according to Detective Izumi's

18    report. *See* Claim Three, subsections 3-4. Reasonable counsel, knowing that

19    Latasha Jinnies Brown lived in the critical area of the 1660 Kendall Drive apartment

20    complex, and knowing that her eyewitness accounts were inconsistent, would have

21    interviewed her. SHP Ex. 45 at ¶¶ 8, 16. Trial counsel's failure to do so was not

22    strategic.

23    Had counsel interviewed Ms. Jinnies Brown he would have discovered and

24    could have presented information that (1) the suspect who Latasha Jinnies Brown

25    saw on the evening of December 6, 1992 was not Mr. Howard, but likely co-

26    defendant Funches, which in turn indicated that Det. Izumi falsified the report of his

27    interview with her. *See* Claim Three, subsection 3. Had trial counsel adduced

28    evidence that Det. Izumi falsified his report and Jinnies Brown saw a suspect

Petition for Writ of Habeas Corpus

1    wearing clothing consistent with that of the co-defendant's, the jury would have had

2    reason to question Det. Izumi's credibility, and by extension all of the eyewitness

3    investigation reports that he wrote, including those of Laurie and Michael Manzella,

4    and Theresa Brown. The jury would also have had reason to question whether Mr.

5    Howard was in fact in the area where the police recovered the .357 revolver and

6    where Funches was arrested.

**Russell Cecala's Description of a Suspect Consistent with Funches**

7

8        Trial counsel failed to investigate, develop, and present evidence from

9    eyewitness Russell Cecala, the resident of apartment 3 of the 1660 Kendall Drive

10   apartment complex. Trial counsel knew or should have known that Russell Cecala

11   lived in apartment 3 of the 1660 Kendall apartment complex on December 6, 1992,

12   near where the .357 revolver the police claimed Mr. Howard carried on the day of

13   the crime was found (SHP Ex. 1 at 239; 7 RT 1649, 1675-76; 8 RT 1972-73), and

14   that Funches was arrested in that area. 8 RT 1946-50; Prosecution Exhibit 1. Trial

15   counsel also should have known that Cecala was interviewed the morning after the

16   shooting, (SHP Ex. 1 at 185), and that the description he provided of the person he

17   saw resembled co-defendant Funches. *Id.* at 186.

18       On December 7, 1992, at 5:00 a.m., Det. Izumi interviewed Cecala about his

19   interaction with a suspect the previous evening. SHP Ex. 1 at 185. Det. Izumi also

20   wrote the report of this interview. *Id.* According to Det. Izumi's report, around the

21   time that Cecala heard a helicopter flying overhead, an individual saw him and asked

22   to use his telephone. *Id.* Cecala retrieved the telephone from his apartment and gave

23   it to the person to use. *Id.*

24       According to Det. Izumi's report, Cecala described the person as being of a

25   height between 5'7" and 5'9" and described him as wearing his hair in "pseudo

26   pigtails." *Id.* at 186. Cecala was able to get a "good look," at the suspect because

27   the streetlights were on and because they had the opportunity to interact while the

28   suspect used his telephone. SHP Ex. 48 at 2. This description was consistent with

Petition for Writ of Habeas Corpus

1    the height and hairstyle of Mitchell Funches on December 6, 1992. ASupp. 1 CT

2    10.

3        Reasonable counsel knowing that Cecala lived in a critically located

4    apartment and knowing that Cecala interacted with a suspect on December 6, 1992,

5    was interviewed about this suspect, and described him as having physical

6    characteristics consistent with those of Funches, would have interviewed Cecala.

7    SHP Ex. 45 at ¶¶ 8, 16. Counsel prejudicially, and without any justifiable or

8    informed reason, failed to do so, however.

9        Had counsel interviewed Cecala, trial counsel would have discovered and

10   could have presented information indicating that it was Funches whom was seen by

11   Mr. Cecala and his immediate neighbors, Michael and Laurie Manzella, as set forth

12   above. The physical description Cecala provided to law enforcement is consistent

13   with the appearance of Funches. Cecala did not just get merely a "quick glance" of

14   the suspect from behind or from the side, rather he had a conversation with him,

15   observed him talking on the phone, and saw him from the front. Had trial counsel

16   interviewed and presented the information Cecala provided, trial counsel would have

17   impeached the validity and reliability of Laurie Manzella's identification and the

18   clothing descriptions provided by Michael Manzella and Theresa Brown.

19        **Detective Izumi's Inconsistent and Unreliable Reports**

20        A report written by Det. Roy Izumi falsified and materially misrepresented the

21   account that eyewitness Latasha Jinnies Brown had provided on the night of the

22   incident when police canvassed for witnesses. *See* Claim Three, subsections 3-4.

23   On the night of the incident, Mrs. Jinnies Brown told San Bernardino Police Officer

24   Stieg she has seen a Black male wearing a black shirt. SHP Ex. 1 at 201. Four days

25   later, Detectives Dale Blackwell and Roy Izumi interviewed Mrs. Jinnies Brown

26   again. *Id.* at 175. In Det. Izumi's report of their interview, he wrote that Mrs. Jinnies

27   Brown stated she saw a Black male wearing a "white pullover shirt." *Id.* at 175.

28   Det. Izumi's report therefore contained false representations to support a theory that

Petition for Writ of Habeas Corpus

1    Mr. Howard was the second assailant.

2        Trial counsel unreasonably and prejudicially failed to adequately and

3    effectively cross-examine Det. Izumi about the inconsistencies in his reports and

4    elaborations designed to implicate Mr. Howard. Trial counsel also prejudicially and

5    unreasonably failed to establish that at least one of these reports was fabricated.

6        Trial counsel's failure to cross-examine Det. Izumi regarding the

7    inconsistencies contained in several of his reports of witness interviews also fell

8    below the minimum standard of care. *See* SHP Ex. 1 at 19, 175, 199, 201. This

9    included the failure to cross-examine Det. Izumi on the inaccuracies of the witnesses'

10    alleged observations based on the witnesses' self-declared vantage point. SHP Ex. 1

11    at 265; 7 RT 1851. Importantly, trial counsel could and should have established that

12    Det. Izumi's report of his interview with Latasha Jinnies Brown was falsified.

### 2) Trial Counsel's Failure to Challenge the Prosecution's Eyewitness Evidence and the Credibility of the Police's Investigation Prejudiced Mr. Howard.

16        Individually and collectively, counsel's missteps prejudicially allowed the

17    shaky identifications to remain virtually unchallenged. The prosecutor relied on

18    Theresa Brown's identification during closing arguments. 9 RT 2402-03. The

19    prosecutor argued to the jury that Brown called 911 and told them that the suspect

20    she saw was wearing "a white pull-over something." 9 RT 2403. The prosecutor

21    further argued that Theresa Brown independently came up with this description,

22    rather than being given a description from the 911 operators. 9 RT 2403. The jury

23    was also focused on the identification testimony as evidenced by the request for read

24    back of the Manzellas' testimony during guilt phase deliberations. 9 RT 2450-51.

25        The testimony of the Manzellas and of Theresa Brown established a nexus

26    between Mr. Howard and the .357 revolver and between co-defendant Funches and

27    Mr. Howard in the aftermath of the homicide. Trial counsel could have easily

28    challenged their testimony by presenting the testimony of Russell Cecala and

Latasha Jinnies Brown, and by impeaching the identifications made by the Manzellas and Theresa Brown with their prior inconsistent statements and with expert witness testimony demonstrating the unreliability of their identifications based on empirical factors. But for counsel's individual and collective failures to challenge the eyewitness testimony there is a reasonable probability that Mr. Howard would not have been convicted or sentenced to death.

**9. Trial Counsel Unreasonably and Prejudicially Failed to Adequately and Effectively Challenge the Admission of Unduly Prejudicial Evidence that Had Little or No Probative Value of Mr. Howard's Guilt.**

Trial counsel was ineffective for failing to challenge the admission of unduly prejudicial information that had little or no probative value of Mr. Howard's guilt including the testimonies of prosecution witnesses Michael Collins and Edward Brock, the eyewitness identifications made by Laurie Manzella and Theresa Brown, and the admission of the .357 revolver the police and prosecution claimed Mr. Howard carried on the day of the crime. 7 RT 1649, 1675-76; 8 RT 1972-73

**a. Facts and Allegations**

**Failure to Challenge Admission of Michael Collins's Testimony**

Trial counsel knew or should have known that Michael Collins, Sherry Collins's brother, was likely to testify because he was on the prosecution's witness list. Michael Collins's testimony at the guilt phase of Mr. Howard's trial was not relevant to any contested issue at guilt. 8 RT 2108-10. Michael Collins gave emotional testimony about his sister and identified her photograph on direct examination. 8 RT 2109-10; People's Ex. No. 24. Trial counsel did not question Michael Collins on cross-examination. 8 RT 2110.

Reasonably competent counsel, knowing that Michael Collins's testimony would be heart-wrenching and likely to inflame the jury's emotions, would have challenged its admission by relying on one of any measures available to counsel

Petition for Writ of Habeas Corpus

including stipulations, 402 hearings, and requests for offer of proof.  SHP Ex. 45 at ¶ 16.  Indeed, as trial counsel concedes, "it was critical to curtail and try to limit as much as possible victim impact testimony or evidence, as it can be devastating." SHP Ex. 90 at ¶ 9.  Yet he did not try to limit this devastating testimony, prejudicing Mr. Howard.

**Failure to Challenge Admission of Officer Brock's Testimony**

Reasonably competent trial counsel would also have moved to exclude testimony from California State University, San Bernardino Police Officer Edward Brock, who co-defendant Mitchell Funches shot when Brock tried to arrest him.  8 RT 1920; Funches' People's Ex. No. 1.

Counsel was aware that Funches shot Ofc. Brock and that separate charges had been levied against him relating to that conduct.  The prosecution never attempted to implicate Mr. Howard in the events culminating in the shooting of Officer Brock, however.  Yet, Ofc. Brock testified at length about what it felt like to be shot, his hospital stay, and the surgery he underwent.  8 RT 1911-25.

Because Ofc. Brock's testimony offered no probative value in establishing Mr. Howard's involvement in the shooting of Ms. Collins, and was likely to create an emotional reaction in the jurors, reasonable counsel would have moved to exclude this testimony as irrelevant and unduly prejudicial.  SHP Ex. 45 at ¶ 16.  As was the case with Michael Collins's testimony, trial counsel had no strategic reason to justify failing to challenge admission of Brock's testimony, which did not even mention Mr. Howard.

**Failure to Challenge The Identification Testimony of Laurie Manzella and Theresa Brown**

Trial counsel unreasonably and prejudicially failed to challenge the admission of both Laurie Manzella's in-court and out-of-court photo line-up identifications of Mr. Howard and was ineffective for failing to challenge the admission of Theresa Brown's in-court identification.

---

Petition for Writ of Habeas Corpus

As described in further detail in Claim Three, trial counsel had ample evidence casting doubt on the reliability of both Laurie Manzella's and Theresa Brown's in-court identifications. Accordingly, trial counsel should have moved to exclude their testimony in the first instance. SHP Ex. 45 at ¶ 16.

**Failure to Adequately Challenge Admissibility of the Gun at the 402 Hearing**

Trial counsel was ineffective for failing to adequately challenge the admission of the .357 revolver at the 402 hearing. As demonstrated above and incorporated herein, trial counsel knew that Torrence's statements and testimony linking Mr. Howard to the .357 revolver found by law enforcement were unreliable and subject to challenge. Indeed, trial counsel requested a 402 hearing to challenge its admissibility. 6 RT 1595. The prosecution presented Cedric Torrence. 7 RT 1601-13. Trial counsel presented no witnesses. 7 RT 1601-13.

Trial counsel's failure to use evidence he possessed or should have uncovered, developed, and presented, was as prejudicial at this juncture as it was during the case-in-chief, and could not have been the product an informed and reasoned decision. Indeed, had trial counsel done the work mandated by prevailing professional norms, trial counsel likely would have succeeded in accomplishing his goal of excluding Torrence's testimony linking Mr. Howard to the .357 revolver.

**b. Legal Framework**

Evidence that is only of marginal relevance may be excluded on the grounds that its probative value is outweighed by its prejudicial effect. Cal. Evid. Code § 352. The admission of such inflammatory evidence violates due process. *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (holding that a defendant is denied a fair trial where "there are no permissible inferences the jury may draw from the [admitted and unduly prejudicial] evidence"); *Duncan v. Henry*, 513 U.S. 364, 366 (1995); *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994); *Estelle v. McGuire*, 502 U.S. 62, 70 (1991).

Petition for Writ of Habeas Corpus

1    A defendant is also denied a fair trial when improper evidence misleads a jury,

2    clouds its deliberations, or otherwise distracts it from carefully analyzing relevant

3    evidence.  *See, e.g., McKinney v. Rees*, 993 F.2d 1378, 1385 (9th Cir. 1995), *cert.*

4    *denied*, 510 U.S. 1020 (holding that the admission of irrelevant evidence violates

5    due process when it preys on the jurors' emotions, making it likely that they would

6    avoid careful analysis of relevant evidence and convict on an improper basis);

7    *Martin v. Parker*, 11 F.3d 613, 616 (6th Cir. 1994) (finding that a defendant's due

8    process rights were violated when inflammatory remarks "invoke[d] emotions which

9    may [have] cloud[ed] the jury's determination of the defendant's guilt"); *Dudley v.*

10   *Duckworth*, 854 F.2d 967, 972 (7th Cir. 1988) (determining that due process was

11   violated where a review of the record strongly suggested that the contested evidence

12   was intended to prejudice the defendant rather than address its proffered purpose),

13   *cert. denied*, 490 U.S. 1011 (1989).

14       **c. Trial Counsel's Failure to Challenge the Admissibility of**

15       **Irrelevant and Inflammatory Evidence Prejudiced Mr. Howard.**

16       The prosecution witness testimony of Michael Collins and Officer Edward

17   Brock had little to no bearing on Mr. Howard's purported guilt and the evidence was

18   therefore more prejudicial than probative and should have been excluded had

19   counsel acted in accord with the standard of practice.  For example, the only possible

20   relevance of Mr. Collins's testimony was to establish Ms. Collins's identity, but the

21   coroner's testimony adequately established this fact.  8 RT 2044.  In any event, her

22   identity was not in dispute. Mr. Collins's testimony served no purpose other than to

23   inflame the passions of the jury.  Trial counsel's failure to exclude his testimony was

24   prejudicial, as evidenced by the success of Funches' trial counsel, who successfully

25   objected to its admissibility.  Funches' RT 2038-39.

26       Similarly, Police Officer Edward Brock's testimony related exclusively to

27   separate charges filed against Mitchell Funches, whose trial was severed from Mr.

28   Howard's, based on his shooting of Ofc. Brock. Ofc. Brock testified about the events

leading up to this shooing and testified at length about what it felt like to be shot, his hospitalization, and surgery he underwent. 8 RT 1911-25. Ofc. Brock made no reference to Mr. Howard whatsoever, nor did the prosecution suggest that Mr. Howard was implicated in the events culminating in Ofc. Brock's shooting. The only conceivable purpose of this testimony was to inflame the passions of the jury and to invite punishment of Mr. Howard by association.

As to the purported "eyewitness identifications" of Laurie Manzella and Theresa Brown, and the evidence of the .357 revolver, trial counsel had ample evidence casting doubt on the reliability of both Manzella's and Brown's in-court and out-of-court identifications because of law enforcement's suggestive identification procedures. And as noted above, the prosecution relied heavily on the testimony as did the jury.

Last, trial counsel's failure to adequately challenge the admission of the .357 revolver at the 402 hearing prejudiced Mr. Howard. Had trial counsel used the evidence he possessed, or the evidence he should have uncovered, developed, and presented, he could have undermined Torrence's credibility which would have resulted in the court's excluding Torrence's unreliable testimony linking Mr. Howard to the .357 revolver. Because Torrence's testimony was the *only* evidence linking Mr. Howard to the .357 revolver, counsel's failure manifestly prejudiced Mr. Howard.

### 10. Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Present Evidence of Mr. Howard's Brain Damage in Order to Explain the Impact of Mr. Howard's Deficits on His Ability to Testify, the Testimony Itself, and His In-Court Demeanor.

Trial counsel unreasonably and prejudicially failed adequately to investigate and present during the guilt phase of trial, evidence of Mr. Howard's mental health and functioning, to provide mental health professionals with information necessary to conduct minimally competent mental health evaluations of Mr. Howard, and to

114

1   explain the impact of Mr. Howard's deficits on his ability to testify, the testimony

2   itself, and his in-court demeanor.   Reasonably competent counsel would have

3   investigated, developed and presented evidence of Mr. Howard's life-long history of

4   mental, psychological, neuropsychological, emotional, cognitive, social, and

5   adaptive functioning deficits, as required by 1989 ABA Guideline 11.4.1.   The facts

6   and allegations contained in Claim Nine of Mr. Howard's Amended State Habeas

7   Petition and the accompanying exhibits (ineffective assistance of counsel at the

8   penalty phase) are incorporated by reference as if fully set forth herein.

9           **a.   Facts and Allegations**

10          Trial counsel knew or should have known that Mr. Howard's life experiences

11  and cognitive abilities likely impacted the development of his brain and resulted in

12  psychological functioning and cognitive deficits that had an impact on his behavior.

13  Trial counsel knew or should have known that Mr. Howard had suffered in utero

14  insults to his brain as a consequence of his mother's ingesting quinine, Humphry's

15  11, Wind Flower sepia, dry mustard, and castor oil; and as a result of her inhaling

16  turpentine fumes until she vomited.   SHP Ex. 61 at ¶¶ 6, 24.

17          Trial counsel knew or should have known that Mr. Howard was impulsive and

18  immature (SHP Ex. 73 at ¶ 287), that he had been abandoned and neglected as a

19  child (SHP Ex. 61 at ¶¶ 9, 11, 13, 24), and that Mr. Howard had an extensive history

20  of drug use, including a pronounced history of sniffing glue and paint, and of using

21  phencyclidine (PCP), during his developmental years.   SHP Ex. 61 at ¶¶ 18, 24; *see*

22  *also* SHP Ex. 65 at ¶ 9.

23          Counsel's knowledge triggered the duty to investigate, develop, and present

24  readily available evidence in the form of witness testimony and documents, which

25  would have substantiated the degree to which Mr. Howard's behavior was impaired.

26  The individuals who could have provided such information, and a detailed

27  description of this information is set forth extensively in Claim Nine of Mr.

28  Howard's Amended State Habeas Petition and the accompanying exhibits.

Reasonable counsel knowing that Mr. Howard suffered from exposure to neurotoxins and other chemicals while in utero, knowing that he had a history of neglect and abandonment, and knowing that he abused drugs during his developmental years, would have retained appropriate experts in order to develop and present compelling expert testimony concerning Mr. Howard's mental functioning as it related to his supposed involvement in the crime. SHP Ex. 45 at ¶ 28. These experts include, but are not limited to, the following:

A mental health expert to document, present, and explain how Mr. Howard's brain damage and life experiences impacted his ability to demonstrate the full range of emotional affect.

An appropriate expert to provide a professional opinion as to Mr. Howard's ability to provide cogent testimony; both in terms of understanding questions posed to him on direct and cross-examination, and in terms of framing his responses.

An appropriate expert to explain, were it necessary, the impact of Mr. Howard's deficits on his testimony and on his presentation of this testimony.

Trial counsel prejudicially failed to retain appropriate experts to evaluate whether Mr. Howard suffered from brain damage, and to determine what effects such damage would have had on Mr. Howard's ability to testify and on his affect and demeanor in court. Trial counsel had no informed strategic basis not to take these steps.

Absent trial counsel's failure, the jury would have heard readily available, relevant, reliable, and admissible evidence about Mr. Howard's cognitive and psychological impairments. This evidence would have contextualized Mr. Howard's offenses and prior uncharged acts and supposed conduct in the instant case. Such evidence follows.

Mr. Howard's neuropsychological functioning is impaired in the domains of executive functioning. SHP Ex. 53 at ¶ 57. This impedes his ability to reason in the abstract, learn from experience by utilizing feedback, plan, organize, and to use

1    expressive language to make himself clear. *Id.* It also affects his memory, ability to

2    focus, and the speed with which he processes information. *Id.*

3        In a trial setting, Mr. Howard's impairments would limit his ability to assess

4    contextual expectations, including his ability to participate in strategic decision

5    making, and his capacity to model proper affect in court. SHP Ex. 73 at ¶ 296. Mr.

6    Howard's impairments would also impact his ability to process and respond to novel

7    situations and information. SHP Ex. 53 at ¶¶ 58, 60.

8        In the context of providing trial testimony, Mr. Howard's perseverative

9    tendencies could cause him to fixate on a piece of possibly inconsequential

10   information, and to miss the larger picture. As a result, when faced with questions

11   on direct or cross-examination, Mr. Howard's responses could seem evasive, non-

12   responsive, or inappropriate. SHP Ex. 53 at ¶ 60; SHP Ex. 73 at ¶ 296.

13       The record establishes Mr. Howard's inability to comprehend certain

14   questions posed to him during his testimony. *See, e.g.,* 9 RT 2228, 2231, 2239, 2242.

15   The jurors likewise witnessed Mr. Howard's inappropriate affect. SHP Ex. 74 at ¶ 2;

16   SHP Ex. 59 at ¶ 3. An appropriate expert would have advised trial counsel that Mr.

17   Howard's impairments would have affected his ability to testify on his own behalf.

18   SHP Ex. 73 at ¶ 295.

19       Trial counsel affirms that had he possessed the information contained in the

20   declarations of Drs. Wood and Gregory explaining Mr. Howard's deficits and how

21   they affect his demeanor and affect, he would have used it. SHP Ex. 90 at ¶ 16. This

22   includes appreciating that it would not be wise for Mr. Howard to testify. SHP Ex.

23   45 at ¶ 27.

24       **b.  Legal Framework**

25       The Sixth Amendment guarantees a capitally charged defendant the right to

26   have his attorney secure the benefit of services that are reasonably available under

27   California law and necessary to prepare his case. *See Ainsworth v. Woodford*, 268

28   F.3d at 876-77 (finding counsel deficient, in part, for failing to seek the services of

additional trial defense team members pursuant to Penal Code section 987.9).  This includes a duty to investigate a defendant's mental health functioning and to secure the assistance of an expert when necessary to the preparation of the defense.  ABA Guidelines, Guideline 11.4.1. (1989).

### c. Trial Counsel's Failure to Investigate and Develop Evidence of Mr. Howard's Brain Damage and Explain the Impact Prejudiced Mr. Howard

Educated by appropriate experts, trial counsel would have recommended that Mr. Howard not testify, or worked extensively on preparing him to testify with knowledge of his particular deficits in mind.  Trial counsel could have introduced expert testimony to explain and contextualize why Mr. Howard demonstrated confusion while testifying as well as his inappropriate emotional affect.  Had trial counsel taken either of these steps, the jury would not have been negatively influenced by Mr. Howard's affect or by his apparent inability to understand some of the questions posed to him during his testimony.  Either of these courses of action would have resulted in a different verdict at the guilt phase of Mr. Howard's trial.

### 11. Trial Counsel Unreasonably and Prejudicially Failed to Advise Mr. Howard Not to Testify and Provided Inadequate and Ineffective Assistance in Preparing Him to Testify.

Trial counsel unreasonably and prejudicially failed to advise Mr. Howard not to testify, and in the alternative, provided inadequate and ineffective assistance in preparing him to testify.

### a. Facts and Allegations

Trial counsel knew or should have known that calling Mr. Howard as a witness posed enormous risks.  Nevertheless, counsel failed to conduct the necessary and thorough investigation of Mr. Howard's mental health and cognitive deficits that would have informed how he advised and/or prepared Mr. Howard on this issue.  Consistent with the standard of care, attorneys representing clients in capital

Petition for Writ of Habeas Corpus

1   proceedings know that calling a defendant to testify is fraught with risk including

2   but not limited to prosecutorial impeachment with bad acts and, effective cross-

3   examination that makes a client seem shifty or non-credible, from which a jury will

4   draw negative inferences based on the client's conduct. *See* SHP Ex. 45 at ¶ 22.

5       Because Mr. Howard was a compliant client, there is every reason to believe

6   that had trial counsel explained to Mr. Howard the dangers attendant to testifying

7   and advised him against it, Mr. Howard would have followed this advice.  His

8   compliance is evidenced by the record: Mr. Howard repeatedly waived his right to a

9   speedy preliminary hearing upon counsel's request for more time, (1 RT 13-14, 17,

10  22, 26, 28, 32, 36, 47, 52, 78), never caused any disturbance in court, (1 RT 6), never

11  acted out in any way, (2 RT 505), and never treated the court or anyone else with

12  disrespect. 2 RT 505.[22]

13      The unreasonableness of counsel's failure is underscored by comparing all

14  that trial counsel could have presented had he performed reasonably with respect to

15  other witnesses and evidence. Mr. Howard, in order to support his defense,

16  predominantly needed to establish that (1) he was not carrying a gun on December

17  6, 1992, (2) that there was no discussion of a jacking or robbery while he was in the

18  garage area, (3) that he was not with co-defendant Funches when Funches shot Ms.

19  Collins; and, (4) that he had a legitimate reason for being in the area of the Kendall

20  Drive apartment complex. A number of witnesses, both those who testified and those

21  who would have testified had they been contacted by the defense, could have

22  adequately established these facts, as described and argued above.  In this context,

23  the negative consequences to which trial counsel exposed Mr. Howard far

---

25  [22]  As set forth in Claim One, trial counsel also knew or should have known that
26  Mr. Howard was very worried and preoccupied by the stun belt restraint that the
    court erroneously imposed. 2 RT 505 (counsel informing the court that a person
    wearing a stun belt can be shocked with 50,000 volts of electricity); 9 RT 2185
27  (counsel drawing out the fact that Mr. Howard was nervous at the beginning of his
28  testimony).

Petition for Writ of Habeas Corpus

1    outweighed that which he could have added had trial counsel performed in

2    conformity with professional norms with respect to investigation and development

3    of evidence.

4         Moreover, counsel knew or should have known that Mr. Howard's cognitive

5    limitations as a consequence of brain damage incurred during the developmental

6    period, impacted Mr. Howard's affect during his testimony, and his ability to

7    understand and appropriately respond to questions posed to him during his

8    testimony.    Given the above circumstances and prevailing standard of care

9    reasonable counsel would have advised Mr. Howard not to testify.

10        In the alternative, trial counsel unreasonably and prejudicially failed to

11   adequately and thoroughly prepare Mr. Howard to testify.    Trial counsel knew or

12   should have known that if he were to testify, adequately preparing Mr. Howard to do

13   so was essential.    SHP Ex. 45 at ¶ 22. Reasonable counsel, knowing that adequately

14   preparing a capital defendant to testify in his own behalf was critical, would have

15   spent sufficient time with Mr. Howard preparing him for his testimony. *Id.*

16        It is evident trial counsel did none of this.    Mr. Howard's nervousness and

17   inability to comprehend some of the questions posed to him demonstrates he was ill-

18   equipped to cope with testifying and being cross-examined. *See, e.g.*, 9 RT 2185

19   (nervous about testifying); 9 RT 2234 (confused about the question being asked).

20        **b.  Legal Framework**

21        A trial counsel's failure to advise his client whether to testify constitutes

22   ineffective assistance of counsel. *Perez v. Rosario*, 294 F. Supp. 2d 1125, 1138 (N.D.

23   Cal. 2003) ("[T]rial lawyers have a duty to counsel defendants whether or not to

24   exercise [the right to testify]"); *United States v. Teague*, 953 F.2d 1525, 1533 (11th

25   Cir. 1992) ("Defense counsel bears the primary responsibility for advising the

26   defendant of his right to testify or not to testify, *the strategic implications* of each

27   choice, and that it is ultimately for the defendant himself to decide.") (emphasis

28   added); *Harris By and Through Ramseyer v. Wood*, 64 F.3d 1432 (finding the

120

Petition for Writ of Habeas Corpus

1   decision to call defendant to testify combined with the failure to adequately consult

2   with defendant constituted deficient performance and contributed to ineffective

3   assistance of counsel.); *United States v. Hung Thien Ly*, 646 F.3d 1307, 1313 (11th

4   Cir. 2011) ("[T]he right to testify is truly protected only when the defendant makes

5   his decision knowingly and intelligently.").

6        A trial counsel's failure to adequately prepare his client to testify similarly

7   constitutes deficient performance. *Chandler v. Jones*, 813 F.2d 773, 781 (6th Cir.

8   1987) (finding that trial counsel's "failure to prepare [defendant] for direct or cross-

9   examination constituted a lack of "functioning as counsel guaranteed by the Sixth

10   Amendment"), *Credell v. Bodison*, 818 F. Supp. 2d 928, 936 (D.S.C. 2011) ("Trial

11   counsel clearly did not provide competent professional advice concerning whether

12   the Petitioner should testify, and, if so, what he should offer on direct examination.).

13        It is well established under "prevailing norms of practice," such as

14        the American Bar Association Standards, that a defense counsel has

15        the duty to 'inform[] himself or herself fully on . . . the law' and then

16        'advise the accused . . . concerning all aspects of the case.' . . . This

17        advice is particularly critical regarding whether a defendant should

18        testify because this is a decision that must be 'made by the accused

19        after full consultation with counsel.

20   *Credell*, 818 F. Supp. 2d at 936 (internal citations omitted).

21        **c.  Trial Counsel's Failure to Advise Mr. Howard Not to Testify and**

22            **to Adequately Prepare Him for His Testimony Prejudiced Mr.**

23            **Howard**

24        Had trial counsel advised Mr. Howard not testify, he would not have testified,

25   and the jury would not have made credibility determinations based on his demeanor

26   or the inappropriate answers he gave in response to both trial counsel's and the

27   prosecution's questions.  SHP Ex. 59 at ¶ 3; SHP Ex. 74 at ¶ 2; SHP Ex. 73 at ¶ 296

28   (citing 9 RT 2228, 2231, 2239, 2242).

Even if counsel made a tactical decision to advise Mr. Howard to testify, he should have adequately prepared Mr. Howard. The record demonstrates that he did not. Had trial counsel adequately prepared Mr. Howard for his testimony, he would not have been confused about questions posed to him or as nervous and the jury might not have drawn negative inferences from his affect or perceived evasiveness. *See, e.g.*, 9 RT 2185, 2234.

### 12. Trial Counsel Unreasonably and Prejudicially Failed to Object to Several Instances of Prosecutorial Misconduct.

Trial counsel deficiently and prejudicially failed to object to the prosecutorial misconduct including arguing facts not in evidence to undermine Mr. Howard's credibility and the credibility of his key alibi witnesses, by improperly bolstering the testimony of the key prosecution forensic expert, and by referring to Mr. Howard in degrading terms.

#### a. Facts and Allegations

Counsel knew or should have known that the prosecutor committed several instances of misconduct by misstating critical facts during argument, misstating Mr. Howard's testimony, arguing facts not in evidence, improperly shifting the burden to Mr. Howard, improperly denigrating the defense, and making misleading and inflammatory arguments. The instances of prosecutor's misconduct include, arguing that there was no evidence that Mr. Howard's aunt, Sandra Willcot, lived in an apartment on Kendall Drive. 9 RT 2438. According to the stipulated testimony of Mr. Howard's uncle, Willie Kelly, he was living with his sister, Sandra Willcot, in an apartment on Kendall Drive at the time of the crime. 9 RT 2295. This fact buttressed Mr. Howard's defense that he was located in the vicinity of the apartment complex where he was arrested for legitimate reasons. 10 RT 2609. Kelly further testified that Mr. Howard had come to the Kendall apartment complex on the evening of the crime in order to borrow money that Kelly had promised Mr. Howard. 9 RT 2295. The prosecutor's statement prejudicially impugned the credibility of Mr.

Howard's alibi witness.

The prosecutor also improperly misstated Mr. Howard's testimony in violation of his right to due process.  During his guilt phase closing argument, the prosecutor painted Mr. Howard as an unreliable liar by misstating that Mr. Howard testified that he never knew Torrence. 9 RT 2433. Mr. Howard in fact testified that Torrence was the father of his sister's child and that he saw Torrence on occasion when he came to the house where Mr. Howard lived to pick up the child, or when Mr. Howard went with his sister to Torrence's house.  9 RT 2187.  In light of the overwhelming evidence presented to establish that Mr. Howard did know Torrence, the prosecutor's prejudicial statement suggesting that Mr. Howard denied this fact served to undermine Mr. Howard's credibility.

The prosecutor improperly argued facts not in evidence.  During guilt phase closing arguments, without any evidentiary support, the prosecutor argued that two of Mr. Howard's alibi witnesses, Roxanne Winn and Segonia Washington, did not come forward until "two or three weeks" prior to trial. 9 RT 2434. The prosecutor's prejudicial misstatement created the inaccurate impression that Mr. Howard came up with his alibi on the eve of trial.

Finally, the prosecutor improperly vouched for a prosecution expert and impermissibly implied that Mr. Howard had an affirmative duty to prove his innocence.  In closing guilt phase arguments, the prosecutor argued that he thought that Chuck Ogino, the state's fiber expert, had "testified very credibly." 9 RT 2436. He further argued that Ogino's testimony must have been accurate because the defense did not present a fiber expert to contradict his conclusions.  9 RT 2436. These statements prejudicially suggested that the sole piece of physical evidence allegedly linking Mr. Howard to the crime conclusively established his participation because if it did not, trial counsel would have presented evidence to the contrary.

A reasonably competent attorney acting at the time of Mr. Howard's trial knowing that the prosecutor committed such misconduct would have objected to

Petition for Writ of Habeas Corpus

1    every instance of this misconduct.  SHP Ex. 45 at ¶ 16.  Trial counsel, however,

2    unreasonably and prejudicially failed to do so.

3              **b.  Legal Framework**

4              The law governing prosecutorial ethical obligations is well-established.  The

5    prosecutor's role "isn't just to win, but to win fairly, staying well within the rules."

6    *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993).  Prosecutorial

7    misconduct that "so infect[s] the trial with unfairness as to make the resulting

8    conviction a denial of due process" warrants relief.  *Donnelly v. DeChristoforo*, 416

9    U.S. 637, 643 (1974).  The prosecution may not make closing arguments that serve

10   only to arouse the passions and prejudice of the jury.  *Viereck v. United States*, 318

11   U.S. 236, 247 (1943).  It is also settled that prosecutors may not vouch for witnesses.

12   32 C.F.R. § 776.43 (prohibiting counsel from "stat[ing] a personal opinion as to . . .

13   the credibility of a witness").

14             Trial counsel's failure to object to such misconduct is ineffective where this

15   failure prejudices the outcome of a client's case.  The failure to object to prejudicial

16   prosecutorial misconduct can be the grounds for habeas corpus relief.  *See, e.g.*,

17   *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) (relief granted for trial counsel's

18   failure to object to several instances of misconduct during the prosecutor's closing

19   argument, including commenting on believability of witness, accusing defense

20   expert and petitioner of lying, misrepresenting facts of the case, making derogatory

21   remarks about the petitioner); *Cargle v. Mullin*, 317 F.3d 1196, 1216 (10th Cir. 2003)

22   (finding ineffective assistance of counsel where trial counsel failed to object

23   prosecutor's statements vouching for witness's truthfulness); *Washington v.*

24   *Hofbauer*, 228 F.3d 689 (6th Cir. 2000) (finding trial counsel prejudicially

25   ineffective for failing to object to prosecutor's improper emphasis on defendant's

26   bad character during argument); *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996)

27   (reversing denial of habeas relief for failure to object to prosecutorial misconduct).

28

124

### c. Trial Counsel's Failure to Object to Prosecutorial Misconduct Prejudiced Mr. Howard.

Trial counsel's deficient failure to object to the prosecutorial misconduct described above, affected the outcome of Mr. Howard's case. Had trial counsel objected to the many instances of the prosecutor's misconduct, the jury would not have considered the prosecutor's misstatements of critical facts during argument, misstatements concerning Mr. Howard's testimony, arguments based on facts not in evidence, or the prosecutor's misleading and inflammatory arguments. In addition, had counsel made the above-mentioned objections, he successfully would have raised for the jury not only the false and misleading nature of the evidence presented by the prosecutor, but also the false and misleading tactics consistently employed by the prosecutor, thus undermining the jury's confidence in the prosecution case as a general matter. But for trial counsel's deficient performance, the results of the proceedings would have been different.

### 13. Trial Counsel Unreasonably and Prejudicially Failed to Present an Adequate Motion for a New Trial.

Trial counsel was ineffective for failing to support his motion for a new trial with evidence presented in Mr. Howard's state habeas petition, undermining the main components of the prosecution's case.

### a. Facts and Allegations

Trial counsel knew that establishing that Torrence's testimony was not credible or corroborated was critical to obtaining a new trial. On November 15, 1995, trial counsel filed a Notice of and Points and Authorities in Support of Motion. 2 CT 361. Trial counsel chiefly argued that the new evidence "destroy[ed] the credibility of the main prosecution witness" (2 CT 363) and presented newly discovered evidence in support of the motion.

Such evidence included declarations from Brandon Nunez and David Janes indicating that Torrence had lied about Mr. Howard's involvement in the instant

crime. 2 CT 369; 2 CT 371. Brandon Nunez and David Janes were housed at the West Valley Detention Center on May 10, 1995, and were transported to their respective court hearings in Victorville on a bus with other inmates, including Mr. Howard and Torrence. 2 CT 369; 2 CT 371. Both Nunez and Janes overheard a conversation between Mr. Howard and Torrence in which Torrence implied that, to protect himself, he had lied about Mr. Howard's involvement in the crime and about Mr. Howard's having had a gun on December 6, 1992. 2 CT 369-70; 2 CT 371

Trial counsel also presented a declaration from Funches reaffirming what he had maintained from the time of his arrest: He did not know Mr. Howard prior to his arrest and that Mr. Howard was not with him when he committed the homicide. 2 CT 372.

On December 7, 1995, the Court heard and denied trial counsel's motion, finding Torrence credible and his testimony corroborated by evidence. Reasonable counsel knowing that challenging Torrence's testimony was critical to Mr. Howard's ability to obtain a new trial would have adequately challenged and impeached Torrence's testimony. SHP Ex. 45 at ¶¶ 8, 16, 18, 19.

Furthermore, the evidence upon which the trial court relied demonstrates the prejudice inured by trial counsel's failure to investigate, develop, and present evidence to challenge the prosecution's case in the first instance. Specifically, the court cited the following: 1) Craig Ogino's testimony that fibers present on Ms. Collins' shoes "came from the same manufacturer as the clothing worn by Mr. Howard on the night of the killing" (11 RT 2767); 2) The fact that a .357 revolver was found near the scene of the crime (11 RT 2765); 3) Theresa Brown's testimony that she saw a man in a "white pullover with a hood," and her testimony linking her recollections with a booking photo of Mr. Howard (11 RT 2765); 4) Danny Rivera's testimony that Mr. Howard and Funches were in the garage at the same time, which according to the court, established that Mr. Howard and Funches knew one another prior to being arrested for the instant offense (11 RT 2766); and 5) George Rivera's

1    testimony, which the court credited with having established that Mr. Howard knew

2    Funches prior to being arrested.  11 RT 2766.  But having not conducted the

3    necessary investigation to refute these facts, trial counsel could not undermine the

4    trial court's reliance upon them.

5        But trial counsel could have corrected the trial court's reliance on facts not in

6    evidence.  For example, the court relied on the testimony of Steven Larsen who the

7    court stated had identified Mr. Howard as being the person who was with Funches

8    on the evening of the crime.  11 RT 2766.  In fact, Mr. Larsen did not identify Mr.

9    Howard as being with Funches on December 6, 1992.  In addition, the court wrongly

10   stated that George Rivera had testified that Mr. Howard and Funches "were both

11   present," at the football game.  11 RT 2766.  George Rivera specifically testified that

12   Funches joined them after the football game.  9 RT 2279.

13       **b.  Legal Framework**

14       Trial counsel may be ineffective for failing to raise or adequately raise post-

15   trial motions, including motions for a new trial.  *See, e.g.*, *United States v. Recio*,

16   258 F.3d 1069, 1074 (9th Cir. 2000) (holding that trial counsel was ineffective for

17   failing to move for a judgment of acquittal with respect to one of the charges against

18   defendant post-trial) *rev'd on other grounds*, 537 U.S. 270 (2003); *Gravley v. Mills*,

19   87 F.3d 779 (6th Cir. 1996) (finding trial counsel ineffective for failing to present an

20   adequate motion for a new trial); *See also Ferrell v. Hall*, 640 F.3d 1199, 1236 (11th

21   Cir. 2011) (finding appellate counsel ineffective for failing to adequately support

22   defendant's motion for a new trial).

23       **c.  Trial Counsel's Failure to Adequately Support a Motion for a New**

24           **Trial Prejudiced Mr. Howard.**

25       Trial counsel's failure to provide the court with adequate information to

26   support Mr. Howard's motion for a new trial, coupled with his failure to correct the

27   court's mistaken beliefs about the evidence was deficient and prejudiced Mr.

28   Howard's case.  Throughout this claim, Mr. Howard has established that had counsel

Petition for Writ of Habeas Corpus

conducted a thorough investigation and utilized readily available documents, counsel could have properly supported his motion for a new trial with evidence undermining Torrence's credibility, showing that Funches and Mr. Howard did not know one another, demonstrating that the prosecution's fiber evidence was false and misleading, and showing that the purported eyewitness testimony was highly unreliable.

Had trial counsel adequately challenged this evidence in its case in chief and had trial counsel corrected the court's misstatements concerning the facts in evidence, the court's ruling on Mr. Howard's new trial motion, would have been different.

**14. The Cumulative Effect of Trial Counsel's Errors Prejudiced Mr. Howard's Case but for Which the Outcome Would Have Been Different.**

In assessing prejudice, this Court must aggregate counsel's failings and consider them in the context of the evidence presented at trial. Though one error considered in isolation may be deemed not to have created a reasonable probability that the result of the proceeding would have been different, the cumulative effect of all of the errors, considered in relation to the available options at trial, did deprive Mr. Howard of the effective assistance of counsel. *See Wade v. Calderon*, 29 F.3d 1312, 1325 (9th Cir. 1993) ("Although several of counsel's individual decisions, taken in isolation, might arguably have been justified, there can be no justification for his overall performance when those actions are viewed in context.") *overruled on other grounds by Pensinger v. Chappell*, 787 F.3d 1014, 1030 (2015) ; *People v. Holt*, 37 Cal. 3d 436, 458-59 (1984) (cumulating effect of errors); *People v. Cardenas*, 31 Cal. 3d 897, 907 (1982) (recognizing cumulative error analysis).

Given the Eighth Amendment requirement of heightened reliability in capital cases in particular, this Court must examine the complete record to ascertain whether a death-sentenced defendant received a fair trial. *United States v. Frederick*, 78 F.3d

1370, 1381 (9th Cir. 1996) (balkanized, issue-by-issue, harmless error review insufficient for protection of constitutional rights).

By virtue of trial counsel's failures, Mr. Howard was denied effective assistance of counsel, and a fair and reliable determination of guilt to which he was entitled. Trial counsel's failings, individually and cumulatively unfairly deprived Mr. Howard of a rational and reliable determination of guilt. But for any or all of counsel's failing, there is a reasonable probability that the jury would have reached a different verdict at the guilt phase of Mr. Howard's trial.

C.    **Claim Three: The Prosecution Violated Mr. Howard's Rights by Failing to Disclose Brady Material; Introducing Coerced, Unreliable, and False Testimony; and Using Unduly Suggestive Identification Procedures.**

1.  **Introduction**

State officials committed multiple acts of misconduct throughout the investigation and prosecution of Mr. Howard. The acts included failing to disclose material, exculpatory evidence; providing falsified evidence; introducing coerced, unreliable, and false testimony; and employing unduly suggestive identification procedures. Mr. Howard incorporates by reference the allegations in Claims Two, Four, and Eleven as if fully set forth herein.

Law enforcement and the prosecution's acts of misconduct, individually and cumulatively, violated Mr. Howard's constitutional rights, rendered the trial proceedings fundamentally unfair, had a substantial and injurious effect and influence in the determination of the jury's verdict, and unconstitutionally deprived Mr. Howard of a fair and reliable determination of guilt.

Relatedly, trial counsel was constitutionally ineffective in failing to challenge and object to the state misconduct on any and all of the facts and grounds set forth in this claim and those incorporated by reference. Trial counsel's actions and omissions were not strategic, fell below the standards for reasonably competent

1     counsel, and prejudiced Mr. Howard.

2          To the extent this Court concludes that trial counsel or appellate counsel failed

3     to object to the various acts of misconduct or raise this challenge on appeal, despite

4     the non-record facts presented in support of this claim, Mr. Howard has been

5     prejudicially deprived of effective assistance of trial or appellate counsel.

6          **2.  The Prosecution Knowingly Presented Coerced and Unreliable**

7              **Testimony.**

8          The prosecution unconstitutionally and prejudicially introduced the coerced

9     and unreliable testimony of key prosecution witness Cedric Torrence.  Torrence was

10    with Mr. Howard until the late afternoon on December 6, 1992, and provided the

11    only direct evidence linking Mr. Howard to a gun or to the alleged plan to commit a

12    robbery.  7 RT 1662, 1675-76.  San Bernardino Police Detective Dale Blackwell

13    coerced Torrence's testimony by threatening to have him fired from his job and to

14    incarcerate him.

15         A criminal defendant's due process rights are violated if his conviction is

16    founded upon witness testimony obtained as the result of threats or coercion applied

17    by the state. *Pyle v. Kansas*, 317 U.S. 213 (1942); *Clanton v. Cooper*, 129 F.3d 1147,

18    1158 (10th Cir. 1997) ("It is unthinkable that a statement obtained by . . . conduct

19    belonging only in a police state should be admitted at the government's behest in

20    order to bolster its case . . . . [M]ethods offensive when used against an accused do

21    not magically become any less so when exerted against a witness"); *People v. Boyer*,

22    38 Cal. 4th 412, 444 (2006) ("The coerced testimony of a witness other than the

23    accused is excluded in order to protect the defendant's own federal due process right

24    to a fair trial, and in particular, to ensure the reliability of testimony offered against

25    him.").  "[C]oercion can be mental as well as physical." *Arizona v. Fulminante*, 499

26    U.S. 279, 287 (1991).  In assessing whether a witness has been improperly coerced,

27    the courts must consider the totality of the circumstances including "both the

28    characteristics of the accused and the details of the interrogation." *Schneckloth v.*

Petition for Writ of Habeas Corpus

1    *Bustamonte*, 412 U.S. 218, 226 (1973).   Where such improper coercion has

2    "impaired the reliability" of a witness's trial testimony, this testimony must be

3    excluded.   *People v. Badgett*, 10 Cal. 4th 330, 348 (1995) (noting this is a

4    requirement in federal court).   Evidence demonstrating Det. Blackwell's coercive

5    tactics includes but is not limited to the details that follow.

6        During Det. Blackwell's first interview of Torrence on February 10, 1993, he

7    threatened to have Torrence fired from his new job working as a janitor at Kaiser

8    Hospital.   SHP Ex. 3 at 1959, 1962.   At the outset of the interview, Det. Blackwell

9    questioned Torrence about his new job.   SHP Ex. 3 at 1961-63.   Torrence asked Det.

10   Blackwell if just having engaged in the interview was "going on the grapevine," if

11   he was "straight on [his] job," and if Det. Blackwell was "positive" that he was not

12   going to interfere with his job.   SHP Ex. 3 at 1961-64.   Det. Blackwell leveraged Mr.

13   Torrence's anxiety about losing his job by stating that "just [his] association with

14   [the crime] would make [his employer] raise an eyebrow [and] say you're out of

15   here."   SHP Ex. 3 at 1962.   Det. Blackwell told Torrence that he "wouldn't mess him

16   up . . . depend[ing] on what [Torrence] told him."   SHP Ex. 3 at 1962.   Det.

17   Blackwell ended the interview by again suggested he could cause Torrence to lose

18   his job: "I don't wanna call your work and get you in trouble . . . to where you lose

19   your job . . . just a detective calling from the police department and they go crazy."

20   SHP Ex. 3 at 2018.

21       Det. Blackwell also threatened Torrence with incarceration for charges related

22   to the homicide, telling Torrence, that he could be implicated in the crime and that

23   he knew that Torrence had dropped Mr. Howard and Funches near to where the crime

24   occurred.   SHP Ex. 3 at 1965.   When Torrence denied this, Det. Blackwell told him

25   that he would have to prove it, because Mr. Howard was "saying [he] did," (SHP Ex.

26   3 at 1965), though Mr. Howard made no such explicit statements.   Det. Blackwell

27   told Torrence that if Mr. Howard were telling the truth, Torrence would have to

28   "spend[] the rest of his life in prison . . . ."   *Id.* at 1990.

Det. Blackwell said Torrence could avoid incarceration and "keep [his] ass out of jail . . . by refusing what [Mr. Howard] [had] to say . . . . " *Id.* at 1985. He reinforced this by telling Torrence that he had "absolutely nothing to lose by giving us what is needed by you, and everything to lose by fucking up on it." *Id.* at 1960. Torrence later told members of Mr. Howard's and co-defendant Funches' defense teams that he thought "he was looking at some time" when Det. Blackwell interviewed him about the offense. SHP Ex. 9 at 2478.

Danny Rivera, a friend of both Torrence and Funches, recalled that Torrence was concerned about being incarcerated for charges related to the instant crime. Ex. 68 at ¶¶ 1, 5. And Rivera remembered Torrence staying in jail after first being questioned by Det. Blackwell. SHP Ex. 68 at ¶ 5.

Torrence's testimony was critical to the prosecution's ability to bring charges against Mr. Howard, central to the prosecution's guilt phase case against Mr. Howard, and critical to the court's decision not to grant Mr. Howard's motion for a new trial based on newly discovered evidence. The facts supporting a conclusion that his coerced testimony was material to the prosecution's case include but is not limited to the details that follow.

Torrence provided the prosecution's only direct evidence linking Mr. Howard in any way to an alleged carjacking and to the .357 revolver found in the vicinity of the 1660 Kendall Drive Apartment Complex. *See* Claim Two. Torrence also provided the prosecution's only evidence indicating that Mr. Howard and Mr. Funches had a relationship prior to the day of the crime, which Mr. Howard disputes. *See* Claim Two.

The prosecution could not have and did not charge Mr. Howard for his alleged involvement in the offense prior to obtaining a statement from Torrence. 1 CT 488; SHP Ex. 3 at 1959. The trial court's decision to deny Mr. Howard's motion for a new trial also relied, in large part, on Torrence's testimony. 11 RT 2764-67.

That Torrence's trial testimony was tainted by this coercion is evidenced by

Petition for Writ of Habeas Corpus

the multiple inconsistencies as to critical facts between his multiple pretrial statements and testimony.  Torrence, who was in a bitter child custody and child support dispute with Mr. Howard's sister and the mother of Torrence's child, Delena Gandy, professed his willingness to lie.  Specifically, Gandy provided information to law enforcement that Torrence had alternately threatened to kill her and had offered to testify favorably for Mr. Howard if she gave him custody of their son. *See* SHP Ex. 26 at 4111.

In order to determine whether testimony has been unconstitutionally coerced, this court must look at the totality of the circumstances.  Statements made by the witness himself indicating that he was coerced are not necessary to a court's assessment.  Here, the many inconsistencies in Mr. Torrence's statements to police and in pre-trial and trial testimony, as well as his threats and inducements of Delena Gandy evidencing a willingness to lie, demonstrate that Det. Blackwell's coercion rendered Mr. Torrence's testimony unreliable.  Mr. Howard's due process rights to a fair trial were therefore violated.

### 3. The Prosecution Failed to Turn Over Material, Exculpatory Information and Falsified Incriminating Information in Its Place.

A report written by Detective Roy Izumi falsified and materially misrepresented the account that eyewitness Latasha Jinnies Brown had provided on the night of the incident when police canvassed for witnesses.

Under the Due Process Clause of the Fourteenth Amendment, the prosecution has a constitutional duty to disclose to the defense all favorable evidence material to guilt or punishment.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  Favorable evidence includes evidence that impeaches the credibility of a witness as well as that which diminishes criminal liability or exculpates the defendant.  *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within th[e] general rule [of *Brady*].") (internal quotations omitted);

Petition for Writ of Habeas Corpus

1    *see also Brady*, 373 U.S. at 91 (finding constitutional violation regarding sentencing

2    decision because suppressed confession of a co-defendant inculpating himself as the

3    triggerman arguably could have led a jury to a sentence other than death); *United*

4    *States v. Bagley*, 473 U.S. 667, 676-77 (1985) ("This Court has rejected any . . .

5    distinction between impeachment evidence and exculpatory evidence" in the context

6    of finding error); *United States v. Badalamente*, 507 F.2d 12 (2d Cir. 1974) (finding

7    a Brady violation where the prosecution withheld evidence that had "importance as

8    a tool for impeachment of a critical witness."); *People v. Ruthford*, 14 Cal. 3d 399,

9    408 (1975) (holding that suppression of substantial material evidence bearing on the

10    credibility of a key prosecution witness is a denial of due process within the meaning

11    of the Fourteenth Amendment), overruled on other grounds in *In re Saussounian*, 9

12    Cal. 4th 535 (1995).  Such evidence is material if there is a "reasonable probability

13    that, had the evidence been disclosed to the defense, the result of the proceeding

14    would have been different." *Bagley*, 473 U.S. at 682.  A petitioner need only

15    demonstrate "a probability [that is] 'sufficient to undermine confidence in the

16    outcome'" to establish a violation. *Id.* (quoting *Strickland v. Washington*, 466 U.S.

17    668, 694 (1984)); *see also People v. Earp*, 20 Cal. 4th 826, 866 (1999).

18    Thus, to prevail on a *Brady* claim, a habeas corpus petitioner must meet the

19    following three-part test: (1) the evidence at issue must be favorable to the accused

20    either because it is exculpatory or impeaching; (2) the evidence must have been

21    suppressed by the state, either willfully or inadvertently; and (3) the evidence must

22    be material, that is, the prejudice must be "sufficient to undermine confidence in the

23    outcome" of the trial. *Kyles v. Whitley*, 514 U.S. 419, 433-41 (1995); *Strickler v.*

24    *Greene*, 527 U.S. 263, 281-82 (1999).

25    Jinnies Brown lived in the 1660 Kendall Drive Apartment Complex in the area

26    where Funches was arrested and where the .357 revolver that the prosecution

27    claimed Mr. Howard carried on the day of the crime was found.  7 RT 1649; 8 RT

28    1946-50; Funches's People's Ex. No. 1; SHP Ex. 1 at 201, 239; SHP Ex. 41.  Jinnies

1   Brown was a neighbor of other apartment complex residents and prosecution

2   eyewitnesses, Michael Manzella, Laurie Manzella, and Theresa Brown. SHP Ex. 1

3   at 199, 265; SHP Ex. 41.

4        On December 6, 1992, around 10:50 p.m., Mrs. Jinnies Brown was

5   interviewed by San Bernardino Police Officer Stieg. She told Ofc. Stieg she has

6   seen a black male wearing a black shirt. SHP Ex. 1 at 201. Four days later, on

7   December 10, 1992, at 3:45 p.m., Detectives Dale Blackwell and Roy Izumi

8   interviewed Jinnies Brown again. *Id.* at 175. In Det. Izumi's report of their

9   interview, he wrote that Jinnies Brown stated she saw a black male wearing a "white

10   pullover shirt." *Id.* at 175. The report further stated that Jinnies Brown was unable

11   to get a "full facial view" of the suspect because "he was trying to avoid looking at

12   her," that the suspect she saw was coming from the "direction of buildings 1 and 2,"

13   and when she saw him he "came out of the shadows and walk[ed] by her apartment."

14   *Id.* at 175. The apartments of Michael and Laurie Manzella, and Theresa Brown

15   were in Buildings 1 and 2. *Id.* at 199, 265; SHP Ex. 41. They are also near the

16   location where police recovered the .357 revolver that they alleged Mr. Howard

17   carried on the day of the crime (SHP Ex. 1 at 239; SHP Ex. 41) and the location

18   where Funches was arrested. 8 RT 1946-50; Funches' People's Ex. No. 1.

19        Det. Izumi's report contained false and misleading representations to support

20   a theory that Mr. Howard was the second assailant. The true information not

21   contained in the reports and undisclosed information includes but is not limited to

22   what follows.

23        Jinnies Brown *did not* state the suspect was wearing a "white pullover shirt."

24   She told both officers that he was wearing dark colors. SHP Ex. 47 at ¶ 7. Jinnies

25   Brown *did* get a good look at the suspect's face and it was not Mr. Howard's. *Id.* at

26   ¶ 9. Jinnies Brown *did not* state that the suspect was coming from the direction of

27   buildings 1 and 2, and *did not* make any statements about the suspect she saw coming

28   from out of the "shadows." *Id.* at ¶ 8.

1    The physical description Jinnies Brown provided to Detectives Blackwell and

2    Izumi, including that the suspect was wearing dark colors, was inconsistent with Mr.

3    Howard's clothing (People's Ex. No. 162), and contradicted law enforcement's

4    theory that Mr. Howard was the person seen by Jinnies Brown.  SHP Ex. 1 at 175; 9

5    RT 2436.

6    Jinnies Brown's true account of what she witnessed contradicted the

7    testimony of prosecution eye-witnesses Michael and Laurie Manzella, and Theresa

8    Brown who claimed that they saw someone located by their apartments wearing a

9    white pullover shirt.

10    Instead, Det. Izumi's report (SHP Ex. 1 at 175) contained false and misleading

11    representations that implicated Mr. Howard, including that Jinnies Brown's

12    description of the suspect's shirt according to Det. Izumi's report, matched that of

13    Mr. Howard's at the time of his arrest on December 6, 1992.  People's Ex. No. 162.

14    Further implicating Mr. Howard, Det. Izumi's report falsely stated that Jinnies

15    Brown had seen the suspect come from the direction of buildings 1 and 2, placed the

16    suspect in the area where the .357 revolver was found and recovered by the police,

17    and where Funches' was arrested.  SHP Ex. 1 at 239, Ex 41; 7 RT 649, 8 RT 1946-

18    50; Funches' People's Ex. No. 1.  Det. Izumi's report that the suspect avoided

19    making eye contact with Jinnies Brown, and that as such she was not able to get a

20    "full facial view," served the state's theory of why she was unable to identify the

21    suspect in a lineup with Mr. Howard's photograph.  SHP Ex. 1 at 175.

22    The favorable information about Jinnies Brown's true statement to Det. Izumi

23    was never disclosed to trial counsel.  It was material and exculpatory because it could

24    have used it to impeach the testimony of Michael and Laurie Manzella, and Theresa

25    Brown, (*see* Claim Two, § B(9)(d)), as well as to undermine the veracity of Det.

26    Izumi's reports of witness interviews and the integrity of law enforcement's

27    investigation as a whole.  Information contradicting the Manzella and Brown

28    eyewitness accounts would also have assisted trial counsel in advancing the theory

Petition for Writ of Habeas Corpus

1  that the second suspect was someone other than Mr. Howard.    9 RT 2436.

2  Importantly, the jury considered Michael and Laurie Manzella's testimony critical,

3  as demonstrated by the request that it be read back to the jury.  9 RT 2450-51.  But

4  for the prosecution's failure to disclose the material evidence, the jury would not

5  have convicted Mr. Howard or sentenced him to death.

6  **4.  The Prosecution Knowingly Presented False, Unreliable, and**

7  **Misleading Evidence.**

8  The prosecution knowingly introduced false, unreliable, and misleading

9  testimony of multiple witnesses, including Det. Dale Blackwell, who testified that

10  the surviving victim had told him the assailant alleged to be Mr. Howard had a gun

11  in his hand during the course of the attempted robbery.  To the contrary, Randi

12  Collins never told Det. Blackwell or any other law enforcement officer who

13  interviewed her that the assailant alleged to be Mr. Howard had a gun.

14  The prosecution knowingly introduced the false testimony of California State

15  University (CSU) of San Bernardino Police Officer Manuel Castro, who was one of

16  the officers who arrested Mr. Howard on the night of the incident. Ofc. Castro falsely

17  testified that he arrested Mr. Howard because he matched the description of the

18  suspect for whom Ofc. Castro was searching, when in fact no such description had

19  been broadcast.  8 RT 2024.

20  The prosecution knowingly and intentionally introduced unreliable and

21  misleading testimony of Laurie Manzella and Theresa Brown, eyewitnesses who

22  reported seeing a suspect fleeing.  The identifications of Mr. Howard by both these

23  witnesses were obtained via unduly suggestive means which rendered them

24  unreliable.

25  The prosecution may not use false evidence to obtain a criminal conviction.

26  *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (citing *Napue v. Illinois*, 360 U.S.

27  264, 269 (1959)).  When a prosecutor obtains a conviction through perjured or false

28  testimony, or by failing to correct unsolicited false testimony, a defendant's

Petition for Writ of Habeas Corpus

constitutional rights are violated. *Napue*, 360 U.S. at 269. Where the government knowingly permits the introduction of false testimony, reversal is "virtually automatic," *Hayes*, 399 F.3d at 978 (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)), and the conviction must be set aside if there "'is any reasonable likelihood that the false testimony could have affected the jury verdict.'" *United States v. Cooper*, 173 F.3d 1192, 1203 (9th Cir. 1999) (quoting *Ortiz v. Stewart*, 149 F.3d 923, 936 (9th Cir. 1998)); *see also Hayes*, 399 F.3d at 984-85.

Even if the prosecutor is unaware the testimony is false or misleading at the time it is adduced, a defendant is entitled to relief if the prosecutor later learns it to be false. *Hall v. Director of Corrections*, 343 F.3d 976, 981 (9th Cir. 2003) (finding government's "present knowledge" that evidence was falsified is sufficient); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (observing that the state of mind of the testifying witness and prosecution's knowledge of witness's falsehoods are irrelevant); *United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994) (holding that a defendant convicted on false testimony was entitled to new trial even if prosecutor unwittingly presented that false evidence); *Sanders v. Sullivan*, 900 F.2d 601 (2d Cir. 1990) (granting habeas relief even where the perjurious nature of testimony was not known to anyone until after trial).

In determining whether false evidence entitles a petitioner to relief, a court must determine whether "there is a 'reasonable probability' that, had it not been introduced, the result would have been different." *In re Sassonian*, 9 Cal. 4th 535, 546 (1995). "Reasonable probability" is a chance great enough, under the totality of the circumstances, to objectively undermine the court's confidence in the outcome. *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985) and *Strickland v. Washington*, 466 U.S. 668, 695 (1984)). Once a habeas petitioner has demonstrated that false evidence or testimony was presented at his trial and that the false or perjured testimony may have affected the jury's verdict, no additional showing of prejudice is required under the harmless error analysis articulated in *Chapman v.*

138

1  *California*, 386 U.S. 18, 24 (1967).  *See Bagley*, 473 U.S. at 682; *Sassounian*, 9 Cal.

2  4th at 545, n.7.  At that juncture, it is the state's burden to demonstrate that the

3  outcome of the trial was not affected by the false evidence.  *United Stated v. Agurs*,

4  427 U.S. 97, 103-07 (1976).

5        The need for heightened reliability in capital proceedings, as protected by the

6  Due Process Clause requirement of fundamental fairness and the Eighth Amendment

7  guarantee against cruel and unusual punishment, also mandates reversal of a

8  conviction and death sentence obtained on the basis of false and unreliable evidence.

9  *See Simmons v. South Carolina*, 512 U.S. 154 (1994) (holding that the Due Process

10  Clause required a defendant be permitted to inform the jury of parole ineligibility to

11  correct the misimpression created by the state's argument that he would present a

12  danger to community if not sentenced to death); *Johnson v. Mississippi*, 486 U.S.

13  578 (1988) (holding that the Eighth Amendment required reversal of a death

14  sentence based in part upon a felony conviction subsequently set aside); *Gardner v.*

15  *Florida*, 430 U.S. 349 (1977) (finding that the Due Process Clause was violated

16  where a death sentence was based in part upon false information contained in a

17  probation report that defendant had no opportunity to rebut); *United States v. Petty*,

18  982 F.2d 1365, 1369 (9th Cir. 1993) (holding that the defendant had a due process

19  right not to be sentenced on basis of materially incorrect information).

20        **a.  False and misleading evidence that the second assailant held a gun**

21              **during the attempted robbery**

22        Randi Collins gave three statements to police prior to her testimony at Mr.

23  Howard's trial.  In none of the statements did she state that she had seen the assailant

24  on her mother's side of the car holding or using a gun and expressly denied it when

25  asked. 7 RT 1782-88; FHP Ex. 1; FHP Ex. 2.  In a recorded interview four days after

26  the incident, Detective Blackwell asked Randi: "The man in the white coat, did he

27  have anything in his hands? Did you see anything? No? Shaking your head no. You

28  didn't see anything in his hands? Did he point his hands or like point his fingers at

Petition for Writ of Habeas Corpus

1   your mom or anything? Do you remember? No? Okay." FHP Ex. 2.

2      At trial, Det. Blackwell read into the record a portion of a report he wrote

3   summarizing the interview in which he misrepresents what Randi stated.   He

4   testified that Randi initially said she did not see a gun but heard it and then "she saw

5   the subject on her mother's side of the car holding a gun by his stomach."  7 RT

6   1806.  Randi Collins did not herself testify that the assailant struggling with her

7   mother held a gun.  7 RT 1785-87.

8      If this false and misleading testimony had not been introduced, it is reasonably

9   probable that the jury would not have found that Mr. Howard's alleged conduct in

10  the attempted robbery rose to the level of reckless indifference to human life and

11  would therefore not have found the special circumstance allegations to be true.  *See*

12  *Tison v. Arizona,* 481 U.S. 137 (1987); *Enmund v. Florida*, 458 U.S. 782 (1982);

13  *People v. Banks*, 61 Cal. 4th 788 (2015); and *People v. Clark*, 63 Cal. 4th 522 (2016).

14      **b. False evidence regarding the dispatch report of the suspect's**

15      **description to justify an arrest without probable cause**

16      Ofc. Castro testified that he was searching for a Black male wearing a

17  "p[o]ncho-type gray-colored jacket and dark-colored pants."  8 RT 2024.  However,

18  none of the lay witness or law enforcement descriptions of the suspects available to

19  Ofc. Castro described either suspect as wearing a gray pull-over sweater with a hood.

20  The facts indicating that the prosecution knowing presented false testimony include

21  but are not limited to the details that follow.

22      At 6:55 p.m., on December 6, 1992, the San Bernardino Police Department's

23  911 dispatcher received a call that a woman had been shot in her garage in the Acacia

24  Park Resort Apartments located on 5280 Little Mountain Drive.  SHP Ex. 3 at 1851.

25  At 6:58 p.m., a dispatcher for the CSU Police at San Bernardino, reported in the CSU

26  San Bernardino Department of Public Safety Dispatcher's Radio Log that according

27  to the San Bernardino City Police Department's radio traffic on the dispatch scanner,

28  there were two suspects involved in the shooting both of an unknown race one

Petition for Writ of Habeas Corpus

wearing a "white T-shirt," and the other "wearing dark clothes." SHP Ex. 1 at 95; Ex. 3 at 1875. At 7:00 p.m., the dispatcher received an updated description of the two suspects from "city units" that radioed from the scene: two "negro male adults" one wearing a "white T-shirt," the other "wearing dark clothing." SHP Ex. 1 at 132; Ex 1 at 95.

At 7:08 p.m., eyewitness Steve Larsen provided a remarkably similar description of the suspects to the San Bernardino Police Department's 911 dispatch: he reported seeing two suspects and that one was wearing a "white tee shirt" and that the other was wearing a "dark jacket." SHP Ex. 3 at 1854.

At 7:11 p.m., according to the SCU Public Safety Dispatcher's Radio Log, the suspects were described as two black males: one "skinny" and wearing a "white T-shirt" and "black pants," and the other "heavy-set" and wearing "all-black clothing." Both were described as having short hair. SHP Ex. 1 at 132; SHP Ex. 3 at 1879.

At 7:18 p.m., eyewitness Theresa Brown telephoned 911 and described one of the suspects as wearing dark clothing, and the other as wearing a white shirt and a backwards baseball cap. SHP Ex. 3 at 1857. The clothing descriptions provided by these individuals as reported in police logs were consistent.

At 7:30 p.m., according to the Department of Public Safety CSU Dispatcher's Radio Log, police officers had one of the suspects in custody. This suspect was a black male, 5'9" tall, heavy set, wearing dark clothing, and had short hair in dread locks. SHP Ex. 1 at 96-97.

At 10:05 p.m., CSU Police Officers Keller and Castro spotted a black male wearing a "gray hooded sweatshirt," using a public pay phone. *Id.* at 106, 402. The man the officers saw at the pay phone was later identified as Mr. Howard. *Id.* at 402. Officers Castro and Keller detained, searched and arrested Mr. Howard with their guns drawn. *Id.* at 403. Ofc. Castro testified that he arrested Mr. Howard based on the description he received that the suspect was wearing a "poncho-type, gray colored jacket and dark pants." 8 RT 2024. There was, however, no such

1   documented description prior to Mr. Howard's arrest. In addition, dispatch

2   broadcast that the suspect wearing a white t-shirt was "skinny." SHP Ex. 3 at 1858.

3   Mr. Howard, at five feet four inches and a weight of 160 pounds, was not skinny.

4   SHP Ex. 1 at 307.

5        The arrest was based on a description inconsistent with Mr. Howard's

6   appearance. As such, the officers did not have probable cause to arrest Mr. Howard,

7   or even a reasonable suspicion warranting detention. *See* Claim Two. Ofc. Castro's

8   testimony was material because it was the only evidence that provided a justification

9   for Mr. Howard's arrest or supported the theory that Mr. Howard was the person

10   eyewitnesses claimed they had seen. Had the jury known that there was no

11   description of a perpetrator wearing a "p[o]ncho-type gray-colored jacket," (8 RT

12   2024), and that Mr. Howard was arrested despite not matching the description of the

13   alleged perpetrator, it would have undermined the legality of and confidence in the

14   arrest of Mr. Howard and their confidence in law enforcement's investigation and

15   prosecution of Mr. Howard. Two eyewitnesses, Lori Dean and Russell Cecala, did

16   report seeing a suspect wearing a "gray jacket" and a "hooded gray poncho," but

17   these reports both occurred *after* Mr. Howard's arrest.

18        Moreover, Ofc. Castro wrote an arrest report over nine months after the arrest

19   in which he fabricated a story about how he obtained a description of the suspect's

20   clothing before it was broadcast on dispatch. He wrote that he had seen a San

21   Bernardino police unit approaching him about 9:00 p.m., and realized the driver was

22   a sergeant because he "saw that he had sergeant stripes on the sleeves of his shirt."

23   Ofc. Castro wrote that the unnamed sergeant told him that he had "heard that the

24   second suspect was a Black male wearing a gray, 'Poncho' type jacket with a hood,

25   and dark colored pants." SHP Ex. 1 at 402. After allegedly receiving this update,

26   Ofc. Castro stated that he returned to his station where he joined Ofc. Keller, before

27   spotting Mr. Howard at 10:05 p.m. *Id.*

28        Ofc. Castro's testimony was material because it was the only evidence that

1    linked the second suspect to Mr. Howard's arrest. Had the jury known that Ofc.

2    Castro had never been provided with an eyewitness description of a suspect wearing

3    clothes that matched Mr. Howard's, and that Mr. Howard was arrested despite not

4    matching the multiple eyewitness descriptions of the alleged perpetrator actually

5    given to Ofc. Castro, it would have undermined the jury's confidence in the police's

6    arrest of Mr. Howard and in law enforcement's investigation and prosecution of Mr.

7    Howard. Additionally, the fabrication prevented trial counsel from challenging Mr.

8    Howard's initial unlawful detention which could not have been based on reasonable

9    suspicion. *Terry v. Ohio*, 392 U.S. 1 (1968).

10        **c. False and misleading evidence of eyewitness identifications**

11            **elicited under unduly suggestive circumstances**

12        The introduction of eyewitness identifications by Laurie Manzella and

13    Theresa Brown violated Mr. Howard's constitutional rights because they were

14    conducted in an unduly suggestive manner and were not reliable under the totality

15    of the circumstances.

16        Improper use of photos by police may cause witnesses to misidentify a

17    suspect. *Simmons v. U.S*, 390 U.S. 377, 383 (1968). Even where the use of photos

18    is not improper, where a witness only a brief glimpse of a suspect or saw him under

19    poor conditions the risk of unreliability is present. *Id.* The risk of misidentification

20    is increased if the police display to the witness only a single individual's photo or

21    the photo of a single individual is in some way emphasized in a line-up. *Id.*

22        The dangers of reliance on eyewitness identification are well-known, with the

23    "potential for misidentification" the primary danger sought to be avoided. *See, e.g.*,

24    *United States v. Wade*, 388 U.S. 218 (1967). "A lineup is unduly suggestive as to a

25    given defendant if he meets the description of the perpetrator previously given by

26    the witness and the other lineup participants obviously do not." *Raheem v. Kelly*,

27    257 F.3d 122, 134 (2d Cir. 2001) (determining that a lineup was unduly suggestive

28    where the two identifying witnesses provided suspect descriptions emphasizing a

Petition for Writ of Habeas Corpus

black leather coat and where the lineup contained only one person wearing a black leather coat: the defendant); *Solomon v. Smith*, 645 F.2d 1179, 1183 (2d Cir. 1981) (finding pretrial identification procedures suggestive where assailant had been described as 5'7" tall and weighing 145 pounds and a lineup was held in which the defendant, who was 5'6" tall and weighed 130 pounds, was the only person near that description.); *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975) (holding that a lineup was unduly suggestive where "glasses, the outstanding feature of the assailant's appearance to the victim and an integral part of the description provided the police" and where defendant was the only person wearing glasses in the lineup); *United States v. Williams*, 469 F.2d 540, 547 (D.C. Cir.) cert. denied, 409 U.S. 872 (1972) (holding that a lineup was unduly suggestive where the "prior description of the gunman indicated that he did not wear a hat" and the lineup included only one person, the prime suspect, without one).

The determination as to whether identifications are reliable under the totality of the circumstances turns on five factors: the witness's opportunity to view the subject at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the level of certainty demonstrated by the witness at the time of the identification, and the length of time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

Where the lineup procedures are suggestive and unreliable, the identification is not a matter for the jury's consideration, but rather, is inadmissible. *Biggers*, 409 U.S. at 198; *Foster v. California*, 394 U.S. 440 (1969). In addition, eyewitness identifications made in-court following a pretrial identification made pursuant to unduly suggestive procedures implicate the particular concern "that the witness later identifies the person in court, not from his or her recollection of observations at the time of the crime charged, but from the suggestive pretrial identification," and as such are not admissible. *See United States v. Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986) (citing *United States v. Jarrad*, 754 F.2d 1451, 1455 (9th Cir. 1985)).

1       Here, the prosecution knowingly and intentionally allowed Laurie Manzella

2   to testify falsely that she had previously identified Mr. Howard. During an interview

3   on February 3, 1993, nearly two months after the incident, Detectives Roy Izumi and

4   David Dillon showed Michael and Laurie Manzella a photo line-up consisting of six

5   photographs, including one of Mr. Howard. SHP Ex. 1 at 265. According to a report

6   that Det. Izumi wrote following this interview, Michael Manzella, in the presence of

7   Laurie Manzella, described the suspect as wearing a "white pullover shirt/jacket with

8   a hood and pockets in the front." *Id.* Laurie Manzella did not provide any

9   description of the suspect's clothing or physical appearance. *Id.* The line-up

10   presented to Laurie Manzella included a photo of Mr. Howard as the only person

11   depicted wearing a pullover shirt with a hood. People's Ex. No. 35. Even so, Laurie

12   Manzella's initial identification of Mr. Howard's photograph was uncertain. She

13   stated that he "look[ed] like the one," but, that "she couldn't be positively sure."

14   HCP Ex. 1 at 265.

15       During trial, however, Laurie Manzella testified that she had previously

16   identified Mr. Howard in the photo line-up presented to her by Detectives Izumi and

17   Dillon. 7 RT 1856. This testimony was material because it gave the jury the

18   impression that she had made the identification with certainty. The prosecution's

19   presentation of Laurie Manzella testimony, as the only witness who testified that she

20   had identified Mr. Howard by his face and saw him in the vicinity of the .357

21   revolver and near to where Funches was arrested, was therefore material and

22   prejudicial.

23       Theresa Brown's in-court identification of Mr. Howard was also conducted

24   pursuant to unduly suggestive procedures and was therefore unreliable. During

25   Brown's testimony, the prosecution showed her a *single* booking photograph of Mr.

26   Howard from *behind*, wearing a knit pullover sweater with a hood, with his hands

27   obviously handcuffed. 7 RT 1832; People's Ex. No. 67. Brown testified that she

28   recognized the person in the photo and stated that the person depicted was

1    "definitely" the man she saw on the evening of the crime. It is well-settled that the

2    practice of showing an eyewitness a single photograph to identify a suspect should

3    "be viewed in general with suspicion." *Manson v. Brathwaite*, 432 U.S. 98, 116

4    (1977); *Simmons v. United States*, 390 U.S. at 383 ("This danger [of

5    misidentification] will be increased if the police display to the witness only the

6    picture of a single individual who generally resembles the person he saw . . . .").

7        Brown further testified that the "hooded jacket" was what she remembered

8    the most and the "fact that the head was real close." 7 RT 1832. Brown's

9    identification, like the unduly suggestive lineups described in *Raheem*, 257 F.3d 122,

10   *Odom*, 521 F.2d 1370, *Williams*, 469 F.2d 540, and *Solomon*, 645 F.2d 1179, was

11   similarly based in large part on identifying an article of clothing.

12       Brown's identification was not independently reliable under the totality of the

13   circumstances.  On December 6, 1992, at 7:18 p.m., Brown called 911 and

14   reported having two Black male suspects in her sight, one wearing dark bell-bottom

15   cords and a dark windbreaker and the other wearing a white shirt and baseball cap.

16   SHP Ex. 3 at 1856-57. She made no mention of a "pullover" shirt made from "woven

17   material" with a hood. *Id*. Four days later, during an interview with Detectives

18   Izumi and Dillon, Brown was not able to identify Mr. Howard in the photo lineup.

19   SHP Ex. 1 at 189. Between when Brown called 911 and trial, her description of the

20   clothing worn by the suspect, changed from a "white shirt" and "baseball cap" to a

21   "white woven material pullover type jacket" (*Id.*) – in other words it changed to

22   match the clothing Mr. Howard was wearing when arrested. The contrast between

23   this description and the description offered while she was viewing the suspects

24   undermines both the reliability of Ms. Brown's interview with Detectives Izumi and

25   Dillon and her in-court identification.

26       Laurie Manzella's pretrial and in-court identifications and Theresa Brown's

27   in-court identification were conducted pursuant to unduly suggestive processes and

28   were unreliable under the totality of the circumstances. They should have been

146

Petition for Writ of Habeas Corpus

suppressed.  Because Laurie Manzella and Theresa Brown were the only prosecution witnesses who claimed to be able to identify Mr. Howard in proximity to the .357 revolver purportedly used in the crime and the location where Mitchell Funches was arrested, the prejudice that resulted from their testimony is manifest.  But for this damaging testimony the outcome of Mr. Howard's trial would have been different.

## D.    Claim Four: Mr. Howard's Is Innocent of Murder.

### 1.    Introduction

Mr. Howard's conviction, sentence, and confinement are unlawful and were obtained in violation of his rights to due process, equal protection, a fair trial, compulsory process, a reliable and accurate guilt and penalty assessment based on accurate rather than misleading and false testimony and evidence, the effective assistance of counsel, a fair, reliable and non-arbitrary sentencing determination, and his rights to present a defense, to confront adverse witnesses, to conviction upon proof beyond a reasonable doubt by a unanimous and impartial jury, and to be free from the imposition of cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments; and international law as established by international treaties, human rights law, customary international law, and under the doctrine of *jus cogens*, because Mr. Howard is actually innocent of the murder for which he was convicted and sentenced to death. Those facts and allegations set forth in Claims Two and Three and the accompanying exhibits, are incorporated by reference as if fully set forth herein.

In addition to record evidence that contradicts the prosecution's theory of the case, Mr. Howard has presented substantial new evidence demonstrating that he was innocent of all charged offenses, including that: the fiber evidence introduced by the prosecution was based on inadequate testing and unreliable; he did not plan a robbery with Mitchell Funches; multiple witnesses corroborate his alibi; and multiple eyewitnesses in the vicinity of the incident who made identifications inconsistent

Petition for Writ of Habeas Corpus

with Mr. Howard's appearance at arrest were never called to testify. This all points clearly towards Mr. Howard's innocence.

### 2. Applicable Law

In *Herrera v. Collins*, 506 U.S. 390 (1993), "a majority of the Supreme Court assumed, without deciding, that execution of an innocent person would violate the Constitution." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997). A petitioner must make an "extraordinarily high" showing of innocence under this standard. *Herrera*, 506 U.S. at 417. While the standard has not been precisely defined, the Supreme Court in *House v. Bell*, 547 U.S. 518, 555 (2000), indicated that a freestanding innocence claim "requires more convincing proof of innocence than" the actual innocence standard announced in *Schlup v. Delo*, 513 U.S. 298 (1995). A petitioner meets the standard announced in *Schlup* by showing "that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. Thus, the most stringent iteration of the legal standard for federal relief on a freestanding innocence claim is that the new evidence shows, by a margin greater than the more-likely-than-not standard, that no reasonable juror would have voted for the imprisonment and death sentence of the petitioner. Evidence of actual innocence may include evidence that there were no aggravating circumstance as well as evidence of innocence of the crime itself. *See, e.g.*, *Sawyer v. Whitley*, 505 U.S. 333, 344-45 (1992).

### 3. Facts Supporting Mr. Howard's Alibi

Mr. Howard was not present when Funches shot Ms. Collins. Ms. Collins was shot around 6:55 p.m. on the evening of December 6, 1992. SHP Ex. 3 at 1851. Mr. Howard was with Roxanne Winn during the late afternoon and early evening of December 6, 1992, until she left him in the parking lot of a 7-Eleven. 9 RT 2261-64, 2298, 2307-08.

Around 3:00 p.m., Winn went to pick up Mr. Howard where he was staying with his aunt, Patricia Washington, to take him back with her to Los Angeles where

she was living at the time.  9 RT 2261-62.  Mr. Howard was not there, and Winn left and returned a few times looking for him.  9 RT 2299.  Eventually, Mr. Howard called his aunt's house and spoke to Winn, gave her directions to his location, and she went to pick him up.  9 RT 2261-62.  She drove around while the two fought for about half an hour.  9 RT 2262-63.  Winn then kicked Mr. Howard out of her car at a 7-Eleven, around dusk.  9 RT 2263-4.

Segonia Washington, Mr. Howard's cousin, and Mr. Howard's aunt, Patricia Washington, recalled that Winn came to their house looking for Mr. Howard on a Sunday afternoon in December.  9 RT 2297-98, 2303.  Mr. Howard's Aunt Sandra Kelly Willcot and Uncle Willie Kelly, lived in an apartment located at 2490 Kendall Drive, Apartment 103B.  SHP Ex. 72 at ¶ 21.  Kelly was expecting Howard to stop by their apartment on the evening of December 6, 1992, to pick up money that Kelly offered to give to Mr. Howard to help him get on his feet.  9 RT 2295; SHP Ex. 62 at ¶ 23.

After Winn left Mr. Howard at the 7-Eleven, he searched for his Aunt Sandra's apartment without success.  He knocked on the door of James Chism, the resident in apartment number 135 of the Kendall Drive Apartment Complex and asked if he could borrow his phone to arrange a ride.  7 RT 1864, 65, 69.  Chism's apartment was located at the opposite end of the complex from where police recovered the .357 revolver that the prosecution tried to tie to Mr. Howard.  It was also the opposite end from Funches' arrest location.   7 RT 1649, 1675-76; 8 RT 1946-50, 1972-73; People's Ex. No. 1; SHP Ex. 41.

Not long after leaving Chism's apartment, Mr. Howard was arrested at a phone booth while he was talking to his sister, Delena Gandy, who arranged a three-way call so that he could speak with his Aunt Sandra, whose number Mr. Howard did not know.  SHP Ex. 1 at 282; SHP Ex. 72 at ¶ 21.

Based on the above accounts of multiple witnesses, Mr. Howard could not have been with Funches at the time he killed Ms. Collins.

### 4. Facts And New Evidence Undermining Testimony That The Robbery Was Planned

Mr. Howard was convicted of felony murder and special circumstances based on theory that the murder was committed in the course of an attempted robbery. 10 RT 2521. To support this allegation, Mr. Howard provides evidence of police records that were not presented to Mr. Howard's jury and newly obtained witness declarations undermining evidence of a plan to commit a robbery.

This evidence includes that Funches had money on him at the time of the robbery and was wearing a 10 karat gold ring and 14 karat gold earrings. Funches' Defense Ex. No. 87. Meanwhile, Mr. Howard's uncle, Willie Kelly had offered to provide him with money that day. SHP Ex. 62 at ¶ 23. In other words, neither man was without means.

Moreover, Ms. Collins' money, purse, jewelry and car keys were left untouched during the incident. SHP Ex. 1 at 121. The only eyewitness to the crime itself, Randy Collins, Ms. Collins' daughter, told police that the assailants did not try to take her mother's purse, car keys, or anything else from the car. SHP Ex. 2 at 1840.

In addition, Cedric Torrence, the only person to testify that he heard Mr. Howard and Funches plan a robbery, was not a credible witness. 7 RT 1661-62. Newly developed evidence for the state habeas petition shows that Torrence told Delena Gandy, Mr. Howard's sister and the mother of Torrence's child, that he would lie to implicate Mr. Howard if she did not give him custody of their son. SHP Ex. 26 at 4109. Torrence's testimony was also controverted by George Rivera and Danny Rivera, who were present in the garage where Torrence asserted he overheard the robbery being planned; they testified they did not hear any discussion about a jacking or a robbery. 8 RT 2080; 9 RT 2280. Torrence's testimony was also the product of coercion. During interviews at the police station, Detective Blackwell led Torrence to believe that if he did not implicate Mr. Howard, he would lose his

Petition for Writ of Habeas Corpus

1    job and face time in prison. *See* Claim Three, § A(2). Finally, in the presence of two

2    impartial witnesses, David Janes and Michael Nunez, Torrence admitted to Mr.

3    Howard – after he had been convicted – that his testimony was the result of law

4    enforcement pressure. 2 CT 369-72; SHP Ex. 58 at ¶ 5.

### 5. New Evidence Undermines The Fiber Evidence Used At Trial

6        Newly discovered evidence undermines the only physical evidence placing

7    Mr. Howard at the scene of the crime. Craig Ogino, the prosecution's criminalist,

8    testified that fibers manufactured at the same plant as those contained in Mr.

9    Howard's clothing were found on the bottom of the victim's shoes. 8 RT 2142.

10   Criminalist Ogino could not have reached such a conclusion based on the limited

11   testing that he performed. SHP Ex. 70 at ¶¶ 18-22. Lawrence Wayne, a senior

12   research microscopist, after reviewing Criminalist Orgino's testimony and the

13   testing of the fiber evidence introduced at trial, concluded that the tests Criminalist

14   Orgino performed were insufficient to support the conclusions drawn and testified

15   to. SHP Ex. 70 at ¶ 23.

### 6. Evidence undermining eyewitness identifications

17       Newly discovered evidence shows that Mr. Howard was not one of the

18   perpetrators. Russell Cecala and Latasha Jinnies Brown, two witnesses not called to

19   testify for the prosecution and not interviewed by the defense, both saw a suspect

20   whose appearance was consistent with that of co-defendant Funches the evening of

21   the crime. SHP Exs. 47, 48.

22       On the evening of his arrest, Mr. Howard was wearing a gray hooded pullover

23   sweater. People's Ex. No. 2. Between 6:58 p.m. and 7:11 p.m., four individuals

24   called 911 to report seeing two suspects flee from the Acacia Park Resort Apartments

25   where Ms. Collins was shot. SHP Ex. 1 at 95, 132; SHP Ex. 3 at 1851, 75, 79. These

26   individuals all described one of the perpetrators as wearing dark clothing, and the

27   other perpetrator as wearing a "white t-shirt." SHP Ex. 1 at 95, 132; SHP Ex. 3 at

28   1875, 79. Several eyewitnesses also reported seeing a suspect or suspects in the

Petition for Writ of Habeas Corpus

vicinity of buildings 1 and 2 of the 1660 Kendall Drive Apartment Complex, where co-defendant Funches was arrested about a half an hour after he shot Ms. Collins. SHP Ex. 1 at 427.

At 7:18 p.m., Theresa Brown, who lived in apartment 8 in building number 1 (SHP Ex. 41; SHP Ex. 1 at 199), called 911 and reported seeing two suspects: one suspect wearing dark clothing and the other wearing a white shirt and a backwards baseball cap. SHP Ex. 3 at 1857.

Eyewitness Russell Cecala, who spoke with a suspect the evening of the crime, and who lived in apartment 3 of the 1660 Drive Apartment Complex, very close to where the police found the .357 revolver that they claimed Mr. Howard possessed on the day of the crime, (7 RT 1649, 1675-76; SHP Ex. 1 at 239; 8 RT 1972-73), reported in a police interview that the suspect he saw resembled co-defendant Mitchell Funches, in terms of his hairstyle and height, not Mr. Howard. SHP Ex. 1 at 186, 427; People's Ex. No. 1.

Latasha Jinnies Brown another eyewitness who lived in this area, similarly described seeing a suspect wearing all dark clothing, consistent with Funches' clothing, not Mr. Howard's. SHP Ex. 1 at 201; SHP Ex. 47 at ¶ 7; 8 RT 1915, 20; People's Ex. No. 1.

The above facts and newly discovered evidence, individually and cumulatively, establish Mr. Howard's innocence. His conviction therefore violated his Fourteenth Amendment right to due process and the Eighth Amendment proscription against cruel and unusual punishment.

**E.    Claim Five: Mr. Howard Was Incompetent to Stand Trial**

   **1.  Introduction**

Several factors, individually and cumulatively, rendered Mr. Howard incompetent to stand trial: 1) Mr. Howard's lifelong neuropsychological impairments and neurobiological anxiety, which existed at the time of his arrest and

Petition for Writ of Habeas Corpus

1    continued throughout his pretrial incarceration, trial, and sentencing; 2) the effects

2    of the psychiatric medication he was administered by jail medical staff throughout

3    trial; 3) the forced imposition of a stun belt by the trial court; and 4) the stressful and

4    violent conditions of his confinement throughout proceedings.  Because of these

5    circumstances, Mr. Howard was tried, convicted, and sentenced while unable to

6    rationally consult with his counsel and understand the proceedings against him,

7    present with an appropriate affect and demeanor, and appropriately testify on his

8    own behalf, as required and guaranteed by the United States Constitution.

9        It is well established that when there is a genuine doubt regarding the

10   competence of a criminal defendant, the trial judge must suspend criminal

11   proceedings and hold a competency hearing. *Drope v. Missouri*, 420 U.S. 162, 171

12   (1975); *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *Blazak v. Ricketts*, 1 F.3d 891,

13   893, n.1, (9th Cir. 1993) cert. den. 511 U.S. 1097 (1994).  Here, the trial court was

14   put on notice concerning Mr. Howard's incompetence at the end of trial. The proper

15   remedy would have been to suspend proceedings immediately, investigate the

16   competency claim, hold a competency hearing, and grant a new trial.

17       The trial court's failure to suspend proceedings despite clearly observable

18   indications of incompetence and a declaration of doubt as to competence by Mr.

19   Howard, deprived Mr. Howard of substantive and procedural due process of law, a

20   fair trial, his rights to confrontation and cross-examination, effective assistance of

21   counsel, equal protection and a reliable guilt verdict, rights guaranteed by the Fifth,

22   Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

23   Accordingly, the guilt verdict must be vacated. *Drope v. Missouri*, 420 U.S. at 172.

24       Both the nature and extent of Mr. Howard's mental impairments were readily

25   evident to the trial court, trial counsel, prosecutor, and all other state officials who

26   had custody and control of Mr. Howard as a pretrial detainee.  Those individuals and

27   officials unreasonably and intentionally failed to inquire into the need for, or

28   employment of, readily available remedies to enable Mr. Howard to comprehend and

Petition for Writ of Habeas Corpus

1    participate in the proceedings.  For this reason, Mr. Howard's trial was infected with

2    structural error mandating reversal.  The deprivation of Mr. Howard's fundamental

3    constitutional right to be competent at all proceedings was prejudicial per se and

4    requires vacating his conviction, judgment, and sentence.

5        Additionally, because trial counsel knew or reasonably should have known

6    facts that called into question Mr. Howard's competence but did not raise a doubt as

7    to his competence with the trial court, Mr. Howard was denied the effective

8    assistance of counsel, warranting a new trial.

9        **2.  Facts and Allegations**

10            **a.  Mr. Howard's neuropsychological impairments rendered him**

11                **incompetent.**

12        The exhibits submitted in support of Mr. Howard's claims demonstrate his

13    incompetency as a matter of clinical fact at all stages of the trial proceedings.

14    Amanda Gregory, Ph.D., a neuropsychologist who examined Mr. Howard post-trial,

15    concluded that Mr. Howard suffers from moderate to severe neuropsychological

16    impairments in several domains of functioning, principally in the frontal lobe.

17    Testing also revealed that he has slow speed of processing information, which is

18    associated with impaired white matter functioning.    Finally, his results were

19    consistent with mildly lateralized brain damage, based on the impairment he

20    exhibited on visual-spatial/right hemisphere tasks.    SHP Ex. 53 at ¶ 56.  These

21    impairments significantly affected Mr. Howard's daily functioning and in particular

22    his ability to focus and follow the multitude of stimuli endemic to his capital trial

23    proceedings. *Id.* at ¶ 58.

24        Mr. Howard, consistent with his brain impairments, perseverates in speech

25    and thought.  Mr. Howard's brain becomes absorbed on an issue or topic such that

26    there is no room for new information, even if it is relevant, to be processed,

27    addressed, and considered. *Id.* at ¶ 59.  Consequentially, Mr. Howard misses and/or

28    fails to process relevant important data.

Petition for Writ of Habeas Corpus

1    Dr. George Woods, a neuropsychiatrist, conducted a neuropsychiatric
2    assessment of Mr. Howard and found that he experienced profound neglect,
3    abandonment, and abuse throughout his childhood and adolescence, which produced
4    deficits in his ability to understand appropriate contextual responses and process,
5    assess, and manage social, psychological, and emotional cues.  SHP Ex. 73 at ¶¶ 101-
6    44, 279.  Dr. Woods confirms that Mr. Howard becomes so preservative that he
7    fixates on isolated details and misses critical information about the larger context.
8    *Id.* at ¶¶ 284-85.

9    Dr. Woods concluded Mr. Howard was not able to meaningfully attend to the
10   trial proceedings due to his inability to focus on various aspects of his defense for
11   much of the trial, considering his perseveration and its effect on his ability to
12   disengage his focus in order to see the context within which he must solve problems,
13   plan, and process changing information.  *Id.* at ¶ 294.  Dr. Woods further concluded
14   that the combination of his frontal lobe impairments, when coupled with his
15   emotional responses, made assessing contextual expectations, such as trial strategy
16   and proper court affect, difficult.  *Id.*

17   Mr. Howard's demeanor confirmed he was not attending to proceedings.
18   According to one juror, it appeared as if he "was just going through the process and
19   unconcerned about the outcome," and his "facial expressions were rather like a blank
20   canvas throughout the whole trial."  SHP Ex. 59 at ¶ 3.

21   Moreover, his impairments are exacerbated when he is placed in a stressful
22   situation, as he was during his confinement at the West Valley Detention Center, and
23   when subjected to the security measures that were instituted in the courtroom.

24   **b.  Mr. Howard's incompetency was exacerbated by being medicated**
25   **throughout the trial.**

26   During the course of Mr. Howard's incarceration in the West Valley Detention
27   Center, medical personnel prescribed Mr. Howard the drug trazodone.  Beginning at
28   least as early as December 15, 1994, and continuing through early November 1995,

Petition for Writ of Habeas Corpus

Mr. Howard received daily doses of trazodone, from 100 mg to 200 mg per day. SHP Ex. 78 at 5188-01. Jail staff discontinued the trazadone on May 1, 1995. *Id.* at 5195. Mr. Howard testified on May 3, 1995. The jail restarted medication on May 13, 1995, through approximately the end of November 1995. *Id.* at 5188-95.

The side effects of trazadone include nervousness, heaviness in the head or headaches, weakness or tiredness, confusion, decreased ability to concentrate, memory problems, drowsiness, lightheadedness, and dizziness.

Mr. Howard informed trial counsel that the medication was affecting his functioning and then, on December 7, 1995, about a week after his last dose of trazodone, and immediately prior to his sentencing, Mr. Howard addressed the court directly about its effects on his functioning. He expressed concern that the trazodone had adversely affected his demeanor before the jury and affected his ability to cooperate with trial counsel. 11 RT 2767-68. It also, in combination with the other factors listed herein, resulted in his inability to provide coherent and helpful guilt phase testimony on his own behalf or to assist defense counsel meaningfully, rationally, and fully in participating in the preparation of his trial testimony and other issues in his case.

There is no question Mr. Howard suffered from anxiety, depression, and psychological distress pending and during the trial (SHP Ex. 73 at ¶ 275; SHP Ex. 28 at 4180, 4182, 4186-87, 4201-02; SHP Ex. 78 at 5158-59). And as can frequently occur, he somaticized his psychiatric distress. SHP Ex. 73 at ¶¶ 276, 278. The frequency with which he identified physiological ills suggests that he was under tremendous psychiatric stress likely due in part to organic impairments, his medication regime, and being forcibly restrained while in court. *Id.* at ¶ 278.

For example, Mr. Howard suffered multiple health issues while incarcerated pending and during trial, including: back and neck pain, hand pain, sore throat, viral symptoms, nausea, spine pain, numerous complaints for wrist pain, chest pains, and congestion. SHP Ex. 73 at 276; SHP Ex. 28 at 4178-202; SHP Ex. 78 at 5156-73; 1

Petition for Writ of Habeas Corpus

CT 170-71.  He also suffered from periods of being ill from fever, and on May 1, 1995 the court granted an order for Mr. Howard to be seen by jail medical staff.  8 RT 1986.

On May 3, 1995, the day of his guilt phase testimony, Mr. Howard testified that he had been ill over the weekend and was not feeling well while he testified.  9 RT 2185.

At times, Mr. Howard's requests for medical treatment occurred on nearly a monthly basis.  Sometimes, he sought medical attention weekly or on more than one occasion in the same day.  SHP Ex. 73 at ¶ 276.

As is common, when individuals who somaticize their psychiatric decompensation, no underlying condition can be found for the physiological conditions they identify.  Such was the case with Mr. Howard: on at least three occasions after medical staff examined Mr. Howard for his underlying complaints – a bite on his stomach, blurred vision, ear problems, nausea, lower back pain, and occasional dizziness – they found nothing wrong.  *Id.*

### c.  Mr. Howard declared a doubt as to his own competency a week after the jail stopped administering trazodone to him.

Mr. Howard informed the court that he had been taking anti-psychotic medication prescribed by a psychiatrist during his trial.  11 RT 2767-68.  He explained that he did not want to be on this medication and that his psychiatrist had been on vacation during his trial.  11 RT 2768.  He felt that taking this medication had adversely affected his ability to cooperate with his attorney and had prejudicially affected his demeanor before the jury, including, inter alia, his facial expressions, emotional responses, mannerisms, credibility, persuasiveness, and the degree to which he invoked sympathy. 11 RT 2768.  He also said that he had brought this situation to his attorney's attention, but trial counsel never brought it to the court's attention.  11 RT 2769.

### d.  Mr. Howard's incompetency was exacerbated by being forced to wear a stun belt during trial.

As described in Claim One, the trial court forced Mr. Howard to wear a stun belt over trial counsel's objection on grounds that Mr. Howard had not engaged in disruptive behavior in the courtroom and was always respectful. 2 RT 505.

Stun belts are terrifying to the wearer, carrying quantitatively and qualitatively more severe psychological consequences than more traditional restraints. A stun belt can be activated through a remote-control device from up to 300 feet away. When activated, the belt immobilizes and incapacitates the wearer by administering a 50,000-volt electric shock. 2 RT 504-05. The shock lasts several seconds, and once the device is activated, the period of electric shock cannot be shortened. When the belt is activated, an electrical current enters the wearer's body near his kidneys and travels along blood channels and nerve pathways. The electrical current coursing through the wearer's body is generally sufficient to knock him to the ground and cause him to shake uncontrollably, immediately incapacitating the wearer and causing severe pain thereafter. Estimates of the time that its torturous effects last include 30-45 minutes of muscular weakness. Activation may produce involuntary defecation and urination. Stun belts can also cause seizures and arrhythmias. The belt's metal prongs can leave welts on the wearer after the belt has been activated, which may take up to six months to heal. Moreover, stun belts are known to malfunction and cause the wearer to be accidentally shocked. Jonathan Turley, Torture at the Push of a Button, Washington Post, Aug. 28, 2003, https://www.washingtonpost.com/archive/opinions/2003/08/28/torture-at-the-push-of-a-button/0c962af1-de74-41cf-9a0d-948a369852b0/; Amnesty International, *The Pain Merchants: security equipment and its use in torture and other ill treatment*, at 44-46 (2003), https://www.amnesty.org/es/wp-content/uploads/2021/06/act400082003en.pdf.

Mr. Howard heard of the possibility of malfunction from other inmates in the

Petition for Writ of Habeas Corpus

county jail and further feared that court security staff would accidentally activate the stun belt, causing him to urinate or defecate on himself and experience the other forms of pain described above.  SHP Ex. 73 at ¶ 293.

Mr. Howard's background of abuse and trauma made him particularly susceptible to the unremitting stress caused by being restrained by stun belt throughout trial.  *Id.*  The state of constant fear associated with being restrained by the stun belt acting in concert with his neurobiological and cognitive deficits, prevented Mr. Howard from meaningfully attending to the trial proceedings.  *Id.* at ¶ 294; 9 RT 2185.

### e.  Mr. Howard's incompetency was exacerbated by the conditions at the West Valley Detention Center.

Mr. Howard's ability to rationally assist counsel, attend to the proceedings, present appropriate affect, and adequately provide testimony at the guilt phase of his trial were exacerbated by the conditions in the West Valley Detention Center where Mr. Howard was housed from April 6, 1993 through early December 1995.

During Mr. Howard's incarceration, the jail was violent, overcrowded, and consumed with racial strife.  Gang violence dominated the modules at the jail.  Fights occurred on a regular basis, and inmates constantly feared the threat of violence. SHP Ex. 58 at ¶ 2.

Stabbings and other forms of assault were commonplace and unpredictable.[23] *Id.* ("Inmates were jumped or attacked, for any number of reasons: for borrowing things from, or talking to, someone of a different race; for talking to Correctional Officers too much; for not getting along with a cell mate; or for being disrespectful of peoples' phone time.  I saw guys get jumped just for their tennis shoes.").

---

[23]  The violent conditions present in the jail during trial were realized for Mr. Howard when, on December 1, 1995, another inmate stabbed him multiple times while he was using the telephone. The stabbing occurred a week prior to the denial of his motion for a new trial.  SHP Ex. 29 at 4209, 4214; SHP Ex. 73 at ¶ 274.

Petition for Writ of Habeas Corpus

1    Overcrowding plagued the jail and the racial strife resulted in Mr. Howard being
2    moved on at least one occasion to achieve racial balance.  SHP Ex. 73 at ¶ 271.

3    Law enforcement personnel transported Mr. Howard under stressful and
4    exhausting conditions.  SHP Ex. 58 at ¶ 3.  Law enforcement woke people with trial
5    dates, like Mr. Howard, between 3 a.m. and 4 a.m. to make the hour-long bus ride
6    from San Bernardino to the Victorville courthouse, where Mr. Howard's trial was
7    held.  *Id.*  Mr. Howard and others did not return to the West Valley Detention Center
8    until 8 p.m.  *Id.*

9    The inhumane conditions at the West Valley Detention Center adversely
10   affected Mr. Howard's already compromised functioning and his impaired ability to
11   rationally assist counsel and testify on his own behalf.  *Id.* at ¶¶ 58-59.

12   ### 3.  Summary of Applicable Law

13   "It has long been accepted that a person whose mental condition is such that
14   he lacks the capacity to understand the nature and object of the proceedings against
15   him, to consult with counsel, and to assist in preparing his defense may not be
16   subjected to a trial." *Drope v. Missouri*, 420 U.S. at 171.  "[T]he criminal trial of an
17   incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348,
18   354 (1996) ("Both the due process clause of the Fourteenth Amendment to the
19   United States Constitution and state law prohibit the state from trying or convicting
20   a criminal defendant while he or she is mentally incompetent." (quoting *Medina v.
21   California*, 505 U.S. 437, 453 (1992)); *accord People v. Rogers*, 39 Cal. 4th 826,
22   846-47 (2006), (citing *Drope v. Missouri*, 420 U.S. at 181, *Pate v. Robinson*, 383
23   U.S. at 384-86 (1966), Cal. Penal Code § 1367, and *People v. Ramos*, 34 Cal. 4th
24   494, 507 (2004)).

25   A defendant is competent if he has "sufficient present ability to consult with
26   his lawyer with a reasonable degree of rational understanding and . . . a rational as
27   well as factual understanding of the proceedings against him." *Dusky v. United
28   States*, 362 U.S. 402 (1960).  The criminal trial of an incompetent defendant is per

se prejudicial. *See, e.g.*, *Cooper*, 517 U.S. at 354 (citing *Medina v. California*, 505 U.S. 437, 453 (1992)). It is a foundational principle that a criminal defendant may not be tried unless competent and that the state must give the defendant access to procedures for determining competency. *Pate v. Robinson*, 383 U.S. at 386; *Drope v. Missouri*, 420 U.S. at 172; *Odle v. Woodford*, 238 F.3d 1084, 1087 (9th Cir. 2001); *Cacoperdo v. Demonsthenes*, 37 F.3d 504, 510, (9th Cir. 1994), cert. den. 514 U.S. 1026 (1994); accord *Medina v. California*, 505 U.S. 437, 449 (1992).

The rule that a criminal defendant who is incompetent should not be required to stand trial is "fundamental to an adversary system of justice" (*Drope v. Missouri*, 420 U.S. at 172) and "has deep roots in our common-law heritage." *Medina v. California*, 505 U.S. at 446. As Justice Kennedy emphasized in *Riggins v. Nevada*:

Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. 504 U.S. 127, 139-40 (1992) (conc. opn. of Kennedy, J.); *see also Cooper v. Oklahoma*, 517 U.S. 348 (1996).

### a. Incompetence need not arise from a diagnosed disorder.

Although a defendant who is incompetent to stand trial may suffer from a diagnosed mental illness or developmental disability, federal law does not require that the defendant's incompetence arise from a diagnosed disorder because symptoms indicative of or consistent with a possible mental or medical condition, without rising to the level of a diagnosis of a specific disorder, equally may interfere with one's "mental acuity to see, hear, and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense." *Odle v. Woodford*, 238 F.3d at 1089.

**b. A substantive due process habeas claim is not limited to the record at trial.**

A substantive due process claim – that is, a claim that a petitioner actually was incompetent at the time of trial – presented in habeas proceedings is not limited to the record at the time of the trial. *Odle v. Woodford*, 238 F.3d at 1090 (holding that "old and new" evidence may be reviewed to determine the petitioner's competence at the time of trial). Thus, in deciding Mr. Howard's claim of incompetence in fact, this Court must consider facts and evidence that were not available to the trial court. *Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2002); *Deere v. Woodford*, 339 F.3d 1084, 1086, as amended on denial of reh'g (9th Cir. 2003) ("'In a habeas proceeding, a petitioner is entitled to an evidentiary hearing on the issue of competency to stand trial if he presents sufficient facts to create a real and substantial doubt as to his competency, even if those facts were not presented to the trial court.'" (quoting *Boag v. Raines*, 769 F.2d 1341, 1343 (9th Cir. 1985))). When a defendant shows that the evidence before the trial court raised such a doubt as to competency, the conviction must be set aside; if the prosecution then wishes to retry the defendant, a hearing must be held to determine present competency. *Pate v. Robinson*, 383 U.S. at 387; *Drope v. Missouri*, 420 U.S. at 183.

**c. The question is whether there is a sufficient doubt as to competency to suspend proceedings and hold a hearing.**

The initial question is not whether the defendant is definitely incompetent, but merely whether there is sufficient doubt in that regard:

> Under the rule of *Pate v. Robinson* (1966) 383 U.S. 375, [] a due process evidentiary hearing is constitutionally compelled at any time that there is "substantial evidence" that the defendant may be mentally incompetent to stand trial. "Substantial evidence" is a term of art. "Evidence" encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or

1       it is in the form of medical reports or other kinds of reports that have

2       been filed with the court. Evidence is "substantial" if it raises a

3       reasonable doubt about the defendant's competency to stand trial.

4       Once there is such evidence from any source, there is a doubt that

5       cannot be dispelled by resort to conflicting evidence. The function of

6       the trial court in applying *Pate's* substantial evidence test is not to

7       determine the ultimate issue: Is the defendant competent to stand trial?

8       It[s] sole function is to decide whether there is any evidence which,

9       assuming its truth, raises a reasonable doubt about the defendant's

10      competency. At any time that such evidence appears, the trial court

11      *sua sponte* must order an evidentiary hearing on the competency issue.

12      It is only after the evidentiary hearing, applying the usual rules

13      appropriate to trial, that the court decides the issue of competency of

14      the defendant to stand trial.

15  *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1976) *cert. den.* 429 U.S.

16  919 (1976), emph. added.

17      **d.  Federal constitutional requirements are codified in California**

18         **law.**

19      The California Supreme Court, in *People v. Pennington*, 66 Cal. 2d 508, 518

20  (1967), explained that the decision in *Pate v. Robinson* transformed Penal Code

21  section 1368 into a constitutional requirement. The constitutionally mandated

22  procedure governing competency questions in California is thus codified in Penal

23  Code sections 1367 *et seq.*   Section 1367 parallels federal constitutional

24  requirements, providing that a trial may not occur if "the defendant is unable to

25  understand the nature of the criminal proceedings or to assist counsel in the conduct

26  of a defense in a rational manner." *Id.*, subd. (a).

27      California Penal Code section 1368 provides the mechanism for ensuring the

28  protection of the defendant by imposing two obligations on the trial court: First,

section 1368 requires the trial court to inquire about the defendant's mental competency when any doubt about such competency arises. Second, section 1368 imposes a duty on a trial court to order a competency hearing if there is substantial evidence that the defendant is incompetent. *People v. Guzman*, 45 Cal. 3d 915, 963 (1988) ("a competency hearing is mandatory when 'substantial' evidence of the accused's incompetence has been introduced"), *overruled* on other grounds. Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial. *People v. Danielson*, 3 Cal. 4th 691, 726 (1992); *see also People v. Weaver*, 26 Cal. 4th 876, 953 (2001).

### 4. Substantial Evidence was Before the Court that Mr. Howard was Incompetent

The court's duty to conduct a competency hearing arises when substantial evidence raising doubt as to mental competence is presented at any time before judgment. *Drope v. Missouri*, 420 U.S. at 181. "Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion must impanel a jury and conduct a [competency] hearing." *Pate v. Robinson*, 383 U.S. at 385. A bona fide doubt should exist where there is substantial evidence of incompetence. *Moran v. Godinez*, 57 F.3d 690, 695 (9th Cir. 1995); *see also Drope v. Missouri*, 420 U.S. at 180; *People v. Hale*, 44 Cal. 3d 531, 539 (1988).[24]

There are "no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated." *Drope v. Missouri*, 420 U.S. at 180. The Supreme Court has recognized that in some cases

---

[24] Courts have used different terms to describe the level of "doubt" required before a trial court must hold a competency hearing. *Chavez v. United States*, 656 F.2d 512, 516, n.1 (9th Cir. 1981) (collecting cases using "sufficient doubt," "good faith doubt," "genuine doubt," "reasonable doubt," and "substantial question"). Regardless of the term used, the standard has remained the same for decades. *Blazak v. Ricketts*, 1 F.3d at 893.

1    many factors may be significant, while in others, just one factor may be enough to

2    require that a competency hearing be held.  *Id.*

3            Mr. Howard provided substantial information to the court of his

4    incompetence, specifying the numerous functions affected by the trazodone

5    medication, from facial expressions to his ability to meaningfully cooperate with

6    counsel.  Moreover, once the trial court had evidence from "any source," that

7    evidence raised "a doubt which cannot be dispelled by resort to conflicting

8    evidence."  *Moore v. United States*, 464 F.2d at 666.  In other words, the trial court

9    should not have attempted to resolve the issue of competence on its own but rather

10   should have taken the evidence presented by Mr. Howard as true in which case it

11   raised a reasonable doubt as to Mr. Howard's competency.  *Id.*; *Pate v. Robinson*,

12   383 U.S. at 385.  Once that doubt was raised, proceedings should have been

13   suspended and the issue of competency investigated further – as was done with co-

14   defendant Funches.  1 RT 83

15           Instead, the trial court unilaterally decided the ultimate issue of competence

16   without expert evaluation or the presentation of such evidence at a competency trial.

17   The trial court decided the issue without inquiring into why Mr. Howard was

18   prescribed the medication in the first place, the name of the medication, the dosage,

19   the side effects, , or whether the jail psychiatrist had considered less intrusive

20   medications which would have served a similar purpose.[25]  Substantial information

21   was before the court than demanded further inquiry into competence and the trial

22   court's failure to make further inquiry denied Mr. Howard a fair trial.  *Drope v.*

23   *Missouri*, 420 U.S. at 174-75; *People v. Pennington*, 66 Cal. 2d at 518; *see, e.g.,*

24

---

25   [25]   In *People v. O'Dell*, 126 Cal. App. 4th 562, 571 (2005), a court's order to
       involuntary medicate a defendant was vacated where "the hospital never specified
26     the actual anti-psychotic medication it was proposing to administer to defendant."
       The appellate court recognized that "'[d]ifferent kinds of antipsychotic drugs may
27     produce different side effects and enjoy different levels of success.'" *Id.* at 572
       (citing and quoting *Sell v. United States*, 539 U.S. 166, 181 (2003).

28

Petition for Writ of Habeas Corpus

1    *People v. Jones* 53 Cal. 3d 1115, 1153 (1991).

2    A trial court has no power to proceed with trial once a doubt arises as to the

3    competency of a defendant. In trying Mr. Howard without first determining at a

4    hearing his competency to stand trial, the court both denied him a substantial right

5    and pronounced judgment on him without jurisdiction to do so. In such cases the

6    error is per se prejudicial. As the United States Supreme Court specifically held in

7    *Pate v. Robinson*, the error cannot cured by a retrospective determination of mental

8    competency at the time of trial. The court's failure to hold a hearing in this case, in

9    the face of substantial evidence of Mr. Howard's incompetence, resulted in him

10   being tried while incompetent; the error was structural and requires reversal of the

11   guilt judgment. *Pate v. Robinson*, 383 U.S. 375, 387,

12   Due process requirements are not satisfied if the court merely hears the

13   evidence to guide it in determining if it should declare the existence of a doubt as to

14   the defendant's competency; the trial court has no discretion on whether or not to

15   order a competency hearing once there exists substantial evidence giving rise to a

16   doubt regarding competency. *People v. Superior Court (Marks)*, 1 Cal. 4th 56, 69

17   (1991) (citing *Pennington*, 66 Cal. 2d 508 and *Pate v. Robinson*, 383 U.S. 375). If a

18   state fails to observe its statutorily prescribed procedures aimed at testing whether a

19   defendant is competent to stand trial, then that defendant's right to due process has

20   been violated. *Drope v. Missouri*, 420 U.S. at 172; *Matheney v. Anderson*, 253 F.3d

21   1025, 1040 (7th Cir. 2001).

22   It is also of no import that Mr. Howard's counsel did not advance his cause in

23   this matter. Competency cannot be waived by a defendant or his counsel. *In re*

24   *Davis*, 8 Cal. 3d 798, 808 (1973), cert. den. 414 U.S. 870 (1973); *see Pate v.*

25   *Robinson*, 383 U.S. at 384; *People v. Marks*, 45 Cal. 3d 1335, 1340, 1342 (1988).

26   The trial court would have been obligated to conduct a hearing even if defense

27   counsel had objected or asserted a belief that the defendant was competent. *People*

28   *v. Guzman*, 45 Cal. 3d at 963; Penal Code §1368, subd. (b). Here, defense counsel

was merely silent.  11 RT 2769.

### 5.  Trial Counsel Was Ineffective for Failing to Declare a Doubt

The facts contained in the allegations set forth above and in Claim Two and the supporting citations and exhibits are incorporated by reference as if fully set forth herein.  Trial counsel knew or reasonably should have known that Mr. Howard's various impairments prevented him from being able to rationally provide testimony at the guilt phase and attend to the proceedings.  Counsel, long familiar with Mr. Howard's vulnerabilities, should have understood that exponentially higher stakes at issue in a capital trial would have correspondingly increased Mr. Howard's stress and related inability to attend and participate. *See, e.g.*, SHP Ex. 73 at ¶¶ 293-95.

Despite this knowledge, trial counsel unreasonably failed to investigate, develop, or present reliable credible evidence that Mr. Howard was incompetent to testify, stand trial, or declare a doubt about his competency.  Trial counsel's failures include but are not limited to the following instances of deficient performance.

1) Reasonably competent counsel at the time of Mr. Howard's trial carefully monitored a capital defendant's competency to stand trial, and if counsel knew his or her client was medicated, competent counsel acting under prevailing standards at the time, would have obtained the client's medical records and conducted further investigation in order to determine whether the client's ability to attend proceedings, assist counsel, and provided appropriate responses and demeanor were being adversely affected.  SHP Ex. 45 at ¶ 14.

2) Reasonably competent counsel also would have recognized that all of these factors, when combined with Mr. Howard's impairments and psychological distress – about which counsel knew or should have known – rendered him incapable of rationally assisting in his defense by, inter alia, providing relevant and accurate information to his attorneys, following his attorneys' advice, and presenting an appropriate demeanor at trial. *Id.*

3) Trial counsel's actions fell below the generally recognized and reasonable

Petition for Writ of Habeas Corpus

standard of care, and were prejudicial per se, or alternatively, prejudiced Mr. Howard because he was unable meaningfully to participate in his capital trial, and it is reasonably probable that had counsel declared a doubt, the court would have suspended proceedings, and Mr. Howard would have been found incompetent to stand trial.

By virtue of trial counsel's failures, Mr. Howard was denied effective assistance of counsel and a competency determination based on evidence to which he was entitled. Trial counsel's failings, individually and cumulatively, prejudiced Mr. Howard because it is reasonably probable that in their absence a different result would have occurred.

**F.     Claim Six: The Trial Court's Denial of the New Trial Motion Supported by Newly Discovered Evidence Corroborating Mr. Howard's Innocence Was Prejudicial Error.**

**1.   Introduction**

Following trial, and as explained in Claim Two, Mr. Howard filed a motion for new trial. In support of the motion, he submitted sworn affidavits from two impartial witnesses who asserted that the prosecution's key witness, Cedric Torrence, had lied under oath. 2 CT 369-71. Mr. Howard also submitted an affidavit from the former co-defendant and actual killer, Mitchell Funches, naming a person other than Mr. Howard as his accomplice. 2 CT 372. The trial court denied Mr. Howard's motion without holding a hearing. 2 CT 456; 11 RT 2778, 2781. This erroneous denial by the trial court of Mr. Howard's meritorious new trial motion was an abuse of discretion that deprived him of his right to due process and a fundamentally fair trial (U.S. Const. amends. V, XIV; *Estelle v. Williams*, 425 U.S. 501, 505 (1976); *Holbrook v. Flynn*, 475 U.S. 560, 565-66 (1986); *McKinney v. Rees*, 993 F.2d 1378 (9th Cir. 1993)); his right to a reliable adjudication (U.S. Const.

1    amend. VIII; *Beck v. Alabama*, 447 U.S. 625, 638 (1980)); and his right to present a

2    defense. U.S. Const. amend. VI; *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).

3    A denial of a motion for new trial predicated on newly discovered evidence that a

4    key witness falsely testified is a proper matter for appellate review and Mr. Howard's

5    conviction should be reversed accordingly.    *Miller v. Pate*, 386 U.S. 1, 7 (1967);

6    *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Young*, 17 F.3d 1201,

7    1204 (9th Cir. 1994); Cal. Penal Code §§ 1237(a), 1466(2)(a).

8        **2.  Relevant Facts**

9        After the jury returned its guilty verdict against Mr. Howard, on May 10, 1995,

10    he found himself sitting directly behind the prosecution's key witness, Cedric

11    Torrence, on a Sheriff's transit bus. 2 CT 364; 11 RT 2761-62.   Torrence had been

12    coincidentally placed on the same bus following his arrest on an outstanding traffic

13    warrant. 2 CT 364, 407.

14        Brandon Nunez and David Janes were both housed at the West Valley

15    Detention Center on May 10, 1995, and were transported to their respective court

16    hearings in Victorville on the same bus as other inmates, including Mr. Howard and

17    Torrence. 2 CT 369, 371.  Neither Janes nor Nunez knew Torrence or Mr. Howard.

18    2 CT 369-71.  All the men were shackled. 2 CT 364-71.

19        In support of his new trial motion, Mr. Howard presented affidavits from both

20    Janes and Nunez. 2 CT 369-71.   In these affidavits, Janes and Nunez asserted they

21    had overheard the conversation between Mr. Howard and Torrence in which

22    Torrence implied that, in order to protect himself, he had lied about Mr. Howard's

23    involvement in the crime and about Mr. Howard's having had a gun on December 6,

24    1992, that he had been worried about threats he had received from those who were

25    actually involved, and that he was sorry. 2 CT 369-71.

26        The new trial motion also included an affidavit from Mitchell Funches stating

27    that Mr. Howard was not with him on the night of Ms. Collins' homicide and naming

28    Kevin "Kino" Allen as his real accomplice. 2 CT 372.  The trial court denied Mr.

Petition for Writ of Habeas Corpus

1     Howard's motion for new trial on December 7, 1995.  2 CT 456; 11 RT 2778, 2781

2      **3.   Janes, Nunez and Funches Provided New, Admissible, and Material**

3         **Evidence of Mr. Howard's Innocence, Which Directly Contradicted**

4         **the Prosecution's Evidence.**

5      In addressing a motion for new trial, the California Supreme Court has

6 explained that while it is true that the California Penal Code limits the grant of a new

7 trial to only those enumerated in the statute, "the statute should not be read to limit

8 the constitutional duty of trial courts to ensure that defendants be accorded due

9 process of law." *People v. Fosselman*, 33 Cal. 3d 572, 582 (1983) (citing *Powell v.*

10 *Alabama*, 287 U.S. 45, 52 (1932)).  In any event, the grounds upon which Mr.

11 Howard sought a new trial are provided for in Penal Code section 1181, subdivision

12 (8) which states that the trial court has the statutory power to grant a new trial when:

13       [Ne]w evidence is discovered material to the defendant, and which he

14       could not, with reasonable diligence, have discovered and produced at

15       the trial.  When a motion for a new trial is made upon the ground of

16       newly discovered evidence, the defendant must produce at the

17       hearing, in support thereof, the affidavits of the witnesses by whom

18       such evidence is expected to be given . . . .

19 Penal Code § 1181, subd. (8).

20      Here, the exculpatory evidence was newly discovered and could not have been

21 produced at the trial with reasonable diligence.  The conversation that Janes and

22 Nunez overheard on the transport bus between Mr. Howard and Torrence did not

23 occur until after the trial.  Funches' affidavit could not have been obtained prior to

24 trial or October 27, 1995, because Funches' attorney would not allow his client either

25 to be interviewed or to testify prior to entry of his plea.  2 CT 365.

26      The affidavits in support of the new trial motion are also indisputably material.

27 Funches' affidavit exonerated Mr. Howard of involvement in the offense while the

28 affidavits from Janes and Nunez attested to Torrence's perjury.  Where, as here, the

1    key prosecution witness admits he lied during the case-in-chief, such evidence is

2    irrefutably material. *United States v. Sutton*, 455 F.2d 974 (9th Cir. 1972) (alleged

3    perjury by main prosecuting witness was ground for motion for new trial); *Killian v.*

4    *Poole*, 282 F.3d 1204, 1209 (9th Cir. 2002) (perjury by key prosecution witness

5    entitled petitioner to relief notwithstanding that the "false evidence [was] presented

6    in good faith"); *Commonwealth v. Krick*, 67 A.2d 746, 749 (Pa. 1949) (motion for a

7    new trial should have been granted where the prosecuting witness's recantation

8    "destroy[ed] and obliterate[d] the testimony of the one witness upon whose

9    testimony the defendant was convicted").

10       Evidence of Torrence's perjury was not only material – he was the "make-or-

11   break witness for the state, [and] there is a reasonable probability that, without all the

12   perjury, the result of the proceeding would have been different. [Citation omitted.]"

13   *Killian v. Poole*, 282 F.3d at 1209-10.   Torrence was the only person directly linking

14   Mr. Howard to the offense.   He was the only witness to testify he heard Mr. Howard

15   discuss a "jacking" or robbery earlier that same day.   7 RT 1662, 1668.   And,

16   Torrence was the only witness to testify he saw Mr. Howard with a gun.   7 RT 1657.

17   Torrence's testimony was the lynchpin of the prosecution's case.

18       Moreover, all three affidavits presented by Mr. Howard had strong indicia of

19   reliability and trustworthiness.   Janes and Nunez were independent, unbiased

20   witnesses and accidental bystanders who had no control over where they were placed

21   near in the transport bus, which underscores the reliability of their statements. They

22   had no incentive to help or hinder Mr. Howard.   With respect to Funches, this was

23   not a situation where a co-defendant opportunistically recanted prior inculpatory

24   testimony against an accomplice, which may be given little credence.   *See, e.g.,*

25   *People v. Dyer*, 45 Cal. 3d 26, 50 (1988).   Funches did not testify against Mr. Howard

26   and in fact, under his attorney's advice, refused to provide any evidence to Mr.

27   Howard until his own plea negotiations were finalized.   2 CT 365.   Moreover, by

28   naming his actual accomplice, Funches risked being labeled as a snitch in prison.

Petition for Writ of Habeas Corpus

1    *See, e.g., People v. Marshall*, 13 Cal. 4th 799, 828 (1996) (typically, inmates would

2    much rather remain silent under such circumstances than be labeled a snitch by

3    fellow inmates). The fact that Funches was willing to risk a snitch label underscores

4    the reliability of his sworn statement.

5         Nor was the evidence cumulative of Torrence's lack of credibility. On cross-

6    examination, Torrence admitted he initially lied to Det. Blackwell about Mr. Howard

7    having a gun and other matters. 7 RT 1697-700. However, this new evidence did

8    more than just impeach Torrence. It was an admission of perjury overheard by two

9    unbiased witnesses. As repeatedly emphasized throughout this petition, Torrence's

10   testimony was central to the prosecution's case. Without Torrence, the case against

11   Mr. Howard would fall apart. Even Funches' jury, knowing he was the actual killer,

12   hung on the attempted robbery charge without testimony from Torrence – the charge

13   which underlay the felony murder theory and the special circumstances allegation in

14   Mr. Howard's case. In other words, "[t]he jury's verdict cannot be sustained without

15   [Torrence's] testimony." *Commonwealth v. Krick*, 67 A.2d at 749.

16       **4.   The Judge Relied on Irrelevant Evidence to Deny Mr. Howard's New**

17           **Trial Motion.**

18        In California, the trial court's role in deciding a motion for new trial under

19   these circumstances is to make a threshold determination of credibility, not to decide

20   whether the proffered testimony is true or false. *See People v. Minnick*, 214 Cal.

21   App. 3d 1478, 1482 (1989). That determination is made after a consideration of all

22   the facts pertinent to the particular issue. But, "[t]he trial court is not the final arbiter

23   of the truth or falsity of the new evidence." *Id.*

24        Here, the trial court improperly disregarded the sworn statements of two

25   bystanders, who overheard a conversation and who lacked any motive to falsify

26   information, simply because they had a criminal record. The trial court decided that

27   Janes and Nunez were not credible based on their probation reports and rap sheets

28   which the prosecution attached to its opposition to the new trial motion. 2 CT 409-

19, 428-41; 11 RT 2764.

The trial court also dismissed Mitchell Funches' affidavit based on earlier competency proceedings in which the trial court determined Funches had attempted to feign mental illness.  1 RT 69, 86; 2 RT 444-45; 11 RT 2764.  The trial judge reasoned that:

> Assuming that Mr. Funches were to testify, I would think that there
> would be serious problems in anybody believing what Mr.
> Funches had to say about this matter.  There are similar problems with
> the declarants . . . given their criminal backgrounds.

11 RT 2764.

The court never took the opportunity to observe the demeanor of James and Nunez nor their manner of testifying and instead improperly determined their credibility solely based on criminal history.  Meanwhile, the trial court's observations of Mitchell Funches were limited to pre-trial competency proceedings, failing to acknowledge that circumstances had changed and any motivations to be dishonest no longer existed, post plea.  As one California appellate court put it:

> Under these circumstances the trial court should have taken
> affirmative action to call [the declarant] as a witness and examine him
> under oath.  Had the court done so [the declarant's] testimony might
> have established (a) that there was substantial merit to [defendant's]
> motion, or (b) that [the declarant] had perjured himself to help out a
> friend.  Either outcome would have contributed positively to the
> administration of justice.  Even if [the declarant's] testimony had
> turned out to be inclusive, at least the court would have had all
> available information before it in ruling on the motion for a new trial.

*People v. Hairgrove*, 18 Cal. App. 3d 606, 610-11 (1971).

The trial court arbitrarily denied Mr. Howard the right to have his evidence be assessed when it made unfounded credibility determinations without holding a

Petition for Writ of Habeas Corpus

hearing in which the three witnesses – none of whom stood to gain anything – could testify under oath about the facts recounted in their sworn statements. *Cf. Hicks v. Oklahoma*, 447 U.S. 343 (1980) (the arbitrary deprivation of a purely state law entitlement may also violate the Due Process Clause of the Fourteenth Amendment).

### 5. The Trial Court's Error Was Prejudicial

It is a fundamental cornerstone of due process that the Constitution "cannot tolerate a . . . criminal conviction obtained by the knowing use of false evidence." *Miller v. Pate*, 386 U.S. at 7. The prosecution offends due process when false evidence is used, whether it solicits the evidence or simply allows it "to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. at 269 (citations omitted). Due process is equally offended by direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). When false evidence is used, even unwittingly, a new trial is required "if there is a reasonable probability that [without the evidence] the result of the proceeding would have been different." *United States v. Young*, 17 F.3d at 1204.

The "false impression" given by Torrence's perjured testimony to the jury is best viewed by looking at what happened at Funches' trial. *Alcorta v. Texas*, 355 U.S. at 31. Torrence, Funches' neighbor and friend, did not testify at Funches' trial. Notwithstanding Torrence's absence, the prosecution had a much stronger case against Funches than Mr. Howard. The evidence included an eyewitness/victim (Ofc. Brock), a murder weapon, and fingerprints from the scene, all directly connecting him to the crime. 7 RT 1810-12; 8 RT 1920, 1928, 2001-05, 2064-67. Yet, the jury hung on the special circumstance allegation and Funches was sentenced to life without the possibility of parole through a plea agreement. 11 RT 2773, 2777. By contrast, in Mr. Howard's case, the prosecution had no fingerprints, no eyewitnesses, and no murder weapon to connect him to the crime. What the prosecution did have was a fragile case held together by generic fiber evidence and,

Petition for Writ of Habeas Corpus

most importantly, Cedric Torrence.   Had Mr. Howard been given the opportunity to present evidence that Torrence fabricated the entire story to protect himself, a different result would have been more than a "reasonable probability" – it would have been a virtual certainty.

## G.    Claim Seven: The Trial Court Erroneously and Prejudicially Admitted Inflammatory Evidence

### 1.  The Trial Court Erroneously and Prejudicially Admitted a Gun

The admission of a gun – not the murder weapon – had virtually no relevance, given the tenuous and unreliable evidence tying it to Mr. Howard.  Because the evidence was unreliable, the probative value was far outweighed by its prejudicial effect and it should have been excluded.  The trial court's erroneous admission of the inflammatory gun evidence violated Mr. Howard's fair trial and due process rights and prejudiced him.  U.S. Const. amend. V, VIII and XIV.

#### a.  Relevant Facts

Six days after the homicide, a seven-year-old child found a loaded black .357 revolver near apartment 3 in the apartment complex at 1616 Kendall Street.   6  RT 1580; 8 RT 1894-96, 1972.[26]  The boy's mother turned the gun over to police.  6  RT 1580.  It is undisputed that this gun was not the murder weapon.  The prosecutor sought to have it admitted on the theory that Mr. Howard had used the weapon during the attempted robbery.  6 RT 1577-80.   The sole evidence linking Mr. Howard to the gun was that he had purportedly been seen in the vicinity of the apartment where the gun was found and that the prosecution's witness and informant, Cedric Torrence, had seen Mr. Howard earlier in the day with a gun.  6 RT 1580.

---

[26]   As previously noted, Laurie Manzella, who testified she saw Mr. Howard in her apartment hallway that night, lived in apartment number two of this complex. 8 RT 1848.

Petition for Writ of Habeas Corpus

During in limine proceedings, defense counsel made, inter alia, relevancy, foundational, and Evidence Code section 352[27] objections to the gun's admission, arguing the lack of evidence tying Mr. Howard to the gun.  6 RT 1574, 1577, 1592, 1595; 7 RT 1601.  Even the trial court pressed the prosecutor about the lack of any evidence linking Mr. Howard to the gun:

> THE COURT: Is there anything else to tie that gun to other than the
>
> black .357 at that location and was seen at that location?  Anything
>
> else, fingerprints, admissions?
>
> MR. HESS: No fingerprints.  That's it.

6 RT 1580.

The prosecutor conceded that Torrence had not identified this gun at the grand jury proceedings but asserted he would be able to identify it at trial.  6 RT 1580-81. Following section 352 arguments from both parties, the court ordered a hearing prior to deciding the admissibility of the gun, in which Torrence would testify.  On April 25, 1995, the trial court held an Evidence Code section 402 hearing regarding the gun's admissibility and granted its admission despite the unreliable and inconsistent nature of the evidence presented by the prosecution to try to tie the gun to Mr. Howard.  7 RT 1613.

### b. The Prosecution's Evidence Tying the Gun to Mr. Howard Was Weak, Unreliable, And Irrelevant

#### 1) Cedric Torrence's Testimony On the Gun Was Equivocal and Inconsistent

At the 402 hearing, Torrence testified that on the day of the homicide, he saw Mr. Howard with a .357 black handgun.  7 RT 1603.   He was only able to describe

---

[27] Section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Petition for Writ of Habeas Corpus

the gun as "average" and estimate the gun's length between twelve and sixteen inches. 7 RT 1603. The prosecutor showed Torrence a black .357 handgun (People's Exhibit 3) and asked whether he could identify it as the gun he purportedly saw Mr. Howard with earlier on the day of the homicide. Torrence responded, "All I know is it was a black .357. I really didn't –". 7 RT 1603-04. The prosecutor interrupted, prompting Torrence to make an identification, asking him alternately if it was the actual gun or if the gun looked like the one he saw that night. Torrence responded, "yes," to both questions. 7 RT 1604.

Indeed, multiple times, the prosecutor cut off Torrence's testimony when he equivocated. Initially, when asked to identify the gun, Torrence could not do so, saying, "I really didn't –" but was abruptly cut off by the prosecutor. 7 RT 1604. The prosecutor's actions served to signal to Torrence that his initial response was unacceptable. Torrence followed the prosecutor's cue, eventually identifying the weapon and giving the answer the prosecution wanted.

Under cross-examination, however, Torrence admitted he was having trouble identifying the gun and twice refused to answer whether Exhibit 3 was the gun he purportedly saw Mr. Howard with prior to the homicide. 7 RT 1604-05.

Specifically, Torrence agreed he was "hesitant about identifying the gun." 7 RT 1604. When asked if he could really identify the gun, however, he responded, "It's a black gun." 7 RT 1605. When asked a third time if he was sure it was the gun, he dug in and asserted, "That's the gun." 7 RT 1605. Torrence twice testified that he saw Mr. Howard with the gun in the garage. 7 RT 1603, 1605. But when defense counsel cross-examined him about the other people in the garage at the time who had *not* seen the gun, Torrence's testimony became muddled:

Q. BY MR. NACSIN: Who was present when this happened?

A. Just – well, I was the only one present when I seen the gun.

Q. Where was everybody else?

177

Petition for Writ of Habeas Corpus

1    A. They was – they was – they wasn't around.

2    Q. Who was in the garage at the time you saw the gun?

3    A. I seen the gun before I was in the garage.

4    Q. Didn't you just tell us you saw the gun in the garage?

5    A. I seen it in the garage; before the garage.

6    7 RT 1606-07.

7    Torrence changed his testimony, stating that he had actually seen Mr. Howard

8    with the gun before going to the garage, and that Mr. Howard had left the gun under

9    Torrence's bed at his house.  7 RT 1607-08.  He claimed Mr. Howard had retrieved

10    the gun from his house after playing football and before going to the garage.  7 RT

11    1611.[28]

12    Torrence similarly changed his testimony about how many times he saw Mr.

13    Howard exhibit a gun.   On direct examination, Torrence testified that while in the

14    garage, Mr. Howard took out the gun from his back pants' waist about three times,

15    over a period of time, but before the others arrived at the garage.  7 RT 1611-12.

16    Then, on cross-examination, Torrence testified that Mr. Howard pulled a gun out in

17    the garage only once, not three times.  7 RT 1612.

18    Torrence's story changed so many times that it rendered his testimony wholly

19    untrustworthy. As defense counsel argued, it was "only after he was pushed [by the

20    prosecutor] did he say, 'Yes, that's the gun . . . ".  7 RT 1613.

21    The trial court prejudicially erred when it admitted the gun on the basis of

22    Torrence's vague testimony that it was "black," "average" and between "twelve and

23    sixteen inches."   7 RT 1605.   Torrence's testimony on both direct and cross

24    examination was inconsistent, equivocal and lacked the reliability necessary to

25

26    [28]   Several witnesses (Roxanne Winn, Danny Rivera, George Rivera, Patricia

27    Washington, and Segonia Washington) who had been with Mr. Howard earlier that
day, either in the garage or elsewhere, testified that he did not have a weapon.  8

28    RT 2081; 9 RT 2263, 2277, 2280, 2297-98, 2302.

Petition for Writ of Habeas Corpus

1    render the gun evidence relevant.  For this reason, the probative value was far

2    outweighed by the highly prejudicial and inflammatory nature of the evidence.  The

3    trial court was charged with exercising its discretion under Evidence Code section

4    402, to determine the question of admissibility of the gun.  Evid. Code, § 402(a), (b).

5    In this, it failed.  The admission of the unreliable and irrelevant gun evidence resulted

6    in an unfair trial and violated Mr. Howard's due process rights. *Jammal v. Van de*

7    *Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (holding admission of evidence violates

8    due process if there are no permissible inferences the jury may draw from it); *Alcala*

9    *v. Woodford*, 334 F.3d 862, 887 (9th Cir. 2003) (stating admission of evidence that is

10    irrelevant and which results in an unfair trial violates due process).

11         **2) A Gun Found Six Days after the Homicide Insufficient**

12         **Evidence to Establish Ownership**

13    The prosecution's attempt to establish a foundation for the gun's admission was

14    based in part on the location where it was found: on the grounds of an apartment

15    complex not far from where Mr. Howard had purportedly been seen on the night of

16    the homicide.  The prosecution theorized that Mr. Howard's arrest in the general

17    vicinity of where the gun was found six days later was proof of ownership of the

18    gun.  The gun did not have Mr. Howard's fingerprints or other forensic markers to

19    establish he had handled the gun, however.   6 RT 1580.  No witness, other than

20    Torrence, testified they had ever seen him with a gun, nor did any witness observe

21    him discarding a gun.

22        No evidence was presented that the model or make of the gun was unique in

23    any way.  To the contrary, .357 caliber pistols are prevalent in the United States.  In

24    essence, the prosecution attempted to corroborate Torrence's equivocal and

25    inconsistent testimony about the gun with other equally weak evidence.

26         **c. The Trial Court's Failure to Weigh Probative Value Against**

27         **Prejudice Violated Mr. Howard's Constitutional Rights**

28    Defense counsel made an Evidence Code section 352 objection to the admission of

1    the gun, but the trial court never addressed this objection nor stated its reasoning

2    under Section 352 for admitting the gun. 6 RT 1577; 7 RT 1601-13. The court,

3    whose duty it was to weigh the probative value of the evidence against the

4    prejudicial effect to ensure a fair trial, stated nothing more than:

5        The issue is one of foundation for admissibility of the evidence with

6        regard to the finding of the firearm and it's [sic] admissibility, and in

7        my view the evidence is sufficient so it will be admitted.

8    7 RT 1613.

9        When Section 352 has been invoked, the record must affirmatively show that

10    the trial judge did in fact weigh prejudice against probative value. *People v. Green*,

11    27 Cal. 3d 1, 25 (1980) *disapproved on other grounds in People v. Hall*, 41 Cal. 3d

12    836, 834, n.3 (1986).

13        [T]he reason for the rule is to furnish the appellate courts with the

14        record necessary for meaningful review of any ensuing claim of abuse

15        of discretion; an additional reason is to ensure that the ruling on the

16        motion 'be the product of a mature and careful reflection on the part

17        of the judge,' [citations omitted]

18    *People v. Montiel*, 39 Cal. 3d 910, 924 (1985).

19        It is well settled that "[a]n important element of a fair trial is that a jury

20    consider only relevant and competent evidence bearing on the issue of guilt or

21    innocence." *Bruton v. United States*, 391 U.S. 123, 131, n.6 (1968). Because a

22    "careful weighing of prejudice against probative value under [Evidence Code section

23    352] is essential to protect a defendant's due process right to a fundamentally fair

24    trial" the trial court had an obligation to do so, and to do so on the records in this

25    capital trial. *People v. Jennings*, 81 Cal. App. 4th 1301, 1314 (2000).

26        The erroneous admission of evidence in this capital case also violated the

27    Eighth Amendment. The death penalty's qualitatively different character from all

28    other punishments necessitates a corresponding increase in the need for reliability

Petition for Writ of Habeas Corpus

1    at *both* the guilt and penalty phases of a capital trial.  *See, e.g.*, *Beck v. Alabama*,

2    447 U.S. 625, 637 (1980); *Kyles v. Whitley*, 514 U.S. 419, 422 (1995).

3    Where, as here, "a State has provided for the imposition of criminal

4    punishment . . . it is not correct to say that the defendant's interest in the exercise

5    of that discretion is merely a matter of state procedural law." *Hicks v. Oklahoma*,

6    447 U.S. 343, 346 (1980).  Likewise, it cannot be argued here that the trial court

7    merely denied a procedural right of exclusively state concern.  A state evidentiary

8    rules create "a substantial and legitimate expectation" that a defendant will not be

9    deprived of his life or liberty in violation of those rules.  *Id.*  The trial court's

10   prejudicial failure to weigh the value and effect of the gun evidence in this case

11   rendered Mr. Howard's trial fundamentally unfair and deprived him of his federal

12   constitutional rights to due process.  U.S. Const. amend. V, VIII and XIV.

13   **2.  The Trial Court Prejudicially Erred in Admitting a Photograph of the**
14   **Victim's Body**

15   **a.  Relevant Facts**

16   Defense counsel objected to the admission of Exhibit 59, a ten-by-twelve-inch

17   close-up autopsy photograph of the Sherri Collins' face and head.  1 CT 186; 6 RT

18   1593.  The photograph showed two head wounds, a copper bullet jacket partially

19   protruding from Ms. Collins' scalp amidst hair matted with blood, and some glass

20   wounds on the skin of her face.  6 RT 1585-86, 1592-95.  The prosecution contended

21   that the photograph would assist the pathologist in his testimony to show that the

22   bullet "split" after passing through the glass window, causing two entrance wounds,

23   and that the copper bullet jacket was a match to the bullet recovered from Ofc. Brock

24   as well as to Mitchell Funches' gun.  6 RT 1586, 1593-94.  While the defense counsel

25   agreed that he had "seen worse," he objected because the photograph was likely to

26   raise the passions of the jurors.  6 RT 1594.

27   Counsel argued that the prosecution expert could introduce the same evidence

28

Petition for Writ of Habeas Corpus

through skull diagrams and that the probative value of the photograph was outweighed by the risk of undue prejudice within the meaning of Evidence Code section 352.   6 RT 1593.   The trial court denied the defense motion to exclude this photograph finding that although it was "unpleasant," it was "not extremely inflammatory or gruesome" and there appeared to be no danger of undue prejudice. 6 RT 1594.   The court further explained that the photograph was "probative as to several issues in the case, including the identity of the perpetrators."  *Id.*[29]

### b. Admission Violated Mr. Howard's Constitutional Rights

As noted, Evidence Code section 352 gives a court discretion to exclude evidence when its probative value is outweighed by the probability it will create a substantial danger of undue prejudice, confuse the issues, or mislead the jury. Various state courts have recognized the inflammatory nature of photographs of the bodies of murder victims and have found an abuse of discretion where trial courts have admitted such evidence.   *Beagles v. Florida*, 273 So. 2d 796, 798 (Fla. 1973) (reversing murder conviction where there was no issue in dispute necessitating admission of gruesome photographs showing shotgun wound to victim's head); *Utah v. Cloud*, 722 P.2d 750, 752-55 (Utah 1986) (reversing murder conviction because of erroneous admission of graphic photographs); *People v. Marsh*, 175 Cal. App. 3d 987, 997 (1985) ("Unnecessary admission of gruesome photographs can deprive a defendant of a fair trial and require reversal of a judgment."); *People v. Cavanaugh*, 44 Cal. 2d 252, 268-69 (1955) (recognizing admission of gruesome photographs may deprive defendant of fair trial and require reversal of judgment); *People v. Chavez*, 50 Cal. 2d 778, 792 (1958) ("photographs should be excluded where their principal effect would be to inflame the jurors against the defendant because of the

---

[29]   Defense counsel did not object to admission of the photograph during trial. 8 RT 2056. Such an objection would have been futile in any event given the court's earlier ruling and would have also served to bring further jury attention to the picture.

Petition for Writ of Habeas Corpus

1    horror of the crime").

2        In this case, contrary to the trial court's finding, the photograph was not

3    relevant to the "the identity of the perpetrators." 6 RT 1594.   It was undisputed that

4    Mitchell Funches shot Ms. Collins and that the bullet came from his gun.  8 RT 2064-

5    67.   It was also undisputed how Ms. Collins' death occurred.  Dr. Frank Sheridan,

6    the forensic pathologist, testified that Ms. Collins died instantaneously from a bullet

7    wound to the left side of her head.  8 RT 2042, 2046, 2049, 2053.   Defense counsel

8    did not cross-examine Dr. Sheridan.    8 RT 2057.   He did not need to because there

9    was no issue as to the manner of death.    8 RT 2050.   As trial counsel argued, Dr.

10   Sheridan could have just as easily used a diagram as a visual aid to depict the wounds

11   without resort to a bloody photograph of the victim's head.  8 RT 2053.

12       Admission of irrelevant and lurid photographs may render a trial

13   fundamentally unfair.  *See, e.g.*, *Ferrier v. Duckworth*, 902 F.2d 545, 548 (7th Cir.

14   1990).   When a trial court's ruling admitting prejudicial evidence renders a trial

15   fundamentally unfair, regardless of whether the ruling complies with or violates state

16   evidentiary law, the ruling runs afoul of the Due Process Clause.  *Jammal v. Van De*

17   *Kamp*, 926 F.2d at 919.  As previously stated, a due process analysis is virtually the

18   same as an Evidence Code section 352 analysis because "[a] careful weighing of

19   prejudice against probative value under [Evidence Code section 352] is essential to

20   protect a defendant's due process right to a fundamentally fair trial."  *People v.*

21   *Jennings*, 81 Cal. App. 4th at 1314.   The California Supreme Court has itself

22   recognized that section 352 as providing a realistic safeguard from due process

23   violations.  *People v. Falsetta*, 21 Cal. 4th 903, 919-20 (1999); *People v. Fitch*, 55

24   Cal. App. 4th 172, 183 (1997).

25       The wrongful admission of this type of inflammatory evidence also violates

26   the Eighth Amendment prohibition on cruel and unusual punishments, extended to

27   the states through the Fourteenth Amendment, which encompasses the right to a fair

28   and reliable guilt and penalty determination.  *Gardner v. Florida*, 430 U.S. 349, 357-

Petition for Writ of Habeas Corpus

1  58 (1977); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

2  As these cases make clear, the trial court erred in admitting the photograph

3  over defense objections.   The key lesson from the state and federal cases cited above

4  is that when the depiction of a victim's injuries is unnecessary for the resolution of

5  disputed issues, introduction of a gruesome photograph of the victim is error.   Here,

6  because there was no dispute as to the manner of death, the murder weapon, or the

7  identity of the shooter, the photograph had little probative value while being highly

8  inflammatory and prejudicial.   The wounds portrayed in the picture were described

9  to the jury and the picture served no purpose other than to inflame the passions of

10  the jury.

11  **c.  Admission of the Autopsy Photo Prejudiced Mr. Howard**

12  When a trial court's error infringes upon the federal constitutional rights of a

13  criminal defendant, the error is subject to review under the standard of *Chapman v.*

14  *California*, 386 U.S. 18 (1967), and reversal is required unless the prosecution can

15  show the error to have been harmless beyond a reasonable doubt.   Because the

16  photograph in this case did not tend to prove anything of consequence to any

17  disputed fact in the case, the evidence was not relevant.   *See* Evid. Code § 210.

18  Having failed the test of relevance, this leaves only the gruesome and inflammatory

19  nature of the photographs.

20  When deciding the impact of photographs on jurors, a reviewing court is

21  usually left to speculate as to how the jurors may have been affected by viewing the

22  photographs.   Studies have recognized that graphic photographs have the power to

23  arouse jurors' emotions: "Juries are comprised of ordinary people who are likely to

24  be dramatically affected by viewing graphic or gruesome photographs."   Julie

25  Rubenstein, *A Picture Is Worth a Thousand Words – The Use of Graphic*

26  *Photographs as Evidence in Massachusetts Murder Trials*, 6 Suffolk J. Trial & App.

27  Advoc. 197, 208 (2001); *see* K.S. Douglas et al., *The Impact of Graphic*

28  *Photographic Evidence on Mock Jurors' Decisions in a Murder Trial: Probative or*

Petition for Writ of Habeas Corpus

1    *Prejudicial?*, 21 Law & Hum. Behav. 485, 491-92 (1997) (documenting jurors'

2    emotional reactions to viewing graphic photographs of murder victim); James

3    Kelley, *Addressing Juror Stress: A Trial Judge's Perspective*, 43 Drake L. Rev. 97,

4    104 (1994) (recounting juror's posttraumatic-stress symptoms experienced after

5    viewing graphic photos of murder victim).

6          Studies also show that graphic photographs influence the verdicts that juries

7    return.   M.O.  Miller & Thomas Mauet, *The Psychology of Jury Persuasion*, 22

8    Am. J. Trial Advoc. 549, 563 (1999) (juries that viewed autopsy photographs during

9    medical examiner's testimony were more likely to vote to convict a defendant than

10   those not shown photographs); Douglas et al., 21 Law & Hum. Behav. at 492-94

11   (accord).   These studies demonstrate that it is likely that the jurors were affected by

12   the photograph in making their guilt decision.

13         Another important consideration in determining prejudice is the weakness of

14   the case. This was a case in which the prosecution had little evidence against Mr.

15   Howard: a few strands of generic fiber evidence, being in the vicinity of the crime,

16   and the testimony of the prosecution's witness, Torrence, who later admitted that he

17   lied.  *See* Claim Six.  The prosecution had no fingerprints, no eyewitnesses, and no

18   murder weapon to connect Mr. Howard to the crime. Moreover, the jury clearly

19   struggled during guilt phase deliberations, asking for read back of the testimony of

20   Michael Manzella, Laurie Manzella, and Mr. Howard (9 RT 2451; 10 RT 2469)[30]

21   and deliberating for nearly two days. 9 RT 2395-2497; 10 RT 2498-2519.  In a weak

22   case like this one, the nature of this picture, a blown-up bloody head shot of a murder

23   victim, naturally would prejudice the jury.   Because the injuries had already been

24   described in testimony, any information the pictures might have contained was

25   cumulative and unduly prejudicial, with little probative value.

26   _____

27   [30]  The jury also asked for read back of testimony from Cedric Torrence (10 RT
     2628), Det. Blackwell (10 RT 2693), and Laura Carroll (10 RT 2733) during penalty

28   deliberations.

Petition for Writ of Habeas Corpus

The trial court's decision to admit an irrelevant, inflammatory, and gruesome photograph depicting the body of the victim was error and deprived Mr. Howard of an impartial jury, a fair trial, due process of law, and a reliable penalty determination in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

**H.    Claim Eight: The Trial Court Lacked Jurisdictional to Try Mr. Howard for First Degree Felony Murder and Erred In So Instructing the Jury.**

Mr. Howard was charged with second degree malice murder by his Grand Jury Indictment. CT 1-4. At the close of trial, however, the jury was instructed *only* on first degree felony murder pursuant to California Penal Code Section 189 and California Criminal Jury Instructions (hereafter "CALJIC") No. 8.21. Because Mr. Howard's indictment did not charge him with first-degree murder and did not allege the facts necessary to establish first degree murder, his first degree murder conviction must be reversed.[31] *United States v. Cotton*, 535 U.S. 625 (2002) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."), citing and quoting *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *see also United States v. Peter*, 310 F.3d 709, 712-13 (11th Cir. 2002) (holding that the failure to state an offense is an error so fundamental that it warrants a writ of error coram nobis).

The relevant part of the grand jury Indictment reads as follows:

---

[31]    Mr. Howard does not contend that the Indictment was defective. On the contrary, as set forth above, Count One was an entirely correct charge of second degree malice-murder in violation of Penal Code section 187. The error arose when the trial court instructed the jury on the separate uncharged crime of first degree felony-murder in violation of Penal Code section 189.

Petition for Writ of Habeas Corpus

On or about December 6, 1992, . . . the crime of murder, in violation of Penal Code § 187(a), a Felony, was committed by Mitchell Lee Funches and Demetrius Charles Howard, who did willfully, unlawfully, and with malice aforethought kill Sherry A. Collins, a human being.

CT 1.

In other words, Mr. Howard was indicted only for second degree malice-murder, in violation of Penal Code section 187. But, the jury was instructed only on CALJIC No. 8.21, as follows:

The unlawful killing of a human being whether intentional, unintentional, or accidental which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime.

CT 259; 7 RT 1636.

Second degree murder is the unlawful killing of a human being with malice aforethought, "but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder." *People v. Hansen*, 9 Cal. 4th 300, 307 (1994); Pen. Code § 187.[32] Penal Code "[s]ection 189 defines first degree murder as all murder committed by specified lethal means 'or by any other kind of willful, deliberate, and premeditated killing,' or a killing which is committed in the perpetration of enumerated felonies." *People v. Watson*, 30 Cal. 3d 290, 295 (1981).

Mr. Howard's Indictment did not specify the degree of murder or the facts required to elevate it to first-degree murder. The Constitution requires more specific

---

[32] Subdivision (a) of Penal Code section 187, provides: "Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."

notice in this context. In *Apprendi v. New Jersey*, the Supreme Court declared that, under the notice and jury-trial guarantees of the Sixth Amendment and the due process guarantee of the Fourteenth Amendment, "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury and proved beyond a reasonable doubt." 530 U.S. at 476; *see also Hamling v. United States*, 418 U.S. 87, 117 (1974) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.' [Citation omitted.]").

Premeditation and the facts necessary to bring a killing within the first degree felony-murder rule are facts that increase the maximum penalty for the crime of murder. If they are not present, the crime is second degree murder, and the maximum punishment is life in prison. If they are present, the crime is first degree murder, special circumstances can apply, and the punishment can be life imprisonment without parole or death. Therefore, the absence of those facts in the Indictment render it invalid as a charging document for first degree murder. *See State v. Fortin*, 843 A.2d 974, 1035-36 (N.J. 2004).

The trial court lacked jurisdiction to try Mr. Howard for first degree murder and prejudicially erred by instructing the jury only on first degree murder. The instructional error, specifically, allowed the jury to convict Mr. Howard of murder without finding the malice which was an essential element of the crime alleged in the indictment and violated Mr. Howard's right to a fair and reliable capital guilt trial. U.S. Const. amends. VI, VIII, XIV; *Beck v. Alabama*, 447 U.S. 625, 638 (1980). Instructing the jury on first degree murder and permitting the jury to convict Mr. Howard of an uncharged crime violated his right to due process of law. U.S. Const. amend. XIV; *DeJonge v. Oregon*, 299 U.S. 353, 362 (1937). This, combined with the additional instructional errors, *see* Claim Nine, prejudiced Mr. Howard. If they

had not occurred, he could have been convicted only of second degree murder. *See State v. Fortin*, 843 A.2d at 1034-35.

## I.    Claim Nine: The Trial Court's Instructional Errors Prejudiced Mr. Howard.

The trial court delivered three guilt-phase instructions to the jury relating to Mr. Howard's statements to police: CALJIC Nos. 2.03, 2.71 and 2.72. 1 CT 230-33; 9 RT 2373-74.[33] These instructions, which were given over defense objections, erroneously and unfairly permitted the jury to draw improper and adverse inferences against Mr. Howard, and deprived him of his rights to due process, the presumption of innocence, a fair trial, a jury trial, equal protection, and reliable jury determinations on guilt, the special circumstance and penalty. U.S. Const. amends. V, VI, VIII, XIV.

### 1.    The Jury Was Improperly Instructed on Consciousness of Guilt

#### a.    The Consciousness of Guilt Instruction Improperly Duplicated the Circumstantial Evidence Instruction

The trial court, over defense objection, gave CALJIC No. 2.03, the consciousness-of-guilt instruction, as follows:

> If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider such statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination.

---

[33]    The trial court also gave CALJIC 2.71.7 on pre-offense statements, presumably related to testimony that Mr. Howard supposedly was overheard discussing a "jacking" or robbery prior to the homicide. 1 CT 232; 9 RT 2373-74.

Petition for Writ of Habeas Corpus

1    1 CT 230; 9 RT 2317-18, 2343-46, 2373.

2    The trial court reasoned that the lone fact that Mr. Howard gave a false name,

3    Shawntik Wilcox, to police when he was arrested was a sufficient basis for this

4    instruction.  8 RT 2028, 2343-46.[34]  The court further decided, over a defense

5    objection, that the false name amounted to an admission and was a proper basis for

6    giving CALJIC Nos. 2.71 and 2.72.

7    The instruction under CALJIC No. 2.03 was unnecessary.   Specific

8    instructions relating to the consideration of evidence that simply reiterate a general

9    principle upon which a jury already has been instructed should not be given.  Here,

10    the trial court had already instructed the jury on circumstantial evidence with the

11    standard CALJIC Nos. 2.00, 2.01 and 2.02 instructions.  1 CT 227-29; 7 RT 1631, 9

12    RT 2370-73.  These instructions informed the jury that it may draw inferences from

13    the circumstantial evidence.  In other words, the jury was informed that it could infer

14    facts tending to show Mr. Howard's guilt from the circumstances of the alleged

15    crimes.  There was no need to repeat this general principle in the guise of permissive

16    inferences of consciousness of guilt, particularly since the trial court did not

17    similarly instruct the jury on permissive inferences of reasonable doubt about guilt.

18    Additionally, the jury was instructed on CALJIC Nos. 2.23 and 2.24 regarding

19    the credibility of witnesses.  1 CT 243; 7 RT 1633-34.  These instructions again made

20    CALJIC 2.03 unnecessary since "[t]here is little probative value in giving a

21    'fabrication instruction' when the jury is properly instructed on assessment of

22    witness credibility."  *State v. Nelson*, 48 P.3d 739, 745 (Mont. 2002) (instruction

23    regarding fabrication by defendant was an improper comment on the evidence).

24

25    _____

      [34]   Mr. Howard also admitted that while in jail awaiting trial, he called his

26    mother and asked her to ask Cedric Torrence to provide an alibi for him.  9 RT

27    2219-20.  The alibi evidence was not discussed during the in limine proceedings

      on this jury instruction although the prosecution argued that the fabricated alibi

28    attempt was "consciousness of guilt" in closing argument.  9 RT 2396.

1    This unnecessary consciousness-of-guilt instruction focused the jury's

2    attention on evidence favorable to the prosecution, amounting to judicial imprimatur

3    of the prosecution's position and lessening the prosecution's burden of proof. This

4    unnecessary benefit to the prosecution violated both the due process and equal

5    protection clauses of the Fourteenth Amendment. *See Wardius v. Oregon*, 412 U.S.

6    470, 479 (1973) (holding that state rule that defendant must reveal his alibi defense

7    without providing discovery of prosecution's rebuttal witnesses gives unfair

8    advantage to prosecution in violation of due process); *Lindsay v. Normet*, 405 U.S.

9    56, 77 (1972) (holding that arbitrary preference to particular litigants violates equal

10    protection).

11        **b.  The Consciousness of Guilt Instruction Was Unfairly Partisan and**

12            **Argumentative**

13    The consciousness-of-guilt instruction in the instant case was not just

14    unnecessary, it was also impermissibly argumentative. Argumentative instructions

15    present the jury with a partisan argument disguised as a neutral, authoritative

16    statement of the law. Such an instruction unfairly highlights isolated facts and

17    intimates to the jury that it should give special consideration to those facts.

18    Argumentative instructions, in essence, invite the jury to draw inferences favorable

19    to one of the parties from specified items of evidence. *See, e.g.*, *People v. Mincey*, 2

20    Cal. 4th 408, 437 (1992). An instructional analysis that distinguishes between

21    parties to the defendant's detriment deprives the defendant of his due process right

22    to a fair trial (*Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 510 (1989);

23    *Wardius v. Oregon*, 412 U.S. at 474), and the arbitrary distinction between litigants

24    also deprives the defendant of equal protection of the law. *Lindsay v. Normet*, 405

25    U.S. at 77. Moreover, the instruction given in this case also violated due process by

26    lessening the prosecution's burden of proof. *In re Winship*, 397 U.S. 358, 364

27    (1970). For the above reasons, CALJIC No. 2.03 interfered with Mr. Howard's

28    rights to an impartial and properly-instructed jury, and to a fair and reliable capital

1  trial.

### c. The Consciousness of Guilt Instruction Created an Improper Inference about Mr. Howard's Guilt

The consciousness-of-guilt instruction should not be given generally because it contains a permissive inference that allowed the jury to infer one fact, purported consciousness of guilt, from another fact: that Mr. Howard initially gave a false name to the police.   The Ninth Circuit has held that a permissive inference instruction can intrude improperly upon a jury's exclusive role as fact finder.   *See United States v. Warren*, 25 F.3d 890, 899 (9th Cir. 1994).   By focusing on an isolated fact such as the false statement, jurors may well overlook exculpatory evidence and convict a defendant without considering all relevant evidence.    *United States v. Rubio-Villareal*, 967 F.2d 294, 299-300 (*en banc*) (9th Cir. 1992).   A passing reference to consider all evidence will not cure this defect.    *United States v. Warren*, 25 F.3d at 899.   These and other considerations have prompted the Ninth Circuit to "question the effectiveness of permissive inference instructions."    *Id.* at 899-900 (J., Rymer, concurring) ("[I]nference instructions in general are a bad idea. There is normally no need for the court to pick out one of several inferences that may be drawn from circumstantial evidence in order for that possible inference to be considered by the jury.").

Though permissive inference jury instructions are constitutional as long as there is a rational connection between the facts found by the jury from the evidence and the facts inferred by the jury pursuant to the instruction (*Ulster Cnty. Court v. Allen*, 442 U.S. 140, 157 (1979); *United States v. Gainey*, 380 U.S. 63, 66-67 (1965)), the Due Process Clause of the Fourteenth Amendment "demands that even inferences—not just presumptions—be based on a rational connection between the fact proved and the fact to be inferred. [Citations omitted.]"   *People v. Castro*, 38 Cal. 3d 301, 313 (1985).

In this context, a rational connection is not merely a logical or reasonable one;

192

rather, it is a connection that is "more likely than not." *Ulster Cnty. Court v. Allen*, 442 U.S. at 165-167, and fn. 28; *see also Schwendeman v. Wallenstein*, 971 F.2d 313, 316 (9th Cir. 1992) (noting that the Supreme Court has required "'substantial assurance' that the inferred fact is 'more likely than not to flow from the proved fact on which it is made to depend.'").   This test is applied to judge the inference as it operates under the facts of each specific case. *Ulster Cnty. Court v. Allen*, 442 U.S. at 157, 162-63.

Here, the consciousness-of-guilt instruction permitted the irrational inference that Mr. Howard was guilty of first-degree felony murder from the fact of giving a false name when confronted by police.   If an accused gives a false name, does not make it more likely than not that he committed all the crimes which may be alleged, however.   Particularly when Mr. Howard had a plausible explanation for the falsehoods – his fear that as a Black parolee in the vicinity of a crime scene he would become law enforcement's primary suspect – instructing the jury on consciousness of guilt was highly prejudicial.  8 RT 2028, 9 RT 2218.

Because the consciousness-of-guilt instruction permitted the jury to draw unreasonable inferences of guilt against Mr. Howard, use of the instruction undermined the reasonable doubt requirement and denied him a fair trial and due process of law.   U.S. Const. amends. VI, XIV.   By reducing the reliability of the jury's determination and creating the risk that the jury would make erroneous factual determinations, the instruction also violated Mr. Howard's right to a fair and reliable capital trial.   U.S. Const. amends. VIII, XIV.

## 2.  The Jury Was Improperly Instructed on Admission of Guilt

The trial judge also instructed the jury on CALJIC No. 2.71, which reads:

> An admission is a statement made by the defendant other than at his trial which does not by itself acknowledge his guilt of the crime for which defendant is on trial, but which statement tends to prove his

Petition for Writ of Habeas Corpus

guilt when considered with the rest of the evidence.[35]  You are the exclusive judges as to whether the defendant made an admission and, if so, whether such statement is true in whole or in part.  If you should find that the defendant did not make the statement you must reject it.  If you find that it is true in whole or in part, you may consider that part which you find to be true.  Evidence of an oral admission of the defendant should be viewed with caution.

1 CT 231; 9 RT 2373.

Because the trial court instructed the jury on admissions, it also instructed on the corpus delicti rule, CALJIC No. 2.72, prohibiting conviction of an offense solely on the basis of an admission:

No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial.  The identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime.  Such identity or degree of the crime may be established by an admission.

1 CT 233; 9 RT 2374.

In giving these instructions, the trial judge improperly reasoned that evidence of Mr. Howard giving a false name necessitated "instructions about admissions and corpus delicti." 9 RT 2344.  The defense objected, arguing, inter alia, that "[s]tating a false name isn't an admission; it's a credibility. [sic.]  You lie, it goes to your credibility."  9 RT 2345.  In other words, providing a false name went to Mr.

---

[35]    The written CALJIC 2.71 given to the jury had "evidence" but the trial court erroneously stated "testimony" in reading this instruction.   1 CT 231; 9 RT 2373.

1    Howard's credibility and was sufficiently covered by the instructions addressing

2    witness credibility (CALJIC Nos. 2.23 and 2.24) as well as those related to

3    circumstantial evidence (CALJIC Nos. 2.00, 2.01 and 2.02).

4         CALJIC Nos. 2.71 and 2.72 also suffer from the same constitutional and

5    prejudicial defects as CALJIC No. 2.03.[36] As with CALJIC No. 2.03, CALJIC No.

6    2.71 is also unconstitutionally argumentative and favors the prosecution. Instructing

7    the jury on it, therefore violated Mr. Howard's due process rights. Giving of the

8    instruction invited the jury to draw inferences favorable to the prosecution,

9    specifically, that Mr. Howard acknowledged guilt of felony murder from the single

10   fact of giving a false name. The one-sided nature of the argumentative instructions,

11   taken together, i.e., that the jury could infer guilt if Mr. Howard denies involvement

12   (CALJIC No. 2.03), and at the same time, infer guilt if he admits involvement

13   (CALJIC Nos. 2.71 and 2.72), is unfair and impermissibly stacked the deck against

14   him. *See Wardius v. Oregon*, 412 U.S. at 475-476; *United States v. Harbin*, 250 F.3d

15   532, 540-42 (7th Cir. 2001).

16        Giving CALJIC No. 2.72 did not alleviate the harm done by giving CALJIC

17   No. 2.71; on the contrary, it exacerbated it. CALJIC 2.72 expressly told the jury that

18   identity "may be established by an admission." Mr. Howard's entire defense was

19   one of mistaken identity. The instruction, taken as whole, effectively told the jury

20   that something as minor as providing a false name to police while on a parole

21   violation could tend to prove Mr. Howard's guilt of first degree felony murder "when

22   considered with the rest of the evidence."

23

24

25   _____

     [36]   If, as the California Supreme Court has asserted, "the effect of [CALJIC No.
26   2.71] is beneficial to [the] defendant" (*People v. Frye*, 18 Cal. 4th 894, 959
     (1998)), then as with CALJIC 2.03, a defendant should be able to waive the giving
27   of the instruction at his discretion, at least where there are legitimate strategic or
     evidentiary reasons for doing so.

28

### 3. Prejudice

Here, the jury was given not one, but three unconstitutional instructions, magnifying the argumentative nature of the instructions and their impermissible inferences. This was error of federal constitutional magnitude that was not harmless and requires reversal. *Chapman v. California*, 386 U.S. 18, 24 (1967); *see Schwendeman v. Wallenstein*, 971 F.2d at 316 ("A constitutionally deficient jury instruction requires reversal unless the error is harmless beyond a reasonable doubt"). Moreover, the instructions under CALJIC Nos. 2.03, 2.71 and 2.72 were based on the thinnest of evidence – Mr. Howard's use of an alias and a purported attempt to solicit an alibi. The error affected the central contested issue in the case – Mr. Howard's involvement in the felony murder.

## J.    Claim Ten: Death Qualifying Jurors is Unconstitutional

### 1. Introduction

The death-qualification procedure used in California to select juries in capital cases is unconstitutional. It produces juries which are both more likely to convict, more likely to vote for death, and disproportionately removes women, members of racial minorities and people of faith, violating the rights of capitally charged individuals to a fair trial, equal protection and due process as well as the right to a reliable death penalty adjudication, in derogation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. Because "the exclusion of opponents of capital punishment capable of impartially determining culpability infringes a capital defendant's constitutional right to a fair and impartial jury," Mr. Howard's constitutional rights were violated and he is entitled to a reversal of the guilt finding. *See Lockhart v. McCree*, 476 U.S. 162, 198 (1986) (Marshall, J., Brennan, J., & Stevens, J., dissenting).

### 2. "Death Qualification" of Jurors Produces Biased Juries That Do Not Reflect a Fair Cross Section of the Community

A death qualified jury creates a "conviction prone" jury because jurors who support the death penalty tend to be less sympathetic toward defendants. Claudia L. Cowan, William C. Thompson & Phoebe C. Ellsworth, *The Effects of Death Qualification of Jurors; Predisposition to Convict and the Quality of Deliberation*, 8 Law & Hum. Behav. 53 (1984). Numerous studies show that "subjects who had served on mixed juries were generally more critical of the witnesses, less satisfied with their juries, and better able to remember the evidence than subjects from the death-qualified juries." *Id.* Studies also show that women, African Americans and other minority groups tend to be more opposed to the death penalty compared to white men, while juries who are death qualified tend to have more white males than any other racial or ethnic group. David Lindorff, *The Death Penalty's Other Victims*, Salon (Jan 2, 2021), at https://www.salon.com/2001/01/02/death_penalty_4/.

### 3. *Lockhart v. McCree* Misinterpreted Scientific Data

The United States Supreme Court decided *Lockhart v. McCree*, 476 U.S. 162, 165 (1986), relying on statistical data which has since been undermined by subsequent empirical studies. *Lockhart* wrongly rejected a claim that death qualification violated a defendant's Sixth and Fourteenth Amendment rights to have guilt or innocence determined by an impartial jury selected from a representative cross-section of the community.[37]

---

[37] The appellant in *Lockhart* challenged the death qualification process permitted by *Wainwright v. Witt*, 496 U.S. 412 (1985), which gave more discretion to judges to decide whether jurors' attitudes toward the death penalty would prevent or substantially impair their ability to decide on sentence fairly. Under *Witt*, a judge decided whether a jurors attitude toward the death penalty would alter his decision about guilt or innocence, undoing the previous standard articulated in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), permitting excusal for cause only where a juror

Petition for Writ of Habeas Corpus

The *Lockhart* opinion has been widely criticized for its analysis of both the data and the law related to death qualification. New evidence has since established that the factual basis upon which *Lockhart* rests is invalid and that the decision was based on faulty science and improper logic.  *See, e.g.*, L. Marshall Smith, *Due Process Education for the Jury: Overcoming the Bias of Death Qualified Juries*, 18 Sw. U. L. Rev. 493, 528 (1989) (hereafter "Smith") (The analysis in *Lockhart* was "characterized by unstated premises, fallacious argumentation and assumptions that are unexplained or undefended"); W.C. Thompson, *Death Qualification After Wainright v. Witt and Lockhart v. McCree*, 13 Law & Hum. Behav. 185, 202 (1989) (hereafter "Thompson") (*Lockhart* is "poorly reasoned and unconvincing both in its analysis of the social science evidence and its analysis of the legal issue of jury impartiality"); Jane Byrne, *Lockhart v. McCree: Conviction-Proneness and the Constitutionality of Death-Qualified Juries*, 36 Cath. U. L. Rev. 287, 318 (1986) (hereafter "Byrne") (*Lockhart* was a "fragmented judicial analysis," representing an "uncommon situation where the Court allows financial considerations to outweigh an individual's fundamental constitutional right to an impartial and representative jury."); Ian T. Moar, *Death-Qualified Juries in Capital Cases: The Supreme Court's Decision in Lockhart v. McCree*, 19 Colum. Hum. Rts. L. Rev. 369, 374 (1988) (hereafter "Moar") (detailing criticism of the *Lockhart* analysis of the scientific data); Donald N. Bersoff & David J. Glass, *The Not-So Weisman: The Supreme Court's Continuing Misuse of Social Science Research*, 2 U. Chi. L. Sch. Roundtable 279 (1995); J. Alexander Tanford, *The Limits of a Scientific Jurisprudence: The Supreme Court and Psychology*, 66 Ind. L.J. 137 (1990).

---

stated that he or she would automatically vote guilty or not guilty due to his or her beliefs. Unsurprisingly, *Witt* produced more death qualified juries than *Witherspoon*, effecting the outcome of death penalty cases in a number of ways, including by creating "tribunal[s] organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521.

1    In *Lockhart*, the Supreme Court was presented with over fifteen years of

2    scholarly research on death-qualification procedures, using a "wide variety of

3    stimuli, subjects, methodologies, and statistical analyses."  Moar, *supra*, 19 Colum.

4    Hum. Rts. L. Rev. at 386-87.  From both a scientific and a legal perspective,

5    "[g]iven the seriousness of the constitutional issues involved [] and the extent and

6    unanimity of the empirical evidence, it is hard to justify [the Court's] superficial

7    analysis and rejection of the social science research." *Id.* at p. 387.  The *Lockhart*

8    decision "ignored the evidence which indicates that a death-qualified jury,

9    composed of individuals with pro-prosecution attitudes, is more likely to decide

10   against criminal defendants than a typical jury which sits in all noncapital cases."

11   Byrne, *supra*, 36 Cath. U. L. Rev. at 315.

12       Though the studies presented in *Lockhart* were carried out in a "manner

13   appropriate and acceptable to social or behavioral scientists," the Court categorically

14   dismissed them.  Smith, *supra*, 18 Sw. U. L. Rev. at 537.  This improper scientific

15   assessment was key to the analysis and therefore undermines the *Lockhart* decision.

16   Moreover, because the Supreme Court did not evaluate the studies as a whole body

17   of data, it ignored their powerful cumulative effect.  *Id.*  When the Supreme Court

18   found a "'flaw' in a study, or a group of studies, the Court dismissed it from further

19   consideration, never considering that alternative hypotheses left open by

20   shortcomings in studies of one type might be ruled out by studies of another type."

21   Thompson, *supra*, 13 Law & Hum. Behav. at 195.  The Court dismissed any study

22   that it deemed less than definitive.  *Id.* ("The Court's adamant refusal to

23   acknowledge the strength of the evidence before it casts grave doubts upon its

24   ultimate holding in *Lockhart*.").

25       The fact that the Supreme Court can misrepresent and grossly

26   misinterpret the findings in this study renders the Court's

27   interpretation of all the empirical evidence before it in [*Lockhart v.*]

28   *McCree* suspect.  Social science research cannot provide answers with

199

*absolute* certainty. We will never know precisely how many convicted defendants in death penalty cases would have been acquitted if death qualification did not take place prior to the guilt-innocence stage.

Rick Seltzer, *The Effect of Death Qualification on the Propensity of Jurors to Convict: The Maryland Example,* 29 How. L.J. 571, 590 (1986).

As one scholar explained, the Supreme Court "erred in its rejection of the empirical evidence." Moar, *supra*, 19 Colum. Hum. Rts. L. Rev. at p. 396. This is because none of their independent weaknesses in the studies of potential effects of death qualifying jurors "justify the Court's rejection of the studies' significance for McCree's claim that the death-qualification procedure tends to produce guilt-prone juries." *Id.* at 382.

*Lockhart* did not address whether death qualification had a negative impact on the racial, gender, and religious composition of juries. Now that such research is available, it compels a re-examination of the constitutionality of the death-qualification process and its exclusion of important classes of people in capital juries. *See United States v. Carolene Products*, 304 U.S. 144, 153 (1938).

### 4. Scientific Evidence Post-*Lockhart*

Empirical studies of jurors from capital cases show that many jurors who had been screened to serve under the *Wainwright v. Witt* standard, and were thus death-qualified, and "who had decided a real capital defendant's fate, approached their task believing that the death penalty is the only appropriate penalty for many of the kinds of murder commonly tried as capital offenses." William J. Bowers & Wanda D. Foglia, *Still Singularly Agonizing: The Law's Failure to Purge Arbitrariness from Capital Sentencing*, 39 Crim. L. Bull. 51, 62 (2003) (hereafter "Bowers & Foglia").

For example, studies have repeatedly shown that death-qualified juries are more likely to vote in favor of *guilt* than non-death-qualified juries. *See* Byrne, *supra*, 36 Cath. U. L. Rev. at 291-92; James S. Liebman, *The Overproduction of Death*, 100 Colum. L. Rev. 2030, 2097 (2000) (hereafter "Leibman") (prosecutors

use death qualification to eliminate segment of a jury pool most likely to be critical of police and forensic testimony, and least likely to discount the "beyond a reasonable doubt" standard); Mona Lynch & Craig Haney, *Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination*, 33 L. & Hum. Behav. 481, 485 (2009) (hereafter "Lynch & Haney").

This well-established fact has led one Supreme Court Justice to observe that death qualification is "a procedure that has the purpose and effect of obtaining a jury that is biased in favor of conviction." *Baze v. Rees*, 553 U.S. 35, 84 (2008) (Stevens, J., concurring); *see also Glossip v. Gross*, 135 S. Ct. 2726, 2757-58 (2015) (Breyer, J., dissenting) (citing death qualification as one factor that may explain why capital prosecutions have "*a greater likelihood of an initial wrongful conviction*" when compared to non-capital cases).

Research has shown a significant correlation between attitudes about the death penalty and the gender, race, age, and educational backgrounds of jurors. James Luginbuhl & Kathi Middendorf, *Death Penalty Beliefs and Jurors' Response to Aggravating and Mitigating Circumstances in Capital Trials*, 12 Law & Hum. Behav. 263, 269 (1988). Potential jurors who may be more skeptical of the prosecution, and who would therefore keep the prosecutor's power in check, are the very people excluded from the jury via death qualification. This is evidenced by numerous studies showing that "proportionately more Blacks than Whites and more women than men are against the death penalty." The exclusion of these potential jurors via death qualification therefore adversely affects two distinctive groups under a fair cross-section analysis. Moar, *supra*, 19 Colum. Hum. Rts. L. Rev. at 386, 388, 396 (the process has a "detrimental effect on the representation of blacks and women on capital juries.").

Thus, the unrepresentativeness of death-qualified juries is created by the tendency of death qualification to remove ethnic and racial minority venirepersons and women, all of whom constitute cognizably distinctive groups and protected

classes in the community.  Lynch & Haney, *supra*, 33 L. & Hum. Behav. at 485 (process of death qualification "disproportionately eliminate[s] racial minorities"); Craig Haney, *Death by Design: Capital Punishment as a Social Psychological System*, 109-10 & n.63 (Oxford Univ. Press 2005); *see also* Seltzer, *supra*, 29 How. L.J. at 604 ("[T]he process of death qualification results in juries which under-represent blacks.").

In 1990, a group of researchers formed the Capital Jury Project ("CJP").[38] One of its purposes was to generate a comprehensive and detailed understanding of how capital jurors actually make their life or death decisions.  *See* Williams J. Bowers, *The Capital Jury Project: Rationale, Design, and Preview of Early Findings*, 70 Ind. L.J. 1043 (1995).  The work of the CJP has addressed many of the specific problems noted by the Supreme Court in *Lockhart*.  First, it studied a large cohort of 1201 actual jurors who served in a total of 354 trials.  *See* Bowers & Foglia, *supra*, 39 Crim. L. Bull. 51, 51 (2003).  Second, because the CJP studied jurors who actually served, it necessarily studied how their decisions were influenced by their peers during jury deliberations. Third, as a result of studying actual jurors, this research data is not "contaminated" by the influence of the so-called nullifiers (automatic life jurors) because they were all excused during the death-qualification process at voir dire.  Susan Rozelle, *The Principled Executioner: Capital Juries' Bias and the Benefits of True Bifurcation*, 38 Ariz. St. L.J. 769, 784 (Fall 2006).

The CJP research shows that the death-qualification process produces biased juries, particularly in the following ways: 1) there are more automatic death penalty jurors; 2) many of these jurors don't understand the nature of mitigation evidence; and 3) such jurors tend to decide prematurely both to convict and to choose the death

---

[38]  CJP was under the leadership of Professor William J. Bowers, Ph.D., the Principal Research Scientist, College of Criminal Justice, Northeastern University. The project was funded by the Law and Social Sciences Program of the National Science Foundation.

sentence. *Id.* at 787-93. The CJP study confirms what the earlier studies described in *Lockhart* showed: the death-qualification process results in juries more prone to convict and to choose the death penalty. Rozelle, *supra*, 38 Ariz. St. L.J. 785.

### 5. Prosecutorial Misuse of Death Qualification

Research shows that a "prosecutor can increase the chances of getting a conviction by putting the defendant's life at issue." Thompson, *supra*, 13 Law & Hum. Behav. at 199 (citing Samuel R. Gross, *Determining the Neutrality of Death-Qualified Juries: Judicial Appraisal of Empirical Data*, 8 Law & Hum. Behav. 7, 13 (1984)). Some prosecutors have acknowledged that death qualification skews the jury and that they use this unconstitutional practice to their advantage in obtaining conviction-prone juries. Leibman, *supra*, 100 Colum. L. Rev. at 2097 & fns. 163-64, quoting Tina Rosenberg, *The Deadliest D.A.* (1995) N.Y. Times Magazine, July 16, 1995, at 42.[39] Prosecutors routinely use this voir dire practice to eliminate the segment of the jury pool which is most likely to be critical of police and forensic testimony and least likely to discount the "beyond a reasonable doubt" standard of proof. *Id.*

---

[39] Rosenberg's article quotes "various former and current Pennsylvania prosecutors explaining the Philadelphia District Attorney's practice of seeking the death penalty in nearly all murder cases as self-consciously designed to give prosecutors 'a permanent thumb on the scale' enabling them to 'use everything you can' to win[:] 'everyone who's ever prosecuted a murder case wants a death-qualified jury,' because of the 'perception . . . that minorities tend to say much more often that they are opposed to the death penalty,' so that '[a] lot of Latinos and blacks will be [stricken from capital juries as a result of] these [death qualification] questions.'" (Rosenberg, *supra*, N.Y. Times Magazine, at 42; *see also* Adam Liptak, *Facing a Jury of (Some of) One's Peers*, N.Y. Times, July 20, 2003, sec. 4 ("The ability to screen jurors may invite prosecutorial gamesmanship, tempting prosecutors to charge cases as capital crimes solely to produce a 'friendlier' jury. In his 1986 dissent [in *Lockhart*], Justice Marshall noted that it was all but impossible to prove that a prosecutor had engaged in this sort of 'tactical ruse.' Though facts suggesting the tactic have been present in at least a half-dozen cases, no court has overturned a conviction on this ground.")

---

Petition for Writ of Habeas Corpus

The *Lockhart* majority declined to consider the prosecutorial motives underlying death qualification because the petitioner had not argued that death qualification was instituted as a means "for the State to arbitrarily skew the composition of capital-case juries." *Lockhart*, 476 U.S. at 176. The forceful dissent in *Lockhart*, however, rightly recognized the that "[t]he State's mere announcement that it intends to seek the death penalty if the defendant is found guilty of a capital offense will . . . give the prosecution license to empanel a jury especially likely to return that very verdict." *Id.* at 185 (J. Marshall, J., Brennan, J., & Stevens, J., dissenting).

### 6.  Death Qualification in California Violates the Eighth Amendment

The death-qualification process, which skews juries to being more conviction-prone, fails the Eighth Amendment requirement for "heightened reliability" in capital cases because "death is different." *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion). "[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long . . . Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305. Since death qualification results in a jury more likely to choose a death sentence, capital defendants are tried by juries at both the guilt and penalty phases that are far less "impartial" than juries provided to defendants in any other kind of criminal case. The death qualification process therefore cannot meet the heightened reliability required by the Eighth Amendment.

### 7.  Death Qualification Violates the Right to a Jury Trial

Death qualification of jurors defeats the three purposes underlying the Sixth Amendment right to a jury trial, articulated in *Taylor v. Louisiana*, 419 U.S. 522, 530-31 (1975).

First, "the purpose of a jury is to guard against the exercise of arbitrary power – to make available the common sense judgment of the community as a hedge

Petition for Writ of Habeas Corpus

against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge." *Id.* Death qualification fails to guard against "the exercise of arbitrary power." Potential jurors who may skeptical of a death penalty prosecution and would keep the prosecutor's power in check are the very people excluded from the jury via death qualification. Death qualification excludes jurors who show the "common sense judgment of the community" and narrows selection to a small segment of the community with fixed views that skew towards conviction. Prosecutors intentionally use the death-qualification process to remove potential jurors so that there is no "hedge" to prevent their overzealousness. *See* Leibman, *supra*, 100 Colum. L. Rev at 2097, n.163.

The second purpose of the jury trial is to preserve public confidence in the fairness of trials: "Community participation in the administration of the criminal law . . . is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." *Taylor*, 419 U.S. at 530-31. Death qualification fails to preserve confidence in the system and discourages community participation. *See, e.g*, Smith, *supra*, 18 Sw. U. L. Rev. at p. 499 ("[T]he irony of trusting the life or death decision to that segment of the population least likely to show mercy is apparent.").

The third purpose is to enforce an understanding that "sharing in the administration of justice is a phase of civic responsibility." *Taylor*, 419 U.S. at 532. The exclusion of a segment of the community from jury duty sends a message that the administration of justice is not a responsibility shared equally by all citizens.

Finally, because the death-qualification process undermines the purposes of the Sixth Amendment right to a jury trial, excluding individuals with views against the death penalty from capital juries, it also violates the fair cross-section requirement and the Equal Protection Clause. "We think it obvious that the concept of "distinctiveness" must be linked to the purposes of the fair cross-section requirement." *Lockhart*, 476 U.S. at 175. For these reasons, death qualification

Petition for Writ of Habeas Corpus

1    violates the Sixth and Fourteenth Amendments of the United States Constitution.

2    **a.  Unconstitutional Prosecutorial Use of Peremptory Challenges**

3    In this case, the prosecutor's impermissible use of peremptory challenges to

4    systematically exclude jurors with reservations about capital punishment, thereby

5    ensuring more extreme death qualification of the jury, denied Mr. Howard his

6    constitutional rights. *Gray v. Mississippi*, 481 U.S. 648, 667-68 (1987) (finding that

7    exclusion of juror for cause, in capital prosecution, who was not irrevocably

8    committed to vote against death penalty regardless of facts and circumstances that

9    might emerge in course of proceedings, was reversible constitutional error and not

10    subject to harmless-error review).

11    After all jurors who declared they could not impose a death sentence were

12    excused, various prospective jurors remained who had reservations about the death

13    penalty, but who were not excludable for cause under *Witherspoon* and *Witt*.  These

14    prospective jurors stated that they could vote for the death penalty in an appropriate

15    case.  When these jurors were called to the jury box, however, the prosecutor

16    systematically used peremptory challenges to exclude them.

17    Here, the prosecutor used a peremptory challenge to strike prospective juror

18    Amy Harrison, whose answers on the juror questionnaire showed hesitation about

19    imposing the death sentence.  In answer to question number 23, she chose (b), which

20    states that she "believe[s] in the death penalty but will not vote to impose it in every

21    case." 5 JQ CT 1476.  Ms. Harrison also wrote in response to question number 24,

22    that her general feelings about the death penalty were that it is "necessary when no

23    chance of rehabilitation and can not [sic] contribute to society and would be a danger

24    to anyone." 5 JQ CT 1477.

25    The prosecutor also used a peremptory challenge to strike prospective juror

26    Trudy Swafford, whose answers on the jury questionnaire also showed hesitation to

27    impose a death sentence.  Ms. Swafford wrote, "I think that any moral person would

28    have to feel somewhat reluctant to impose the death penalty on another individual.

But I believe I would do what the law requires." 10 JQ CT 2928.  In answering question number 23, Ms. Swafford chose the neutral option, (c), which states that she "neither favor[s] or oppose[s] the death penalty; it would depend on the facts." 10 JQ CT 2926.

The prosecutor also used a peremptory challenge against Jacqueline A. Harper, one of the very few African Americans on the venire panel.  In response to question number 23 on the juror questionnaire, Ms. Harper chose (d), which states that she "[has] doubts about the death penalty but will not always vote against it in every case." 11 JQ CT 3082.

Similarly, the prosecutor peremptorily struck Ruth Anderson, whose answers on the juror questionnaire showed a hesitancy about voting for a death sentence. While she indicated, in answering question number 23, that she believed in the death penalty, Ms. Anderson also wrote that "in most cases" that the sentence of life without the possibility of parole "would be better than the death penalty." 11 JQ CT 3910.

Finally, the prosecutor also struck John Jordan, whose answers on the questionnaire showed misgivings about the death penalty. In answer to question number 24, Mr. Jordan wrote: "Have doubts about the death penalty but will not always vote against it in every case." 15 JQ CT 4363.  Mr. Jordan also stated that he believed that the sentence of the life without parole was a more severe punishment than the death penalty.  15 JQ CT 4365.

Despite these jurors' expression of their intent to uphold the law and willingness to impose the death penalty in appropriate circumstances, their failure to forcefully endorse the punishment resulted in excusal.  The prosecutor's improper use of peremptory challenges in this case denied Mr. Howard his federal constitutional rights to due process, equal protection, an impartial jury, a jury drawn from a fair cross-section of the community and a reliable determination of guilt and sentence under the Fifth, Sixth, Eighth and Fourteenth Amendments of the U.S.

1    Constitution. *Gray v. Mississippi*, 481 U.S. at 667-68.

2         The prosecutor shares responsibility with the trial judge to preserve a

3    defendant's right to a representative jury and should exercise peremptory challenges

4    only for legitimate purposes. Since the State is forbidden from excusing a class of

5    jurors for cause based on their death penalty skepticism, those views are not a proper

6    basis for a peremptory challenge either. The State has no legitimate interest in the

7    removal of jurors who can follow their oaths, but who may also be skeptical about

8    the death penalty. A jury stripped of the significant community viewpoint that these

9    prospective jurors provide is not ideally suited to the purpose and functioning of a

10   jury in a criminal trial. *Ballew v. Georgia*, 435 U.S. 223, 239-42 (1978). The

11   systematic, peremptory exclusion of death penalty skeptics in Mr. Howard's case

12   skewed the jury to being conviction prone and violated his constitutional rights.

13        **b.  Errors in Death Qualifying the Penalty Jury Requires Reversal of**

14            **the Guilt Verdict**

15        In *Witherspoon v. Illinois*, 391 U.S. 510, the Supreme Court identified three

16   separate problems regarding death qualification. First, death qualification can be so

17   extreme as to make the jury biased at the penalty phase. Second, death qualification

18   that is so extreme may also make the jury biased at the guilt phase. Third, even death

19   qualification that is not so extreme biases the jury at the guilt phase.

20        The first issue is the one that formed the basis for the limits on death

21   qualification in *Witherspoon*. The second and third issues were left open because at

22   the time the case was decided the evidence on this second issue was not yet

23   developed. *Id.* at 516-18, 522, n.21. The third issue is whether, assuming the State

24   properly death-qualified the jury for purposes of the penalty phase, it was proper for

25   such death qualification to also exclude potential jurors from the guilt phase. *Id.* at

26   521, n.19. The extensive studies, described above, demonstrating that a death-

27   qualified jury is more conviction-prone and excludes key classes of people,

28   including women and minorities, shows Mr. Howard faced a biased jury in the guilt

phase, in violation of his constitutional rights.

### K.  Claim Eleven: State Impediments Prevented a Full and Reliable Presentation and Litigation of All Potentially Meritorious Guilt Phase Claims for Relief.

#### 1. Introduction

California's capital appellate and post-conviction system deprived Mr. Howard of the process and protections to which he is entitled under the United States Constitution.  Mr. Howard's continuing confinement violates his rights to due process; equal protection; counsel and the effective assistance of trial, appellate, and post-conviction counsel; freedom from the infliction of cruel and unusual punishment; a reliable, rational, non-arbitrary assessment of penalty; and the review and consideration of materially accurate, relevant evidence that is not impermissibly inflammatory, by an impartial and disinterested tribunal; as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and international human rights law as established in treaties, customary law, and under the doctrine of jus cogens, because of the systemic flaws, impediments, and deficiencies innate to the system in California and how it operates.

Fundamental flaws in the California system prevented Mr. Howard from timely developing and presenting potentially meritorious guilt phase claims and facts.  The failure to accord timely, necessary processes has and will continue to deprive Mr. Howard of effective state and federal forums for seeking relief and is a violation of his federal constitutional rights to due process and counsel. On direct appeal and in his state habeas petition, Mr. Howard alleged multiple significant prejudicial constitutional violations that require the institution of formal proceedings and ultimately the grant of relief.  Mr. Howard was hampered in his efforts to perfect his allegations and support for those allegations by multiple defects and impediments over which he has no control and for which he is not responsible that prevent

1    meaningful appellate and habeas corpus review and further violate his constitutional

2    rights.

3    State postconviction deficiencies, including the delayed appointment of

4    appellate and habeas counsel, limitations on postconviction discovery, and arbitrary

5    adjudication of claims, individually and cumulatively invalidate his conviction.

6    These constitutional deficits mandate that Mr. Howard is entitled to an order to show

7    cause and to habeas relief.

8    **2. Mr. Howard Was Unconstitutionally Subjected to Untimely**

9    **Appointment of Appellate and Habeas Counsel**

10    The lengthy delay in appointing the Habeas Corpus Resource Center

11    (HCRC) – more than fourteen years after the date Mr. Howard was sentenced –

12    compromised post-conviction counsel's effort to present facts in support of his guilt

13    phase claims for relief. By the time habeas counsel was appointed and able to review

14    Mr. Howard's case, material documents had been destroyed, material witnesses had

15    died, and the evidentiary value of physical evidence was eviscerated. In preparing to

16    file a habeas corpus petition on behalf of Mr. Howard, counsel have an obligation to

17    "make reasonable investigations or to make a reasonable decision that makes

18    particular investigation unnecessary," *Strickland v. Washington*, 466 U.S. 668, 691

19    (1984); *In re Lucas*, 33 Cal. 4th 682, 722 (2004). The delay in appointing habeas

20    counsel prevented habeas counsel from fulfilling this obligation because material

21    evidence and witnesses were no longer available.

22    **a. Applicable Law**

23    Despite the guarantee of counsel and the commitment to timely adjudication,

24    California has been unable to make prompt appointments of appellate and

25    postconviction counsel, which prejudicially limits capital defendants' rights to

26    appeal and collaterally challenge their capital convictions and sentences. Cf. Arthur

27    L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. 697,

28    709 (2007) (observing that California's lengthy postconviction delays "undermine

Petition for Writ of Habeas Corpus

1    one of the very purposes of a review of a judgment of death, which is to uncover

2    mistakes made at trial, both in the guilt and penalty phases, as efficiently and

3    expeditiously as possible in order to protect the prisoner's right to a fair trial.").

4    Indeed, the California Supreme Court has clearly acknowledged the difficulties it

5    faces in recruiting qualified counsel:

6          Ideally, the appointment of habeas corpus counsel should occur

7          shortly after an indigent defendant's judgment of death . . . But our

8          task of recruiting counsel has been made difficult by a serious shortage

9          of qualified counsel willing to accept an appointment as habeas corpus

10         counsel in a death penalty case. Quite few in number are the attorneys

11         who meet this court's standards for representation and are willing to

12         represent capital inmates in habeas corpus proceedings. The reasons

13         are these: First, work on a capital habeas corpus petition demands a

14         unique combination of skills . . . . Second, the need for qualified

15         habeas corpus counsel has increased dramatically in the past 20

16         years[.]

17   *In re Morgan*, 50 Cal. 4th 932, 937-38 (2010); *see id.* at 939 (noting that petitioner

18   did not have habeas counsel after thirteen years on death row); *see also In re*

19   *Jimenez*, 50 Cal. 4th 951, 957 (2010) ("[P]etitioner invoked [his] right [to

20   appointed habeas corpus counsel] in 1998, five weeks or so after the judgment of

21   death, but it was not until 2007 that we were able to recruit a qualified attorney

22   willing to accept the appointment.").

23         From 1995 to the date of the filing of Mr. Howard's Amended Petition in 2012,

24   approximately 423 people were added to California's death row, but the California

25   Supreme Court made significantly fewer new habeas or dual (appellate and habeas)

26   appointments of counsel. SHP Ex. 79; *see also* Alarcón, 80 S. Cal. L. Rev. at 720-

27   21 (describing significant delays in appointing counsel for individuals sentenced to

28   death in the early 2000s).

Petition for Writ of Habeas Corpus

The California Supreme Court's delays in appointment of appellate counsel alone violates indigent petitioners' rights to due process and to counsel because only such-situated prisoners must endure lengthy waits to receive counsel as opposed prisoners who can afford to pay for their own counsel. *See, e.g.*, *Douglas v. People of State of Cal.*, 372 U.S. 353, 357-58 (1963) ("There is lacking that equality demanded by the Fourteenth Amendment where the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself"); *Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (addressing a state law that required defendants to pay for a trial transcript in order to submit an appeal and stating that a state may not grant appellate review "in a way that discriminates against some convicted defendants on account of their poverty"); *see also Alarcón*, 80 S. Cal. L. Rev. at 726-27 (same).

The principles of due process and equal protection that motivate the constitutional recognition of a right to appellate counsel apply fully and equally to habeas proceedings where a petitioner first raises claims that he could not raise at trial or on direct appeal. *See Honore v. Wash. State Bd. of Prison Terms & Paroles*, 466 P.2d 485, 492-93 (Wash. 1970) (recognizing a constitutional right to counsel in habeas proceedings that provide the first forum for review of claims challenging the integrity of a criminal judgment); *cf. Martinez v. Ryan*, 566 U.S 1, 11 (2012) ("Where, as here, the initial-review collateral proceeding is the first designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim.").

In California, habeas is the proper vehicle to raise claims predicated on extra-record materials that a petitioner could not present at trial or on direct appeal. *In re Bower*, 38 Cal. 3d 865, 872 (1985) ("[W]hen reference to matters outside the record

Petition for Writ of Habeas Corpus

1   is necessary to establish that a defendant has been denied a fundamental

2   constitutional right[,] resort to habeas corpus is not only appropriate, but required.")

3   It follows that the protracted delays in appointment of habeas counsel violate the

4   Fifth and Sixth Amendment guarantees of due process and right to counsel, just as

5   do the delays in appointment of direct appeal counsel.  The sheer volume of cases

6   and the lengthy delays in appointment of direct appeal and habeas counsel impede

7   California's ability to provide heightened review in capital cases and thus fail to

8   eliminate arbitrariness and capriciousness in the death-selection process, as the U.S.

9   Constitution mandates.  *See, e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980).

### b.  Material Documents Were Destroyed and Material Witnesses Had Died by the Time Habeas Counsel Was Appointed.

12   Documents that had been destroyed by the time the HCRC was appointed to

13   represent Mr. Howard include, but are not limited to, portions of Mr. Howard's jail

14   records, medical and mental health records, Material witnesses who died between

15   1999 and 2009 include but are not limited to percipient witnesses, institutional

16   personnel, prosecution experts, court personnel, police informants, alternate

17   suspects and other material witnesses on the issue of guilt, including people familiar

18   with the alternate suspects.  *See, e.g.*, SHP Ex. 22 at 3903-06.

19   Mr. Howard personally took extraordinary steps to advance his case, to bring

20   the dangers of delay to the state high court's attention, and to prevent the loss or

21   destruction of material evidence and testimony.  Shortly after being sentenced to

22   death, on December 5, 1997, Mr. Howard filed a pro per habeas corpus petition

23   seeking the appointment of counsel.  *In re Howard* (Demetrius C.), Case No.

24   S066292.  The writ was denied as moot on August 16, 2000, after direct appeal

25   counsel was appointed to represent Mr. Howard.

26   Additionally, through no fault of his own, Mr. Howard has suffered

27   unforeseen, additional impediments in litigating his right to habeas corpus relief,

28   including the appointment and withdrawal of two different habeas corpus and

Petition for Writ of Habeas Corpus

1    executive clemency counsel. Attorney Robert C. Chandler was appointed in 2001

2    and withdrew in 2006. Judd C. Iverson was appointed on October 12, 2006.  The

3    appointment order stated that "[a]ny petition for writ of habeas corpus will be

4    presumed to be filed without substantial delay if it is filed . . . within 36 months of

5    this date." Attorney Iverson subsequently withdrew, more than half way through the

6    36-month period, on May 12, 2008.

7        On April 29, 2009, the HCRC was appointed as habeas counsel.[40]

8        Only a few other death sentenced individuals have suffered having had two

9    prior sets of habeas counsel ostensibly begin the habeas investigation to then

10   abandon it years later.  Mr. Howard had to wait close to eleven years from the initial

11   appointment of habeas counsel to have his meritorious claims for habeas corpus

12   relief presented in state court.  Until the HCRC was appointed in 2009, the facts and

13   allegations presented in his state habeas proceedings had not been developed or

14   crystallized. In other words, Mr. Howard waited approximately 14 years before

15   effective habeas counsel could begin investigating habeas corpus claims.

16       Mr. Howard's circumstances were not unique to capitally sentenced

17   individuals. California courts generally have been unable to find enough qualified

18   counsel, who possess the necessary "unique combination of skills," *Morgan*, 50 Cal.

19   4th at 938, and are willing to undertake the "mammoth responsibility" of

20   representing a death-sentenced prisoner.

21       The detrimental effects flowing from the delay are most amply realized in

22   state habeas counsel's ability to demonstrate how counsel's omissions and

23   commissions prejudiced Mr. Howard.  *See, e.g.*, *Sanders v. Ratelle*, 21 F.3d 1446,

24   1456 (9th Cir. 1994) (defense counsel must, "at a minimum, conduct a reasonable

25

26   [40]  The HCRC prepared a petition for writ of habeas corpus and continued to
     represented Mr. Howard in state habeas corpus proceedings until he was
27   resentenced to life in prison without the possibility of parole, on May 12, 2022.

28

Petition for Writ of Habeas Corpus

investigation enabling him to make informed decisions about how best to represent his client"); *Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003) (counsel ineffective for failing to "adequately prepare the witnesses in order to present the material he did gather to the jury in a sufficiently detailed and sympathetic manner"); *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) (en banc), reversed on other grounds, 523 U.S. 538 (1998) (counsel ineffective for failing to rebut forensic evidence, despite readily available evidence); *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998), cert. denied, 525 U.S. 1093 (1999) (counsel ineffective for failing to conduct investigation into extent or possible ramifications of petitioner's psychiatric impairment); *Turner v. Duncan,* 158 F.3d 449 (9th Cir. 1998) (failure to investigate and prepare mental state defense).

### 3. California Provides Inadequate Access to Fact Development Mechanisms

Because Mr. Howard advanced well-pled claims of constitutional violations in his state petition, his due process rights were violated when the California Supreme Court denied all guilt claims without granting him access to fact-development mechanisms necessary to prove his claims, including discovery, subpoena power, and an evidentiary hearing. *Carter v. Texas*, 177 U.S. 442, 447-49 (1900); *Angel v. Bullington*, 330 U.S. 183, 188 (1947); *Davis v. Wechsler*, 263 U.S. 22, 24-25 (1923); *Coleman v. Alabama*, 377 U.S. 129, 133 (1964).

#### a. Applicable Law

When a petitioner presents a well-pled claim for habeas relief in federal court, he is constitutionally entitled to develop the facts supporting his claim through an evidentiary hearing or other fact-development mechanisms, including discovery. *Carter*, 177 U.S. at 447-49; *Angel*, 330 U.S. at 188 (noting that states may not avoid obligations to adjudicate constitutional claims that are "plainly and reasonably made"); *Davis*, 263 U.S. at 24-25 (holding that states may not "put unreasonable obstacles" in the way of persons seeking to vindicate federal rights that are "plainly

and reasonably made"); *see also Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (under federal Habeas Corpus Rule 6(a), it would be an abuse of discretion to deny discovery to a petitioner who has shown "good cause" for it, which exists where "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.").

Where a state court does not permit a petitioner to discover and present evidence in support of his claim, its decision is subject to reversal. *Coleman*, 377 U.S. at 133 (reversing the Alabama Supreme Court's denial of a challenge to the racial composition of a grand jury because the "record shows that petitioner was not permitted to offer evidence to support his claim.").

Moreover, a state court's refusal to allow discovery, as is true in California, violates due process where it deprives the petitioner of fundamental fairness. *See, e.g.*, *Cochrane v. Scutt*, No. 09-11963, 2013 WL 655140, *7 (E.D. Mich. Feb. 22, 2013). California's restrictive discovery procedures – including precluding the compulsion of disclosure of material information in the possession of law enforcement agencies, requiring the petitioner to make a showing that requested discovery materials actually exist, and declining to order depositions – also prevent heightened reliability review in capital cases and fail to eliminate arbitrariness and capriciousness in the death selection process, as constitutionally required. *See Godfrey*, 446 U.S. at 427.

In California, state habeas petitioners like Mr. Howard are entitled to "only limited discovery" in preparing their petitions prior to the issuance of an order to show cause. *In re Steele*, 32 Cal. 4th 682, 695 (2004); *see also People v. Gonzalez*, 51 Cal. 3d 1179, 1258-61 (1990) (the judiciary has no inherent power to grant post-conviction discovery until an order to show cause has issued). Consequently, nearly every petitioner receives only the limited discovery that California provides prior to issuance of an order to show cause. Absent the issuance of an order to show cause,

1    Mr. Howard lacks the power to issue subpoenas and compel witness testimony.  Cal.

2    Penal Code § 1484; *Durdines v. Super. Ct.*, 76 Cal. App. 4th 247, 252 (1999) (holding

3    that the court lacked power to solicit trial counsel's declaration before the issuance

4    of a writ or order to show cause).    Thus, his primary mechanism for state

5    postconviction discovery is California Penal Code section 1054.9.  Section 1054.9

6    authorizes Mr. Howard reasonable access to materials he would have been entitled

7    to receive at trial, to the extent that such materials are currently in the possession of

8    the prosecution or law enforcement authorities who were involved in the

9    investigation or prosecution of his case.  Cal. Penal Code § 1054.9; *Steele*, 32 Cal.

10   4th at 697.    However, the California courts have limited the scope of available

11   discovery by means of procedural hurdles that are frequently impossible for

12   petitioners to surmount.

13        Chief among these limitations is this Court's mandate that petitioners are not

14   entitled to materials that would have been discoverable at trial, but that have never

15   been disclosed, unless they are able to demonstrate a basis to believe that the

16   materials exist. *Barnett v. Super. Ct.*, 50 Cal. 4th 890, 901 (2010).  This forces state

17   habeas counsel to play a nearly impossible guessing game: petitioners can access

18   discoverable material only if habeas counsel is able to divine sufficient clues to the

19   existence of materials that the defense has never seen, but to which the defense

20   would unquestionably be entitled access under the discovery rules.

21        California capital habeas petitioners are also hampered in their ability to

22   develop the factual predicate of their claims due to facets of the state's system that

23   enhance the probability that relevant evidence will be lost or destroyed.  The state

24   high court has held that Section 1054.9 does not impose a duty on law enforcement

25   or the prosecution to preserve evidence pending the resolution of postconviction

26   proceedings. *Steele*, 32 Cal. 4th at 695.  The California Supreme Court has even

27   acknowledged, "[t]he longer the delay [in bringing a postconviction discovery

28   motion], the greater the likelihood that the postconviction discovery items sought

217

1    will no longer exist[.]" *Catlin v. Super. Ct.*, 51 Cal. 4th 300, 308 (2011).

2        In California, the state's extreme delay in appointment of capital

3    postconviction counsel, described above, heightens the twin risks of evidence

4    destruction and witness unavailability.    Thus, even before a petitioner's

5    postconviction investigation has begun, California's procedures have already

6    impeded the full and fair development of meritorious claims for relief.

7        California petitioners face additional restrictions to their ability to develop the

8    factual predicate of their claims.  Section 1054.9 does not permit petitioners to access

9    material discovery that law enforcement or the prosecution did not possess at the

10   time of trial, but do possess at the time 1054.9 discovery is provided.  This includes

11   both materials that were possessed by others at the time of trial and materials that

12   did not exist until after a petitioner's conviction.

13       The California Supreme Court's refusal to allow for fact development

14   mechanisms – like depositions (except in extraordinary circumstances and as

15   provided in Penal Code section 1335); the service of interrogatories or of subpoenas;

16   the authorization of document production requests; or any other discovery to habeas

17   petitioners that is not expressly authorized by statute – is in direct contrast to the

18   federal courts' consistent practice, which recognizes that fundamental fairness

19   requires a petitioner have access to discovery where a constitutional violation is

20   claimed.  Cf. *Bracy*, 520 U.S. at 908-09 (holding that it would be an abuse of

21   discretion to deny discovery where "specific allegations before the court show

22   reason to believe that the petitioner may, if the facts are fully developed, be able to

23   demonstrate that he is . . . entitled to relief" (internal quotation omitted)); *Stanley v.

24   Martel*, No. C-07-4727 EMC, 2011 WL 5085060, *2 (N.D. Cal. Oct. 26, 2011)

25   (same); *Ervin v. Cullen*, No. C 00-01228 CW, 2011 WL 4005389, *2 (N.D. Cal. Sept.

26   8, 2011) (same).

27

28

Petition for Writ of Habeas Corpus

### b. Mr. Howard Was Unable to Obtain Access to Relevant and Material Information Required Develop and Perfect His Claims.

California's pre-order to show cause discovery procedures greatly compromised Mr. Howard's ability to discover and present all facts supporting his prima facie claims of constitutional violations and thus have deprived him of fundamental fairness, warranting habeas relief. *See Cochrane*, 2013 WL 655140 at *7. Without the power to compel, Mr. Howard was denied disclosure of documents and information relevant to claims regarding charging, state misconduct, and ineffective assistance of counsel. Mr. Howard did not receive, via section 1054.9, nor was he able to compel the production of materials from multiple sources that were necessary to develop and perfect his guilt claims. This impeded Mr. Howard's ability to adequately plead claims for relief or obtain an order to show cause and evidentiary hearing. For example:

1) The inability to compel the San Bernardino County Superior Court to provide jury selection procedures and practices prevented Mr. Howard from perfecting his allegations that his jury was not drawn from a representative cross-section of the community.

2) The inability to compel San Bernardino District Attorney's Office to provide the guidelines used in determining whether to charge an individual with a capital crime and whether to seek death precluded Mr. Howard from substantiating trial counsel's failure to challenge the decision to allege special circumstances and seek death as reflecting discriminatory charging patterns.

3) The absence of bench notes, photographs or other materials documenting the forensic testing conducted by San Bernardino County personnel – materials which are typically prepared and retained by criminalists – hindered Mr. Howard's ability to accurately assess whether testimony and conclusions were reliable and accurate or subject to challenge. SHP Ex. 75 at ¶¶ 7-10, 13-14.

### 4.  Arbitrary Adjudication of Direct Appeals and Habeas Petitions

Adjudication of automatic appeals and capital habeas corpus petitions in California is arbitrary and does not constitute meaningful, full, and fair appellate review before an impartial tribunal, as required by the constitution.

#### a.  Applicable Law

Under the federal Constitution's Suspension Clause, a petitioner is entitled to one adequate and effective opportunity to demonstrate the illegality of his detention. *Boumediene v. Bush*, 553 U.S. 723, 779, 790 (2008).  Critically, the modern habeas system presupposes that state postconviction courts will assume primary responsibility to adjudicate constitutional violations suffered by state prisoners. *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011).  In order for the state postconviction process to satisfy the Suspension Clause's requirements, it must include a "full and fair opportunity to develop the factual predicate of [the petitioner's] claims." *Boumediene*, 553 U.S. at 790; *see also Miller v. Marr*, 141 F.3d 976, 977 (10th Cir. 1998) (holding that a Suspension Clause violation occurs where a restriction on habeas renders the writ "inadequate or ineffective" to test the legality of detention (internal citation omitted)).

As has been established, under California law, after a habeas petition is filed and any informal briefing has concluded, the state court must assume the petitioner's allegations to be true and determine whether his claims state a prima facie case for relief.  If so, the state court must issue an order to show cause on the relevant claims. Cal. Rules Ct. 4.551(c); *Durdines*, 76 Cal. App. 4th at 252.  Following the issuance of an order to show cause, the respondent is entitled to file a return arguing that the petitioner's detention is legal and in turn petitioner may file a responsive traverse. Cal. Rules Ct. 4.551(d) & (e).  The state court may then hold an evidentiary hearing prior to granting or denying the petition.  Cal. Rules Ct. 4.551(f); *People v. Duvall*, 9 Cal. 4th 464, 474 (1995).

Where a petitioner states a prima facie claim for relief, he is entitled to an

order to show cause and to further state process, including fact development, to perfect his claim. If he is arbitrarily denied an order to show cause and subsequent process, then he is deprived of his constitutionally-required full and fair opportunity to develop and present his claims for relief. *Boumediene*, 553 U.S. at 779, 790.

Where California courts deny orders to show cause to petitioners who have presented prima facie constitutional claims, they fail to comply with the state's own rules in determining whether a cause of action should be instituted – and to provide petitioners with their constitutionally-required full and fair opportunity to develop and present their claims. *Boumediene*, 553 U.S. at 779, 790.

### b. California's Adjudication of Capital Direct Appeals and Habeas Petitions Is Inconsistent and Arbitrary.

Beginning in 1986, the California Supreme Court affirmed over ninety percent of capital judgments on direct appeal. This affirmance rate continued to escalate during the period that Mr. Howard awaited appointment of counsel. From April 2008 through June 2009, the year prior to appointment of habeas counsel to Mr. Howard's case, the California Supreme Court affirmed ninety-one percent of the thirty-six capital judgments it reviewed. From July 2009 through June 30, 2010, it affirmed ninety-five percent of the twenty-two capital judgments it reviewed. From July 1, 2010 through June 2011, the high court affirmed one hundred percent of the twenty-six capital judgments it reviewed. From July 1, 2011, to March 1, 2014, it affirmed fifty-five of sixty death judgments on direct appeal (91.6% affirmance rate).

The California Supreme Court's denial rate in capital habeas corpus cases is on par with its affirmance rate on direct appeal. In virtually all capital habeas denials, the high court issues summary orders providing no reasoned explanation for the denials, as it did in denying Mr. Howard's habeas guilt claims. Between 1978 and 2007, the California Supreme Court issued orders to show cause in only 8.3% of capital habeas cases and granted evidentiary hearings in only 4.5% of cases. Between 1978 and 2011, the state high court granted relief in only seventeen capital

1    habeas cases. From January 1, 2000, to June 1, 2013, it had disposed of 353 habeas

2    corpus cases brought by death-row inmates (no including petitions dismissed by the

3    death of the inmate). Of those, the court issued orders to show cause in fifty

4    instances and summarily denied 303 petitions, resulting in a summary denial rate of

5    85.8%. The arbitrariness of the state court denials of orders to show cause is

6    illustrated by the fact that, as of 2011, federal courts had granted relief in sixty-five

7    to seventy percent of habeas petitions governed by 28 U.S.C. § 2254 arising from

8    California death judgments. *Commission Report* at 115; Arthur L. Alarcón & Paula

9    M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the*

10   *California Legislatures Multi-Billion-Dollar Debacle*, 44 Loy. L.A. L. Rev. S41, S55

11   n.26 (2011).

12       The California Supreme Court has summarily denied the overwhelming

13   majority of capital habeas corpus petitions without any explication of its reasoning

14   after reviewing only the petition and, usually, but not always, informal briefing.

15   Arthur L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L.

16   Rev at 741; *see also Commission Report*, *supra*, at 134.

17       The California Supreme Court even rejected a request from the Ninth Circuit

18   Court of Appeals to include reasons for the denial its orders denying state habeas

19   corpus petitions, stating that to do so would be unduly time-consuming and

20   detrimental to this Court's performance of its responsibilities in noncapital cases.

21   SHP Ex. 80 at 5246.

22       Former California Supreme Court Chief Justice Ronald M. George explained

23   that this conclusion was based on a two-year internal experiment to determine the

24   feasibility of issuing expanded orders in capital habeas cases. SHP Ex. 80 at 5247.

25   In a letter to United States Senator Diane Feinstein, dated November 29, 2005,

26   former Chief Justice George explained that when the Court reviews a capital habeas

27   petition, "it is not uncommon now for the justices to conclude that a claim is without

28   merit– while not necessarily agreeing upon all bases for that conclusion." SHP Ex.

81 at 5251.

Political and financial considerations have also influenced the review of death penalty cases in California, where the Governor appoints the justices to the California Supreme Court. The Justices must be approved by the voters in order to retain that appointment or seat at the next gubernatorial election after appointment, and also upon the expiration of their terms; the state constitution provides that justices are elected for twelve-year terms.

In 1986, Chief Justice Rose Bird and Associate Justices Cruz Reynoso and Joseph Grodin were targeted for defeat in the November 1986 election because of their decisions in capital cases. A fourth justice, Justice Mosk, who was also required to stand for election, was not targeted. The targeted justices were voted out of office. Groups and individuals favoring capital punishment spent millions of dollars to remove the three targeted justices. Joseph R. Grodin, *Developing a Consensus of Constraint: A Judge's Perspective on Judicial Retention Elections*, 61 S. Cal. L. Rev. 1969, 1981 (1988).

The Court itself recognized the prominent role of the death penalty in the justices' defeat, recognizing that they were "the objects of a strenuous and well publicized campaign to unseat them at the impending retention election. It coalesced around the high percentage of death penalty reversals . . . . " *People v. Cox,* 53 Cal. 3d 618, 696 (1991).

The campaign was successful for death penalty proponents. Former Governor Deukmejian, on November 5, 1988, lauded the affirmance rate of the newly constituted and approved California Supreme Court: "In just the last year and a half, the new Supreme Court, under the leadership of Chief Justice Malcolm Lucas has affirmed 43 cases." John W. Poulos, *Capital Punishment, The Legal Process, and the Emergence of the Lucas Court in California*, 23 U.C. Davis L. Rev. 157, 220 n.336 (1990).

**c. Mr. Howard was subjected to arbitrary and inconsistent adjudication of his state habeas petition.**

Because Mr. Howard was denied an order to show cause on all guilt claims, he too has not received a full and fair fact development of his claims of constitutional error and violation of his constitutional rights. Mr. Howard's rights were violated when the California Supreme Court denied him an order to show cause on any guilt phase issues, despite his presentation of prima facie claims for relief. The statistics cited above provide support for Mr. Howard's claim, illustrating the state supreme court's history of summarily denying claims that are subsequently disproportionately found to be meritorious in federal habeas proceedings. California Commission on the Fair Administration of Justice, *Report and Recommendation on the Administration of the Death Penalty in California* 115 (Gerald Uelmen ed., 2008); Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislature's Multi-Billion-Dollar Debacle*, 44 Loy. L.A. L. Rev. S41, S55 n.26 (2011).

The Court's current practices in disposing of capital habeas petitions fail to comply with its own rules in determining whether a proceeding or cause of action should be instituted. As a result of the procedures created by state decisional law for adjudicating a habeas corpus petition, full and fair fact development of the claims for relief alleged by habeas petitioners occurs only after the issuance of an order to show cause, which institutes a habeas proceeding or cause of action. According to state law, an order to show cause must be issued if a petitioner has stated a prima facie case for relief. However, orders to show cause do not always issue where they are legally warranted, and consequently, subsequent full and fair fact development does not always ensue. This constitutes an unconstitutional suspension of habeas corpus in California as to those petitioners, such as Mr. Howard, who state a prima

Petition for Writ of Habeas Corpus

1    facie case for relief and are nonetheless denied an order to show cause.[41]

2    **L.    Claim Twelve: Mr. Howard's Conviction Is Unconstitutional Because**

3           **Prejudicial Juror Misconduct Occurred During His Trial.**

4           **1. Introduction**

5           Mr. Howard's conviction, sentence, and confinement are unlawful and were

6    unconstitutionally obtained in violation of his rights to due process; to a fair and

7

8    ───────────────────

     [41]    Although the operation of Proposition 66 did not affect the adjudication of

9    Mr. Howard's Amended Petition, review of Proposition 66's operative impact

10   underscores the conclusion that the California death penalty scheme is irrevocably

     broken. Among other provisions, the ballot measure vested the authority to appoint

11   counsel to represent death-sentenced individuals in state habeas proceedings in the

12   superior court that presided over sentencing.  Cal. Gov. Code, § 68662.  Since

     Proposition 66 became effective, however, no individual or entity has been

13   appointed to represent any of the individuals prioritized as requiring habeas

14   counsel. As Justice Goodwin Liu explained, Proposition 66 does not expedite the

     appointment of capital habeas corpus attorneys, (*Briggs v. Brown*, 3 Cal. 5th 808,

15   868 (2017) (conc. opn. of Liu, J.)), and, as the Committee on Revision of the Penal

16   Code concluded, "Proposition 66 has slowed down post-conviction proceedings."

17   In total, there are 388 people awaiting the appointment of habeas corpus counsel

     in the California courts.  This is because Proposition 66 made superior courts

18   responsible for adjudicating and reviewing habeas corpus petitions.  Either party

19   can appeal a superior court's decision on an initial petition.  *See* Cal. Penal Code,

     § 1509.1, subd. (a).  On appeal, a petitioner may present certain additional claims

20   if the petitioner's prior habeas corpus counsel was ineffective for failing to raise

21   those claims in the initial state habeas petition.  Cal. Penal Code, § 1509.1, subd.

     (b).   Moreover, habeas corpus counsel in the Court of Appeal cannot "have

22   represented the petitioner in the habeas corpus proceedings that are the subject of

23   the appeal unless the petitioner and counsel expressly request, in writing, continued

     representation."  Cal. Rules of Court, rule 8.391.  Thus, as of 2021, 25 petitioners

24   are awaiting appointment of appellate habeas corpus counsel in the California

25   Courts of Appeal. The courts have generally stayed these appeals because no

     competent authority has indicated the funds from which appellate counsel in habeas

26   corpus proceedings will be compensated. "There also is no ruling by competent

27   authority on the rate at which appointed appellate counsel will be compensated,

     which is a matter that appears to require statewide uniformity." *See, e.g.*, Order, *In*

28   *re Roldan*, No. B295451, 2d Dist. Ct. App. Sept. 3, 2019.

     ───────────────────

     Petition for Writ of Habeas Corpus

impartial jury; to equal protection of the laws; to confrontation; to compulsory process; to the effective assistance of counsel; to notice of the evidence against him; to conviction upon proof beyond a reasonable doubt on record evidence and by a unanimous jury; to the enforcement of state-mandated jury selection procedures and jury trial rights, including the exercise of peremptory challenges and challenges for cause; to a unanimous verdict of twelve jurors; and to reliable guilt assessments based upon accurate, reliable, relevant, and non-prejudicial record evidence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; international law as established by customary international law, international human rights law, and under the doctrine of *jus cogens*, by juror misconduct, bias, and taint.

Here, Mr. Howard's capital jury improperly and prejudicially considered extra record evidence that implied Mr. Howard had committed multiple serious criminal acts as a juvenile about which they were not permitted to hear.

### 2. Applicable Law

Criminal defendants have a constitutional right to a fair trial by a panel of impartial, indifferent jurors. *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (holding that the Sixth Amendment guarantees the right to trial by impartial jury and to confrontation of witnesses); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (same). Exposure to extrinsic evidence may bias a jury such that the key question becomes "whether there exists a possibility that the extrinsic information influenced the verdict." *United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir. 1979). In other words, the inquiry is whether the defendant was prejudiced as a consequence of this exposure. *Rodriguez v. Marshall*, 125 F.3d 739, 744 (9th Cir. 1997), overruled on other grounds by *Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002). In making this assessment, the courts consider whether the misconduct "relates directly to a material aspect of the case," or is merely "duplicative or cumulative extraneous material." *Rodriguez*, 25 F.3d at 744.

### 3. The Jury Improperly Considered, Speculated upon and Assigned Weight to Inadmissible, Extra-Record Information.

The prosecution informed the jury during the guilt phase of trial that Mr. Howard had a sealed juvenile record. SHP Ex. 59 at ¶ 6. The jurors were aware that Mr. Howard had been convicted of a serious offense, assault with a deadly weapon, as a juvenile and therefore believed that Mr. Howard had been convicted of other crimes of an equally serious nature as a juvenile. *Id.* One juror stated that the jury "thought that this meant there were other bad things Mr. Howard had done as a juvenile which [they] would not learn" and said the "information influenced [their] deliberations at both the guilt and penalty phase of the trial." *Id.* The jury found this inadmissible and extra-record information to be "very off-putting" and improperly and prejudicially discussed, considered, and assigned weight to it. *Id.*

The improper consideration of and speculation about the extra-record evidence had a substantial and injurious influence or effect on the jury's guilt verdict. It denied Mr. Howard the opportunity to confront the extra-record information considered by the jury and to address their speculation. The result was that the jury made its guilt determination based in part on inadmissible and prejudicial information, as well as improper supposition, rather than solely upon the evidence presented and the legal instructions given by the court. The consideration of the extra-record evidence constituted misconduct, tainted the verdict and was per se prejudicial and requires a new trial. *United States v. Vasquez*, 597 F.2d at 193; *Parker v. Gladden*, 385 U.S. at 364; *Irvin v. Dowd*, 366 U.S. at 722.

### M. Claim Thirteen: The Superior Court's Failure to Create, Preserve, and Settle a Complete, Accurate, and Reliable Record of the Proceedings Deprived Mr. Howard of His Constitutional Rights.

#### 1. Introduction

The trial court failed to comply with constitutional and statutory requirements

that all capital proceedings be conducted on the record and that the record compiled on appeal be accurate, reliable, complete, and adequate for meaningful appellate review.    Here, attachments to the arrest warrant affidavit and multiple juror questionnaires are missing from the record, in violation of Mr. Howard's right to due process; equal protection; a reliable determination of punishment; reliable and meaningful appellate review based on a full and accurate record; effective assistance of counsel at trial and on appeal; the enforcement of mandatory state rights; and to be free of the influence of prosecutorial misconduct as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and international law as set forth in treaties, customary law, human rights law, and under the doctrine of *jus cogens* were violated by the court's failure, rendering his confinement unconstitutional.

## 2. Applicable Law

Due Process Clause of the United States Constitution require a record of trial court proceedings in death penalty cases that accurately and comprehensively reports and reflects the substance of all proceedings conducted in the case so that meaningful appellate review may be accomplished. An incomplete record constitutes a violation of due process when the missing documents are important to a petitioner's ability to obtain the relief he seeks and when there are no alternative documents that serve the same purpose.

Adequate and meaningful appellate review can only be accomplished when a defendant's fundamental constitutional rights to a complete appellate record are protected. *Chessman v. Teets*, 354 U.S. 156, 157-66 (1957) (emphasizing that due process requires that the record in a criminal case, especially a capital case, must be accurate and complete); *see, e.g.*, *Gardner v. Florida*, 430 U.S. 349, 361 (1977) (recognizing that "it is important that the record on appeal disclose to the reviewing court the basis for the considerations which motivated the death sentence in every case in which it is imposed").

The California Penal Code and Rules of Court codify federal due process rights to a complete record for purposes of meaningful appellate review. With respect to trial proceedings, the California Penal Code mandates that in cases where death may be imposed "all proceedings conducted in the superior court, including all conferences and proceedings, whether in open court, in conference in the court room, or in chambers, shall be conducted on the record with a court reporter present." Penal Code § 190.9(a)(1). The California Rules of Court further dictate that the "record must include a reporter's transcript containing . . . [t]he oral proceedings at trial; . . . [a]ny oral communication between the court and the jury or any individual juror; [a]ny oral opinion of the court; . . . [a]ny comment on the evidence by the court to the jury; . . . [and] [a]ny other oral proceedings in the case." Cal. Rule of Court 8.610(a)(2). The California Supreme Court has reinforced these constitutional and correlating statutory imperatives, urging trial judges to "assiduously preserve a detailed account of all proceedings regardless of their perceived significance, particularly in capital cases." *People v. Hawthorne*, 4 Cal. 4th 43, 63 (1992) (in which the appellant raised federal constitutional issues related to record preservation and completion).

### 3. Missing Attachments to Detective Blackwell's Declaration Deprived Mr. Howard of His Constitutional Rights.

The documents attached to San Bernardino Police Officer Dale Blackwell's Declaration in Support of Arrest Warrant, filed on March 9, 1993, never became a part of the record. 1 CT 488. These documents are critical to Mr. Howard's ability to challenge the constitutionality of the March 9, 1993 warrant for his arrest.

Notably, in paragraph three of the Declaration, Det. Blackwell states "[t]he said probable cause is exhibited in the official law enforcement reports prepared regarding the matter, a true copy of the pertinent parts of which is attached hereto and incorporated herein by reference." 1 CT 488. In paragraph four of the Declaration, Det. Blackwell again references additional documents that are attached:

Petition for Writ of Habeas Corpus

1  " . . . I believe that the conduct of the accused and the circumstances which give

2  probable cause to believe that the accused committed the crime(s) listed . . . were

3  personally observed by the person(s) whose statements regarding such crime(s) are

4  contained in the said incorporated reports, and that the facts relating to the source

5  and reliability of such statements are as set forth in those reports."  1 CT 488.  In

6  paragraph five of the Declaration, Det. Blackwell states: "[a] description of the

7  accused appears in the said incorporated reports."  1 CT 488.

8      Appellate counsel and the prosecution stipulated to the inclusion of Det.

9  Blackwell's declaration during record correction proceedings, and on June 25, 2003,

10  the Superior Court of San Bernardino ordered the Declaration's addition to the

11  record.  2 CT 1003-07.  However, while the declaration itself was included in the

12  record, the attachments were not.[42]

13      The incomplete record with respect to the arrest warrant prejudices Mr.

14  Howard's ability to assess the effectiveness of trial counsel in performing his duty

15  to challenge an unlawful arrest or detention.

16      Additionally, Det. Blackwell's declaration and attachments were presented to

17  the court before Mr. Howard was formally charged with the instant crime.  While

18  Mr. Howard was initially arrested on December 6, 1992, for his suspected

19  involvement in the capital offense, insufficient evidence existed to hold him on the

20  capital case.  Instead, Mr. Howard was officially taken into custody on the basis of

21  a parole violation.  SHP Ex. 1 at 307.  Mr. Howard was not arrested for his

22  involvement in this case until March 9, 1993, after Det. Blackwell received a warrant

23  from the court which he obtained by providing the court with the declaration

24  described above and the supporting documentation that is missing and is, in part, the

25

26  [42]  On July 1, 2003, a Deputy Clerk of the Appeals Division of the Superior

27  Court in San Bernardino County, stated in an affidavit that the declaration of
    Detective Blackwell had already been provided, and that this document would

28  therefore not be included in the augmented record on appeal.  2 CT 1008-09.

1  subject of this claim.

2      The prejudice that inured to Mr. Howard as a consequence of these missing

3  documents is evident: Mr. Howard cannot assert trial counsel's failure to challenge

4  the lack of probable cause supporting his arrest without knowing the probable cause

5  bases that law enforcement proffered.   Finally, appellate counsel's failure to

6  challenge the lack of documentation establishing the probable cause for the March

7  9, 1993, warrant for Mr. Howard's arrest was not and could not have been strategic.

8  This failing fell below the standards of reasonably competent appellate counsel and

9  prejudiced Mr. Howard.

10     **4. Missing Juror Questionnaires Deprived Mr. Howard of His**

11         **Constitutional Rights**

12     The record is also missing jury questionnaire forms for twenty-one jurors,

13  some of whom were eliminated for cause.   These missing juror questionnaires

14  prejudiced Mr. Howard by (1) depriving him of data he could use to support his fair

15  cross section claim, (2) depriving him of the opportunity to challenge the

16  constitutionality of the excusal of the jurors who were struck for cause; and, (3)

17  impacting his ability to support his *Batson* challenges with comparative juror

18  analysis.

19     Jury questionnaire forms for the following jurors, many of whom were

20  excused for cause, are missing from the record:

21     Cynthia Naberman (4 RT 929), Mark Navarro (4 RT 929), Estelle Roy (4 RT

22  929), Mary Consalvo (4 RT 929), Hardy Valentine (4 RT 929), Blake Curry (4 RT

23  929), Conrad Ferneau (4 RT 929), Emanuel Guidry (4 RT 929), David Hubert (4 RT

24  929), Frank Kostusak (4 RT 930), Gina Martin (4 RT 930), Connie Nichols (4 RT

25  930), Douglas Robertson (4 RT 930), Gary Scheer, (4 RT 960-70), Jacqueline Jones

26  (4 RT 997-1008), Ray Rincon (4 RT 1008-13), David Vargas (4 RT 1014-27),

27  William Kirk (5 RT 1131), Donna Baker (5 RT 1131), Diane Armstrong (5 RT 1136),

28  and, Diana Peverly (5 RT 1137).

Petition for Writ of Habeas Corpus

The lack of jury questionnaire forms for these jurors prejudices Mr. Howard's ability to assess trial counsel's effectiveness with respect to counsel's duty to raise or bolster equal protection, jury composition, fair cross-section, and *Batson* challenges.  Additionally, appellate counsel was ineffective for failing to raise the above arguments on direct appeal.  Appellate counsel's failure to challenge the missing juror questionnaire forms was not and could not have been strategic.  This failing fell below the standards of reasonably competent counsel and prejudiced Mr. Howard.

The superior court's failure to create, preserve, and settle a complete, accurate, and reliable record of the proceedings deprived Mr. Howard of his constitutional rights. *Chessman v. Teets*, 354 U.S. 156.

## N.    Claim Fourteen: The Cumulative Nature of the Errors Requires Habeas Corpus Relief.

### 1. Introduction

The multiple constitutional errors committed by state actors, counsel for Mr. Howard, the jury and the trial court, together rendered Mr. Howard's trial fundamentally unfair and the guilt verdict unreliable.  These cumulative errors render Mr. Howard's convictions, sentence, and confinement unlawful and unconstitutional violations of Mr. Howard's rights to a trial by a fair and impartial jury; a reliable, fair, non-arbitrary, and non-capricious determination of guilt; the effective assistance of counsel; present a defense; confrontation and compulsory process; the privilege against self-incrimination; the enforcement of mandatory state law; a trial free of materially false and misleading evidence; a fair trial; an impartial and disinterested tribunal; equal protection; and due process of law as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and international human rights law as established in treaties, customary law, and under the doctrine of *jus cogens*, in support of this Claim, Mr. Howard

alleges the facts that follow.

## 2. Grounds for Relief

The facts and allegations contained in each and every Claim in this Petition for Writ of Habeas Corpus and its accompanying exhibits, the Amended State Habeas Petition and its accompanying exhibits and the errors set forth on direct appeal, are hereby incorporated by this reference as if fully set forth herein.

Such errors, individually and cumulatively, had a substantial and injurious influence and effect on the jury's determination of the verdict at trial, and prejudicially deprived Mr. Howard of his constitutional rights to reliable assessments of guilt. This Court's constitutional obligation and capital case jurisprudence require it to conduct a cumulative error analysis and impose a heightened, special duty to examine the complete record to ascertain whether a capitally-charged defendant received a fair trial.

Denied substantive and procedural due process and other safeguards necessary to a reliable determination of guilt, as set forth herein, Mr. Howard is entitled to a collective or cumulative assessment of prejudice. This is so even if each individual claim does not require that the guilt judgment be set aside, or does not rise to the level of a constitutional violation when viewed alone. Assessed together, they require relief. The cumulative errors follow.

The trial court's order that Mr. Howard wear a high voltage stun belt throughout trial, without grounds, denied Mr. Howard's rights to due process, equal protection, a fair and impartial trial, testify in his own defense, counsel, and freedom from cruel and unusual punishment, as set forth in Claim One.

Mr. Howard was deprived of the effective assistance of counsel in violation of constitutional principles and international law as set forth with particularity throughout this Petition and especially in Claim Two. Such acts of commission and omission include but are not limited to trial counsel's failure to properly challenge the constitutionality of Mr. Howard's arrest; to challenge the jury selection

procedures employed in this case and to investigate and present or argue potentially meritorious defenses to the murder charges and special circumstances allegations; to interview and present numerous potential witnesses and utilize relevant readily available documents at the guilt trial; to adequately impeach prosecution witnesses; to adequately investigate, develop, and present evidence supporting Mr. Howard's alibi defense; to investigate and present evidence pointing towards Mr. Howard's innocence of capital murder; to request appointment of, or to adequately prepare, experts, including qualified forensic experts, and appropriate mental health experts as mandated; to investigate, develop, and present evidence concerning Mr. Howard's cognitive and neuropsychological impairments as factors relevant to his purported involvement in the capital offense; to adequately investigate, develop, and present evidence in support of a motion for new trial; and to present and litigate all errors cognizable on direct appeal.

Errors and misconduct committed by state actors permeated the prosecution and trial of Mr. Howard, in derogation of his constitutional rights. The acts included failing to disclose material, exculpatory evidence; providing falsified evidence; introducing coerced, unreliable, and false testimony; and employing unduly suggestive identification procedures, as set forth in Claim Three.

Mr. Howard was denied multiple constitutional rights because he is actually innocent of the murder for which he was convicted and sentenced to death, as set forth on Claim Four.

Mr. Howard was denied due process of law when he was forced to stand trial while incompetent due to his neuropsychological impairments, being medicated at the time of trial, being forced to wear a stun belt, and because of the violent and difficult conditions he was subjected to prior to and during trial at the jail. Mr. Howard was tried without meaningful evaluation of his competency as reasonably required by the facts known to trial counsel and the trial court, as set forth in Claim Five.

The trial court engaged in prejudicial error and denied Mr. Howard multiple constitutional rights when it admitted inflammatory and prejudicial evidence; instructed jurors to the unfair advantage of the prosecution; assumed jurisdiction over an offense for which Mr. Howard was not indicted; denied the new trial motion supported by newly discovered and exculpatory evidence without a hearing, as set forth in Claims, Six, Seven, Eight, and Nine of this Petition.

The "death qualification" of jurors, which skews juries to being conviction prone violated multiple constitutional rights, as set forth in Claim Ten.

The state impediments to a capital habeas petitioner, including untimely appointment of counsel, inadequate fact development mechanisms, and the arbitrary adjudication of capital appellate and habeas corpus claims that result in excessive delays and unduly high rates of denials based on political winds, as set forth in Claim Eleven.

Multiple instances of jury misconduct, as set forth in Claim Twelve, violated various constitutional mandates.

The absence of an accurate and complete records and the trial court's and counsel's failure to preserve the record, as articulated in Claim Thirteen, is unconstitutional.

As demonstrated, the constitutional violations alleged in this Petition for Writ of Habeas Corpus individually had a substantial and injurious influence and effect on the jury's determination of guilt.  The cumulative prejudice of the errors manifestly entitles Mr. Howard to habeas corpus relief.

### 3. The Cumulative Errors Deprived Mr. Howard of Multiple Substantial Constitutional Rights and Demand Relief

Multiple deficiencies merit a collective or cumulative assessment of prejudice; errors that do not, standing alone, require a judgment to be set aside may require relief in the aggregate. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 421, 440-

1  41 (1995) (assessing prejudice/materiality cumulatively); *Chambers v. Mississippi*,

2  410 U.S. 284, 298, 302-03 (1973) (cumulating errors and finding prejudice); *see also*

3  *Alcala v. Woodford*, 334 F.3d 862, 883-94 (9th Cir. 2003) (holding that the combined

4  prejudice of multiple errors deprived the defendant of a fundamentally fair trial and

5  constitute a separate and independent basis for relief); *Killian v. Poole*, 282 F.3d

6  1204, 1211 (9th Cir. 2002) (holding that, even where no single error is prejudicial,

7  the collective presence of errors throughout the trial is "devastating to one's

8  confidence in the reliability of [the] verdict" and, accordingly, requires reversal);

9  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where . . . there are

10  a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far

11  less effective than analyzing the overall effect of all the errors . . . . " (internal

12  citation omitted)); *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir. 1992) (holding that

13  the cumulative impact of multiple errors established prejudice).  The Ninth Circuit

14  has explained that in assessing whether the existence and effect of cumulative

15  constitutional error produced a fundamentally unfair trial, the court should

16  amalgamate different types of error.  *See Alcala*, 334 F.3d at 883; *Mak*, 970 F.2d at

17  622.

18      At each stage of his capital trial, Mr. Howard was subjected to numerous,

19  substantial constitutional violations at the hands of his counsel, the prosecutor, state

20  officials, and the jurors. This Petition, the Amended State Petition for Writ of Habeas

21  Corpus, and the direct appeal, with their supporting exhibits, establish in compelling

22  detail the constitutional errors that precluded a fair and reliable adjudication of the

23  guilt phase of trial.  These errors, singly and cumulatively, had a "substantial and

24  injurious effect or influence in determining the jury's verdict," *Brecht v.*

25  *Abrahamson*, 507 U.S. 619, 638 (1993), and require that Mr. Howard be granted a

26  new trial for the determination of his guilt or innocence.

27

28

Petition for Writ of Habeas Corpus

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court,

1) Appoint counsel to represent Petitioner in the litigation of this petition, specifically the Office of the Federal Public Defender for the Central District of California, as requested in the concurrently-filed Request for Appointment of Counsel;

2) After full consideration of the issues raised in this petition, issue a writ of habeas corpus to discharge Petitioner from his unconstitutional confinement and restraint and relieve him of his unconstitutional convictions and sentences;

3) Order Respondent to answer this petition by specifically admitting or denying each allegation and claim herein;

4) Permit Petitioner, who is indigent, to proceed without prepayment of costs and fees;

5) Require Respondent to bring forth the entire state court record so the Court can review the record on the issues and defenses raised in this proceeding;

6) Permit Petitioner to engage in discovery and obtain subpoenas without fees for witnesses and documents necessary to further prove the facts alleged in this petition;

7) Order an evidentiary hearing at which proof may be offered concerning the allegations in this petition or any affirmative defenses presented by Respondent;

8) Grant Petitioner sufficient funds to secure investigation and expert assistance as necessary to prove the facts alleged in this petition;

9) Permit Petitioner to amend this petition, if necessary; and,

//

//

//

Petition for Writ of Habeas Corpus

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Petitioner prays that this Court,

1) Appoint counsel to represent Petitioner in the litigation of this petition, specifically the Office of the Federal Public Defender for the Central District of California, as requested in the concurrently-filed Request for Appointment of Counsel;

2) After full consideration of the issues raised in this petition, issue a writ of habeas corpus to discharge Petitioner from his unconstitutional confinement and restraint and relieve him of his unconstitutional convictions and sentences;

3) Order Respondent to answer this petition by specifically admitting or denying each allegation and claim herein;

4) Permit Petitioner, who is indigent, to proceed without prepayment of costs and fees;

5) Require Respondent to bring forth the entire state court record so the Court can review the record on the issues and defenses raised in this proceeding;

6) Permit Petitioner to engage in discovery and obtain subpoenas without fees for witnesses and documents necessary to further prove the facts alleged in this petition;

7) Order an evidentiary hearing at which proof may be offered concerning the allegations in this petition or any affirmative defenses presented by Respondent;

8) Grant Petitioner sufficient funds to secure investigation and expert assistance as necessary to prove the facts alleged in this petition;

9) Permit Petitioner to amend this petition, if necessary; and,

//

//

//

Petition for Writ of Habeas Corpus

1   10) Grant such other and further relief as may be appropriate and necessary to

2 dispose of the matter as justice may require.

3

4 Dated: 4/18/23 , 2023   Respectfully submitted,

5           DEMETRIUS CHARLES HOWARD

6

7        *Demetrius C. Howard*

8         Demetrius Charles Howard

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Petition for Writ of Habeas Corpus

## IX.  VERIFICATION

I, Demetrius Charles Howard, declare under penalty of perjury that the foregoing Petition for Writ of Habeas Corpus is true and correct.

Executed (signed) on _4/18/23_, 2023, in San Quentin California.

_Demetrius C. Howard_

Demetrius Charles Howard

Petition for Writ of Habeas Corpus